UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

HARRY L. FRANKLIN,

                                        Plaintiff,

               v.                                                    9:16-cv-1229
                                                                     (FJS/TWD)

NATHAN YORK and WARREN COUNTY,

                                        Defendants.
_____

APPEARANCES:                                      OF COUNSEL:

HARRY L. FRANKLIN
Plaintiff, *pro se*
17 LaClaire Street
Hudson Falls, NY 12839

MURPHY BURNS, LLP                                 THOMAS K. MURPHY, ESQ.
Counsel for Defendants
407 Albany Shaker Road
Loudonville, NY 12211

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

## I.    INTRODUCTION

       This *pro se* civil rights action, brought under 42 U.S.C. § 1983, has been referred for a

report and recommendation by the Hon. Fredrick J. Scullin, Jr., Senior United States District

Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule ("L.R.")

72.3(c).  Plaintiff Harry Franklin alleges violations of his First Amendment rights to free exercise

of his religion and to the free flow of mail while incarcerated at Warren County Correctional

Facility ("WCCF" or the "facility").  (Dkt. No. 12.)  Defendants are Warren County Sheriff

Nathan York ("Sheriff York") and Warren County.  *Id.*

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 25.)  Plaintiff has not opposed Defendants' motion despite the Court granting an extension of time within which to do so.  (Dkt. Nos. 27, 28.)  For the reasons discussed below, the Court recommends that Defendants' motion be granted.

## II.    BACKGROUND

Plaintiff identifies as Muslim and has practiced the religion of Islam since 2007.  (Dkt. No. 25-9 at 35-36.[1])  From April 15, 2016, through October 19, 2016, Plaintiff was incarcerated at WCCF.  *Id.* at 8-19.  Plaintiff claims he was not allowed to have a prayer rug and his religious meals were not served at the times consistent with his religious beliefs.  (Dkt. No. 12 at 2-5.)  Plaintiff alleges Sheriff York was aware of Plaintiff's problems with his religious meals but failed to correct the problems.  *Id.* at 3-4.  Plaintiff also claims he was denied access to some of his personal mail, including mail which contained his prayer schedules.  *Id.* at 2-3.  Plaintiff attributes the wrongdoing alleged in the amended complaint to policies that Warren County put in place and that Sheriff York carried out.  *Id.* at 2-5.  Plaintiff seeks monetary damages.  *Id.* at 5.

### A.    Grievance Program

In order to provide an effective and impartial procedure for the timely resolution of inmate complaints, the WCCF maintains a grievance program that is consistent with the regulations governing the New York State Commission of Corrections ("NYSCC").  (Dkt. No. 25-12 at ¶ 6.)  An inmate wishing to register a complaint must file a grievance, which is investigated by the Grievance Coordinator, who then issues a determination denying the

---

[1]  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.  Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

grievance or accepting the grievance and taking corrective action. *Id*. at ¶ 7. If the inmate does not accept the determination of the Grievance Coordinator, the inmate may appeal the determination to the facility's Corrections Administrator. *Id*. at ¶ 8. Within five business days of receiving the grievance appeal, the Corrections Administrator issues a written determination which is provided to the inmate. *Id*. at ¶ 11. Within five days of receipt of the appeal determination, the inmate may appeal to the NYSCC Citizen's Policy and Complaint Review Council ("CPCRC"). *Id*. at ¶ 12. The CPCRC reviews the appeal and issues a written determination within forty-five days of receipt of it. *Id*. at ¶ 13. The CPCRC may make a determination in favor of the inmate, directing the facility to supply an appropriate remedy, or the CPCRC may deny the grievance, sustaining the action taken by the facility's administration. *Id*.

At all relevant times, non-party Officer Ryan Tourge ("Tourge") served as the Grievance Coordinator and Sheriff York served as the Correction Administrator at the WCCF. *Id*. at ¶ 9; *see also* Dkt. No. 25-10; No. 25-11.

**B.    Prayer Rug**

Plaintiff alleges he was not allowed to have a prayer rug. (Dkt. No. 12 at 2.) On April 20, 2016, Plaintiff asked a corrections officer "if personal prayer rugs could be brought into the facility," and the officer replied, "no, because there is a possibility that drugs could be smuggled into the facility by way of the prayer rug." *Id*. On April 22, 2015, Plaintiff spoke to a sergeant "regarding his prayer rug being brought in" and the sergeant stated he "would look into it" and "get back" to Plaintiff. *Id*. Plaintiff alleges that as of May 13, 2016, he had not heard from the sergeant or "anyone from administration." *Id*.

On May 4, 2016, Plaintiff filed an inmate grievance (No. 2016-0456) stating:

> I have been asking for permission to have a prayer rug.  I wrote the
> Jail Admin asking if I could have my prayer rug from my home or
> if one needs to be sent in from a vendor.  I made this request at
> least a week ago with no response as of yet.  I kneel and my face
> has to touch the ground and without it I can't make my prayers.

(Dkt. No. 25-2 at 1.)  On May 5, 2016, WCCF Grievance Coordinator Tourge advised Plaintiff

that he was allowed to have a prayer rug the same size as allowed by the New York State

Department of Corrections and Community Supervision ("DOCCS"), and that the prayer rug

must come from a vendor whose normal business is selling and shipping such an item.  (Dkt. No.

25-11 at ¶¶ 1, 5.)  Tourge further advised Plaintiff that he would have to keep the prayer rug in

his cell.  *Id*. at ¶ 5.  Plaintiff signed and "voided" the grievance.  (Dkt. No. 25-2 at 1.)

### C.    Prayer Schedules

Plaintiff claims he was denied access to some of his personal mail, including mail which

contained his prayer schedules.  (Dkt. No. 12 at 2.)  According to Plaintiff, on May 13, 2016,

"prayer schedules were withheld by the [WCCF] that were sent to [him] via United Postal

Service.  [The] [r]eason given was that mail was downloaded from the Internet and that it could

be laced or tainted with drugs."  *Id*.  Plaintiff also claims he was "given a Mail

Rejection/Disposition Notice with no definitive reason for withholding [the mail]."  *Id*. at 3.

According to Tourge, his review of WCCF's records indicated that on May 13, 2016, the

facility received mail for Plaintiff "consisting of four pages of material copies from the internet.

That material was prohibited under the facility's policy regarding correspondence."  (Dkt. No.

25-11 at ¶ 13.)  The relevant portion of the facility's policy provides:

> Computer generated correspondence containing typed text only
> shall be accepted.  Any computer generated correspondence
> containing images, or anything other than typed text, shall be
> retained with the inmate's secured property for return upon the

> inmate's release or destroyed.  This does not apply to legal
> privileged correspondence.

*Id*.  Pursuant to the facility's policy, Plaintiff received a Mail Rejection/Disposition Notice

identifying the reason the material was withheld.  *Id*.  On May 14, 2016, Plaintiff signed the

Notice acknowledging receipt.  (Dkt. No. 25-8 at 1.)  Tourge states Plaintiff did not file a

grievance with respect to any complaint involving his mail being withheld.  (Dkt. No. 25-11 at ¶

13.)

### D.   Religious Meals

Plaintiff claims his religious meals were not served at the times consistent with his

religious beliefs.  (Dkt. No. 12 at 3-4.)  On June 3, 2016, Plaintiff requested permission to

receive religious meals in accordance with his Islamic faith during Ramadan, from sundown June

6, 2016, through sundown July 5, 2016.  *Id*. at 3; *see also* Dkt. No. 25-5 at 5-8.  Plaintiff signed a

"Religious Diet Inmate Acknowledgement" form on June 8, 2016.  (Dkt. No. 25-5 at 7.)

### 1.   Grievance No. 2016-0623

On June 13, 2016, Plaintiff filed a grievance stating, "The hot meals I received at my

dinner time have been grossly overcooked.  I brought this to the officers on the Pods attention for

the last couple of nights."  (Dkt. No. 25-3 at 1.)  Tourge investigated the matter, accepted the

grievance, and proper food handling instructions were communicated to staff.  (Dkt. No. 25-11 at

¶ 6; Dkt. No. 25-3 at 1.)  Plaintiff accepted the decision by signing Part II of the grievance form.

(Dkt. No. 25-3 at 1.)

### 2.   Grievance No. 2016-0638

On June 16, 2016, Plaintiff filed a grievance because his breakfast meal was served "long

after dawn."  (Dkt. No. 25-4 at 1.)  Tourge conducted an investigation and determined Plaintiff

had not received his morning meal at the appropriate time, approximately 3:45am. (Dkt. No. 25-

11 at ¶ 7.)  Tourge accepted the grievance and reminded staff of the time Ramadan meals need to be served.  (Dkt. No. 25-4 at 1.)  Plaintiff accepted the decision by signing Part II of the grievance form.  *Id*.

### 3.    Grievance No. 2016-0700

On June 29, 2016, at approximately 4:30am, Plaintiff filed a grievance stating, "Food—breakfast was old and overcooked.  Again."  (Dkt. No. 25-6 at 9.)  As relief, Plaintiff requested "to end religious meals and eat when the rest of the population eats."  *Id*.  Tourge investigated the grievance and denied it on the merits because the breakfast complained of was replaced by staff in a timely manner and accepted by Plaintiff.  (Dkt. No. 25-11 at ¶ 9.)  Plaintiff appealed to Sheriff York, who affirmed the determination on July 7, 2016.  (Dkt. No. 25-6 at 12.)  On July 8, 2016, Plaintiff appealed to the CPCRC.  *Id*.  By letter dated August 11, 2016, the CPCRC advised it had reviewed Plaintiff's grievance and voted to "deny" the grievance stating, "t]he Council sustains the action taken by the facility administration."  *Id*. at 1.

### 4.    Grievance No. 2016-0703

Plaintiff filed a second grievance on June 29, 2016, at approximately 2:30pm, stating:

> The facility is trying to dictate how I observe my religious holiday.
> I asked to eat when the rest of the pod was eating and was denied.
> I asked the unit officer to call his superior officer to make sure and
> was denied my lunch.  I have other grievances of the same nature.
> All concerning the practicing of my faith.  The same thing
> happened at dinner also.
>
> I would like this grievance and all other grievances by me to be
> sent to Inmate Grievance at the Commission of Corrections in
> Albany.  These problems are recurring and nothing is being done.
> It's cruel and unusual punishment and also a violation of
> constitutional rights.

(Dkt. No. 25-2 at 2.)  On July 5, 2016, Tourge denied the grievance on the merits because Plaintiff "requested and was approved to participate in Ramadan.  As such his morning meal is

given before dawn and his lunch and dinner meal are held until after sunset." *Id*. During the investigation, Tourge spoke with the facility's Chaplain regarding Plaintiff's request to practice Ramadan by eating when all other inmates eat and the "Chaplain indicated that the practice would go against the fasting requirement of Ramadan." (Dkt. No. 25-11 at ¶ 8.) Plaintiff appealed to Sheriff York, who affirmed the determination on July 7, 2016. (Dkt. No. 25-5 at 3.) On July 8, 2016, Plaintiff appealed to the CPCRC. *Id*. By letter dated August 11, 2016, the CPCRC advised it had reviewed Plaintiff's grievance and voted to deny the grievance stating, "the Council sustains the action taken by the facility administration." *Id*. at 1.

### 5.    Grievance No. 2016-0707

On July 4, 2016, Plaintiff filed a grievance stating:

> This facility's blatant disregard of my Constitutional rights. On more than one occasion. That is to practice my religion without interference. Which is a God given right and to interfere is a violation of the First Amendment of the United States Constitution.

(Dkt. No. 25-7 at 2.) As relief, Plaintiff requested "submission of this grievance and all other grievances on my behalf to the Commissioner of Corrections in Albany, N.Y. Also notice of intent for legal action. Forwarding to my attorney[.]" *Id*. During the investigation, Plaintiff claimed the facility was "not taking his religion seriously" and he referred to his previous complaints regarding his overcooked meals and the occasion when a morning meal was delivered late. (Dkt. No. 25-11 at ¶ 10.) Tourge denied the grievance on the merits, finding Plaintiff's claim was not supported by evidence. (Dkt. No. 25-7 at 2.) Plaintiff appealed to Sheriff York, who affirmed the decision. *Id*. at 3. Plaintiff appealed to the CPCRC on July 8, 2016, and by letter dated August 11, 2016, the CPCRC advised it had reviewed Plaintiff's appeal and voted to deny the grievance, sustaining the action taken by Sheriff York and Tourge. *Id*. at 1.

### III.   APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); Fed. R. Civ. P. 56(c).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).  In *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff."

A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (quotation marks omitted).  "At the summary judgment stage, a nonmoving party

must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and quotation marks omitted). "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876, at \*3 (S.D.N.Y. Oct. 28, 1999)[2] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When a party fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1) determine what material facts, if any, are undisputed in the record; and (2) assure itself that,

---

[2]  Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

based on the undisputed material facts, the law indeed warrants judgment for the moving party.

*Id.*; *see also Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that

not verifying in the record the assertions in the motion for summary judgment "would derogate

the truth-finding functions of the judicial process by substituting convenience for facts").

## IV.   PLAINTIFF'S FAILURE TO COMPLY WITH L.R. 7.1(A)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status

"does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a

motion for summary judgment."  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir.

2003).  In this case, Plaintiff has failed to respond to Defendants' statement of material facts as

required under L.R. 7.1(a)(3).[3]

Where a party has failed to respond to the movant's statement of material facts, the facts

in the movant's statement will be accepted as true (1) to the extent they are supported by

evidence in the record,[4] and (2) the nonmovant, if proceeding *pro se*, has been specifically

advised of the possible consequences of failing to comply with the requirements of Rule 56(e)

and L.R. 7.1.[5]  *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

---

[3]  L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's statement of material facts.  Under the rule, the response "shall mirror the movant's statement of material facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."

[4]  L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  *But see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[5]  Plaintiff was provided with the requisite notice of the consequences of his failure to respond to Defendants' summary judgment motion.  (Dkt. No. 26.)

This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a nonmovant willfully fails to respond to a properly filed summary judgment motion. *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). However, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.

## V.    ANALYSIS

### A.    First Amendment Right to Free Exercise of Religion

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). The Second Circuit has held that the Free Exercise Clause protects an inmate's right to participate in religious services, *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993), and "includes their right to meals that comport with religious requirements." *Williams v. Doe*, 639 F. App'x 55, 56 (2d Cir. 2016).

Those rights, however, are not without limits, and the task of defining the contours requires striking a balance between the rights of prison inmates and the legitimate interests of prison officials responsible for maintaining prison security. *O'Lane v. Estate of Shabazz*, 482 U.S. 342, 348-49 (1987); *Ford*, 352 F.3d at 588 (prisoner's free exercise rights are "[b]alanced

against . . . the interests of prison officials charged with complex duties arising from administration of the penal system") (quotation marks omitted). Accordingly, a prison inmate's Free Exercise claims are "judged under a reasonableness test less restrictive than that ordinarily applied to the alleged infringements of constitutional rights." *Id*.

To succeed on a claim under the Free Exercise Clause, the plaintiff must make a threshold showing that the challenged conduct "substantially burdens his sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 274-75 (citing *Ford*, 352 F.3d at 591). In determining whether religious beliefs are sincere, "an individual . . . need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588. "[A] substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 476-77 (2d Cir. 1996). Inconvenience alone is insufficient to establish a substantial burden. *Singh v. Goord*, 520 F. Supp. 2d. 487, 498 (S.D.N.Y. 2007) (citation omitted). *Id*. Furthermore, the substantial burden test presupposes that some inconveniences may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis*, 357 F.3d 197, 203 n.6 (2d Cir. 2004) (discussing in a footnote the applicability of the "time-honored maxim '*de minimis non curat lex*'"). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See Ford*, 352 F.3d at 593-94.

Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. *See Williams*, 639 F. App'x at 56 ("We have not yet decided whether a prisoner asserting a free-exercise claim must, as a threshold requirement, show that the disputed conduct substantially

burdened his sincerely held religious beliefs."); *Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir.

2014) (declining to decide whether a prisoner must show, as a threshold matter, that the

defendants' conduct substantially burdened his sincerely held religious beliefs in connection with

a First Amendment free exercise claim). In the absence of any controlling precedent to the

contrary, courts in this District have continued to apply the substantial burden test. *See, e.g.*,

*Wright v. Stallone*, No. 9:17-CV-0487 (LEK/TWD), 2018 WL 671256, at *9 (N.D.N.Y. Jan. 31,

2018) (applying substantial burden test); *Berisha v. Farrell*, No. 9:13-CV-1191 (LEK/ATB),

2016 WL 1295178, at *3 (N.D.N.Y. Mar. 8, 2016) (same); *Skates v. Shusda*, 9:14-CV-1092

(TJM/DEP), 2016 WL 3882530, at *4 & n.6 (N.D.N.Y. May 31, 2016) (same). This Court will

do the same.

      Once a plaintiff establishes that a sincerely held religious belief has been substantially

burdened by a practice of prison officials infringing upon the religious belief, "[t]he defendants

then bear the relatively limited burden of identifying the legitimate penological interests that

justify the impinging conduct; the burden remains with the prisoner to show that these articulated

concerns were irrational." *Salahuddin*, 467 F.3d at 275 (quoting *Ford*, 352 F.3d at 595)

(punctuation omitted). To make that determination, a court must consider:

> whether the challenged official action has a valid, rational
> connection to a legitimate governmental objective; whether
> prisoners have alternative means of exercising the burdened right;
> the impact on guards, inmates, and prison resources of
> accommodating the right; and the existence of alternative means of
> facilitating exercise of the right that have only a *de minimis*
> adverse effect on valid penological interests.

*Holland*, 785 F.3d at 222-23 (quoting *Salahudin*, 467 F.3d at 274, citing *Turner v. Safley*, 482

U.S. 78, 89-91 (1987)). The rule requiring a legitimate penological interest is equally applicable

to individual actions of prison personnel as it is to generally applied policies or regulations. *See*

*Salahuddin*, 467 F.3d at 272 n.4 ("An individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise.").

Here, Plaintiff identifies as Muslim and has practiced the religion of Islam since 2007. (Dkt. No. 25-9 at 35-36.)  Plaintiff claims he was denied a prayer rug, prayer schedules, and religious meals in violation of his First Amendment rights to free exercise of his religion and free flow of mail while confined at the WCCF.  (Dkt. No. 12 at 2-5.)  Defendants do not challenge the sincerity of Plaintiff's religious beliefs.  Rather, they argue Plaintiff cannot establish Defendants substantially infringed upon Plaintiff's ability to practice his religion while confined at the WCCF.  (Dkt. No. 25-13 at 5-12.)

### 1.     Prayer Rug

Plaintiff alleges he was denied a prayer rug at the WCCF.  (Dkt. No. 12 at 2.)  The record belies his claim.  Defendants have submitted evidence that Plaintiff was expressly instructed on how to procure a prayer rug from an approved vendor and, that once obtained, he would need to keep it in his cell at all times.  (Dkt. No. 25-2 at 1; 25-11 at ¶ 4.)  Subsequently, Plaintiff voided his "prayer rug" grievance (No. 2016-0456).  (Dkt. No. 25-2 at 1.)  During his deposition, Plaintiff clarified that he "didn't ask for permission for *a* prayer rug, I asked for permission for *my* prayer rug."  (Dkt. No. 25-9 at 41, emphasis added.)  Plaintiff admitted, however, that he was informed personal prayer rugs could not be brought into the facility due to safety issues.  *Id*. at 41-42; *see also* Dkt. No. 12 at 2.[6]

---

[6]  The Court notes at least one other court has upheld a jail's restriction on personal prayer rugs, where, *inter alia*, the plaintiff acknowledged that "absent his personal prayer rug, he was afforded other opportunities and accommodation to practice his faith[.]"  *See Shelton v. El Paso Cty.*, No. EP-O8-CV-26-DB-ML, 2010 WL 3503511, at *3 (W.D. Tex. Sept. 1, 2010).

Even viewed in the light most favorable to Plaintiff, a rational trier of fact could not reasonably find in favor of Plaintiff on this issue based on the evidence in the record. *See Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (an inmate bears the burden of showing that a correctional institution's policy substantially burdens his ability to exercise his religion). Therefore, the Court recommends that Defendants' motion be granted as to this claim.

### 2. Religious Meals

Plaintiff also claims his religious needs were not met during Ramadan. (Dkt. No. 12 at 3-4.) Specifically, Plaintiff claims (1) evening meals were "overcooked" on or about June 13, 2016; (2) one morning meal was delivered late on June 16, 2016; and (3) one morning meal was "old" and "overcooked" on June 29, 2016. *Id*. While a prisoner has a constitutional right to a "diet consistent with his or her religious scruples," *Ford*, 352 F.3d at 597, "isolated deprivations of a religious meal have historically been found to impose only *de minimis* burdens on an inmate's free exercise rights." *Wells v. McKoy*, No. 9:16-CV-405 (GTS/ATB), 2018 U.S. Dist. LEXIS 77516, at *24 (N.D.N.Y. May 7, 2018) (citing *McEachin*, 357 F.3d at 203 ("[t]here may be inconveniences so trivial that they are most properly ignored")), *report-recommendation adopted by* 2018 U.S. Dist. LEXIS 162429 (N.D.N.Y. Sept. 24, 2018); *see, e.g., Washington v. Afify*, 968 F. Supp. 2d 532, 538-39 (W.D.N.Y. Sept. 3, 2013) (holding denial of three consecutive Ramadan meals, including two breakfasts and one evening meal, does not violate the First Amendment); *Jean-Laurent v. Los*, No. 12-CV-132S(F) (WMS/LGF), 2015 WL 1015383, at *6-7 (W.D.N.Y. Mar. 9, 2015) ("missing two of the Ramadan meals . . . does not constitute a violation of Plaintiff's First Amendment right to the free exercise of his religion"); *see also Odom v. Dixion*, No. 04-CV-889 (LGF), 2008 WL 466255, at *10-12 (W.D.N.Y. Feb. 15, 2008)

(holding failure to provide kosher meals on seven occasions was not a substantial burden to establish a First Amendment claim).[7]

In this case, out of the approximately fifty-nine meals served during Ramadan, Plaintiff alleges only one breakfast was brought to him after dawn.  (Dkt. No. 12 at 3.)  As such, the Court finds Plaintiff suffered, at most, *de minimis* harm.  As to the other meals Plaintiff takes issue with, Plaintiff complains only that his meals were overcooked and the record demonstrates Tourge investigated each reported incident and issued a written directive and verbal instructions to the WCCF staff regarding heating and delivering religious meals.  *Id.*; Dkt. No. 25-11 at ¶¶ 6-7.  Even when viewed in the most favorable light, Plaintiff has failed to show a substantial burden on his religious beliefs.  Therefore, the Court recommends that Defendants' motion be granted as to this claim.

### 3.    Prayer Schedule

Plaintiff alleges Defendants interfered with his religious practice by denying his constitutional right to personal correspondence, which contained prayer schedules.  (Dkt. No. 12 at 5.)  Specifically, Plaintiff testified he was unable to complete his five daily prayers because he was denied his prayer schedules. (Dkt. No. 25-9 at 47.)  Defendants argue that withholding

---

[7]  The Court is cognizant of the Second Circuit's recent decision which criticized the line of cases holding that an inmate's allegation that he was deprived of five religious meals over the course of the month plausibly alleged a substantial burden on his religious practice.  *See Williams*, 639 F. App'x at 57.  The case at bar is readily distinguishable from *Williams*.  First, Plaintiff has not alleged he was outright denied meals during Ramadan.  Rather, Plaintiff claims two meals were ill prepared and one was delivered "late."  (Dkt. No. 12 at 2-3.)  More significantly, *Williams* involved a motion to dismiss, whereas Defendants have moved for summary judgment in this case after the completion of discovery.  As a result, the record in this case is well developed regarding the burden, if any, imposed on Plaintiff's observance of Ramadan as described in his deposition testimony.

Plaintiff's prayer schedule did not substantially infringe on his ability to practice his religion as he was free to obtain one in a different format.  (Dkt. No. 25-13 at 9.)

"[A] substantial burden on religious exercise exists when an individual is required to 'choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand.'"  *Smith v. Goord*, 541 F. App'x 133, 134 (2d Cir. 2013) (quoting *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007)).  According to Plaintiff, he was aware that a prayer schedule was acceptable so long as it did not contain images downloaded from the internet.  (Dkt. No. 25-9 at 56-57.)  Plaintiff testified that he made no other attempts to obtain a prayer schedule while incarcerated at the WCCF.  *Id*. at 56-57.

Even when viewed in the most favorable light, Plaintiff has failed to show a substantial burden on his religious beliefs.  *See Neal v. Byrne*, No. 06-CV-6250 (CJS), 2009 WL 3254908, at *15-17 (W.D.N.Y. Oct. 7, 2009) (finding plaintiff could not establish a substantial burden on his religious practice when prison officials banned him from receiving oils via mail as they remained available to him through other sources).  Therefore, the Court recommends that Defendants' motion be granted as to this claim.

**B.    First Amendment Right to Free Flow of Non-Legal Mail**

It is clear that a prisoner's First Amendment rights are implicated when the "free flow of incoming and outgoing mail" is hindered.  *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003).  However, the right to the free flow of mail does not provide for the unfettered free flow of mail. *Id*.  Reasonable restrictions to the free flow of mail are allowed, provided the restrictions "further[ ] one or more of the substantial governmental interests of security, order, and rehabilitation . . . and must be no greater than is necessary or essential to the protection of the

particular governmental interest involved." *Id*. (quoting *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)).

"To establish a claim for interference with regular, non-legal mail in violation of the First Amendment, an inmate 'must show a pattern and practice of interference that is not justified by any legitimate penological concern.'" *Singleton v. Williams*, No. 12 Civ. 02021 (LGS), 2014 WL 2095024, at *3 (S.D.N.Y. May 20, 2014) (citation omitted). The Second Circuit has stated that an "isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Id*. (quoting *Davis v. Goord*, 320 F.3d at 351).

Here, Plaintiff fails to demonstrate a pattern and practice of interference with his incoming, non-legal mail. Indeed, Plaintiff complains of a single instance of mail being withheld on May 13, 2016. (Dkt. No. 12 at 2.) Therefore, the Court recommends granting Defendants' motion for summary judgment on this claim. *See, e.g.*, *Cancel v. Goord*, No. 00-CIV-2942 (LMM), 2001 WL 303713, at *6 (S.D.N.Y. Mar. 29, 2001) (finding that neither one instance of interference with incoming, non-legal mail nor two instances of mail interference with incoming, legal mail amount to a pattern and practice of mail interference).

### C.    Supervisory Liability

Plaintiff brings a supervisory liability claim against Sheriff York. (Dkt. No. 12 at 3-4.) He is the duly elected Sheriff for Warren County, having first been elected in 2007. (Dkt. No. 25-10 at ¶ 1.) The Warren County's Sheriff's Office operates a civil division, provides law enforcement services on a County-wide basis and operates the WCCF pursuant to State mandate. *Id*. at ¶ 2. As Sheriff, he manages and oversees the Sheriff's Office delegating the day-to-day operations of the separate division to subordinate officers. *Id*. at ¶ 3. The operation of the

WCCF is the responsibility of a Division Commander and a staff consisting of approximately seventy-five corrections officers.  *Id*. at ¶ 4.

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977).  "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.").  "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (noting that a defendant may not be held liable in a § 1983 action merely because he or she held a high position of authority).  Therefore, "a plaintiff must . . .  allege a tangible connection between the acts of a defendant and the injuries suffered."  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[8]

Here, because the Court finds Plaintiff's underlying First Amendment claims are without merit, "none of the above bases for supervisory liability are applicable." *Thompson v. Carlsen*, No. 9:08-CV-487 (TJM/RFT), 2010 WL 843872, at *7 (N.D.N.Y. Mar. 10, 2010) (citing *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation.")). Therefore, the Court recommends that Defendants' motion be granted as to this claim.

### D.   Municipal Liability

Plaintiff brings a claim against Warren County for municipal liability under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694, (1978). It is well established that a *Monell* claim cannot lie in the absence of an underlying constitutional violation. *See Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action . . . it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.") (emphasis in original). Thus, "[a]bsent an underlying constitutional violation, a *Monell* claim cannot lie." *Thomas v. Westchester Cty.*, No. 12-CV-6718, 2013 WL 3357171, at *6 (S.D.N.Y. July 3, 2013); *see also Bolden v. Cty. of Sullivan*, 523 F. App'x 832, 834 (2d Cir. 2013) (summary order) ("[B]ecause the district court properly found no underlying constitutional violation, its decision not to address the [c]ounty defendants' liability under *Monell* was correct.").

---

[8]  The Second Circuit has thus far expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

Here, inasmuch as the Court finds Plaintiff's underlying First Amendment claims are without merit, there is no basis for extending liability to Warren County. Therefore, the Court recommends that Defendants' motion be granted as to this claim.

### E. Qualified Immunity

Sheriff York also contends he is entitled to qualified immunity. (Dkt. No. 25-13 at 12-13.) Inasmuch as the Court is recommending that Defendants' motion for summary judgment be granted in its entirety, it finds it unnecessary to reach the qualified immunity argument.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 25) be **GRANTED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[9] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

---

[9] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**SO ORDERED.**

Dated:  October 16, 2018
        Syracuse, New York

Therèse Wiley Dancks
United States Magistrate Judge

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

Cole v. Kruz, Not Reported in F.Supp.2d (1999)
Case 9:16-cv-01229-FJS-TWD   Document 29   Filed 10/16/18   Page 25 of 148
1999 WL 983876

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

### B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent prisoners posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

---

[1]   In light of this finding, there is no need to consider the defendant's qualified immunity argument.

### *Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

1999 WL 983876

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 671256
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bornallah WRIGHT, Plaintiff,
v.
David STALLONE, et al., Defendants.

9:17-CV-0487 (LEK/TWD)
|
Signed 01/31/2018

**Attorneys and Law Firms**

Lisa Anne Proskin, Proskin Law Firm, Albany, NY, for Plaintiff.

Bornallah Wright, Moravia, NY, pro se.

Katie E. Valder, New York State Attorney General, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

*1 Plaintiff Bornallah Wright commenced this action by filing a pro se civil rights complaint pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000 *et seq.*, asserting claims arising out of his confinement in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 1 ("Complaint"). These claims concern Plaintiff's ability to practice his religion at Cayuga Correctional Facility, where he is currently confined, by praying demonstrably in the prison's outdoor yard during recreation. Id.

Presently before the Court are three motions: Plaintiff seeks preliminary injunctive relief, Dkt. No. 9 ("Preliminary Injunction Motion"),[1] and the appointment of counsel, Dkt. No. 46 ("Counsel Motion"); defendants David Stallone, Jeffrey Hale, T. Schadewald, E. Korb, Daniel Figueroa, Ora Perkins, David Haggerty, Mary Coleman, and David Infantino (collectively, "State Defendants") seek to dismiss the claims filed against them.

Dkt. No. 38 ("Motion to Dismiss"). For the reasons stated below, Plaintiff's Preliminary Injunction Motion is granted in part and denied in part; his Counsel Motion is granted; and State Defendants' Motion to Dismiss is granted in part and denied in part.

[1]    Plaintiff's Preliminary Injunction Motion, styled as an Order to Show Cause, was docketed as an exhibit to the Complaint. See Dkt. No. 1-2. To avoid confusion, the Court directed the Clerk to file a copy of the Preliminary Injunction Motion as a separate docket entry. See Dkt. No. 8 ("Order") at 1.

**II. BACKGROUND**

**A. Relevant Facts**

Plaintiff alleges that he is a practicing Muslim who is required by his faith to pray at specific times of day. Compl. at 5. Sometimes these prayers ("commonly known as salaah or salaat") must be performed during recreation, when Plaintiff is outside in the prison's yard. Id. Nevertheless, he and other Muslim inmates were "denied [the] ability to go off to an unoccupied area of the yard to pray [their] salaah." Id. at 6. Plaintiff and the other inmates were informed that a designated area in the yard for prayer could only be used by one inmate—Aurel Smith —in accordance with the terms of an agreement Smith had reached with DOCCS after nine years of litigation. Id. at 6.[2] DOCCS staff also advised Plaintiff and other inmates that they "would have to file a suit, too" if they wanted accommodations for their religious beliefs. Id.[3]

[2]    Among the documents submitted as exhibits to the Complaint is an unsigned draft "Stipulation and Order of Discontinuance Pursuant to Rule 41(A)" bearing the caption of Smith v. Artus, No. 07-CV-1150 (N.D.N.Y. Oct. 29, 2007). Dkt. No. 1-1, at 1–7. A similar Stipulation and Order, signed by the parties and District Judge Mordue, was filed in that action on March 24, 2016. See Stipulation and Order of Discontinuance, Smith v. Artus, No. 07-CV-1150 (N.D.N.Y. Mar. 24, 2016), ECF No. 188. The terms and conditions under which Smith is permitted to engage in demonstrative prayer in any DOCCS facility are set forth in paragraph 10 of the Stipulation and Order. Id. at 4–5.

[3]    According to Plaintiff, Smith advised defendant David Stallone, Cayuga's superintendent, that a "restriction to others' ability to engage in salaah was

not part of Smith's settlement nor an intended effect thereof." Compl. at 7. As alleged, Stallone told Smith that "others will have to still file suits in order to get a court order or settlement." Id.

**\*2** On August 18, 2016, Plaintiff filed an inmate grievance complaining that he was not allowed to pray his salaah in the yard. Id. at 6; see also Dkt. No. 1-1, Ex. 6 ("August Grievance"). Plaintiff requested permission to pray in the yard during recreation, as Smith was permitted to do. Aug. Grievance at 1. The Inmate Grievance Review Committee ("IGRC") denied Plaintiff's request. Compl. at 5; Aug. Grievance at 2. In support of that denial, the IGRC provided Plaintiff with a copy of a memorandum dated March 22, 2016, written by Captain J. Rocker and addressed to Cayuga's security staff regarding Smith's exclusive right to pray demonstrably in the yard. Dkt. No. 1-1, Ex. 7. The memorandum states as follows:

> The results of a recent law-suit filed by Inmate Smith, A. 02A6279 have granted this inmate the right to practice his religion (Islam) by praying in the yard during open recreation.
>
> Effective Wednesday March 24, 2016 Inmate Smith will be allowed to pray in the yard. There is a white painted area 5' by 5' area in the southwest corner near the weight fence. This area is the only area in which Inmate Smith will be allowed to pray.
>
> Inmate Smith will be the **ONLY INMATE** who will be allowed to pray in the yard.

Id. Plaintiff's appeal of the IGRC decision was denied at the facility level on August 29, 2016. Compl. at 6; Dkt. No. 1-1, Ex. 8. The Central Office Review Committee ("CORC") issued a decision dated March 22, 2017, also denying Plaintiff's appeal. Dkt. No. 1-1, Ex. 9 ("CORC notes that a recent settlement agreement permits only one specific inmate to pray in a designated area of the yard during recreation, and that other inmates are not allowed to pray there."). [4]

[4]   Inmate Jimir McMillan filed a similar grievance, dated May 5, 2016, complaining that only Smith was allowed to pray in the yard. Compl. at 5; Dkt. No. 1-1, Exs. 2–5. The IGRC denied the grievance and referenced the same memorandum written by Captain Rocker. Dkt. No. 1-1, Ex. 3. On May 25, 2016, Stallone denied McMillan's appeal. Dkt. No. 1-1, Ex. 4. CORC upheld the denial on October 19, 2016,

stating that "CORC notes that a recent settlement agreement permits only one specific inmate to pray in a designated area of the yard during recreation, and that other inmates are not allowed to pray there." Dkt. No. 1-1, Ex. 5.

Plaintiff commenced this action on May 4, 2017. Compl. On August 24, 2017, officials at Cayuga began to allow Plaintiff to pray demonstrably in the outdoor yard during recreation in a similar fashion to Smith. Dkt. No. 31 ("Preliminary Injunction Opposition") at 1. That is, Plaintiff could pray "in a designated area in the Southwest corner of the yard." Id. at 2. On January 10, 2018, pursuant to a request from the Court, Dkt. No. 57, State Defendants clarified that Plaintiff and Smith could pray simultaneously, but each designated area is separated by fifteen feet, Dkt. No. 58 ("Status Report") at 1. State Defendants also reported that officials at Cayuga had designated a third area in the yard for prayer, and that any Muslim inmate had the right to use the designated areas—not just Plaintiff and Smith. Id. [5] Each designated area could be used by only one inmate at a time, but a maximum of three inmates could pray simultaneously. Id. State Defendants did not explain why Cayuga officials altered its policy regarding demonstrable prayer with respect to Plaintiff or other Muslim inmates.

[5]   Plaintiff filed a response to the Status Report on January 24, 2018. Dkt. No. 61 ("Status Report Opposition"). In this document, Plaintiff disputes State Defendants' characterization of Cayuga's new rules regarding prayer and states that Cayuga officials have not announced that all Muslims have the right to pray demonstrably in the recreation yard. Status Report Opp'n at 2. As described below, this factual dispute does not affect the outcome of the Court's decision.

**\*3** Based upon the foregoing, Plaintiff claims that his right to practice his religion has been and continues to be impermissibly burdened by State Defendants in violation of the First Amendment and RLUIPA. Compl. at 8–9. Plaintiff also asserts a claim for the violation of his rights protected under the Equal Protection Clause of the Fourteenth Amendment. Id. at 10. He seeks an award of monetary damages and injunctive relief. Id. at 11.

### B. Procedural History

Plaintiff commenced this action on May 4, 2017. Compl. In a Decision and Order dated July 28, 2017, Dkt.

No. 8 ("Order"), the Court considered the sufficiency of the allegations set forth in the Complaint in light of 28 U.S.C. §§ 1915(e) and 1915A. The Order dismissed a number of defendants and ordered the remaining defendants to respond to the Complaint and Preliminary Injunction Motion. Order at 12–13. State Defendants filed their opposition to the Preliminary Injunction Motion on October 6, 2017, Prelim. Inj. Opp'n, to which Plaintiff replied on November 13, 2017, Dkt. No. 48 ("Preliminary Injunction Reply"). On October 23, 2017, State Defendants filed their Motion to Dismiss; Plaintiff responded in opposition on January 16, 2018, Dkt. No. 59 ("Dismiss Opposition"), to which State Defendants replied on January 23, 2018, Dkt. No. 60 ("Dismiss Reply"). Finally, Plaintiff filed his Counsel Motion on October 30, 2017. Counsel Mot.

## III. LEGAL STANDARD

### A. Motion to Dismiss

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of the plaintiff. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer more than the possibility of misconduct based on the pleaded facts, the pleader has not demonstrated that he is entitled to relief, and the action is subject to dismissal. Id. at 678–79. Nevertheless, "[f]act-specific question[s] cannot be resolved on the pleadings." Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012) (second alteration in original) (quoting Todd v. Exxon Corp., 275 F.3d 191, 203 (2d Cir. 2001)). Presented with "two plausible inferences

that may be drawn from factual allegations," a court "may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." Id.

### B. Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." Gen. Mills, Inc. v. Chobani LLC, 158 F. Supp. 3d 106, 114 (N.D.N.Y. 2016) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)). Generally, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20.

**\*4** While a district court typically has wide discretion in determining whether to grant preliminary injunctive relief, Moore v. Consol. Edison Co. of N.Y., 409 F.3d 506, 511 (2d Cir. 2005), "[i]n the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of [ ] prisons," Fisher v. Goord, 981 F. Supp. 140, 167 (W.D.N.Y. 1997). "Under the Prison Litigation Reform Act ("PLRA"), preliminary injunctive relief in any civil action with respect to prison conditions must be narrowly drawn, extend no further than necessary to correct the harm, and be the least intrusive means necessary to correct that harm." V.W. v. Conway, 236 F. Supp. 3d 554, 581 (N.D.N.Y. 2017) (citing 18 U.S.C. § 3626(a)(2)). A court must give "substantial weight" to any adverse impact on public safety the injunctive relief might have. § 3626(a)(1)(A).

### C. Motion to Appoint Counsel

In Terminate Control Corp. v. Horowitz, 28 F.3d 1335 (2d Cir. 1994), the Second Circuit reiterated the factors that a court must consider in ruling upon a motion for the appointment of counsel. As a threshold matter, a court must first determine whether the plaintiff's position seems likely to be of substance. Id. at 1341 (citing Hodge v. Police Officers, 802 F.2d 58, 61 (2d Cir. 1986)). If the claim meets this requirement, a court should then consider a number of other factors in making its determination, including the plaintiff's ability to investigate crucial facts and the complexity of the legal issues presented by the case. Id. Of these criteria, the most important is the merits,

i.e., "whether the indigent's position was likely to be of substance." McDowell v. State of New York, No. 91-CV-2440, 1991 WL 177271, at *1 (S.D.N.Y. Sept. 3, 1991) (quoting Cooper v. A. Sargenti Co., Inc., 877 F.2d 170, 172 (2d Cir. 1989)).

## IV. DISCUSSION

### A. Motion to Dismiss

State Defendants move to dismiss the Complaint on two grounds: First, that they are sheltered from liability by the doctrine of qualified immunity, Dismiss Mot. at 2–5, and, second, that State Defendants were not personally involved in the alleged constitutional and statutory violations, id. at 5–7. The Court notes that State Defendants' cursory submission does not distinguish between the multiple violations that Plaintiff has alleged or the different types of relief that Plaintiff sought; Plaintiff has alleged violations of his rights guaranteed by the First Amendment, RLUIPA, and the Fourteenth Amendment, and he seeks monetary damages and injunctive relief. These distinctions make a difference, as the Court will explain below.

### 1. Qualified Immunity

The defense of qualified immunity entitles public officials to freedom from suit for monetary damages, as a result of the consequences of the performance of their discretionary duties, when "their conduct does not violate clearly established rights of which a reasonable person would have been aware." Zalaski v. City of Hartford, 723 F.3d 382, 388 (2d Cir. 2013).[6] Qualified immunity is an affirmative defense, and, as such, defendants bear the burden of proving that the privilege applies. Coolick v. Hughes, 699 F.3d 211, 219 (2d Cir. 2012).

---

[6]     The doctrine of qualified immunity does not "bar any claim for equitable relief." Smith v. Artus, No. 07-CV-1150, 2010 WL 3910086, at *29 (N.D.N.Y. Sept. 30, 2010) (citing Pearson v. Callahan, 555 U.S. 223, 242–43 (2009)), vacated on other grounds, 522 Fed.Appx. 82 (2d Cir. 2013). There is no dispute that Plaintiff has moved for injunctive relief. Compl. at 13; Prelim. Inj. Mot. at 1. Therefore, State Defendants' argument that "the complaint should be dismissed in its entirety" because of the doctrine of qualified immunity is misplaced. Dismiss Mot. at 5.

**\*5** "The determination of qualified immunity depends both on the specific facts of an official's actions—*e.g.*, 'what situation confronted [him], what acts he performed, and his motivation in performing those acts'—and on the clarity of the legal rules governing that particular conduct." Village of Freeport v. Barrella, 814 F.3d 594, 609 (2d Cir. 2016) (quoting Lore v. City of Syracuse, 670 F.3d 127, 162 (2d Cir. 2012)). In deciding whether an officer's actions were objectively reasonable in light of existing law, "the inquiry is not how courts or lawyers might have understood the state of the law at the time of the challenged conduct. Rather, '[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a *reasonable officer* that his conduct was unlawful in the situation he confronted." Zalaski, 723 F.3d at 389 (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).

### a. Free Exercise Claim

State Defendants are correct that, as a general matter, a prisoner's right to pray demonstrably in the recreation yard—whether alone or in congregate—was not clearly established at the time Plaintiff was prevented from doing so. Dismiss Mot. at 2–5. Although numerous prisoners have raised this claim in this Circuit since the late 1970s, no court has clearly established that prisoners have a right to pray demonstrably in the recreation yard by oneself or in small groups. See Shabazz v. Coughlin, 852 F.2d 697, 700–01 (2d Cir. 1988) ("However, as the district court conceded, this court had not then nor since directly addressed the constitutionality of restrictions on group prayer and prayer in prison yards."); Smith v. Artus, No. 07-CV-1150, 2015 WL 9413128, at *11–12 (N.D.N.Y. Dec. 22, 2015) ("Smith II") (finding that defendants were entitled to qualified immunity for preventing plaintiff from praying demonstrably in the prison's recreation yard).

However, Plaintiff is also correct that his situation is not analogous to previous cases in which prisoners challenged DOCCS's policy regarding demonstrable prayer in the recreation yard. Dismiss Opp'n at 6–8. Most importantly, between March 24, 2016 and August 23, 2017, Cayuga officials permitted Smith to pray demonstrably in the recreation yard *and yet* denied Plaintiff the ability to do so. This inconsistent treatment should have raised significant concerns among prison officials regarding the alleged

penological interests supporting the policy of banning individual, demonstrable prayer. See Smith v. Artus, No. 07-CV-1150, 2010 WL 3910086, at *29 (N.D.N.Y. Sept. 30, 2010) ("Smith I") ("The defendants in this case allege that there are concerns for security, as well as staffing and fiscal concerns, associated with accommodating plaintiff's request to pray demonstratively during the recreation period."), vacated on other grounds, 522 Fed.Appx. 82 (2d Cir. 2013). If Smith could pray demonstratively in the recreation yard, why couldn't Plaintiff? What legitimate penological interests did banning Plaintiff (and other inmates) from praying demonstratively in the recreation yard serve? State Defendants make no attempt to justify this inconsistent treatment between Smith and the other inmates.

As discussed more fully below, to defend against a First Amendment free exercise claim brought by a prisoner, prison officials bear the "relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." Salahuddin v. Goord, 467 F.3d 263, 275 (2d Cir. 2006). Courts in this Circuit have highlighted the problem that inconsistent treatment of inmates creates for prison officials in their attempt to justify burdens on prisoners' religious exercise. See, e.g., Aziz v. Le Fevre, 642 F.2d 1109, 1111 (2d Cir. 1981) ("We think it would have some bearing upon the ultimate resolution of the constitutional question if, in fact, the state policy as set forth in Directive No. 4203 is not followed at Green Haven, and hence is not a 'policy' at all."); Pilgrim v. Artus, No. 07-CV-1001, 2010 WL 3724883, at *11 (N.D.N.Y. Mar. 18, 2010), adopted by, 2010 WL 3724881 (N.D.N.Y. Sept. 17, 2010) ("Despite the alleged security concerns, DOCS' policy allows inmates of the Rastafarian faith to wear dreadlocks. Also, Directive #4914 allows all inmates to grow their hair long, provided they wear it pulled back in a ponytail, and also allows inmates to wear their hair in a 'Afro-natural' style. Thus, DOCS affords a degree of leeway with respect to inmates' hairstyles, but has drawn a line in the sand with respect to dreadlocks worn by non-Rastafarian prisoners."); Salahuddin v. Coughlin, 999 F. Supp. 526, 536 (S.D.N.Y. 1998) (describing inconsistent application of DOCCS policy toward congregate religious services in multiple prisons, which "creates an issue of fact as to ... the legitimacy of the penalogical [sic] interest asserted").

*6 At this early stage in the litigation and absent any attempt from State Defendants to justify the inconsistent treatment of Smith and Plaintiff, the Court cannot hold that a reasonable prison official would have understood such treatment to be consistent with the First Amendment. If Cayuga officials had no penological interest in denying Smith the ability to pray demonstrably in the outdoor yard during recreation, then there may have been no penological interest in denying Plaintiff the same ability. Moreover, it was clearly established law in 2016 that prison officials needed *some* legitimate penological interest to justify the burdening of an inmate's sincere religious beliefs. See Ford v. McGinnis, 352 F.3d 582, 597 (2d Cir. 2003) ("We find that prior cases make it sufficiently clear that absent a legitimate penological justification, which for present purposes we must assume defendants were without, prison officials' conduct in denying Ford a feast imbued with religious import was unlawful."). Therefore, at this time, State Defendants are not entitled to qualified immunity regarding Plaintiff's First Amendment Claim.

### b. RLUIPA Claim

Plaintiff may not recover money damages pursuant to RLUIPA against State Defendants either in their individual or official capacities. Smith II, 2015 WL 9413128, at *12 ("RLUIPA does not authorize claims for money damages against state officials in their official capacities and does not create a private right of action against them in their individual capacities." (citing Sossamon v. Texas, 563 U.S. 277, 280 (2011))). However, the doctrine of qualified immunity does not preclude Plaintiff from receiving injunctive relief against State Defendants in their official capacities pursuant to RLUIPA. Id. at *12–13.

### c. Equal Protection Claim

State Defendants do not make any specific arguments in support of their position that they are entitled to qualified immunity regarding Plaintiff's Equal Protection claim. Dismiss Mot. at 4–5. The constitutional questions raised by DOCCS's unequal treatment of Plaintiff and his fellow prisoner, Artus Smith, are distinct from the constitutional questions surrounding Plaintiff's alleged right to pray in the recreation yard pursuant to the First Amendment. Since qualified immunity is an affirmative defense, and, as such, defendants bear the burden of

proving that the privilege of qualified immunity applies, Coolick, 699 F.3d at 219, the Court will not dismiss Plaintiff's Equal Protection claim for monetary damages absent an argument from State Defendants.

### 2. Personal Involvement

State Defendants also move to dismiss Plaintiff's claims based on the requirement that "a plaintiff must show some 'tangible connection' between the unlawful conduct and the defendant[s]." Dismiss Mot. at 5 (quoting Jackson v. Gunsalus, No. 16-CV-647, 2016 WL 4004612, at *3 (N.D.N.Y. June 24, 2016), adopted by 2016 WL 3983635 (N.D.N.Y. July 25, 2016)). "It is well settled in this circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" is insufficient to show his or her personal involvement in that unlawful conduct. Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003); accord Wright, 21 F.3d at 501. In other words, supervisory officials may not be held liable merely because they held a position of authority. Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). Rather, supervisory personnel may be considered "personally involved" only if they: (1) directly participated in the alleged constitutional violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) were grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323–24 (2d Cir. 1986)). [7]

[7]    There is disagreement among district courts in this Circuit as to whether all of the Colon factors are still valid following the Supreme Court's decision in Ashcroft v. Iqbal, 556 U.S. 662 (2009). See, e.g., Dilworth v. Goldberg, No. 10-CV-2224, 2011 WL 3501869 at *17 (S.D.N.Y. Jul. 28, 2011) (collecting cases), adopted by 2011 WL 4526555 (Sept. 30, 2011). "[I]n the absence of contrary direction from the

Second Circuit, the Court will continue to apply those factors." Jackson v. Goord, No. 06-CV-6172, 2011 WL 4829850, at *9 (W.D.N.Y. Oct. 12, 2011).

**\*7** However, "the 'personal involvement requirement does *not* apply to bar actions ... for injunctive relief against a state official.'" Brisco v. Rice, No. 11-CV-578, 2012 WL 253874, at *4 (E.D.N.Y. Jan. 27, 2012) (quoting Marinaccio v. Boardman, No. 02-CV-831, 2005 WL 928631, at *9–10 (N.D.N.Y. Apr. 19, 2005) (emphasis in original)); see also Courts v. Coombe, No. 95-CV-2350, 1996 WL 312357, at *2 (S.D.N.Y. June 11, 1996) ("Personal involvement ... is only required where the complaint seeks monetary damages, not where injunctive or declaratory relief is sought."). Instead, in order to state a claim seeking injunctive relief, a plaintiff must demonstrate that the defendant "has a direct connection to, or responsibility for, the alleged illegal action." Reynolds v. Blumenthal, No. 04-CV-218, 2006 WL 2788380, at *7 (D. Conn. Sept. 26, 2006) (citing Ex parte Young, 209 U.S. 123, 157 (1908)); see also Pugh v. Goord, 571 F. Supp. 2d 477, 517 (S.D.N.Y. 2008) ("Courts in this Circuit have since applied the holding in Ex parte Young to require only that a defendant have a 'connection' with the act, and not more.") (citing In re Dairy Mart Convenience Stores, Inc., 411 F.3d 367, 372–73 (2d Cir. 2005)).

### a. David Stallone

Superintendent Stallone is a supervisory official at Cayuga, and therefore Plaintiff must allege his personal involvement pursuant to Colon with respect to Plaintiff's First Amendment and Equal Protection claims for monetary damages. Plaintiff alleges that Stallone told Smith that any Muslim inmate who wishes to pray demonstrably in the recreation yard "would have to file suits [*sic*] in order to get similar accommodation." Compl. at 6. Plaintiff also presents evidence that Stallone denied an inmate grievance appeal, similar to the one filed by Plaintiff, and stated that only Smith is permitted to pray demonstrably in the recreation yard. Dkt. No. 1-1, Ex. 4. Stallone did not deny Plaintiff's grievance appeal; a designee did. Dkt. No. 1-1, Ex. 8.

Courts in this Circuit are split regarding the extent of involvement that a plaintiff must allege in order to establish a supervisory defendant's requisite personal involvement. Compare McClenton v. Menifee, No. 05-

2018 WL 671256

CV-2844, 2006 WL 2474872, at *10 (S.D.N.Y. Aug. 22, 2006) ("[A] supervisor's mere denial of a grievance is insufficient to establish personal involvement ..."), with Madison v. Mazzuca, No. 02-CV-10299, 2004 WL 3037730, at *10 (S.D.N.Y. Dec. 30, 2004) ("[P]ersonal involvement is present where a supervisory official reviews a prisoner's grievance with respect to a constitutional violation and decides against taking any corrective action."). With regard to Stallone, the Court does not need to take sides in this split, because Plaintiff has alleged that Stallone—outside of the context of grievances—was aware of the alleged violation of Plaintiff's rights, had the authority to remedy such violation, and failed to do so. At this early stage in the litigation, such allegations are sufficient to establish personal involvement under the second prong of Colon. See Saxon v. Attica Med. Dep't, 468 F. Supp. 2d 480, 483 (W.D.N.Y. 2007) (denying a motion to dismiss claims against prison superintendent, even though "allegations ... may be characterized as thin").

With regard to Plaintiff's motion for prospective injunctive relief, Stallone—as the superintendent of Cayuga—has a direct connection to, and is responsible for, the protection of Plaintiff's constitutional and statutory rights. E.g., Jacobson v. Coughlin, 523 F. Supp. 1247, 1249 (N.D.N.Y. 1981) (denying a motion to dismiss claims for injunctive relief against prison superintendent regarding plaintiff's special housing confinement). Plaintiff also has specifically alleged that Stallone was aware of and failed to remedy the alleged constitutional and statutory violations at issue in this case. Therefore, Plaintiff's claims against him for injunctive relief will not be dismissed.

### b. Other State Defendants

**\*8** Plaintiff presents evidence that the other State Defendants—Hale, Schadewald, Korb, Figueroa, Noeth, Perkins, Haggerty, Coleman, and Infantino—were members of either the IGRC or CORC and denied multiple grievances and appeals regarding inmates' ability to pray demonstrably in Cayuga's yard during recreation. Dkt. No. 1-1, Exs. 2–7. Although, as mentioned above, district courts in this Circuit are split regarding the level of involvement represented by a denial of an inmate grievance, the majority of courts have held "that an officer tasked only with reviewing an administrative

determination is not 'personally involved' even if the underlying determination implicates a plaintiff's constitutional rights." Vogelfang v. Capra, 889 F. Supp. 2d 489, 503–04 (S.D.N.Y. 2012) (citing Odom v. Calero, No. 06-CV-15527, 2008 WL 2735868, at *7 (S.D.N.Y. July 10, 2008)); see also Rogers v. Artus, No. 13-CV-21, 2013 WL 5175570 at * 3 (W.D.N.Y. Sept. 11, 2013) ("The denial, or affirmance of a denial, of a grievance by a Superintendent or other supervisory official is insufficient, without more, to create personal involvement in alleged violations." (citing Joyner v. Greiner, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) and James v. Poole, No. 06-CV-6007, 2013 WL 132492 at *7 (W.D.N.Y. Jan. 9, 2013))). In addition, Plaintiff has not alleged that any of these defendants are ultimately responsible for the protection of Plaintiff's constitutional and statutory rights, as defendant Stallone is. Therefore, defendants Hale, Schadewald, Korb, Figueroa, Noeth, Perkins, Haggerty, Coleman, and Infantino must be dismissed. [8]

[8]    This analysis also applies to defendant Joseph Noeth, who was a member of CORC but was not properly served the Complaint because of a typographical error. Dkt. No. 53. In addition, the three named defendants who are inmates—David Jackson, Willie Brown, Jr., and Todd Gage—must be dismissed because they are not state actors. Lewis v. Doe, No. 13-CV-3190, 2013 WL 5923723, at *1 (E.D.N.Y. Oct. 31, 2013).

### B. Preliminary Injunction

Plaintiff seeks injunctive relief with regard to two activities: First, to pray demonstrably in the recreation yard on his own, and, second, to pray demonstrably in the recreation yard in a group of two or three inmates. Prelim. Inj. Mot. at 1. Plaintiff seeks this relief for himself and "similarly situated Muslim prisoners in custody of [ ] DOCCS." Id. However, as a pro se litigant, Plaintiff "has no authority to appear as an attorney for others." Lebron v. Armstrong, 289 F. Supp. 56, 59 (D. Conn. 2003) (citing Eagle Assocs. v. Bank of Montreal, 926 F.2d 1305, 1308 (2d Cir. 1991)). Plaintiff "may seek relief on behalf of himself only." Id. Therefore, his request for relief with respect to other inmates is denied.

*1. Individual, Demonstrable Prayer in the Recreation Yard*

a. Mootness

State Defendants argue that Plaintiff's request for injunctive relief is moot, and therefore the Preliminary Injunction Motion should be denied, because Plaintiff is now able to pray demonstrably in Cayuga's recreation yard. Prelim. Inj. Opp'n at 1. However, "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.' " Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 189 (2000) (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)). Instead, a defendant must meet the "heavy burden of persua[ding]" the Court that "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Id. (quoting United States v. Concentrated Phosphate Exp. Assn., 393 U.S. 199, 203 (1968)).

Here, State Defendants have not met this burden. They do not deny that Plaintiff is able to pray demonstrably only because he filed suit in federal court; there is no indication that, absent this litigation, Cayuga officials would have altered its previous policy. Moreover, State Defendants have not made any indication that DOCCS has reconsidered its "departmental directive prohibiting demonstrative prayer in the [recreation] yard." Dismiss Mot. at 4. In short, State Defendants have not demonstrated that it is absolutely clear that Plaintiff will not be denied the ability to pray demonstrably in Cayuga's yard during recreation in the future. Accordingly, Plaintiff's request for relief is not moot.

b. Likelihood of Success on the Merits

*9 In determining whether Plaintiff has established a likelihood of success on the merits, the Court looks to whether the evidence presented demonstrates that he is likely to prevail at trial on a claim concerning the conduct complained of—in this case, the denial of his ability to pray demonstrably on his own in Cayuga's recreation yard. To succeed on a First Amendment free exercise claim, "the prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." Salahuddin, 467 F.3d at 274–75. Defendants then bear the "relatively limited burden of

identifying the legitimate penological interests that justify the impinging conduct." Id. at 275.

Although State Defendants have not presented an argument on the merits in opposition to the Preliminary Injunction Motion, it is improbable that they would question the sincerity of his religious belief or the fact that the denial of his ability to pray demonstrably in the recreation yard substantially burdens those beliefs. Judge Mordue denied DOCCS's motion for summary judgment advancing such arguments with regard to Smith in 2015. See Smith II, 2015 WL 9413128 at *9 ("The Court rejects defendants' argument that they are entitled to summary judgment dismissing plaintiff's free exercise claim on the ground that the challenged policy does not impose a substantial burden on his sincerely held religious beliefs as a matter of law."). It is also improbable that State Defendants would present an argument that Plaintiff's ability to pray demonstrably threatens legitimate penological interests, since Cayuga now permits Plaintiff—and apparently all other Muslim inmates—to pray demonstrably in the yard during recreation. Status Report at 1.

In sum, Plaintiff is likely to succeed at trial on his claim that denying him the ability to pray demonstrably in the recreation yard at Cayuga violates his First Amendment rights.

c. Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitute irreparable injury." Elrod v. Burns, 427 U.S. 347 (1976). Because Plaintiff alleges that the deprivation of his First Amendment right to the free exercise of religion resulted directly from prison officials' actions, "irreparable harm may be presumed." Keesh v. Smith, No. 04-CV-779, 2006 WL 516793 at *3 (N.D.N.Y. Mar. 2, 2006).

d. Balance of the Equities

In determining whether the balance of equities tips in Plaintiff's favor, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24 (quoting Amoco Prod. Co.

v. Village of Gambell, 480 U.S. 531, 542 (1987)). Here, the hardship faced by Plaintiff is potentially substantial: the loss of his right to exercise his religious beliefs. On the other side, the hardship faced by State Defendants is minimal, since Cayuga now permits Plaintiff to pray demonstrably in its recreation yard. State Defendants make no argument that maintaining this new policy during the course of litigation would impose a hardship on prison administration.

### e. Public Interest

Finally, the Court finds that the issuance of the requested relief serves the public interest. While the Court generally assumes that the acts of a governmental entity are aligned with the interests of the public it serves, N.Y. Progress & Prot. PAC v. Walsh, 733 F.3d 483, 488 (2d Cir. 2013), that is not the case here. "[S]ecuring First Amendment rights is in the public interest," and it is decidedly against the public interest to permit the enforcement of an unconstitutional policy or law. Id.

**\*10** Since Plaintiff has established each of the factors required by Winter, the Court will issue a preliminary injunction with regard to individual, demonstrable prayer in Cayuga's outdoor yard during recreation.

### 2. Congregate, Demonstrable Prayer in the Recreation Yard

Plaintiff's request for injunctive relief regarding his ability to pray in congregate with other inmates is factually distinct from his request for individual prayer. State Defendants have not permitted Plaintiff or other inmates to pray in congregate, and State Defendants maintain that congregate prayer would present serious security threats to prison administration. See Dkt. No. 31-1 ("Kelly Declaration") ¶¶ 20–30. Plaintiff is correct to highlight the apparent contradictions in some of these alleged security threats. E.g., Prelim. Inj. Mot. Reply ¶¶ 36–37. For example, State Defendants do not sufficiently explain why groups of two or three inmates are permitted to gather in the recreation yard for conversation but are not allowed to gather for demonstrable prayer. The fact that Muslims' demonstrable prayer could be "used as code," Kelly Decl. ¶ 25, does not explain why such prayer is different from other activities, such as normal

conversation or hand gestures, that may contain "codes" but which are permitted in the recreation yard among two or three inmates.

But at this early stage in the litigation, the Court cannot find that Plaintiff is likely to succeed on the merits regarding this claim. Courts in this Circuit have upheld prison officials' consistent application of bans on congregate, demonstrable prayer under factually similar circumstances. See, e.g., Withrow v. Bartlett, 15 F. Supp. 2d 292, 296 (W.D.N.Y. 1998) ("I find that defendants had a legitimate penological interest in maintaining security, and that this interest was rationally related to their enforcement of policies that prohibit group demonstrative prayer in Elmira's recreational yard."). Moreover, given the direction from Congress that, "[i]n the prison context, a request for injunctive relief must always be viewed with great caution," Fisher, 981 F. Supp. at 167, the Court will not alter the status quo at Cayuga at this point. Accordingly, Plaintiff's request for injunctive relief with respect to congregate, demonstrable prayer is denied.

### C. Motion to Appoint Counsel

As discussed above, Plaintiff's claims are clearly "of substance." Hodge v. Police Officers, 802 F.2d 58, 61 (2d Cir. 1986). The heart of Plaintiff's lawsuit— whether prisoners have a First Amendment right to pray demonstrably in an outdoor yard during recreation— has perplexed courts in this Circuit since the late 1970s. E.g., Aziz, 642 F.2d at 1111. The large number of similar lawsuits that have ended before the merits were reached strongly suggests that the legal issues are complicated and Plaintiff would benefit from legal representation. In addition, litigating this lawsuit properly will benefit from extensive factfinding, particularly with regard to the practices at other prison facilities in New York. Since Plaintiff has been unable to receive legal representation on his own, Counsel Mot. at 1, the Court grants Plaintiff's Counsel Motion and pro bono counsel will be appointed.

### V. CONCLUSION

**\*11** Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 38) is **GRANTED in part** and **DENIED in part**; the Motion is **GRANTED** as to Plaintiff's claim for monetary damages

pursuant to RLUIPA against all Defendants; the Motion is **GRANTED** as to all of Plaintiff's claims against defendants Jeffrey Hale, T. Schadewald, E. Korb, Daniel Figueroa, Ora Perkins, David Haggerty, Mary Coleman, and David Infantino; the Motion is otherwise **DENIED**; and it is further

**ORDERED**, that Jeffrey Hale, T. Schadewald, E. Korb, Daniel Figueroa, Ora Perkins, David Haggerty, Mary Coleman, David Infantino, Joseph Noeth, David Jackson, Willie Brown, Jr., and Todd Gage are **DISMISSED** as defendants in this action; and it is further

**ORDERED**, that Plaintiff's Preliminary Injunction Motion (Dkt. No. 9) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED**, that each time Plaintiff is permitted to attend recreation in Cayuga's outdoor yard, Plaintiff shall be permitted to participate in individual, demonstrable prayer absent extraordinary circumstances; and it is further

**ORDERED**, that Plaintiff's Counsel Motion (Dkt. No. 46) is **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court is instructed to appoint Lisa Anne Proskin, whose business address is 423 Loudon Road, Albany, New York, 12211, to serve as *pro bono* counsel and to faithfully and diligently represent Plaintiff in this case; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 671256

---

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-01229-FJS-TWD    Document 29    Filed 10/16/18    Page 37 of 148
Berisha v. Farrell, Not Reported in F.Supp.3d (2016)

2016 WL 1295178

2016 WL 1295178
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Merim Berisha, Plaintiff,
v.
Sergeant Farrell, Defendant.

9:13-CV-1191 (LEK/ATB)
|
Signed 03/08/2016

**Attorneys and Law Firms**

MERIM BERISHA, Plaintiff, pro se.

JOSHUA L. FARRELL, Ass't Att'y Gen., for the
Defendants.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

*1 This matter has been referred to me for Report
and Recommendation by the Honorable Lawrence E.
Kahn, Senior United States District Judge. In his amended
civil rights complaint, plaintiff, a practicing Muslim,
alleges that his right to the free exercise of religion under
the First Amendment and the Religious Land Use and
Institutionalized Person Act ("RLUIPA") was violated
when defendant ordered him on two consecutive days
to shave his beard or face disciplinary sanctions. (Dkt.
No. 11, Am. Compl.). Plaintiff's amended complaint also
raised due process, equal protection and retaliation claims
that were dismissed by Judge Kahn on December 11,
2014.[1] (Dkt. No. 12).

---

[1]      In addition, defendants Brian Fischer and Anthony
         Annucci were dismissed as defendants due to a lack
         of personal involvement. (Dkt. No. 12, at 3).

Presently before this court is defendant's motion for
summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt.
No. 19). Plaintiff has responded in opposition to the
motion. (Dkt. No. 23). Defendant submitted a reply, to
which plaintiff also responded. (Dkt. Nos. 24, 25). For the
following reasons, this court agrees with defendants and
will recommend dismissal of the amended complaint.

### I. *Summary Judgment*

Summary judgment is appropriate where there exists
no genuine issue of material fact and, based on the
undisputed facts, the moving party is entitled to judgment
as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,*
467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over
["material"] facts that might affect the outcome of the suit
under the governing law will properly preclude the entry of
summary judgment." *Anderson v. Liberty Lobby,* 477 U.S.
242, 248 (1986). It must be apparent that no rational finder
of fact could find in favor of the non-moving party for a
court to grant a motion for summary judgment. *Gallo v.
Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.
1994).

The moving party has the burden to show the absence of
disputed material facts by informing the court of portions
of pleadings, depositions, and affidavits which support the
motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).
If the moving party satisfies its burden, the nonmoving
party must move forward with specific facts showing that
there is a genuine issue for trial. *Salahuddin v. Goord,*
467 F.3d at 273. In that context, the nonmoving party
must do more than "simply show that there is some
metaphysical doubt as to the material facts." *Matsushita
Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475
U.S. 574, 586 (1986). However, in determining whether
there is a genuine issue of material fact, a court must
resolve all ambiguities, and draw all inferences, against the
movant. *See United States v. Diebold, Inc.,* 369 U.S. 654,
655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

### II. *Facts*

The relevant facts in this case were outlined in Judge
Kahn's December 11, 2013 Decision and Order (Dkt. No.
12) and will be recited herein for clarity and continuity,
with additional details drawn from the exhibits submitted
by the parties in connection with this motion. This court
will cite to additional details from the parties' motion
papers as necessary in its analysis of defendant's summary
judgment motion.

*2 Plaintiff is an inmate incarcerated at Greene
Correctional Facility in Coxsackie, New York
("Greene"). (Am. Compl. at 1). Plaintiff alleges that on
September 16, 2013, at approximately 4:30 p.m., he was
in the Greene mess hall when defendant pulled him aside

to ask if plaintiff had a permit for his beard. (Am. Compl. at 4). Plaintiff responded that he did not, but told Farrell that he was a practicing Muslim who was prohibited from trimming his beard by the Qu'ran. *Id.* Although plaintiff had recently transferred to Greene from another New York State Department of Corrections and Community Supervision ("DOCCS") facility, he was unaware of the DOCCS directive requiring a beard permit for facial hair in excess of one inch. (Dkt. No. 19–3, Joshua L. Farrell Decl. Ex. 1, Transcript of Pl.'s April 24, 2015 deposition ("Dep.") at 13). Plaintiff alleges that defendant then gave him a direct order to cut his beard off and said that he would come to plaintiff's dormitory to see that he complied. *Id.* Plaintiff returned to his dormitory, but did not have access to a beard trimmer. (Dep. at 14). Plaintiff packed his belongings, believing that he was going to be sent to the Special Housing Unit ("SHU"). (*Id.*). At his deposition, plaintiff testified that following this first encounter with defendant, "I wasn't even going to cut my beard. That's honest, I wasn't going to cut my beard. I didn't care." (*Id.*). Defendant never came to check on plaintiff. (*Id.*).

On September 17, 2013, plaintiff informed the Offender Rehabilitation Counselor, Mr. Dobbs ("Dobbs"), and the Superintendent, Mr. Smith ("Smith"), of the prior day's encounter with defendant.[2] (Am. Compl. at 4–5). Smith confirmed that plaintiff was registered in the DOCCS system as a practicing Muslim, and told plaintiff that there would be a temporary hold on cutting his beard. (Dep. at 14). Smith also had plaintiff submit a written request for a DOCCS beard permit, pursuant to the available religious exemption. (Am. Compl. at 5, Dep. at 14–15). Plaintiff asked Smith what he should do if he was stopped or harassed by defendant about his beard. (Dep. at 15). Smith told plaintiff to mention his discussion with the superintendent and advise defendant that he had a temporary hold on shaving. (Am. Compl. at 5; Dep. at 15).

[2]     Neither Dobbs or Smith were named as defendants in this action.

During evening meal service on September 17, 2013, defendant asked plaintiff why he had not shaved his beard, despite his direct order to do so. (Am. Compl. at 5; Dep. at 15). When plaintiff told defendant about the discussion with Smith and the temporary hold on shaving, defendant "went into a rampage" and told plaintiff that he had to comply with defendant's direct order. (Dep. at 15).

Defendant did not threaten any physical violence, but based on defendant's statements, plaintiff believed that he would be sent to "the box," or SHU, if he did not comply.[3] (Dep. at 17). Plaintiff returned to his dorm, obtained a beard trimmer, and shaved his beard. (Am. Compl. at 5; Dep. at 15). Plaintiff claims that he shaved his beard[4] out of fear, and that he would not have done so otherwise, because plaintiff considered the Islamic prohibition on shaving his beard to be a serious religious commitment. (Am. Compl. at 5).

[3]     During his deposition, plaintiff could not recall if the threat of being taken to SHU occurred during his first or second encounter with defendant. (Dep. at 16).

[4]     The record is unclear whether plaintiff shaved off his beard completely, or only trimmed it to comply with the one inch limit. (Am. Compl. at 5; Dkt. No. 23, Ex. D to Pl.'s Mem. of Law). Given plaintiff's belief that any alteration of his beard would violate his religious commitment, this ambiguity does not impact the constitutional analysis.

On September 18, 2013, plaintiff filed a grievance alleging that defendant ordered him to shave his beard, in conflict with plaintiff's Muslim faith. (Am. Compl. at 4). The grievance was accepted in part, although the Superintendent concluded that plaintiff had not advised defendant that he applied for an exemption to the grooming policy. (Dkt. No. 23, Ex. D to Pl.'s Mem. of Law). To prevent similar issues from arising in the future, plaintiff was advised to speak to the facility Imam regarding his beard permit, and the DOCCS grooming directive was read at a subsequent security staff line up to address any misunderstandings regarding its implementation. (*Id.*).

 **\*3** On October 25, 2013, DOCCS Assistant Counsel Leslie H. Becher advised plaintiff by letter that she had reviewed his request for a beard permit, and would be recommending that a permit be issued granting him a religious exemption from the one-inch beard rule. (Dkt. No. 23, Ex. A to Pl.'s Memo. of Law). DOCCS records show that the beard permit was formally issued on November 4, 2013. (Dkt. No. 19–4, Ex. 2 to Joshua L. Farrell Decl.).

### III. *Compliance with Local Rule ("L.R.") 7.1*

As required under L.R. 7.1, defendants have filed a Statement of Material Facts. (Dkt. 19–1.) Plaintiff failed to initially respond to the Statement of Material Facts, but he filed a sur-reply stating that "[t]he facts on record are not in dispute, plaintiff agreeds [sic] with defendant about the 'Material Facts' that plaintiff was not physically harmed as stated on the record." (Dkt. No. 25, ¶ 3). This response does not comply with the requirements of L.R. 7.1(a)(3). Under this rule, the opposing party's response to the movant's statement of material facts "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." Defendant provided plaintiff with notice of L.R. 7.1 and the consequences of non-compliance as part of his summary judgment motion. (Dkt. No. 19, at 3).

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the L.R. provides that facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion. *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) (citation and internal quotation marks omitted). In deference to plaintiff's pro se status and his attempt, albeit inadequate, to respond to defendant's statement of material facts, the court has opted to review the entire summary judgment record.

## IV. *Free Exercise of Religion*

### A. Legal Standards

The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford*

*v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However, the right "is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* No. 04–CV–57, 2007 WL 3046703, at *4 (N.D.N.Y.Oct.17, 2007).

To succeed on a claim under the Free Exercise Clause, the plaintiff must show at the threshold, that the challenged conduct "substantially burdens his sincerely held religious beliefs." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 (S.D.N.Y.2008) (quoting *Salahuddin,* 467 F.3d at 274–75) (citing *Ford,* 352 F.3d at 591). The issue of whether a "substantial burden" is required has been discussed at length, and although not specifically decided, recent cases still apply the requirement to Free Exercise cases. *Holland v. Goord,* 758 F.3d 215, 220–23 (2d Cir.2014); *Walker v. Artus,* No. 9:10–CV–1431(MAD/DEP), 2013 WL 564909, at *8–9 (N.D.N.Y. Sept. 30, 2013) (citing *Salahuddin,* 467 F.3d at 274–75). This court will follow the analysis in *Holland* and will consider the First Amendment claim, assuming that the substantial burden test is still valid.

**\*4** The Religious Land Use and Institutionalized Persons Act ("RLUIPA") also protects inmates' religious rights. RLUIPA prohibits the government from imposing a substantial burden on a prisoner's religious exercise unless the burden is the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. § 2000cc-l(a). For a burden to be substantial, a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith. In addition, this interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine. *Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at *14 (S.D.N.Y. Apr. 22, 2008); *Gill v. Defrank,* No. 98 Civ. 7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin,* 963 F.Supp.2d 227, 230 (W.D.N.Y.1997)).

### B. Application

#### 1. RLUIPA Claim

Plaintiff's amended complaint, which seeks only monetary damages, [5] asserts a RLUIPA claim. (Am. Compl. at 10). It is well-established that monetary damages are not available against state actors in their official capacities for a violation of RLUIPA. *Sossamon v. Texas,* 563 U.S. 277, 293 (2011). In addition, the Second Circuit has held that "RLUIPA does not provide a cause of action against state officials in their individual capacities." *Washington v. Gonyea,* 731 F.3d 143, 145 (2d Cir.2013). Because his damage claim is precluded, this court recommends that plaintiff's RLUIPA claim be dismissed.

[5]    Injunctive relief is unnecessary because plaintiff now has a beard permit allowing him to have facial hair in excess of one inch. (Dkt No. 19–4, Ex. 2 to Joshua L. Farrell Decl.; Dep. at 32).

### 2. First Amendment Claim

Beard grooming standards for all inmates at DOCCS facilities, including Greene, are established by DOCCS Directive 4914(B)(1)(b). Both parties have submitted a copy of this directive in connection with this motion. (Dkt. No. 19–6, Ex. 1 to Mark Farrell Decl.; Dkt. No. 23, Ex. C to Pl.'s Mem. of Law). The directive provides in pertinent part that:

An inmate may grow a beard and/or mustache, but beard/mustache hair may not exceed one (1) inch in length unless:

a.  The inmate has a Court Order restraining the Department from enforcement; or

b.  The inmate has requested and received an exemption based upon his or her documented membership in a religion which has an established tenet against the trimming of beards including, but not limited to, inmates who are Rastafarian, Orthodox Jew, or Muslim. All inmate requests for such exemption shall be referred to and reviewed by Counsel's Office after consultation with the facility Chaplain. After such review, Counsel's Office will make a recommendation to the Deputy Commissioner for Correctional Facilities. If the request is approved by the Deputy Commissioner for Correctional Facilities, a permit will be issued to the inmate.

Further, pending Counsel's Office's determination of requests for exemption from the one (1) inch rule, inmates shall not be required to cut or trim their beards, disciplined for refusing the order to shave, or subject to repeat orders to shave.

An inmate who refuses to comply with this rule will be given 14 days from the date of the written order to shave in which to request an exemption. If the inmate fails to submit a request for an exemption within 14 days, he may be disciplined for refusal to obey such order.

Plaintiff does not allege that the grooming policy itself violates his right to free exercise of religion – an argument that has been considered and rejected in other cases. *See Fromer v. Scully,* 874 F.2d 69, 75–76 (2d Cir.1989) (rejecting First Amendment challenge to one inch beard rule); *Young v. Goord,* No. 1–CV–626, 2005 WL 562756, at *8 (E.D.N.Y. 2005), *aff'd* 192 Fed. App'x 31 (2d Cir. 2006) (rejecting RLUIPA challenge to one inch beard rule); *Verdal v. Frantz,* No. 9:01–CV–910, 2002 WL 31309175, at *3 (dismissing First Amendment challenge to separate DOCCS requirement that new inmates shave upon their arrival to prison); *see also Holt v. Hobbs,* ___ U.S. ____, 135 S.Ct. 853, 868 (2015) (Sotomayer, J., concurring) (describing New York DOCCS inmate grooming policy as "more permissive" than the complete ban on inmate facial hair that the Supreme Court unanimously found to violate RLUIPA). Instead, plaintiff argues that defendant failed to follow the established DOCCS policy that allows fourteen days for an inmate to submit an exemption request before any disciplinary action is taken. (Am. Compl. at 8). As plaintiff characterized his complaint at his deposition, defendant "just jumped the gun" and ordered plaintiff to immediately shave or trim his beard. (Dep. 28).

**\*5** Courts generally do not question the centrality of particular beliefs or practices to a faith, or the validity of a litigant's interpretation of those creeds. *Amaker v. Goord,* No. 06–CV–490A, 2010 WL 2595286, at *11 (W.D.N.Y. Mar. 25, 2010). The Supreme Court has rejected the notion that to claim the protection of the free exercise clause, the plaintiff must be "responding to the commands of a particular religious organization." *Frazee v. Ill. Dep't of Employment Sec.,* 489 U.S. 829, 834 (1989). Courts may, however, consider whether an inmate sincerely holds a particular belief and whether the belief is religious in nature. *Id.* (citing *Ford,* 352 F.3d at 590).

Berisha v. Farrell, Not Reported in F.Supp.3d (2016)

2016 WL 1295178

Plaintiff has demonstrated that DOCCS recognizes him as a practicing Muslim. (Dkt. No. 23, Ex. B to Pl.'s Mem. of Law). In addition, defendant's motion for summary judgment has not challenged the sincerity of plaintiff's belief that his religion forbids him from shaving or trimming his beard, and this court finds no reason to question it. *See Holt,* ___ U.S. ___, 135 S.Ct. at 862–63 (2015) (noting that the belief that men must grow beards is widely followed by observant Muslims across the various schools of Islam).

However, even viewing all facts in the light most favorable to the non-moving party, plaintiff has not demonstrated that defendant's actions on September 16–17, 2013 imposed a substantial burden upon plaintiff's religious exercise. [6] A substantial burden on religious expression is one that " 'puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.' " *Guillory v. Weber,* No. 9:12–CV–280 (LEK/RFT), 2015 WL 1419088, *8 (N.D.N.Y. April 6, 2015) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.,* 450 U.S. 707, 717–18 (1981)). Plaintiff's encounters with defendant in the mess hall do not rise to that level. On September 16, 2016, defendant accurately told plaintiff that his beard was in violation of DOCCS policy. (Am. Compl. at 4). Plaintiff admitted that he chose to ignore defendant's September 16, 2013 order to shave, and faced no repercussions. (Dep. at 14). Instead, plaintiff spoke to Dodd and Smith, who advised him that no disciplinary action could take place for at least fourteen days, and helped plaintiff submit an application for a beard permit. (Am. Compl. at 4–5; Dep. at 14–15). At the time, plaintiff did not express any doubts about the validity of the fourteen day "temporary hold" on shaving, and only asked Smith how to respond if defendant stopped him again. (Dep. at 15).

[6] Even if injunctive relief were available, dismissal of plaintiff's RLUIPA cause of action would still be warranted because substantial burden is a necessary element of a claim under that statute.

The next day, September 17, 2013, defendant again challenged plaintiff about the length of his beard. Plaintiff followed Smith's instructions and advised defendant of his application for a beard permit and the resulting temporary hold. (Am. Compl. at 5; Dep. at 15). Even if, as plaintiff contends, defendant "went into a rampage" and used threats and abusive language toward him, plaintiff knew that any disciplinary action related to his beard would

be delayed by the terms of Directive 4914. (Dkt. No. 19–6, Ex. 1 to Mark Farrell Decl.; Dkt. No. 23, Ex. C to Pl.'s Mem. of Law). Moreover, although plaintiff alleged that defendant threatened to take him to SHU, defendant did not issue any disciplinary ticket to plaintiff. (Dkt. No. 19–1, Statement of Material Facts, ¶ 11). Defendant did not make any physical contact, threaten to physically harm plaintiff or attempt to shave plaintiff himself. (Dep. at 16, 28, 31). Besides the two encounters in the mess hall, plaintiff does not allege any further contact with defendant.

**\*6** Defendant's behavior, while clearly frustrating to plaintiff, does not give rise to a constitutional claim. *See Mack v. Griffin,* No. 9:04–CV–588 (NAM/RFT), 2006 WL 2792736, \*7 (N.D.N.Y. Sept. 27, 2006) (granting summary judgment where Muslim inmate alleged that he had been threatened with SHU if he did not comply with DOCCS beard policy); *see also Hamilton v. Erhardt,* No. 10–CV–6234, 2011 WL 3476475, at \*2–5 (W.D.N.Y. Aug. 9, 2011) (dismissing claims under Fed.R.Civ.P. 12(b)(6) that defendants ordered inmates to shave his beard while mocking and harassing him, but allowing claim that defendants had later threatened physical harm and punished plaintiff). Plaintiff, who had been advised by Superintendent Smith that no disciplinary action was imminent, never faced a "forced choice" to decide between the "equally unpleasant alternatives" of disciplinary sanctions and abandonment of his religious beliefs. *See Smith,* No. 9:07–CV–1150 (NAM/ATB), 2010 WL 3910086, at \*17. As the facts of this case demonstrate, plaintiff had other options that presented a high likelihood of success and would not have impacted his religious beliefs, such as further discussion with Dobbs and Smith or the filing of an administrative grievance.

In addition, plaintiff's encounters with defendant qualify as the type of isolated incident, promptly corrected by the facility, that courts have typically treated as a *de minimis* burden on religious expression. *See, e.g., Williams v. Rock,* 2014 WL 4685035 (N.D.N.Y. Sept. 19, 2014) (staff failure to deliver meals at appropriate time during Ramadan was *de minimis* burden on First Amendment rights); *Smith v. Graziano,* No. 9:08–CV–469 (GLS/RFT), 2010 WL 1330019, at \*9 (N.D.N.Y. March 16, 2010) (cancellation of two religious services, that was the result of a "breakdown of communication between prison officials and security staff," constituted a *de minimis* burden on inmate's ability to freely exercise

his religion); *Allan v. Woods,* No. 9:05–CV–1280 (NAM/ GJD), 2008 WL 724240, at *4–5 (N.D.N.Y. Mar. 17, 2008) (finding that there was no substantial burden where inmate was assigned to work detail on Sabbath one time before officials approved religious accommodation). Prison officials promptly assisted plaintiff with his application for a beard permit after his first encounter with defendant. Responsive measures were also taken after plaintiff filed a grievance related to the second encounter, and plaintiff now has a valid beard permit recognizing his religious exemption.

Based on the record in this case, this court concludes that defendant's actions did not substantially burden plaintiff's ability to practice his religion. Even though plaintiff chose to shave or trim his beard following the alleged threats by defendant, plaintiff did so even though he knew that he had been afforded a fourteen day "temporary hold" on any disciplinary enforcement while his application for a beard permit was pending. At most, defendant's actions imposed a *de minimis* burden on plaintiff's First Amendment rights. Thus, this court recommends that plaintiff's First Amendment claim be dismissed.[7]

---

[7]      Defendant also argues that he is entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability

"insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Because the defendant has not violated plaintiff's constitutional rights in the first instance, the court need not reach the issue of whether a reasonable person would have known of the constitutional violation.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 19) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993)(citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 1295178

---

**End of Document**     © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3882530
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Elijah Skates, Plaintiff,

v.

Jarrod Shusda, et al., Defendants.

Civil Action No. 9:14-CV-1092 (TJM/DEP)
|
Signed 05/31/2016

**Attorneys and Law Firms**

FOR PLAINTIFF: ELIJAH SKATES, Pro se, 97-35 104th Street, Apt. 1, Queens, NY 11416.

FOR DEFENDANTS: HON. ERIC T. SCHNEIDERMAN, New York State Attorney General, The Capitol, OF COUNSEL: ORIANA L. CARRAVETTA, ESQ., Assistant Attorney General, Albany, NY 12224.

<u>REPORT AND RECOMMENDATION</u>

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

This is a civil rights action brought by *pro se* plaintiff Elijah Skates, a former New York State prison inmate, pursuant to 42 U.S.C. § 1983, against five employees of the New York State Department of Corrections and Community Supervision ("DOCCS"), one of whom has been dismissed from the action. In his complaint, as amended and narrowed as a result of earlier court orders, plaintiff alleges that (1) he was denied his First Amendment right to freely exercise his chosen religion because he was not provided a proper religious meal on one occasion; (2) his right to equal protection under the Fourteenth Amendment was denied because he was not treated similarly to those inmates who are members of other religions; and (3) one of the named defendants issued an adverse disciplinary hearing determination in retaliation for plaintiff filing a grievance regarding his religious rights.

Currently pending before the court is a motion brought by the defendants to dismiss plaintiff's remaining three claims. For the reasons set forth below, I recommend that the motion be granted, in part, but otherwise denied.

I. BACKGROUND [1]

[1]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.") (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964). Portions of the background have also been derived from the exhibits that were attached to plaintiff's amended complaint, which may also properly be considered in connection with a dismissal motion. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."); *accord*, *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).

Prior to his release on or about September 11, 2015, [2] plaintiff was a New York State inmate held in the custody of the DOCCS. *See generally* Dkt. No. 33. At the times relevant to his claims in this action, plaintiff was confined in the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York. *Id.* Plaintiff is a member of the Nation of Islam ("NOI") Faith Group and observes Islamic religious beliefs and practices. *Id.* at 3.

[2]    *See* New York State Department of Corrections and Community Supervision, http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ1/WINQ000 (last visited May 27, 2016); *see also* Dkt. No. 30.

In accordance with his religious beliefs, plaintiff planned to observe the NOI Holy Day of Atonement on October 15 and 16, 2013. Dkt. No. 33 at 3. In connection with that religious observance, plaintiff alleges he was supposed to have received a Sahoor bag meal on October 15, 2013, for consumption prior to dawn the following morning in order to begin the fasting process associated with the holy day. *Id.*; *see also* Dkt. No. 33-1 at 1. Despite notifying

2016 WL 3882530

corrections staff of his request for a Sahoor bag meal prior to the evening of October 15, 2013, plaintiff did not receive his meal. Dkt. No. 33 at 3-4.

**\*2** Unrelated to this isolated incident, plaintiff alleges that, in general, corrections personnel at Great Meadow have failed to properly recognize and support the NOI religion. Specifically, in his amended complaint plaintiff alleges that the "NOI Faith Group is the only religion in D.O.C.C.S. [that] does not have a [ministerial program coordinator ('MPC') ] in [the] Central Office." Dkt. No. 33 at 6. Plaintiff also appears to allege that there is no NOI chaplain at Great Meadow. Id. at 7. Notwithstanding this allegation, plaintiff confusingly alleges that Great Meadow, in fact, has a facility chaplain, identified as Imam Aboulkadir Elmi, but that Elmi's "religious outlooks and subjective and objective are in complete contradiction with the (N.O.I.) beliefs." [3] Id.

[3]     Imam Elmi was originally named as a defendant in the action. Dkt. No. 1 at 2. In his amended complaint, however, plaintiff has not asserted any claims against this individual. Dkt. No. 33 at 1, 2.

Plaintiff further alleges that defendant Jarrod Shusda conducted a Tier III disciplinary involving plaintiff on August 11, 2014, and that he found plaintiff guilty during the proceeding in retaliation for plaintiff's earlier grievance concerning the Sahoor bag meal. [4] Dkt. No. 33 at 6.

[4]     The DOCCS conducts three types of inmate disciplinary hearings. See 7 N.Y.C.R.R. § 270.3; see also Hynes v. Squillace, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. Hynes, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. Id. Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. Id.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on or about September 4, 2014. Dkt. No. 1. Following a series of initial procedural developments, plaintiff sought and was granted leave to file an amended complaint in a decision and order issued by Senior District Judge Thomas J. McAvoy on October

22, 2015. [5] Dkt. No. 32. Named as defendants in plaintiff's amended are (1) Jarrod Shusda, who appears to be a food-service worker at Great Meadow; (2) Brent Yukoweic, a clergy member employed by the DOCCS; (3) Cheryl Morris, the DOCCS Director of Ministerial Services; and (4) Robert Schattinger, the DOCCS Director of Nutritional Services. Id. at 2. In his decision, Judge McAvoy accepted the amended complaint for filing only with respect to plaintiff's (1) First Amendment free exercise claim for damages against all defendants, in their individual capacities, arising from the alleged failure to provide him with a religious meal in October 2013; (2) an Equal Protection claim for damages, also against all defendants in their individual capacities; and (3) a retaliation claim for damages against defendant Shusda in his individual capacity. Dkt. No. 32 at 10.

[5]     Judge McAvoy noted that, in accepting certain claims asserted in the amended complaint, he "expresse[d] no opinion as to whether [the surviving] claims can withstand a properly filed motion to dismiss or for summary judgment." Dkt. No. 32 at 10.

In lieu of answering plaintiff's amended complaint, on November 19, 2015, defendants filed the pending motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 34. Defendants' motion, to which plaintiff has not responded, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). See Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Standard of Review
**\*3** A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " Iqbal, 556 U.S. 677-78 (quoting Fed. R. Civ. P. 8(a)(2)). While modest in its requirements, that

rule commands that a complaint contain more than mere legal conclusions. *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Twombly,* 550 U.S. at 555-56); *see also Cooper v. Pate,* 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory,* 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). The tenet that a court must accept as true all of the allegations contained in a complaint does not apply, however, to legal conclusions. *Iqbal,* 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570); *see also Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir. 2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly,* 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 551 U.S. at 94 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " (quoting *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)) (citation omitted)); *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se,* a court is obliged to construe his pleadings liberally." (quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.,* 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

B. Free Exercise Claim

Plaintiff asserts a First Amendment claim against defendants based on allegations that he did not receive

a Sahoor bag meal on October 15, 2013. Dkt. No. 33 at 3-4. Defendants contend that this isolated incident is not sufficient to support a cognizable cause of action. Dkt. No. 34-1 at 6-8.

While inmates confined within prison facilities are by no means entitled to the full gamut of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that provision does afford them at least some measure of constitutional protection, including their right to participate in religious meals. *See Pell v. Procunier,* 417 U.S. 817, 822 (1974) ("In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."); *Ford v. McGinnis,* 352 U.S. 582, 597 (2d Cir. 2003) ("We ... have clearly established that a prisoner has a right to a diet consistent with his or her religious scruples."). That right, however, is not without limits, and the task of defining the contours of that right in a prison setting requires striking a balance between the rights of prison inmates and the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348-49 (1987); *Ford,* 352 F.3d at 588; *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir. 1990). When determining whether a defendant's failure to provide a plaintiff with his religious meals impinges upon his First Amendment free exercise right, the inquiry is "one of reasonableness, taking into account whether the particular [act] affecting [the] right ... is 'reasonably related to legitimate penological interests.' " *Benjamin,* 905 F.2d at 574 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)); *Ford,* 352 F.3d at 588; *see also Farid v. Smith,* 850 F.2d 917, 925 (2d Cir. 1988).

**\*4** As a threshold matter, "[t]he prisoner must show ... that the disputed conduct substantially burdens his sincerely held religious beliefs." [6] *Salahuddin v. Goord,* 467 263, 274-75 (2d Cir. 2006). In evaluating this factor, the court must be wary of " 'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.' " *McEachin v. McGuinnis,* 357 F.3d 197, 201 (2d Cir. 2004) (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699 (1989)). Instead, a court should consider only whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the

individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (quotation marks omitted).

6       The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in *Emp't Div. v. Smith*, 494 U.S 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.' " *Ford*, 352 F.3d at 592 (quoting *Emp't Div.*, 494 U.S. at 887); *see also Williams v. Does*, ___ Fed.Appx. ____, No. 15-0692, 2016 WL 2610028, at *1 (2d Cir. May 6, 2016) ("We have not yet decided whether a prisoner asserting a free-exercise claim must, as a threshold requirement, show that the disputed conduct substantially burdened his sincerely held religious beliefs."); *Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

In their motion, defendants do not question the genuineness of plaintiff's religious beliefs. Dkt. No. 34-1 at 6-9. They do, however, contend that plaintiff's amended complaint does not allege sufficient facts to plausibly suggest that his rights were substantially burdened by defendants' actions. *Id.*

Plaintiff's free-exercise claim turns upon a single instance of the denial of a religious meal. Plaintiff alleges that, as a result of the failure to provide him with a Sahoor bag, he "was unable to properly worship and was forced to not be able to receive the full blessings and enjoy the full effect of the [Holy Day of Atonement]," and, instead, "was forced to dwell in sin" causing him "to inflict self-harm upon himself." [7] Dkt. No. 33 at 7. Various courts in this circuit addressing similar claims have concluded that such isolated incidents that are not representative of larger, systemic deprivations are constitutionally *de minimis* and do not rise to a level sufficient to support a First Amendment claim. *See, e.g., Washington v. Afify*, 968 F. Supp. 2d 532, 538-39 (W.D.N.Y. 2013) (finding the plaintiff's allegations that he was denied two religious breakfast meals and one evening meal were not sufficient to state a plausible First Amendment free exercise claim, noting that the plaintiff

had "alleged no facts to suggest that this brief deprivation was significant enough to more than minimally burden his religious practice"); *Perrilla v. Fischer*, No. 13-CV-0398, 2013 WL 5798557, at *5 (W.D.N.Y. Oct. 28, 2013) [8] (finding the plaintiff's allegations that he was denied double portions of meals and oatmeal in his Sahoor bag and that some religious meals were ill-prepared amounted to no more than a *de minimis* burden of the plaintiff's constitutional rights). In light of the Second Circuit's recent decision in *Williams*, however, in which the court criticized this court's determination that the plaintiff's allegation that he was denied, at most, five religious meals over the course of one month was a *de minimis* burden on plaintiff's rights, it appears that the Second Circuit may now equate a district court's finding of a *de minimis* burden with a finding that a plaintiff's beliefs are insincere. *See Williams*, 2016 WL 2610028, at *1 ("The district court relied on non-binding case law when it determined that [the plaintiff]'s burden was *de minimis* because only a few of his meals were delivered prematurely; its reasoning is inconsistent with this Court's case law, which cautions against the danger that courts will make conclusory judgments about the unimportance of the religious practice to the adherent[.]" (quotation marks omitted)). With this in mind, I find that plaintiff's allegation that the denial of a single religious meal, which allegedly did not allow plaintiff to "enjoy the full effect" of the holy day and caused him to "dwell in sin," Dkt. No. 33 at 7, plausibly alleges that his First Amendment rights were substantially burdened.

7       In his SAC, plaintiff alleges that he cut himself and attempted to overdose on medication as a result of defendants' actions. Dkt. No. 33 at 7-8.

8       All unreported cases cited to in this report have been appended for the convenience of the *pro se* plaintiff.

**\*5** Defendants contend that, even assuming plaintiff's rights were substantially burdened, dismissal of plaintiff's First Amendment claim is warranted because the exhibits attached to plaintiff's amended complaint reflect that the denial of a single religious meal to plaintiff on October 15, 2013, was the result of a mistake, and negligence is not actionable under the First Amendment. Dkt. No. 34-1 at 8-9. Notwithstanding whether defendants are correct with respect to their legal conclusion, [9] their factual conclusion mischaracterizes the evidence. In particular, a careful review of the e-mails attached to the amended complaint reveal that at least some of the named defendants were

aware in advance that the NOI holy day was approaching and that some prisoners would require Sahoor bag meals. Dkt. No. 33-1 at 8-12. According to the e-mails, and assuming the facts in plaintiff's amended complaint are true, notwithstanding this knowledge, no one took further steps to ensure that plaintiff, or any other NOI prisoner, received a religious meal on October 15, 2013. *Id.* Because it is not clear that plaintiff was denied his religious meal on October 15, 2013, as a result of a mistake or negligence, I cannot recommend dismissal of the First Amendment claim on this basis. Accordingly, I recommend that defendants' motion to dismiss plaintiff's free exercise claim be denied.

9   It does not appear that the Second Circuit has rendered an opinion regarding whether negligence is sufficient to sustain a First Amendment claim. *See Hamilton v. Countant*, No. 13-CV-0669, 2016 WL 881126, at *4 (S.D.N.Y. Mar. 1, 2016)* ("Although the Second Circuit does not appear to have addressed whether negligence can sustain a First Amendment claim outside the context of retaliatory litigation, the Third, Fourth, Fifth, and Tenth Circuits have found negligence insufficient." (citations omitted)).

C. Equal Protection Claim
In his complaint, plaintiff intimates that the DOCCS treats the NOI faith group differently than other religious groups in violation of plaintiff's equal protection rights under the Fourteenth Amendment. Dkt. No. 33 at 7. In their motion, defendants also request dismissal of this claim as lacking in facial merit. Dkt. No. 34-1 at 10-11.

The equal protection clause of the Fourteenth Amendment directs state actors to treat similarly situated people alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state a cognizable equal protection cause of action, a plaintiff must allege sufficient facts that plausibly suggest that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995). The plaintiff must also show "that the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not 'reasonably related to any legitimate penological interests.' " *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (alteration omitted) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)).

Plaintiff's amended complaint is internally inconsistent with regard to his allegation that the NOI inmates at Great Meadow do not have a facility chaplain. Dkt. No. 33 at 7. Specifically, while plaintiff contends, at paragraph forty-two, that "the (N.O.I.) Faith Group has no facility Chaplain (N.O.I. Minister), like the other faith groups," in the next paragraph plaintiff states that Great Meadow does, in fact, have a NOI chaplain but that the chaplain's "religious outlooks and subjective and objective are in complete contradiction with the (N.O.I.) beliefs." *Id.* Separately, plaintiff also alleges that there is no NOI MPC within the DOCCS. *Id.* at 6.

Conspicuously absent from plaintiff's amended complaint are any allegations linking the allegations described above and the named defendants. It is well established that the personal involvement of a defendant "in alleged constitutional deprivation is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *see also Iqbal*, 556 U.S. at 683 ("Petitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In this case, because the amended complaint contains no allegations connecting any of the named defendants with the alleged disparity in treatment between the NOI and other religious groups, I recommend that plaintiff's equal protection cause of action be dismissed.

D. Retaliation Claim
**\*6** Plaintiff also asserts a retaliation claim against defendant Shusda based on allegations that Shusda found him guilty during a disciplinary hearing on August 11, 2014, in retaliation for a grievance plaintiff filed concerning his failure to receive his religious meal in October 2013. Dkt. No. 33 at 5-6. Defendants contend that plaintiff's amended complaint fails to allege sufficient facts plausibly suggesting that the hearing determination was motivated by retaliatory animus. Dkt. No. 34-1 at 11-14.

When prison officials take adverse action against an inmate, motivated by the inmate's exercise of constitutional rights, including the free speech provisions of the First Amendment, a cognizable claim of liability under section 1983 lies. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against

an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and prone to abuse, and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations showing that (1) he engaged in protected activity; (2) the defendants took adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

In this instance I assume, for the purposes of this report, that plaintiff's amended complaint plausibly alleges that plaintiff engaged in protected activity by filing a grievance and that defendant Shusda's guilty determination is sufficient to constitute adverse action. What is lacking, however, are any allegations of fact that link the two. To satisfy the nexus requirement for a retaliation claim, plaintiff must show that the protected conduct, in this case plaintiff's filing of a grievance, was a "substantial or motivating factor" in defendant's Shusda's disciplinary hearing determination. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003); *accord, Johnson v. Burge*, 506 Fed.Appx. 10, 12 (2d Cir. 2012). The amended complaint, however, neither alleges when plaintiff filed the grievance nor that defendant Shusda was aware of the grievance plaintiff allegedly filed. Assuming plaintiff filed his grievance in or around the time he was denied his religious meal in October 2013, approximately ten months elapsed between the filing of the grievance and the alleged adverse activity by defendant Shudsa in August 2014. While close temporal proximity may, on its own, be enough to prevent dismissal on the pleadings, *Davis v. Goord*, 320 F.3d 346, 352-54 (2d Cir. 2003), ten months is too attenuated to support plaintiff's retaliation claim. *See, e.g., Nicastro v. N.Y. City Dep't of Design & Constr.*, 125 Fed.Appx. 357, 358 (2d Cir. 2005) (concluding that

the plaintiff could not, at the summary judgment stage, establish even a *prima facie* case of retaliation where the adverse employment action occurred "almost ten months after" the plaintiff engaged in protected conduct and there was no other evidence of causation); *Figueroa v. Johnson*, 109 F. Supp. 3d 532, 552 (E.D.N.Y. 2015). Accordingly, I recommend that plaintiff's retaliation claim against defendant Shusda be dismissed.

### E. Whether to Permit Amendment

**\*7** Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc.*, 949 F.2d at 48 ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In this instance, it is feasible that plaintiff could amend his currently operative pleading to include additional factual allegations that would plausibly suggest both the requisite personal involvement of the named defendants in connection with his equal protection claim and the missing nexus necessary to plead a cognizable retaliation claim. Accordingly, I recommend that plaintiff be granted leave to file a second amended complaint to cure these deficiencies.

If plaintiff chooses to avail himself of this opportunity, he should note that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations

Case 9:16-cv-01229-FJS-TWD    Document 29    Filed 10/16/18    Page 49 of 148
Skates v. Shusda, Not Reported in F.Supp.3d (2016)
2016 WL 3882530

of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *Pourzandvakil v. Humphry*, No. 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any second amended complaint, plaintiff must clearly set forth the facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, plaintiff is informed that any such second amended complaint will replace the existing amended complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (quotation marks omitted)).

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's amended complaint focuses on defendants' alleged failure to provide him with a religious Sahoor bag meal on October 15, 2013. When all inferences are drawn in favor of plaintiff, his amended complaint alleges sufficient facts plausibly suggesting that this deprivation substantially burdened his sincerely held religious beliefs. Accordingly, defendants' motion to dismiss should be denied with respect to plaintiff's First Amendment claim. Plaintiff's equal protection cause of action, however, is

subject to dismissal in light of the fact that the amended complaint does not allege facts plausibly suggesting that any of the named defendants were personally involved in the alleged deprivations. Similarly, plaintiff's retaliation cause of action is subject to dismissal based upon his failure to allege facts plausibly suggesting the existence of a causal connection between his filing of a grievance in or about October 2013 and a disciplinary hearing determination rendered in August 2014. Accordingly, it is hereby respectfully

**\*8** RECOMMENDED that defendants' motion to dismiss (Dkt. No. 34) plaintiff's amended complaint (Dkt. No. 33) be GRANTED, in part, and that his equal protection and retaliation claims be DISMISSED, with leave to file a second amended complaint within thirty days from the date of any order adopting this recommendation, but that the remaining portion of the motion, addressing plaintiff's First Amendment free exercise cause of action, be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in F.Supp.3d, 2016 WL 3882530

---

    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1015383

2015 WL 1015383
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Phillip JEAN–LAURENT, Plaintiff

v.

C.O. R. LOS and C.O. J. Damstetter, Defendants.

No. 12–CV–132S(F).
|
Signed March 8, 2015.
|
Filed March 9, 2015.

**Attorneys and Law Firms**

Phillip Jean–Laurent, South Ozone Park, NY, pro se.

Eric T. Schneiderman, Attorney General, State of New York, Stephanie Joy Calhoun, Assistant Attorney General, of Counsel, Main Place Tower, Buffalo, NY, for Defendants.

## DECISION AND ORDER

WILLIAM M. SKRETNY, Chief Judge.

*1 1. This Court previously referred the matter to the Honorable Leslie G. Foschio, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) to prepare and file a report and recommendation containing findings of fact, conclusions of law and a recommended disposition on any dispositive motion. On June 5, 2014, Defendants filed a motion for summary judgment dismissing Plaintiff's complaint for relief pursuant to 42 U.S.C. § 1983 in its entirety. Despite the scheduling order and the express warning in Defendants' notice of motion that failure to respond could result in dismissal of his complaint, Plaintiff failed to file any opposition to Defendants' motion.

2. On December 2, 2014, Judge Foschio filed a Report and Recommendation finding that Defendants had established their entitlement to summary judgment and recommending that the motion be granted in its entirety. This Court then accepted Plaintiff's untimely-filed objections to the Report and Recommendation

on January 14, 2015. Plaintiff objects therein to the Magistrate Judge's conclusions that: (1) precluding Plaintiff from attending both the law library and Ramadan services during the same evening call-out did not impose a substantial burden on his ability to freely exercise his religion; and (2) the enforcement of the correctional facility's Movement Policy was reasonably related to a legitimate penological interest. (Docket No. 47.)

3. Because Plaintiff failed to raise these arguments before the Magistrate Judge, the Report and Recommendation is reviewed under a clear error rather than de novo standard. *See* *Reiseck v. Universal Comm'ns of Miami,* No. 06 Civ. 0777(LGS), 2014 WL 5364081, *1 (S.D.N.Y. Oct. 22, 2014); *see also* *Patterson–Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985, 990–91 (1st Cir.1988). This Court finds no clear error in the Magistrate Judge's analysis and conclusions, and therefore accepts the Report and Recommendation in its entirety.

IT HEREBY IS ORDERED, that this Court ACCEPTS Judge Foschio's December 2, 2014 Report and Recommendation (Docket No. 45) in its entirety;

FURTHER, that Plaintiff's Objections (Docket No. 47) are DENIED.

FURTHER, that Defendants' motion for summary judgment dismissing the complaint (Docket No. 41) is GRANTED and the complaint is dismissed;

FURTHER, that the Clerk of the Court shall close this case.

SO ORDERED.

## REPORT and RECOMMENDATION

LESLIE G. FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

This case was referred to the undersigned by Honorable William M. Skretny on October 23, 2013, for all pretrial matters. The matter is presently before the court on

Defendants' motion for summary judgment (Doc. No. 41), filed June 5, 2014.

## BACKGROUND

Plaintiff Phillip Jean–Laurent ("Plaintiff"), proceeding *pro se,* commenced this civil rights action on February 13, 2012, alleging that while incarcerated at Collins II Correctional Facility, Defendants R. Los ("Los"), and J. Damstetter ("Damstetter"), both Corrections Officers with New York Department of Corrections and Community Supervision ("DOCCS"), interfered with his First Amendment rights to the free exercise of his Muslim religion, and access to the courts, and the Eighth Amendment. [1] Plaintiff specifically alleges that between August and September 2009, during Ramadan, a period of required Islamic religious exercises, Defendants deprived Plaintiff of morning and evening meals and also prevented Plaintiff from attending Islamic religious services after using the correctional facility's law library as Plaintiff maintains he needed to do to meet deadlines relating to Plaintiff's court cases, causing Plaintiff to miss two of the religious diet meals for consumption during Ramadan's non-fasting hours.

[1]     By Order filed August 28, 2012 (Doc. No. 3), Plaintiff's claim under the Religious Land Use and Institutionalized Persons Act, 42 U . S.C. § 2000cc–1, *et seq.,* was dismissed, and the action was also dismissed as against Defendants Thompson, Berbary, and Bellamy.

**\*2** On June 5, 2014, Defendants filed the instant motion for summary judgment (Doc. No. 41) ("Defendants' Motion"), attaching Defendants' Memorandum of Law in Support of Motion for Summary Judgment (Doc. No. 41–1) ("Defendants' Memorandum"), Statement of Undisputed Facts (Doc. No. 41–2) ("Undisputed Facts"), the Declaration of Defendant John Damstetter (Doc. No. 41–3) ("Damstetter Declaration"), the Declaration of Defendant Rickie Los (Doc. No. 41–4) ("Los Declaration"), the Declaration of Philip Greis (Doc. No. 41–5) ("Greis Declaration"), and the Declaration of Assistant Attorney General Stephanie Joy Calhoun (Doc. No. 41–6) ("Calhoun Declaration"). The Notice of Motion contains the admonishment that "THE CLAIMS PLAINTIFF ASSERTS IN HIS COMPLAINT MAY BE DISMISSED WITHOUT A TRIAL IF HE DOES NOT RESPOND TO THIS MOTION by filing his own

sworn affidavits or other papers as required by Rule 56(d)." Defendants' Motion at 2. Plaintiff, however, did not file any response in opposition to summary judgment. Oral argument was deemed unnecessary.

Based on the following, Defendants' Motion should be GRANTED.

## FACTS [2]

[2]     The Facts are taken from the pleadings and motion papers filed in this action.

At all times relevant to this action, Plaintiff Phillip Jean–Laurent ("Plaintiff" or "Jean-Laurent"), who is Muslim, was incarcerated at Collins II Correctional Facility ("Collins" or "the correctional facility"), where Defendants John Damstetter ("Damstetter"), and Rickie Los ("Los"), served as New York Department of Corrections and Community Supervision ("DOCCS") corrections officers. Collins Policy and Procedure No.2006 ("P & P No.2006"), pertaining to inmate movement within the correctional facility provides that an inmate may sign out to only one destination or "call-out" at a time, and must return to his dorm room and sign out for a second call-out before he is allowed to attend the second call-out. According to Collins Policy and Procedure No.2066 ("P & P No.2066"), an inmate is required to report to his housing unit officer for all correctional facility movements except for Mess Hall call-outs. The housing unit officer then records the designation and time out and in for each call-out.

The regular diet provided to inmates housed in Collins consists of three daily meals including one cold meal and two hot meals. As a Muslim, Plaintiff observes a ritual fast during Ramadan, which takes place during the months of August and September, requiring observants fast between sunrise and sunset. Because participating in the regular diet would result in non-compliance with the Ramadan fasting requirements, each night during Ramadan, observant inmates are allowed to take food from the evening meal served in the correctional facility's cafeteria to non-observant inmates, to their cubes to eat after sundown, and are provided with bags of food which the inmates can consume for the breakfast meal or "Sahor" prior to sunrise. Observant inmates are also permitted to have in their cubes food products purchased

from the commissary, which they may eat before sunrise, and inmate may further prepare any commissary items in the kitchens located on the housing units.

**\*3**  Collins Correctional P & P No.2066 is an inmate movement policy restricting each inmate's movement to that necessary to attend specific programs for which the inmates must sign-up to attend. Movement Policy.[3] The Movement Policy's stated purpose is the provision of a procedure to insure the movement of inmates throughout the correctional facility in an orderly fashion so as to maintain accountability and safety for both staff and inmates. Movement Policy § II. In particular, inmates "must report to housing unit officer for all movements except for Mess Hall movements. Housing unit officers will record the time out/in destination on time out sheets." *Id.* § V.F.1. Movement is by call-out under staff direction for both law library *id.,* § V.B., and for religious services. *Id.* § V.C.

[3]     Greis Declaration Exh. B.

To attend any correctional facility program, including law library and Ramadan services, an inmate must sign up for that program's "call-out." Some call-outs at the correctional facility are voluntary, and some are mandatory. An inmate who signs up for a mandatory call-out takes the place of another inmate such that attendance is required whereas attendance at a voluntary call-out is not required. An inmate who fails to report to a mandatory call-out may be charged with a violation of prison disciplinary rule 109.10 forbidding an inmate within a DOCCS correctional facility from being out of place. Ramadan is a voluntary call-out, whereas the law library is a mandatory call-out because of the limited space and resources available for each call-out time.

At all times relevant to this action, the correctional facility's law library was available to general population inmates twice a day, seven days a week, with law library call-outs held between the hours of 2:00 P.M. and 4:00 P.M. ("afternoon call-out"), and again between 6:00 P.M. and 10:00 P.M. ("evening call-out"). Each day, an inmate may sign up to attend one, both, or none of the law library call-outs. Ramadan call-outs were scheduled for the entire evening, with an inmate allowed to report at 5:30 P.M. to the masjid[4] for evening prayer, following which the inmates were escorted by corrections officers to the messhall for the evening meal, after which the inmates

were permitted either to return to the masjid to participate in further services until 9:30 P.M., or to return to their housing units. When both Ramadan and law library call-outs occur at the same time, an inmate may choose to attend one or the other, but never both. As such, inmates are not allowed to freely move between the law library and Ramadan services that are scheduled for the same time.

[4]     In the interest of consistency with the papers filed by Plaintiff and Defendants, the court refers to the place where Muslims gather for congregate prayer by the Arabic word "masjid" rather than the English word "mosque."

DOCCS's accommodations at Collins permitted Muslim inmates to participate in Ramadan services in the correctional facility's masjid each evening at 5:30 P.M., during which they could participate in congregate prayers, read the Koran, conduct religious classes and break the fast at sunset. In particular, upon the Ramadan call-out, Muslim inmates would report to the masjid for congregate prayer, before being escorted by a correctional officer to the messhall to receive the evening meal and the sahor bag for the following morning meal to be eaten before sunrise. An inmate who signed up for, yet missed the call-out for three Ramadan services would be removed from the Ramadan list and no longer permitted to participate in Ramadan services or to receive the Ramadan meals.

**\*4**  Plaintiff alleges that on August 21, 2009, he commenced his observance of Ramadan requiring Plaintiff, as relevant to this action, to fast between sunrise and sunset, and attend congregate prayer five times each day. At 3:30 A.M. on August 22, 2009, Plaintiff began the daily fast, and reported for Ramadan services to the masjid at 5:30 P.M., then returned to his housing unit to sign up for the law library's evening call-out. Defendant Damstetter, however, advised Plaintiff that because Plaintiff had already chosen to attend Ramadan services, Plaintiff could not interrupt Ramadan services for the law library call-out and that Plaintiff would have to choose to attend one or the other, despite Plaintiff's assertion to Damstetter that deadlines in several of Plaintiff's court cases were approaching. On August 23, 2009, Plaintiff again reported to the masjid for Ramadan services at 5:30 P.M., before returning to his housing unit to sign-up for the evening law library call-out. Plaintiff was permitted to attend the evening law library call-out, but at 7:00 P.M., when Plaintiff informed Defendant Los of his intention to return to the masjid to attend further

Ramadan services that evening, Los advised Plaintiff that such action would subject Plaintiff to punitive confinement and directed Plaintiff to return to his housing unit, advising Plaintiff could not attend both Ramadan services and the law library during the same scheduled call-out. As such, although Plaintiff fasted from sunrise to sunset, in order to attend the law library's evening call-out, Plaintiff was required to forgo participating in Ramadan services, including eating the evening Ramadan meal and receiving the sahor meal bag.

On August 24, 2004, Plaintiff filed an inmate grievance ("inmate grievance"), and complained to the correctional facility's Islamic chaplain ("the chaplain"), about not being allowed to attend both Ramadan call-out and the evening law library call-out. The chaplain informed DOCCS Deputy Superintendent of Programs Thompson ("Thompson"), of the situation, yet Thompson took no action to remedy the problem because of Plaintiff's pending inmate grievance. On September 9, 2009, the inmate grievance was denied. Upon appeal to DOCCS Central Officer Review Committee ("CORC"), the discretion of the correctional facility's administrators to promulgate procedures for inmate movement was upheld, with CORC noting "that accommodations were made for the grievant to have special access to the Law Library and that [Plaintiff] attended regularly." CORC Decision. [5]

[5]   Damstetter Declaration Exh. A at Bates 20.

### DISCUSSION

**1. Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(a)* and *(b)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250–51 (1986)*; *Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir.2003)*. The court is required to construe the evidence in the light most favorable to the non-moving party. *Collazo v. Pagano, 656 F.3d 131, 134 (2d Cir.2011)*. The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving

party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex, 477 U.S. at 322*; *see Anderson, 477 U.S. at 247–48* ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). "A fact is material if it 'might affect the outcome of the suit under governing law.' " *Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir.2008)* (quoting *Anderson, 477 U.S. at 248*).

**\*5**   "[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir.1988)*. A defendant is entitled to summary judgment where " 'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' " an essential element of a claim on which the plaintiff bears the burden of proof. *In re Omnicom Group, Inc., Sec. Litig., 597 F.3d 501, 509 (2d Cir.2010)* (quoting *Burke v. Jacoby, 981 F.2d 1372, 1379 (2d Cir.1992)*). Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir.1995)*. "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dept. of Corrections, 84 F.3d 614, 619 (2d Cir.1996)*.

Plaintiff's claims seeks damages for alleged violations of his constitutional rights pursuant to *42 U.S.C. § 1983* (" *§ 1983*"), which imposes civil liability on persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws of the United States. *Section 1983*, however, does not itself provide a source of substantive rights, but instead provides the mechanism by which a plaintiff may seek vindication of federal rights conferred elsewhere. *Graham v. Connor, 490 U.S. 386, 393–94 (1989)*. Here, Plaintiff's claims alleging Defendants denied him access to both Ramadan services and the law library, interfered with his rights to religious freedom and access to the courts in violation of the First, Eighth, and Fourteenth Amendments.

Moving Defendants argue in support of summary judgment that Defendants' refusal to permit Plaintiff to both attend Ramadan services and visit the correctional facility's law library during the same call-out was in furtherance of a legitimate prison policy in maintaining prison security, Defendants' Memorandum at 3–6; Defendants' actions did not substantially burden Plaintiff's practice of his religion, *id.* at 7–13; that Plaintiff missed two meals is *de minimis* in nature and does not rise to the level of a constitutional violation, *id.* at 13–14; Plaintiff's inability to attend the law library on one occasion was not a denial of his access to the courts. *Id.* at 15–16. As stated, Background and Facts, *supra*, at 2, Plaintiff has not presented any argument in opposition to summary judgment.

**2. Movement Policy**

Although not articulated as such, Plaintiff's claims arise from Defendants' enforcement of the correctional facility's Movement Policy which prevented Plaintiff, as an inmate, from attending on the same day during the month of Ramadan both Ramadan services and the evening law library call-out, thereby allegedly interfering both with Plaintiff's right to the free exercise of his religion as well as his right of access to the courts. It is settled that prisoners do not abandon their constitutional rights at the "jailhouse door." *Bell v. Wolfish,* 441 U.S. 520, 576 (1979) (Marshall, J., dissenting). Nevertheless, " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987) (quoting *Price v. Johnston,* 334 U.S. 266, 285 (1948)). "The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone,* 482 U.S. at 348 (citing cases). To ensure appropriate deference is afforded to prison administrators, "prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* at 349 (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 128 (1977)). " '[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.' " *Id.* (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). "This approach

ensures the ability of corrections officials 'to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration,' and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to 'resolution by decree.' " *Id.* at 349–50 (quoting *Procunier v.. Martinez,* 416 U.S. 396, 405 (1974), *overruled on other grounds by Thornburgh v. Abbott,* 490 U.S. 401 (1989)). As such, "a challenged prison regulation is judged 'under a 'reasonableness' test less restrictive than that ordinarily applied': a regulation that burdens a protected right passes constitutional muster 'if it is reasonably related to legitimate penological interests.' " *Salahuddin,* 467 F.3d at 274 (quoting *O'Lone,* 482 U.S. at 349 (additional internal quotation marks omitted)).

**\*6** Before considering the balance between the restrictions posed by a prison regulation on an inmate's constitutional rights and the legitimate penological interest advanced by the same regulation, however, the inmate plaintiff must establish that his exercise of some constitutional right was substantially burdened. *See Ford v. McGinnis,* 352 F.3d 582, 593–94 (2d Cir.2003) (determining first whether challenged action placed substantial burden on inmate plaintiff's religion before determining whether such action was reasonably related to legitimate penological interest). "The defendants [prison officials] then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct" to shift the burden back to the inmate to "show that these articulated concerns were irrational." *Salahuddin,* at 275 (internal quotation marks, citations, and brackets omitted). As such, before the court addresses the balance between the interests of the inmate and the prison officials, an inmate plaintiff must allege how the conduct infringes the free exercise of his religion. *Candelaria v. Coughlin,* 787 F.Supp.2d 368, 376–77 (S.D.N.Y.1992). Similarly, Plaintiff's access to court claim, based on the First Amendment, requires Plaintiff first demonstrate the alleged interference with his law library attendance during the evening call-out hindered Plaintiff's pursuit of some legal claim. *Lewis v. Casey,* 518 U.S. 343, 351 (1996).

**A. Free Exercise of Religion**
With regard to Plaintiff's claim under the First Amendment that he was wrongfully denied his right to freely exercise his religion when Defendants refused Plaintiff permission to leave the law library to attend

Ramadan services, Defendants argue that Plaintiff's inability to attend the masjid for Ramadan services on two occasions, including on August 22 and 23, 2009, was only a *de minimis* infringement on Plaintiff's exercise of his religion and, thus, did not pose a substantial burden Plaintiff's freedom of religion. Defendants' Memorandum at 8–10. Because Plaintiff did not file anything in opposition to summary judgment, Plaintiff does not argue otherwise.

It is well-settled that despite incarceration, prisoners retain their right to religious freedom and are entitled to reasonable accommodation of their religious beliefs, consistent with the needs of prison security. As such, a religious liberty claim asserted under the First Amendment requires the prisoner first demonstrate "that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (3d Cir.2006). Courts within the Second Circuit have consistently held that missing two religious services does not pose a substantial burden on an inmate's religion. *See Blalock v. Jacobsen,* 2014 WL 5324326, at *7 (S.D.N.Y. Oct. 20, 2014) (dismissing inmate plaintiff's claims alleging a violation of Free Exercise Clause because missing two Muslim religious services while awaiting disciplinary hearing did not substantially burden the plaintiff's ability to freely exercise his religion); *Shapiro v. Community First Services, Inc.,* 2014 WL 1276479, at *11 (E.D.N.Y. Mar. 27, 2014) (holding missing two religious services poses only an insubstantial burden on an inmate's free exercise of his religion); *Williams v. Weaver,* 2006 WL 2794417, at *5 (N.D.N.Y. Sept. 26, 2006) (missing two Muslim religious services and two Muslim religious classes did not arise to constitutional violation). Although not argued by Plaintiff, missing two of the Ramadan meals also does not constitute a violation of Plaintiff's First Amendment right to the free exercise of his religion. *See Washington v. Afify,* 968 F.Supp.2d 532, 537–38 (W.D.N.Y.2013) (denial of three consecutive Ramadan meals, including two breakfasts and one evening meal, does not violate First Amendment). Moreover, Plaintiff's inability to attend the Ramadan services at issue is attributed to Plaintiff's decision to attend the evening law library call-out, which required Plaintiff to forgo attending the Ramadan services, rather than any arbitrary decision by any Defendant to prevent Plaintiff from attending Ramadan services. *See Wray v. City of New York,* 490 F.3d 189, 193–94 (2d Cir.2007)

(requiring causal connection between defendant's action and plaintiff's injury to pursue § 1983 claim).

**\*7** Defendants' Motion seeking summary judgment thus should be GRANTED insofar as Plaintiff alleges the Movement Policy interfered with the free exercise of his religion pursuant to which Plaintiff was not permitted to be called-out for two programs scheduled for the same or overlapping times such that Plaintiff was able, during Ramadan, to attend in the evening either Ramadan services or the evening law library call-out, but not both.

### B. Access to Courts

"It is settled that 'meaningful access to the courts is the touchstone' of the First Amendment as it pertains to litigation commenced by a prison inmate." *Ramsey v. Goord,* 661 F.Supp.2d 370, 401 (W.D.N.Y.2009) (citing *Bounds v. Smith,* 430 U.S. 817, 823 (1977), and *Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997)). An inmate's right of meaningful access to the courts "is rooted in the constitutional guarantees of equal protection of the laws and due process of law." *Bourdon v. Loughren,* 386 F.3d 88, 95 (2d Cir.2004). Among the requirements for such meaningful access is assistance in the preparation and filing of legal papers by providing inmates with, *inter alia,* adequate law libraries. *Bounds,* 430 U.S. at 828. "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Jeromsen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995)). Rather, "to establish a constitutional violation based on a denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in actual injury to the plaintiff." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). Further, to show actual injury, the challenged conduct must have "hindered his efforts to pursue a legal claim." *Id.* Even a prison regulation that substantially burdens an inmate's access to the courts and results in actual injury, however, will not violate the inmate's constitutional right of access to the courts provided the regulation is reasonably related to legitimate penological interests. *Lewis v. Casey,* 518 U.S. 343, 361–62 (1996).

Here, despite asserting that his inability to attend the evening law library call-out would hamper Plaintiff's ability to meet several impending deadlines in pending court actions, Plaintiff has utterly failed to specify what

2015 WL 1015383

deadlines he was in danger of missing in what cases if he chose to attend Ramadan services, thus forgoing the opportunity to attend evening law library call-out. Plaintiff does not assert he was unable to attend the afternoon law library call-out, and utterly fails to attempt to explain why attending only the afternoon law library call-out would not provide him with ample time to prepare papers for such cases. Accordingly, Plaintiff has failed to show the requisite actual injury caused by his inability to attend the evening law library call-out so as to establish the Movement Policy substantially interfered with his constitutional right of access to the courts. *See Wray, 490 F.3d at 193–94* (requiring causal connection between defendant's action and plaintiff's injury to establish § 1983 claim).

### C. Legitimate Penological Interest

**\*8** Although summary judgment in favor of Defendants may be granted based solely on Plaintiff's failure to establish Defendants' restriction of Plaintiff's movement throughout the correctional facility in accordance with the Movement Policy resulted in any substantial interference with Plaintiffs constitutional rights to the free exercise of his religion and of access to the courts, because Defendants' motion is before the undersigned for a report and recommendation, whether the Movement Policy serves a legitimate penological interest is addressed in the alternative.

Because of the "difficult judgments" attendant to prison operation, a generally applicable correctional facility policy, despite burdening an inmate's exercise of his religion, will not violate the inmate's exercise of his religious freedom provided the policy is reasonably related to legitimate penological interests. *Holland v. Goord, 758 F.3d 215, 222 (2d Cir.2014)* (internal quotation marks omitted and citing *O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987); Turner v. Safley, 482 U.S. 78, 89 (1987);* and *Redd v. Wright, 597 F.3d 532, 536 (2d Cir.2010)).* In other words, constitutional protections afforded to inmates must be balanced against the interest of prison officials charged with the complex duties arising from administering the prison system. *Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir.1990).* In making this determination, the court must consider:

> whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the rights; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

*Holland, 758 F.3d at 222–23* (quoting *Salahuddin v. Goord, 467 F.3d 263, 274 (2d Cir.2006)).*

In support of summary judgment, Defendants argue they have demonstrated a neutral and legitimate penal interest in maintaining the inmate movement policy which does not permit Plaintiff or any other inmate to freely move about the correctional facility, but instead restricts movement to call-outs for specific programs. *See* Movement Policy, *passim.* Defendant Greis states that as Collins Deputy of Security, he is responsible for "oversight of security matters and personnel, investigations, and generating as well as enforcing department policies." Greis Declaration ¶ 1. Greis explains that religious celebrations at the correctional facility "like all programs, involve the coordination of programming and security." *Id.* ¶ 3. Significantly, "movement throughout the [correctional] facility is important to the safety and security of both the security personnel, civil personnel and inmates." *Id.* ¶ 16. The Movement Policy is maintained to direct the movement of inmates throughout the correctional facility, *id.,* and all inmates, including Plaintiff are required to adhere to the Movement Policy, *id.* ¶ 17, which does not change during the year. *Id.* ¶ 16. Because DOCCS security personnel are required to enforce the Movement Policy, where two call-outs would occur simultaneously or overlap, an inmate, including Plaintiff, is required to decide which of the programs he wishes to attend. *Id.* ¶¶ 17–19. Greis further maintains that there are two library call-outs each day, with only the evening law library call-out coinciding with Ramadan, such that Plaintiff could have attended the afternoon law library call-out which would not have interfered with also attending the Ramadan services call-out. *Id.* Plaintiff, who has not responded in opposition to summary judgment, does not argue otherwise.

**\*9** Greis's assertions, unchallenged by Plaintiff, establish that Collins's Movement Policy has a "valid, rational

connection to a legitimate governmental objective," for which the corrections officers have no alternative means of ensuring. *Holland,* 758 F.3d at 222–23. Moreover, although the Movement Policy does prevent Plaintiff from attending on the same day during Ramadan both the evening law library call-out as well as the Ramadan call-out, Plaintiff can attend both the afternoon law library call-out and the Ramadan call-out on the same day. *Id.* As discussed, Discussion, *supra,* at 14, Plaintiff does not claim that his inability to attend the evening law library call-out resulting in missing any deadlines in any of his then pending litigation, or resulted in the dismissal of any such action.

On this record, Defendants' enforcement of the Movement Policy, despite rendering it impossible for Plaintiff to attend both the evening law library call-out and Ramadan services call-out, is related to a valid penological interest and poses little hardship on Plaintiff's free exercise of his religion or to Plaintiff's access to the courts. As such, summary judgment should be GRANTED insofar as Plaintiff challenges the Movement Policy.

**3. Missed Meals**

On August 23, 2009, after reporting to the madjid for Ramadan services at 5:30 P.M., Plaintiff then returned to his housing unit to sign-up for the evening law library call-out, subsequent to which Plaintiff's request to return to the masjid to attend further Ramadan services that evening was denied, and Plaintiff was required to return to his housing unit. Complaint ¶¶ 21–22. As such, although Plaintiff fasted from sunrise to sunset, the denial of permission to return for the remaining Ramadan services resulted in Plaintiff's not eating the evening Ramadan meal or receiving the sahor bag for the next morning's breakfast. *Id.* ¶ 23. Plaintiff thus missed two consecutive meals and did not again eat until the evening of August 24, 2009. *Id.* Plaintiff asserts the denial of the two meals constituted cruel and unusual punishment in violation of the Eighth Amendment. Complaint ¶¶ 31–33. Defendants argue in support of summary judgment that missing two meals is *de minimus* and does not arise to a constitutional violation. Defendants' Memorandum at 14.

The Eighth Amendment "require[s] that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and wellbeing of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983). "While no court has held that denial of food is a *per se* violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation ... may well be recognized as being of constitutional dimension." *Id.* (citations omitted). A substantial deprivation of food is one that is sufficient to create a serious danger to the inmate's health. *See, e.g., Beckford v. Portuondo,* 151 F.Supp.2d 204, 213 (N.D.N.Y.2001) (denying summary judgment of Eighth Amendment claim alleging deprivation of two of three meals per day for eight days); and *Moss v. Ward,* 450 F.Supp. 591, 596–97 (W.D.N.Y.1978) (holding denial of all food for four days as punishment for breaking a prison disciplinary rule violated Eighth Amendment). Significantly, courts within the Second Circuit have consistently held the deprivation of two meals is *de minimus* and, thus, insufficient to establish a substantial deprivation creating a serious danger to an inmate's health so as to support an Eighth Amendment claim. *See, e.g., Benjamin v. Kooi,* 2010 WL 985844, at * 11 (N.D.N.Y. Feb. 25, 2010) (missing two or three meals did not "deprive [plaintiff] of the minimal measures of necessities required for civilized living"), *report and recommendation adopted,* 2010 WL 985823 (N.D.N.Y. Mar. 17, 2010); *Waring v. Meachum,* 175 F.Supp.2d 230, 240–41 (D.Conn.2001) (holding no Eighth Amendment violation where inmates missed one or two meals in absence of any indication that future meals were also missed). Moreover, the undisputed facts establish that Plaintiff's missed meals, including the evening meal on August 23, 2009, and breakfast on August 24, 2009, can only be attributed to Plaintiff's attempt to attend two call-outs that were scheduled for the same time, in violation of the correctional facility's Movement Policy. *See Wray,* 490 F.3d at 193–94 (no § 1983 claim lies absent causal connection between defendant's action and plaintiff's injury).

**\*10** Accordingly, summary judgment on Plaintiff's Eighth Amendment claim that he missed two consecutive meals should be GRANTED.

*CONCLUSION*

Based on the foregoing, Defendants' Motion (Doc. No. 41), should be GRANTED; the Clerk of the Court should be directed to close the file.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    8

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

***Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.*** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,*

892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the Plaintiff and the attorneys for the Defendants.

SO ORDERED.

DATED: December 2, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1015383

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 466255

2008 WL 466255
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Jonathan ODOM, Plaintiff,

v.

Thomas DIXION, Don Lopes, Jeff
Sekuterski, C. Jabcuga, C. Petties, Sgt.
Markowski, and John Doe, Defendants.

No. 04-CV-889F.
|
Feb. 15, 2008.

**Attorneys and Law Firms**

Jonathan Odom, Auburn, NY, pro se.

Andrew M. Cuomo, Attorney General, State of New York, Kim S. Murphy, Assistant Attorney General, of Counsel, Buffalo, NY, for Defendants.

**DECISION and ORDER**

LESLIE G. FOSCHIO, United States Magistrate Judge.

*JURISDICTION*

**\*1** On October 24, 2005, the parties to this action consented to proceed before the undersigned. The matter is presently before the court on Defendants' motion for summary judgment (Doc. No. 47), filed December 14, 2006.

*BACKGROUND and FACTS* [1]

[1]    The Facts are taken from the pleadings and motion papers filed in this action.

Plaintiff Jonathan Odom ("Plaintiff") commenced this civil rights action on November 8, 2004, pursuant to 42 U.S.C. §§ 1983 and 1985, alleging Defendants, employees of the New York State Department of Corrections ("DOCS"), at Attica Correctional Facility ("Attica"), where Plaintiff was then incarcerated, violated his constitutional rights by denying him properly prepared kosher meals in accordance with Plaintiff's religious beliefs, and by harassing and retaliating against Plaintiff when he filed grievances regarding the alleged denial of such meals. The Complaint names as Defendants Lieutenant Thomas Dixon [2] ("Lt.Dixon"), Attica Food Services Administrator II Donald Lopes ("Lopes"), Correction Officer ("C.O.") Christopher Jabcuga ("Jabcuga"), Sergeant S. Markowski ("Sgt.Markowski"), C.O. Corey Petties ("Petties"), Sergeant Jeff Sekuterski ("Sgt.Sekuterski"), and John Doe ("Doe"). Plaintiff specifically alleges as his First Cause of Action a denial of the right to freely exercise his religion in violation of the First Amendment and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb et seq., and a denial of equal protection in violation of the Fourteenth Amendment, and, as his Second Cause of Action, retaliation for filing grievances in violation of the First Amendment, and an Eighth Amendment excessive force claim.

[2]    Incorrectly spelled as "Dixion" in the Complaint's caption and allegations.

The gravamen of Plaintiff's religious freedom and equal protection claims concerns his kosher diet, referred to as the "cold alternative diet" or "CAD." On September 1, 2004, Plaintiff filed Inmate Grievances Nos. 47427-04 and 47428-04 ("the Grievances"), complaining about the manner in which the CAD meals were provided to Plaintiff. According to Plaintiff, Defendants failed to provide Plaintiff with the proper utensils to open hermetically sealed kosher food packs, or with hot water for his instant oatmeal and coffee, permitted a non-Jewish inmate to prepare Plaintiff's kosher food, in violation of the dietary rules of the Jewish religion ("the kashrut"), deprived Plaintiff of a proper meal with which to break his fast during Yom Kippur on September 25, 2004, failed to provide Plaintiff with kosher meals while in keeplock on October 1, 6, 7, 10 and 11, 2004, and refused to permit Plaintiff to take certain food items from the assigned mess hall to Plaintiff's cell. Complaint, First Cause of Action. As for the retaliation and excessive force claims, Plaintiff alleges that Defendants retaliated against Plaintiff for filing the Grievances regarding the alleged kosher food plan violations, including the denial of kosher meals, threatening Plaintiff with bodily harm if he continued to pursue his grievances, and, on October 15, 2004, flooding Plaintiff's cell with water, and physically

2008 WL 466255

assaulting Plaintiff, causing Plaintiff to sustain injuries. Complaint, Second Cause of Action.

**\*2** In support of Plaintiff's allegation that he has exhausted all available administrative remedies relative to his claims as required under the Prison Litigation Reform Act of 1986 ("the PLRA"), 110 Stat. 1321 (1996), codified at 42 U.S.C. § 1997e, Plaintiff attaches to the Complaint a copy of a letter from DOCS Inmate Grievance Program Director Thomas G. Eagen, dated October 12, 2004, acknowledging receipt of Plaintiff's correspondence dated September 29, 2004, pertaining to two inmate grievances, specifically, Grievances Nos. 47427/04 and 47428/04 ("the grievances"), raising the issues alleged in this action, and advising that Plaintiff's concerns asserted in the grievances had already been addressed by the Inmate Grievance Program Supervisor on September 30, 2004.

In a Decision and Order filed May 24, 2005 (Doc. No. 13) ("May 24, 2005 Decision and Order"), District Judge Charles J. Siragusa, *sua sponte,* converted Plaintiff's RFRA claim to a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("the RLUIPA"), 42 U.S.C. § 2000cc-1, and permitted the First Cause of Action asserting Plaintiff's claims under the RLUIPA, and the First and Fourteenth Amendments, to proceed only against Defendants Dixon, Lopes and Jabcuga, dismissed such claim as against the other Defendants, thereby dismissing the First Amendment and RLUIPA religious claims and the Fourteenth Amendment equal protection claim against Defendants Sekuterski, Petties, Markowski and Doe. May 24, 2005 Decision and Order at 5-8. Judge Siragusa, also *sua sponte,* permitted Plaintiff's Second Cause of Action alleging First Amendment retaliation and Eight Amendment excessive force claims to proceed only against Defendants Dixon, Markowski and Petties, and dismissed such claims as to the remaining named Defendants, *i.e.,* Lopes and Jabcuga. *Id.* at 8-11. Finally, Judge Siragusa dismissed Plaintiff's § 1985 conspiracy claim as against all Defendants for failing to allege with any specificity that any "meeting of the minds" occurred as required for a conspiracy under § 1985. *Id.* at 12-13.

On December 14, 2006, Defendants filed the instant motion for summary judgment (Doc. No. 47) ("Defendants' motion"), along with a Memorandum of Law (Doc. No. 48) ("Defendants' Memorandum"), a Statement of Undisputed Facts (Doc. No. 49) ("Defendants' Statement of Facts"), and the Declarations

of Lt. Dixon (Doc. No. 50) ("Dixon Declaration") with attached exhibits A through P ("Dixon Declaration Exh(s). __"), Attica Registered Nurse Vance Hawley (Doc. No. 51) ("Hawley Declaration"), Jabcuga (Doc. No. 52) ("Jabcuga Declaration"), Lopes (Doc. No. 53) ("Lopes Declaration"), Markowski (Doc. No. 54) ("Markowski Declaration"), Rabbi Arthur Morgenstern ("Rabbi Morgenstern") (Doc. No. 55) ("Rabbi Morgenstern Declaration"), and Petties (Doc No. 56) ("Petties Declaration").

In light of Plaintiff's *pro se* status, on December 29, 2006, a notice to Plaintiff pursuant to Local Rule of Civil Procedures 56.2 and *Irby v. New York City Transit Authority,* 262 F.3d 412, 413 (2d Cir.2001) (Doc. No. 58) ("IRBY notice"), was mailed to Plaintiff, advising Plaintiff that Defendants had moved the court to decide Plaintiff's claims against Plaintiff, without a trial and based only on written materials submitted in support of Defendant's motion. The IRBY notice further advised Plaintiff that to avoid summary judgment being granted in Defendants' favor, it was necessary to file papers, including sworn affidavits, establishing the existence of a material issue of fact, and that any material issue of undisputed fact set forth in Defendants' Statement of Facts would be deemed admitted if not controverted by Plaintiff.

**\*3** An Order filed January 3, 2007 (Doc. No. 59), established February 16, 2007, as Plaintiff's deadline for filing a response opposing Defendants' motion, and March 2, 2007 as Defendants' deadline for filing any reply in further support of the motion. Plaintiff did not timely respond in opposition to summary judgment and, on March 1, 2007, Defendants filed the Declaration of Assistant Attorney General Kim S. Murphy ("Murphy") (Doc. No. 60) ("Murphy Declaration"), requesting summary judgment be granted in Defendants' favor and the case be dismissed. By letter filed March 8, 2007 (Doc. No. 61) ("March 8, 2007 letter"), Plaintiff advised that during a recent transfer between prison facilities, his legal materials and papers were destroyed such that Plaintiff was unable to further litigate the instant action, and requested the action be terminated. Accordingly, on March 9, 2007, the undersigned entered an order (Doc. No. 62) ("the Dismissal Order"), granting Plaintiff's request and directing the file be closed.

2008 WL 466255

On March 19, 2007, Plaintiff filed a motion (Doc. No. 63), to vacate the Dismissal Order, explaining that the March 8, 2007 letter was intended only to advise the court of Plaintiff's inability to timely respond in opposition to Defendants' motion, rather than to request the action be terminated. Defendants' response in opposition to the motion was filed on April 3, 2007, and, on April 13, 2007, Plaintiff filed a reply in further support of the motion to vacate. By Order filed March 23, 2007 (Doc. No. 69), the undersigned granted Plaintiff's motion to vacate the Dismissal Order, and set July 31, 2007 as the deadline for Plaintiff to file a response in opposition to summary judgment, and August 31, 2007 as Defendants' deadline to file any reply.

On August 20, 2007, Plaintiff filed in opposition to summary judgment a Declaration (Doc. No. 73) ("Plaintiff's Declaration"), with attached exhibits A through M ("Plaintiff's Exh(s). __"), a Brief in Opposition to Defendants' Summary Judgment Motion (Doc. No. 74) ("Plaintiff's Memorandum"), a Statement of Disputed Factual Issues (Doc. No. 75) ("Plaintiff's Statement of Facts"), and the Declaration of Marquis Brooks (Doc. No. 76) ("Brooks Declaration").

In further support of summary judgment, Defendants filed on September 18, 2007, the Reply Declaration of Assistant Attorney General Kim S. Murphy (Doc. No. 78) ("Murphy Reply Declaration"). On October 17, 2007, Plaintiff filed a Supplemental Declaration in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Doc. No. 79) ("Plaintiff's Surreply Declaration"), with attached exhibit A ("Plaintiff's Surreply Exh. A"). Oral argument was deemed unnecessary.

Based on the following, Defendants' motion is GRANTED in part and DENIED in part.

## DISCUSSION

### 1. Summary Judgment
Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The court is required to construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 58, 59 (2d Cir.1999) (citing *Anderson, supra,* 477 U.S. at 255); *Rattner, supra.* The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex,* 477 U.S. at 322; *see Anderson,* 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

**\*4** "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex, supra,* 477 U.S. at 323-24 (1986) (quoting Fed.R.Civ.P. 56). Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case." *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998). Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F .3d 14, 18 (2d Cir.1995). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 619 (2d Cir.1996). Rule 56 further provides that

[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of

the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e).

Defendants are alleged to have violated Plaintiff's civil rights under 42 U.S.C. § 1983, pursuant to which an individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. 42 U.S.C. § 1983. Section 1983, however, " 'is not itself a source of a substantive rights,' but merely provides 'a method for vindication of federal rights elsewhere conferred.' " *Albright v. Oliver,* 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor,* 490 U.S. 386, 394 (1989); and *Baker,* 443 U.S. at 140). Here, Plaintiff alleges as his First Cause of Action violations of his right to religious freedom under the First Amendment, as determined by the court, and the RLUIPA, and a Fourteenth Amendment equal protection violation, and, as his Second Cause of Action, an Eighth Amendment excessive force claim, and a First Amendment retaliation claim. As discussed *infra,* summary judgment is GRANTED as to the claims asserted under the First Cause of Action, but GRANTED in part and DENIED in part as to the claims asserted under the Second Cause of Action.

## 2. Religious Freedom
 **\*5** Plaintiff's religious liberty claim is asserted under both the First Amendment's Free Exercise Clause and § 3 of the RLUIPA. Preliminarily, the court observes that whether asserted under the First Amendment or the RLUIPA, a religious liberty claim requires the prisoner demonstrate "that the disputed conduct substantially burdens his *sincerely held religious beliefs." Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006 (italics added) (citing RLUIPA, 42 U.S.C. § 2000cc-1(a), and *Ford v. McGinnis,* 352 F.3d 582, 587 (2d Cir.2003) (First Amendment Free Exercise Clause)). [3]

[3]    Because the threshold inquiry of a religious freedom claim under both the First Amendment and the

RLUIPA is the same, the court does not consider whether a violation of the RLUIPA, which provides for a separate cause of action, can serve as a basis for a § 1983 claim. *See Salahuddin,* 467 F.3d at 273-75 (addressing inmate plaintiff's § 1983 religious liberty claim asserted under both First Amendment Free Exercise Clause and RLUIPA § 3, without discussing whether RLUIPA provides a basis for § 1983 action).

As relevant, § 3 of the RLUIPA provides that the government shall not "impose a substantial burden" on the "religious exercise" of inmates in certain institutions unless the government demonstrates that the burden furthers a compelling governmental interest by the least restrictive means. 42 U.S.C. § 2000cc-1(a); *see Salahuddin,* 467 F.3d at 273. "Religious exercise" is defined under the RLUIPA to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "Section 3 applies if 'the substantial burden [on religious exercise] is imposed in a program or activity that received Federal financial assistance.' " *Salahuddin,* 467 F.3d at 273 n. 2 (quoting 42 U.S.C. § 2000cc-1(b)(1). "In the prison context, this section sweeps broadly as '[e]very State ... accepts federal funding for its prisons.' " *Id.* (quoting *Cutter v. Wilkinson,* 544 U.S. 709, 716 n. 4 (2005)).

Analyzing Plaintiff's claim under the First Amendment, "[t]he Free Exercise Clause of the First Amendment is an 'unflinching pledge to allow our citizenry to explore ... religious beliefs in accordance with the dictates of their conscience.' " *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999) (quoting *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984)). Because prisoners retain their right to religious freedom even when incarcerated, inmates are entitled to reasonable accommodation of their religious beliefs, consistent with needs of prisoner security, including "religious dietary beliefs, as 'prison officials must provide a prisoner a diet that is consistent with his religious scruples.' " *Jackson,* 196 F.3d at 320 (citing cases and quoting *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992)).

Prisoners do not abandon their constitutional rights at the "jailhouse door," *Bell v. Wolfish,* 441 U.S. 520, 576 (1979) (Marshall, J., dissenting), although " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987) (quoting *Price v. Johnston,* 334 U.S. 266,

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 466255

285 (1948)). As such, "a challenged prison regulation is judged 'under a 'reasonableness' test less restrictive than that ordinarily applied': a regulation that burdens a protected right passes constitutional muster 'if it is reasonably related to legitimate penological interests.' " *Salahuddin,* 467 F.3d at 274 (quoting *O'Lone,* 482 U.S. at 349 (additional internal quotation marks omitted)).

**\*6** As stated, a religious liberty claim, whether asserted under the First Amendment or the RLUIPA, requires the prisoner demonstrate "that the disputed conduct substantially burdens his *sincerely held religious beliefs."* *Salahuddin,* 467 F.3d at 274-75 (italics added) (citing RLUIPA, 42 U.S.C. § 2000cc-1(a), and *Ford v. McGinnis,* 352 F.3d 582, 587 (2d Cir.2003)) (discussing requirements of First Amendment Free Exercise Clause). "The defendants [prison officials] then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct," to shift the burden back to the inmate to "show that these articulated concerns were irrational." *Salahuddin,* 467 F.3d at 275 (citing *Ford,* 352 F.3d at 595) (internal quotations marks and brackets omitted) (bracketed material added).

### A. Sincerity of Plaintiff's Religious Beliefs

As a threshold matter, Defendants argue that Plaintiff's alleged Jewish faith, including its kosher dietary requirements, is not a sincerely held belief, a threshold requirement for any religious freedom claim under either the First Amendment or the RLUIPA. Defendants' Memorandum at 3-5. According to Defendants, Plaintiff "did not practice any type of Judaism prior to his DOCS incarceration in 1992. On August 5, 2004, just a few months prior to the complained of actions, plaintiff switched his religious designation from Muslim to Jewish." Defendant's Memorandum at 4 (citing Dixon Declaration ¶ 4 and Exh. B). Thus, Plaintiff, as far as the prison officials at Attica were concerned, was "Jewish" for less than one month prior to the date of the earliest allegations in the Complaint. *Id.* Defendants also maintain that because DOCS kosher diet is generally considered as better than the meals provided to non-Jewish inmates in the regular prison diet, inmates have been known to convert to Judaism, by submitting forms to change, administratively, their religious preference at the correctional facility, to receive the more palatable meals. *Id.* (citing Dixon Declaration ¶ 10). Furthermore, Defendants urge the court to find that Plaintiff's religious beliefs are not sincerely held

given that "[o]utside prison walls, it is very difficult for a civilian to convert to Judaism," in accordance with the requirements of Judaic law, and also in consideration of "plaintiff's extensive history of bringing frivolous lawsuits." Defendants' Memorandum at 4-5 (citing Rabbi Morgenstern Declaration ¶ 2). Plaintiff has not directly responded to this argument. [4]

[4]      Plaintiff neither challenges the accuracy of Rabbi Morgenstern's interpretation of Judaic law nor disputes Rabbi Morgenstern's explanation of any of the tenets of the Jewish faith.

As discussed, Discussion, *supra,* at 10, the threshold determination to be made with regard to a religious liberty claim under either the First Amendment or the RLUIPA is whether the inmate plaintiff's religious beliefs are sincerely held. *Salahuddin,* 467 F.3d at 274-75 (RLUIPA); and *Ford,* 352 F.3d at 587 (First Amendment Free Exercise Clause). Whether an inmate's beliefs in the Jewish religion are sincerely held, however, is subjective and requires a determination of genuine issues of material fact. Specifically, in a similar case in which the plaintiff inmate alleged that the defendant prison officials' refusal to provide the inmate with a kosher diet violated the inmate's right to religious freedom, the Second Circuit held that summary judgment was precluded based on a genuine issue of material fact as to whether an inmate's beliefs in the Jewish religion were sincerely held, despite the prison's Jewish chaplain's statement that the inmate's alleged conversion to Judaism was not in accordance with Judaic law as required to be considered Jewish. *Jackson,* 196 F.3d at 320-21. Similarly, in the instant case, despite the timing of Plaintiff's "conversion" and Defendants' alleged interference with Plaintiff's kosher diet, the sincerity of Plaintiff's conversion to Judaism cannot be determined without weighing facts. As such, this aspect of Defendants' motion does not warrant summary judgment.

### B. Manner in which kosher meals are provided

**\*7** Plaintiff's allegations, under both the First Amendment and RLUIPA, that Defendants failed to provide Plaintiff with the proper utensils to open hermetically sealed kosher food packs, Complaint ¶ 10, or with hot water for his instant oatmeal and coffee, *id.,* and permitted a non-Jewish inmate to prepare kosher food by opening cans of kosher tuna and sardines, and placing the contents into paper cups, Complaint ¶¶ 17-18, essentially challenge the manner

2008 WL 466255

in which Plaintiff's kosher meals are provided to him. Defendants maintain that even assuming, *arguendo,* such allegations are true, they fail to establish that Defendants substantially burdened Plaintiff's exercise of a key tenet of his religion, citing statements made by Rabbi Morgenstern in support. Defendants' Memorandum at 5-12 (citing Rabbi Morgenstern Declaration ¶¶ 4-6).

As discussed, Discussion, *supra,* at 10, both the First Amendment and the RLUIPA require that the conduct of which the inmate plaintiff complains "substantially burdens" the inmate's "sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274-75 (RLUIPA), and *Ford,* 352 F.3d at 587 (First Amendment Free Exercise Clause)). Although the court is precluded on summary judgment from weighing facts so as to determine the sincerity of Plaintiff's religious beliefs, *Jackson,* 196 F.3d at 320, the court is permitted to determine whether, as a matter of law, Defendants' conduct challenged by Plaintiff "substantially burdens" Plaintiff's practice of his religion by interfering with or violating a key tenet of Judaism. *Salahuddin,* 467 F.3d at 274-75; *Ford,* 352 F.3d at 587.

According to Rabbi Morgenstern, kashrut, the Jewish dietary law governing the preparation and consumption of kosher food, makes no provision regarding where a Jewish person is to consume kosher food, and the location of Plaintiff's kosher meals "has no bearing whatsoever on [Plaintiff's] ability to practice Judaism." Rabbi Morgenstern Declaration ¶¶ 4-5. Nor is there any requirement that kosher food be prepared only by people of the Jewish faith, and not by a non-Jewish person. *Id.* ¶ 6 ("Having a non-Jewish or non-kosher person prepare or open kosher food does not make the food unkosher."). This includes the removal of lids from cans of tuna fish and sardines before serving the contents to the inmates. *Id.* Defendants maintain, and Plaintiff does not dispute, that because the lids have sharp metal edges that could be used as weapons, the removal of the lids before serving the canned foods is a legitimate penological reason, as recognized by the Supreme Court. Defendants' Memorandum at 8 (citing *O'Lone,* 482 U.S. at 353); Dixon Declaration ¶ 16. Rabbi Morgenstern further maintains that it would not offend the kashrut for an inmate who keeps kosher to request a member of the correctional facility to open hermetically sealed foods if the inmate is unable to do so with a plastic utensil. *Id.* Rabbi Morgenstern does not, however, address Plaintiff's allegations regarding the lack of hot water in the mess hall

without which Plaintiff was unable to prepare his instant oatmeal, sanka coffee or tea.

**\*8** In opposition to summary judgment, Plaintiff submits a copy of an article entitled "Kashrut: Jewish Dietary Laws," ("the article") Plaintiff's Exh. A, [5] which Plaintiff maintains establishes that the kashrut requires inmates to eat in a kosher dining hall, and for kosher food to be prepared only by people of the Jewish faith. Plaintiff's Declaration ¶¶ 4-7. A plain reading of the article, however, reveals no mention of any requirement under the kashrut that meals are to be eaten in any particular place, or that only Jewish persons are able to prepare kosher food.

[5]    Defendants do not challenge the article as inadmissible hearsay.

As for Plaintiff's allegations regarding the lack of hot water in the mess hall for preparation of the instant oatmeal packets, sanka coffee and tea, Defendants concede that although generally hot water for such use is made available in the mess hall, on occasion, no hot water is available in the mess halls. Lopes Declaration ¶ 9. Defendants further maintain that even if hot water is not available, inmates are permitted to have in their cells hot pots for heating water for such purposes. *Id.* Regardless of whether hot water is available for inmates to prepare instant oatmeal packets, sanka coffee or tea, Plaintiff points to nothing establishing that the consumption of such foods is required to maintain a kosher diet. Nor does the article Plaintiff submits in opposition to summary judgment specifically require such foods be made available as part of a kosher diet. [6] *See* Plaintiff's Exh. A, *passim.* As such, Plaintiff has failed to establish that the denial of hot water for such purpose substantially burdens the exercise of his religion as required for a religious freedom claim under either the First Amendment Free Exercise Clause or the RLUIPA.

[6]    Notwithstanding the Supreme Court's instruction to liberally construe pleadings of *pro se* plaintiffs, *Haines v. Kerner,* 404 U.S. 519, 520 (1972) (allegations of complaint drafted by *pro se* plaintiff held to less stringent standards than formal pleadings drafted by attorneys), the court declines to construe Plaintiff's allegations regarding the lack of hot water in the mess hall with which to prepare instant oatmeal packets, sanka coffee and tea, Complaint ¶¶ 10, 15, as alleging an Eighth Amendment violation based on prison conditions. Specifically, despite Plaintiff's later

assertions in papers opposing summary judgment regarding the poor quality of the food served for the kosher meals, Plaintiff's Memorandum at 8 and 12-15, as well as the Declaration of Marquis Brooks (Doc. No. 76), Plaintiff submits no evidence that he was unable to obtain nutritionally sound meals from the kosher diet or that he suffered any physical ailments as a result of the diet. Nor has Plaintiff moved to amend the Complaint to allege such a claim.

Furthermore, there is no merit to Plaintiff's contention that to the extent Plaintiff's interpretation of the kashrut differs from that endorsed by Rabbi Morgenstern, and not challenged by Plaintiff, Plaintiff's interpretation is entitled to First Amendment protection, even if it is not consistent with a generally accepted tenet of Judaism, so long as the subject belief is sincerely held by Plaintiff. Plaintiff's Memorandum at 9-12. In support of this argument, Plaintiff references *Frazee v. Illinois Department of Employment Security,* 489 U.S. 829 (1989); *Jackson,* 196 F.3d 316, and *Patrick,* 745 F.2d 153. *Id.* Each of these cases, however, is inapposite.

At issue in *Frazee, supra,* was whether the Illinois Department of Employment Security's determination that the plaintiff's refusal to work on Sunday, where such refusal was not based on the basic tenets of an established religious sect but, rather, on the plaintiff's own personal religious beliefs given that the plaintiff was not a member of any established church or religious sect, disqualified the plaintiff from receiving unemployment benefits. In holding that the denial of unemployment benefits violated the First Amendment's Free Exercise Clause, the Court stated that *"[u]ndoubtedly, membership in an organized religious denomination, especially forbidding members to work on Sunday, would simplify the problem of identifying sincerely held religious beliefs,* but we reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization."* *Frazee,* 489 U.S. at 834 (italics added). The Court thus implied that where, as here, the plaintiff asserts membership in an organized religious denomination, Judaism, the plaintiff must establish that the defendants' challenged conduct violates a fundamental tenet of the particular religion.

**\*9** At issue in *Jackson, supra,* was the inmate's removal from the kosher diet program based on the statement of the correctional facility's rabbi that the inmate was not Jewish according to specific criteria set forth under Judaic law, *i.e.,* that "a Jew is one who was born Jewish or has

formally converted." *Jackson,* 196 F.3d at 317-18 (internal quotation marks omitted). In *Jackson,* the inmate plaintiff had, upon entering the prison system in 1986, identified himself as being of the Jewish faith and participated in the kosher diet program until the rabbi's determination in 1995 that Plaintiff was not Jewish. *Id.* In finding that a genuine issue of fact precluded summary judgment as to whether the inmate plaintiff's beliefs that he was Jewish were sincere, the court stated that "[a] claimant need not be a member of a particular organized religious denomination to show sincerity of belief." *Id.* at 320 (citing *Frazee,* 489 U.S. at 834). As such, the district court had erred in relying on the prison rabbi's statement that the plaintiff was not Jewish. *Id.* In other words, at issue was not whether any particular practice of the inmate plaintiff was in accordance with a sincerely held religious belief but, rather, whether the inmate plaintiff sincerely believed he was of the Jewish faith, a fact which could not be reached on summary judgment. Further, in contrast to the instant case, the plaintiff in *Jackson* was not claiming a violation of his religious liberty based on his own personal interpretation of any the tenet of the Jewish religion.

With regard to *Patrick, supra,* there the inmate plaintiff alleged the defendant prison officials interfered with the plaintiff's right to practice his religion by refusing to recognize as a religious group "the Five Percenter Nation of Islam" and, consequently, denying the plaintiff the right to gather with other inmates for worship purposes. *Patrick,* 745 F.2d at 155. Thus, the issue in *Patrick* was not whether the inmate plaintiff's religious beliefs were sincerely held but, rather, whether the "religion" the inmate practiced should be recognized as a religion, the practice of which would be entitled to First Amendment protection. Accordingly, none of these cases supports Plaintiff's assertion that, as a sincere adherent to Judaism, Plaintiff's individual interpretations of Judaism's dietary requirements must, under the First Amendment or the RLUIPA, be accepted.

Moreover, the sincerity of Plaintiff's interpretation of the kashrut as requiring him to eat in a kosher mess hall, and that the CAD meal be prepared only by people of the Jewish faith who keep kosher, is negated by Plaintiff's reliance on the article for the basis of such belief. Simply put, support for Plaintiff's interpretation of the kashrut is not found anywhere in the article, and Plaintiff's claim thus is nothing more than a conclusory assertion insufficient to survive summary judgment. Rule 56(e); *Kia*

2008 WL 466255

*v. McIntyre,* 235 F.3d 749, 763 (2d Cir.2000) ("A plaintiff may not survive a properly asserted motion for summary judgment on the basis of conclusory allegations alone."). Nor does Plaintiff dispute or challenge the validity or accuracy of Rabbi Morgenstern's interpretation of the kashrut. Further, discovery in this action has concluded and Plaintiff does not contend that he has been prevented by Defendants from obtaining the requisite evidence necessary to support his claim.

**\*10** As for Plaintiff's assertion that he was unable to open the hermetically sealed packets of meats with the plastic spoon provided, creating a further violation of his Kashrut beliefs, Complaint ¶ 10, Rabbi Morgenstern states that "[i]t would not offend kashrut for plaintiff to ask a member of the facility staff to open his hermetically sealed foods for him if he is not able to do so with a plastic spoon or fork." Rabbi Morgenstern Declaration ¶ 6. Plaintiff's conclusory assertion fails to meet his burden on summary judgment by pointing to any evidence contradicting Rabbi Morgenstern's statement. Rule 56(e); *Kia,* 235 F.3d at 763. Significantly, Plaintiff does not challenge Rabbi Morgenstern's standing to make definitive and correct statement regarding the tenets and Judaism, and its related kosher laws.

Finally, Plaintiff's later assertion in opposition to summary judgment that he was provided with non-kosher utensils with which to consume his kosher meal, in violation of the kashrut, Plaintiff's Memorandum at 13; Plaintiff's Declaration ¶ 2; Plaintiff's Statement of Facts ¶ 8, a claim not found in the Complaint, [7] is inconsistent with Plaintiff's allegation, Complaint ¶ 10, that only plastic spoons were provided, as well as with Defendants' assertion that inmates are provided with plastic "sporks" which are not reused and, as such, would never come into contact with any prohibited items. Murphy Reply Declaration ¶ 9. Significantly, "factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes,* 84 F.3d at 619. This claim is therefore without merit.

[7]    Significantly, Plaintiff has not moved to amend the Complaint to add this claim.

Plaintiff has thus failed to point to any evidence establishing any genuine issue of material fact that the manner in which the kosher meals are prepared and served substantially burdens any sincerely held religious belief, constituting a major tenet of Judaism, as required to establish a claim under either the First Amendment Free Exercise Clause or the RLUIPA. Summary judgment as to this aspect of Defendants' motion is therefore GRANTED.

### C. Location where meals are to be consumed

Plaintiff's allegation that he is not permitted to take certain food items from the mess hall to his cell, including uncooked whole onions, green peppers, cucumbers, and packets of instant oatmeal, sanka coffee and tea, Complaint ¶¶ 9, 11, 15-16, challenges the location where Plaintiff is permitted to consume his kosher food. In support of summary judgment, Defendants rely on Rabbi Morgenstern's statement that neither the location of Plaintiff's meals nor Plaintiff's ability to remove food from the mess hall to consume in his cell "has [any] bearing whatsoever on his ability to practice Judaism." Defendants' Memorandum at 7 (citing Morgenstern Declaration ¶ 4). Significantly, Plaintiff points to nothing contradicting Rabbi Morgenstern's statement, nor does the article on which Plaintiff relies, Plaintiff's Exh. A, support this conclusory assertion so as to defeat summary judgment. Rule 56(e); *Kia,* 235 F.3d at 763.

**\*11** Summary judgment is GRANTED as to this claim.

### D. Failure to provide kosher meals

Plaintiff alleges that on September 25, 2004, Defendants Dixon and Lopes canceled Plaintiff's "call-out" to pick up trays of proper foods with which to break the Yom Kippur fast, Complaint ¶¶ 19-21, and that Defendant Lopes failed to provide Plaintiff with kosher meals for breakfast on October 1, 7 and 10, 2004, and dinner on October 6, 7, 10, and 11, 2004, during which time Plaintiff was in keeplock status. Complaint ¶ 22. Defendants do not deny that Plaintiff was not provided with several kosher meals upon being confined on keeplock status; rather, in support of summary judgment, Defendants contend that upon being placed on keeplock status for 15 days, beginning with September 30, 2004, Plaintiff, as a special diet inmate, was required by DOCS regulations to inform Attica's Food Service personnel of the special diet so that appropriate arrangements could be made to provide Plaintiff with the CAD meal in his cell, but that Plaintiff failed to do so. Defendants' Memorandum at 8-9; Dixon Declaration ¶¶ 17-18, and Dixon Declaration Exhs. I and J. Because, as Defendants

contend, Plaintiff failed to timely notify Attica's Food Service personnel of his kosher diet requirements, Plaintiff was temporarily removed from the CAD program, but Plaintiff only missed a few kosher meals over a five-day program resulting from the administrative error caused by Plaintiff's own lack of communication with Attica's food service personnel which, at most, constitutes negligence, and provides no basis for § 1983 relief. *Id.* In fact, in a letter dated October 12, 2004, DOCS Deputy Commissioner John H. Nuttall advised Plaintiff that although Plaintiff's paperwork indicating his religious affiliation had been changed to Jewish from Muslim had been filed, the "automated record system" had not been updated, but had since been corrected and the matter resolved. Dixon Declaration Exh. J. Plaintiff submits nothing contradicting Defendants' assertion that Plaintiff's temporary removal from the CAD program was nothing more than an administrative error based on Plaintiff's failure to timely advise Attica's food service personnel of his brief confinement on keeplock status.

It is settled that mere negligence on the part of prison officials is insufficient to establish liability under § 1983. *Davidson v. Cannon,* 474 U.S. 344, 347-48 (1986); *Poe v. Leonard,* 282 F.3d 123, 145 (2d Cir.2002). The evidence submitted by Defendants in support of summary judgment, including copies of a grievance Plaintiff filed regarding the denial of the CAD meals while in keeplock status, demonstrates no material issue of fact that such denial resulted from Plaintiff's failure to advise Attica's Food Service personnel of such status, and the fact that such confinement occurred within a short time of Plaintiff's administrative change in his religious designation from Muslim to Jewish. Dixon Declaration Exhs. I and J. The evidence also establishes that upon bringing the error to the attention of prison officials, the situation was remedied and Plaintiff received his CAD meal for the balance of his keeplock confinement. *Id.* Plaintiff offers nothing to rebut this evidence. As such, the circumstances of the instant case regarding Plaintiff's deprivation of kosher meals while in keeplock are insufficient to support a § 1983 violation under either the First Amendment or RLUIPA.

**\*12** Insofar as Plaintiff maintains that Defendants "canceled" Plaintiff's "call-out" to pick up trays of kosher food with which Plaintiff was to break the Yom Kippur fast, Complaint ¶ 20, Defendants argue that neither Lt. Dixon, Lopes nor Jabcuga, the only remaining Defendants against whom this claim is asserted, were personally involved in this alleged violation of Plaintiff's religious liberty, as required for § 1983 liability. Defendants' Memorandum at 15-16. Defendants also reference a memorandum prepared by Sr. Rosalind Rosolowski, Coordinating Chaplain to the Attica Watch Commander, dated September 9, 2004, which provides that Jewish inmates are to be provided with meals proper for Jewish High Holy Days, including Yom Kippur for which the "break-the-fast" CAD meal was to be provided "one hour after sundown, [at] approximately 8:00 pm." Dixon Declaration Exh. L.[8] That the subject meal was provided two hours later than the normal dinner hour suggests that Plaintiff may have been confused as to when he should have anticipated being called for the meal, a finding which would negate liability as to Defendants, based on the absence of causality, but which also would require a factual finding not permitted on summary judgment. The court, however, need not deny summary judgment as to this claim for a more basic reason.

[8]    Plaintiff has not objected to the memorandum as inadmissible hearsay.

In particular, Plaintiff does not allege, and points to no evidence suggesting, that he was obligated to eat the specific "break-the-fast" meal for Yom Kippur. As such, it is not established, for the purpose of avoiding summary judgment, that the denial of the meal "substantially burdened" Plaintiff's sincerely held religious belief in any major tenet of the Jewish faith, *Salahuddin,* 467 F.3d at 274-75; *Ford,* 352 F.3d at 587, and this unintentional deprivation therefore provides no basis for liability as a violation of Plaintiff's rights to religious exercise under the First Amendment or the RLUIPA. Accordingly, summary judgment as to this aspect of Plaintiff's claim is GRANTED.

### 3. Equal Protection

As for Plaintiff's Fourteenth Amendment equal protection claim, the court observes that Plaintiff essentially alleges Defendants did not permit Jewish inmates receiving the CAD meal to remove kosher food from the mess hall to eat in their cells, while permitting inmates who eat the regular meal plan, presumably non-Jewish inmates, to do so. Complaint ¶¶ 7, 9, 11-12, 24. Plaintiff specifically maintains he was not allowed to bring to his cell his packets of instant oatmeal, sanka coffee and tea, as well as whole onions, green peppers and cucumbers, and

hermetically sealed packages of meats and cheese, whereas non-Jewish inmates who eat the regular prison diet are permitted to take out of the mess hall all "fruits, hot dogs, hamburgers, cold cuts, cheese, chicken patty and bread." *Id.* ¶¶ 9-12. In support of summary judgment, Defendants attribute Plaintiff's equal protection claim to a misunderstanding created by the renovation of Attica's mess halls just prior to Plaintiff's changing his designated religion to Jewish from Muslim, such that during the renovations, Jewish inmates receiving the CAD diet were required, and permitted, to eat their entire kosher meals in their cells, rather than reporting to an assigned mess hall where the kosher meals are normally provided. Defendants' Memorandum at 6-7; Dixon Declaration ¶¶ 6-9; Dixon Declaration Exhs. C-E. Defendants further maintain that Plaintiff has failed to establish that Defendants' application of Attica's prison policies regarding security and related matters constituted intentional discrimination against Plaintiff based on his Jewish religion. Defendants' Memorandum at 14-15.

**\*13** "The Equal Protection Clause of the Fourteenth Amendment requires that all persons similarly situated be treated in the same manner." *Allen v. Cuomo,* 100 F.3d 253, 260 (2d Cir.1996) (citing *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439 (1985)). Inmates are not, however, similarly situated to unincarcerated persons, and "[t]he rights of prisoners are necessarily limited because of their incarceration," and "[a] state may treat differently situated people in a different way." *Allen,* 100 F.3d at 260 (citing cases). Establishment of an equal protection violation requires the plaintiff show "purposeful discrimination directed at an identifiable suspect class." *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing cases). Although discrimination based on religion can establish an equal protection violation, *Benjamin v. Coughlin,* 905 F.2d 571, 574-75 (2d Cir.1990), inmates are not a suspect class, *Allen,* 100 F.3d at 260 n. 1, and thus, no higher level of scrutiny is required. *Turner v. Safley,* 482 U.S. 78, 81 (1987) (holding lower level of scrutiny is applied to equal protection challenges to prison rules and regulations).

Here, in support of summary judgment, Defendants explain that Plaintiff's equal protection claim is properly attributed to Plaintiff's misunderstanding regarding Attica's policy on the CAD program. Dixon Declaration ¶¶ 6-9; Dixon Declaration Exhs. C-E. Lt. Dixon explains that upon enrolling in the CAD program on

August 9, 2004, Plaintiff received a memorandum from Attica Deputy Superintendent Richard Savage instructing Plaintiff that he could receive his CAD meal by reporting to Mess Hall A and passing through the "Special Diet Line," and also advising that "[m]eal attendance and strict adherence to the Alternative Diet is mandatory and will be closely monitored," and that three unexcused absences within one week's time would result in Plaintiff's suspension from participating in the program. Dixon Declaration ¶ 6; Dixon Declaration Exh. C. Lt. Dixon further explains that between April 6 and July 16, 2004, Attica's three mess halls "underwent reconstruction, followed by a cleanup period," and during this time, one mess hall would be closed for reconstruction, leaving the other two open for service. Dixon Declaration ¶ 8. According to Dixon, with the temporary closure of one mess hall, there was not sufficient room to accommodate the entire prison population, so the decision was made to feed the special diet inmates, including the CAD inmates like Plaintiff, in their cells throughout the reconstruction period while the rest of the general prison population, including the non-Jewish inmates, ate in the two open mess halls. *Id.* Upon completion of the reconstruction, the special diet inmates, including the CAD inmates like Plaintiff, were fed in Mess Hall B, according to the same prison regulations applicable to the general prison population inmates who eat the regular prison diet. *Id.* ¶¶ 8-9 and Exh. E (August 24, 2004 Memorandum from Lopes advising Plaintiff that as of August 26, 2004, Plaintiff was to report to Mess Hall B to receive his CAD meal).

**\*14** Significantly, Plaintiff submits nothing in support of his allegation that inmates within the general prison population who eat the regular prison diet (and who presumably are non-Jewish), are routinely permitted to take food items from the mess halls to their cells and that inmates receiving the CAD are not. Rather, according to the "Inmate Orientation Guideline Manual, Section IV-Food Services, Messhall [*sic* ] Policy and Procedures Part 8.3" ("Food Service Policy"), Dixon Declaration Exh. F, all meals are to be provided "cafeteria style with limits placed on certain items ." Inmates are required to eat all food items selected, and although certain rationed items are permitted to be carried from the mess hall, all other food must be consumed or discarded in the mess hall. Food Service Policy Part 8.3 A maximum of four rationed items are permitted to be taken out of the mess hall, including bakery items, bread, desserts, fresh fruit, meat

2008 WL 466255

without sauce and sugar. *Id.* Certain foods, however, may not be removed, including bulk or scooped food, liquids (such as coffee, juice, and milk), corn on the cob, and vegetables. *Id.*

A plain reading of the Complaint reveals that none of the food items Plaintiff was prohibited from removing from the mess hall, including the instant oatmeal, sanka coffee and tea packets, and the whole onions, peppers and cucumbers, were among the list of rationed items permitted to be removed from the mess hall. Insofar as Plaintiff maintains that the peppers and cucumbers are fruits, rather than vegetables, Complaint ¶ 13, Plaintiff does not allege that any non-Jewish inmate was permitted to remove such food items from the mess hall as required to establish an Equal Protection violation. As for the CAD meal meat items Plaintiff maintains he was not allowed to remove, evidence in the record establishes that Plaintiff was permitted to remove such items once they had been opened, including the hermetically sealed meats and cheeses, and the cans of tuna fish and sardines, and that the requirement that such items be opened prior to eating was a matter of legitimate prison security concerns. *See* Dixon Declaration ¶¶ 15-16; Dixon Declaration Exhs. M and N. Furthermore, all the items Plaintiff maintains the non-Jewish inmates who received the regular prison diet were permitted to remove from the mess hall, including "fruits, hot dogs, hamburgers, cold cuts, cheese, chicken patty and bread," Complaint ¶ 12, are included on the list of rationed items permitted to be removed from the mess hall by any inmate, including Plaintiff if he chose to do so. Food Service Policy Part 8.3. Significantly, Plaintiff does not claim that any other general population non-Jewish inmate was allowed to remove hermetically sealed packages of meat and cheese, or unopened cans of tuna fish and sardines or any other canned foods.

According to Lt. Dixon, in August 2004, around the time that the Jewish inmates began to again receive their CAD meals from the mess hall, rather than having the meals served to them in their cells because of the diminished mess hall seating capacity attributed to the renovation of the mess halls, "CAD inmates were attempting to leave Mess Hall B with their CAD trays still wrapped." Dixon Declaration ¶ 15. Lt. Dixon advised CAD inmates, including Plaintiff, that such conduct was not allowed because of security concerns, but that once the trays were opened in the mess halls, the inmates were permitted to take the same items from the trays to their cells, *i.e.,*

the rationed items, as were the non-Jewish and general prison population receiving the regular prison diet. Dixon Declaration ¶ 15. Plaintiff does not contradict Dixon's Declaration in this regard. Absent some evidence that the Food Service Policy was applied to CAD inmates in a manner different from the way it was applied to non-CAD inmates, there is no basis for Plaintiff's equal protection claim.

**\*15** On this record, Plaintiff's equal protection claim fails, and summary judgment is GRANTED.

### 4. Excessive Force

Plaintiff alleges that Defendants Dixon, Petties and Markowski repeatedly threatened and harassed Plaintiff in an attempt to coerce Plaintiff to discontinue pursuing his grievances, and that when Plaintiff failed to do so, Defendant Petties assaulted Plaintiff. Complaint ¶¶ 33-35. According to Plaintiff, Defendant Markowski ordered Petties to assault Plaintiff, and after the assault, Markowski "informed Plaintiff 'that was just a warning, so you better drop your grievances ... or the next time you won't be so lucky,' " and that " 'accidents happen,' " advising Plaintiff " 'to be smart and drop his grievances ... and save himself [Plaintiff] a lot of trouble, or he might end up in the hospital, if he don't [*sic* ].' " Complaint ¶¶ 36-37. Defendants argue in support of summary judgment of Plaintiff's Eighth Amendment excessive force claim alleged against Defendants Dixon, Petties and Markowski, that Plaintiff has failed to exhaust administrative remedies relative to such claim, Defendants' Memorandum at 18, that no objective evidence substantiates Plaintiff's claim, *id.* at 19-21, and that the alleged use of force was, at most, *de minimus,* which is not actionable under the Eighth Amendment. *Id.* at 22-23. These arguments are, however, insufficient to support summary judgment.

#### A. Failure to Exhaust Administrative Remedies

Defendants contend that Plaintiff's failure to exhaust available administrative remedies as to his Eighth Amendment excessive force claim requires summary judgment on such claim. Defendants' Memorandum at 18. In opposition, Plaintiff argues that he prepared and filed a grievance relative to the excessive force claim, but that Attica's "prison authorities" never forwarded the grievance to DOCS Central Office Review Committee ("the CORC"). Plaintiff's Memorandum at 21; Plaintiff's

Declaration ¶ 14; Plaintiff's Statement of Facts ¶ 14. In support of his contention, Plaintiff does not attach copies of the putative grievances but, rather, references a hand-written list of the inmate grievances he allegedly filed, including the two Plaintiff maintains pertained to the assault, *i.e.,* Inmate Grievances "47651-04-Threats" and "47825-04-Threats." Plaintiff's Memorandum at 21; Plaintiff's Declaration ¶ 14; Plaintiff's Statement of Facts ¶ 14 (all referencing Plaintiff's Exh. I). Significantly, in further support of summary judgment, Defendants assert that the fact that the disputed grievance were assigned grievance numbers negates Plaintiff's assertion that the grievances were never filed and processed. Murphy Reply Declaration ¶ 15.

Under the PLRA, exhaustion of all available administrative remedies is required before a § 1983 civil rights action challenging prison conditions, including excessive force claims, may be commenced. 28 U.S.C. § 1997e; *Macias v. Zenk,* 495 F.3d 37, 40 (2d Cir.2007) (" 'the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " (quoting *Porter v. Nussle,* 534 U.S. 516, 532 (2002)). In New York, DOCS provides a three-step review process which an inmate may exhaust prior to commencing a § 1983 action. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.20002).

**\*16** Specifically, the grievance must first be submitted to the prison's Inmate Grievance Review Committee ("the IGRC"), comprised of both inmates and DOCS employees. *Reyes,* 206 F.Supp.2d at 432. If the IGRC's decision is unfavorable to the inmate, the inmate may appeal the decision to the superintendent of the relevant correctional facility. *Id.* The superintendent's decision is further appealable to the CORC which makes the final administrative decision. *Id.* Significantly, all three levels of administrative review must be exhausted before an inmate may seek § 1983 relief in federal court. *Id.* (citing cases).

Exhaustion of administrative remedies is, however, an affirmative defense, rather than a jurisdictional requirement. *Jones v. Bock,* --- U.S. ----, 127 S.Ct. 910, 919-20 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004). As such, if not raised as an affirmative defense, the defendants waive the failure to exhaust. *Johnson,* 380 F.3d

at 695. Furthermore, as with any affirmative defense, the burden is on the defendants to establish that the plaintiff failed to exhaust. *Giano,* 380 F.3d at 675. Accordingly, in the instant case, it is Defendants' burden to establish that Plaintiff failed to exhaust administrative remedies relative to the Eighth Amendment excessive force claim.

Although exhaustion generally is mandatory, in certain situations, including where administrative remedies are not " 'available' to prisoners seeking redress of their grievances," the plaintiff's failure to exhaust is justified. *Giano,* 380 F.3d at 675 (citing 42 U.S.C. § 1997e(a)). Thus, to meet their burden on the affirmative failure to exhaust defense, Defendants must first establish that administrative remedies were available, but that Plaintiff failed to exhaust them. Significantly, the parties do not dispute that DOCS provides a formal procedure by which an inmate may seek administrative relief for grievances arising at DOCS's facilities and applicable to Plaintiff as of October 15, 2004, when Plaintiff alleges he was assaulted. Rather, Defendants, inconsistently, maintain that Plaintiff "never filed a grievance regarding this alleged assault, and he makes no allegation to the contrary in the complaint," Defendants' Memorandum at 18, but later assert, inconsistently, that although Plaintiff contends Attica prison officials prevented him from filing any grievance regarding the alleged assault, that Plaintiff's handwritten list of the inmate grievances, Plaintiff's Exh. I, includes two grievances pertaining to the alleged assault which were assigned inmate grievance numbers establishes that such grievances were, in fact, filed. Murphy Reply Declaration ¶ 15.

The court need not, however, attempt to resolve this apparent discrepancy as such general assertions regarding Plaintiff's failure to exhaust administrative remedies is, without more, insufficient to satisfy Defendants' burden of proof on this affirmative defense. *See Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996) (holding it is defendant's burden in a § 1983 action to prove, either at trial or on summary judgment, affirmative defense asserted by defendants, and plaintiff was not required to establish absence of such defense). Significantly, Defendants admit that "DOCS maintains records of grievances filed by inmates," Murphy Reply Declaration ¶ 15, yet have not submitted anything substantiating their contention that Plaintiff did not exhaust his administrative remedies as to the alleged assault, such as a log showing the absence of any such claim having been filed during the

2008 WL 466255

relevant period of time, an affidavit from Attica's Inmate Grievance Program ("IGP") indicating that no such claim had ever been filed, or, more significantly, that Inmate Grievance Nos. 47651-04 and 47825-04 were assigned to other claims unrelated to the alleged October 15, 2001 assault on Plaintiff or have never been assigned to any grievance. Nor do Defendants submit anything indicating that Plaintiff's claim was filed with the IGRC, and denied, and that Plaintiff failed to appeal the denial, despite, as indicated, admitting, Murphy Reply Declaration ¶ 15, that the assignment of an inmate grievance number to the disputed grievances is evidence that the grievances were, in fact, filed. *See Henrietta D. v. Bloomberg,* 331 F.3d 261, 278 (2d Cir.2003) (observing that absent statutory language to the contrary, Second Circuit would not hold that Congress intended plaintiff to carry the burden of establishing a negative proposition where such would impose an "enormous evidentiary burden," and citing cases, including *Wyatt v. Terhune,* 315 F.3d 1108, 1119 (9th Cir.2003) (concluding Congress intended PLRA's administrative exhaustion requirement as an affirmative defense because, *inter alia,* prison official defendants have better access to prison records).

**\*17** Accordingly, summary judgment on Plaintiff's Eighth Amendment excessive force claim based on failure to exhaust administrative remedies is DENIED.

### B. Merits of Excessive Force Claim

Having denied summary judgment on Plaintiff's Eighth Amendment excessive force claim based on failure to exhaust, the court considers the merits of the claim. Plaintiff claims that Defendant Petties, acting on Markowski's direction, assaulted him on October 15, 2004, causing Plaintiff physical injuries, including blurry vision, ringing in the ears, migraine headaches and dizziness. Complaint ¶¶ 32 and 40. Defendants argue in support of summary judgment on this claim that no objective evidence in the record supports this claim, Defendants' Memorandum at 19-21, and, in any event, there is no evidence that any force Defendant Petties used against Plaintiff on October 15, 2004 was more than *de minimus,* which is not actionable under § 1983. *Id.* at 22-23.

In assessing an inmate's claims that prison officials subjected him to cruel and unusual punishment by using excessive force, courts must determine whether the prison officials acted "in a good-faith effort to maintain or restore prison discipline, or maliciously and sadistically

to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 7 (1992). An inmate plaintiff claiming that prison officials subjected him to cruel and unusual punishment by use of excessive force must establish both an objective and subjective component of the claim. *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993).

Objectively, a § 1983 plaintiff must establish that the alleged deprivation is sufficiently serious or harmful to reach constitutional dimensions. *Romano,* 998 F.2d at 104; *see Wilson,* 501 U.S. at 296. This objective component is "contextual and responsive to 'contemporary standards of decency.' " *Hudson,* 503 U.S. at 9. Thus, while a *de minimis* use of force will rarely suffice to state a constitutional claim, a plaintiff is not required to show that the application of force resulted in any serious injury. *Id.* at 9-10. The subjective component of an Eighth Amendment excessive force claim is whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm, and the use of any unnecessary force is always considered excessive. *Whitley v. Albers,* 475 U.S. 312, 322 (1986) (use of force is always unreasonable where action was "taken in bad faith or for no legitimate purpose"). In fact, "the malicious use of force to cause harm constitutes an 'Eighth Amendment violation[] *per se* ... whether or not significant injury is evident.' " *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)) (brackets and ellipses in original).

Nor does an Eighth Amendment excessive force claim require any serious injury. *Whitley,* 475 U.S. at 322. Rather, a prison official's malicious and sadistic use of force to cause harm always violates contemporary standards of decency, regardless of whether any significant injury is evident. *Hudson,* 503 U.S. at 9 (citing *Whitley,* 475 U.S. 312, 327 (1986)). "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury," a result as unacceptable to the drafters of the Eighth Amendment as it is today. *Id.* (citing *Estelle v. Gamble,* 429 U.S. 97, 102 (1976), and *Wilkerson v. Utah,* 99 U.S. 130, 136 (1879)).

**\*18** In evaluating Defendants' contentions directed to Plaintiff's excessive force claim, the court finds *Griffin, supra,* to be apposite. At issue in *Griffin,* was whether the District Court erred in dismissing the plaintiff inmate's § 1983 excessive force claim given that the claim was "weak"

and the supporting evidence was "extremely thin." *Griffin,* 193 F.3d at 91–92. In particular, the inmate plaintiff claimed he was subjected to excessive force by two prison guards who assaulted him and then faked and inflicted injuries onto themselves to cover up the misconduct. *Id.* at 90. In that case, the inmate also had pleaded guilty in state court to criminal charges brought in connection with the incident. *Id.* at 90-91. Further, the only evidence offered in support of the claim was plaintiff's own testimony and minimal injuries of a bruised shin and some swelling over a knee. *Id.* at 91. Nevertheless, in reversing, the Second Circuit held that the "weakness" of the claim and "extremely thin" evidence, *i.e.,* the plaintiff's averments and minimal injury, did not preclude a reasonable jury from finding that excessive force was used against the plaintiff. *Id.* at 92.

Here, in support of summary judgment, Defendants maintain that no objective evidence in the record supports Plaintiff's claim that he was assaulted on October 15, 2004 and, as such, any force Defendant Petties used against Plaintiff on that day was, at most, *de minimus,* which is not actionable under § 1983. Defendants' Memorandum at 19-23. In opposing summary judgment on Plaintiff's claim that he sustained physical injuries as a result of the assault, including blurred vision, ringing in the ears, migraine headaches, dizziness, and pain, Complaint ¶ 40, Plaintiff maintains that Defendants have failed to refute the allegation that Petties, acting at Markowski's direction, ordered Plaintiff to the commissary so as to assault Plaintiff, and that Plaintiff's personal log of inmate grievances filed demonstrates he filed an inmate grievance regarding the assault. Plaintiff's Memorandum at 24-25; Plaintiff's Declaration ¶ 12; Plaintiff's Exh. I. Significantly, these averments are corroborated by a statement made by Attica Registered Nurse Vance Hawley ("Hawley"). Specifically, Hawley states that "[a]s the Attica nurse on duty on October 18, 2004, I performed plaintiff's medical examinations because he complained of an assault by an unnamed individual. The medical records of the examination indicate that plaintiff had subjective, unsupported complaints of ringing in the ears and blurred vision." Hawley Declaration ¶ 3. Although Plaintiff "exhibited no bruising, swelling, redness or other signs of any assault," Hawley provided Plaintiff with over-the-counter pain medication. *Id.*[9] Plaintiff's medical records, as related by Vance, thus corroborate Plaintiff's claim that he was assaulted on October 15, 2004 and

creates a genuine issue of material fact as to whether Plaintiff was assaulted. *See Griffin,* 193 F.3d at 91–92.

[9]     While Hawley further avers that "[a] true and correct copy of plaintiff's ambulatory health record is attached hereto as Exhibit A," Hawley Declaration ¶ 3, no such exhibit is attached, nor is any copy of Plaintiff's ambulatory health record found elsewhere in the record.

**\*19** Nor is the fact that Plaintiff's medical records provide no direct evidence that Plaintiff was injured on February 28, 2004 dispositive of the claim. Rather, an Eighth Amendment excessive force claim does not require any serious injury. *Hudson,* 503 U.S. at 8; *Johnson,* 481 F.2d at 1028. Furthermore, the record on this motion establishes that Plaintiff complained of injuries on Monday, October 18, 2004, three days after the alleged assault on Friday, October 15, 2004, thereby presenting a reasonable basis to support an inference that the passage of time between the alleged assault and Vance's examination was sufficient for Plaintiff's injuries to heal enough to not be readily apparent to Hawley.

Further, the statements submitted by Petties and Markowski do not preclude the possibility that Plaintiff may have been assaulted on October 15, 2004. Specifically, although Petties maintain that Plaintiff "incorrectly alleges that I assaulted him on October 15, 2004," Petties Declaration ¶ 3, Petties, without directly denying Plaintiff's allegation, only supports this assertion by pointing to the absence of any documentary evidence to the contrary. For example, Petties represents that he was not aware that Plaintiff had filed Grievances 47427-04 and 47428-04 until Petties read the Complaint. *Id.* ¶ 4. Petties also points to the absence of any "use of force report" which Petties would have been required to complete had he used force against Plaintiff, and that the completion of such report "would have prompted an investigation which never occurred." *Id.* ¶ 5. Petties further asserts that Plaintiff, incorrectly, *see* Discussion, *supra,* at 31-32, never filed any grievance regarding the alleged assault, which would have been investigated, *id.,* and that Petties was never disciplined in connection with any assault. *Id.* ¶ 6. Petties summarizes that the absence of any documentary evidence or investigation into the alleged assault "demonstrate[s] that no assault ever took place." *Id.*

2008 WL 466255

Similarly, Defendant Markowski states that he "never observed any use of force by C.O. Petties on plaintiff," Markowski Declaration ¶ 4, and that Plaintiff never filed any grievance regarding the alleged assault, which would have prompted a thorough investigation into the matter. *Id.* ¶ 5. Markowski continues that he was not aware Plaintiff had filed Grievances 47427-04 and 47428-04 until he read Plaintiff's complaint. *Id.* ¶ 6.

The Petties and Markowski Declarations, however, fail to demonstrate the absence of any genuine issue of material fact as to whether Plaintiff was assaulted. Rather, accepting Petties's statement implying that he did not assault Plaintiff, and Markowski's statement that he did not "observe" Petties assault Plaintiff over Plaintiff's unambiguous statement that he was assaulted by Petties, acting at Markowski's direction, would require the court to weigh evidence, which is not allowed on summary judgment. *Kessler v. Westchester County Dept. of Social Services,* 461 F.3d 199, 206 (2d Cir.2006) (" '[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' " (quoting *Anderson,* 477 U.S. at 249)); *see Griffin,* 183 F.3d at 91-92 (court's consideration of evidence in support of plaintiff inmate's claim as "thin" was improper basis for dismissal of claim). Furthermore, Defendants' assertion that Plaintiff never filed any grievance regarding the alleged assault begs the question given that, as Defendants concede, Murphy Reply Declaration ¶ 15, Plaintiff has submitted evidence, Plaintiff's Exh. I, that a grievance pertaining to the alleged assault was both filed and assigned an inmate grievance number. *See* Discussion, *supra,* at 31-32. Simply, Petties's failure to directly deny Plaintiff's claim that he assaulted Plaintiff, while insisting that Plaintiff "incorrectly" maintains he was assaulted, and Markowski's failure to deny that he directed Petties to assault Plaintiff, and statement that he never observed such an assault attempts to 'slice the cheese' a bit too finely. Indeed, a reasonable jury could find the statements of Petties and Markowski to be evasive. As such, there is a material issue of fact as to the first prong of Plaintiff's excessive force claim, and the court next considers the second, subjective prong of the claim.

**\*20** The subjective component of an Eighth Amendment excessive force claim requires that the defendants act maliciously and with the intent to harm the inmate plaintiff. *Hudson,* 503 U.S. at 7; *Romano,* 998 F.2d at 105. To determine whether the defendants acted maliciously, the trier of fact should consider (1) the extent of the plaintiff's injuries; (2) the need for the application of force; (3) the correlation between the need for force and the amount of force used; (4) the threat reasonably perceived by the defendants; and (5) any efforts made by the defendants to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321. In evaluating a prisoner's Eighth Amendment excessive force claim, even *de minimis* force is taken in bad faith if used for no legitimate purpose. *Id.* at 322. Here, with regard to the first *Whitley* factor, it is undisputed that any injuries Plaintiff sustained as a result of the alleged October 15, 2004 use of force were *de minimus.* Nevertheless, as with the objective prong, whether Plaintiff was subjected to the use of any unnecessary force is a critical disputed fact. This unresolved factual issue as to the objective prong of Plaintiff's excessive force claim is not only material, but also sufficient to preclude summary judgment as it also precludes the court from making any determination as to the second, third, fourth and fifth *Whitley* factors necessary to establish the claim's subjective element.

Nothing in the record, however, indicates any personal involvement by Defendant Dixon in the alleged assault. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (to establish liability under § 1983, plaintiff must show defendant was personally involved in the alleged constitutional violation). As such, summary judgment on Plaintiff's excessive force claim is GRANTED as to Dixon.

Here, because the record establishes a genuine issue of material fact as to whether Plaintiff was subjected to any force on October 15, 2004, the court is unable to reach the issue as to whether such force was reasonable, a question that must therefore await trial. As such, summary judgment as to Plaintiff's excessive force claim is DENIED as to Defendants Petties and Markowski, but GRANTED as to Defendant Dixon.

**5. Retaliation**

Plaintiff alleges that after filing Grievances 47427/04 and 47428/04 on September 1, 2004, complaining about the manner in which the CAD meals were provided, Defendants retaliated against him by placing Plaintiff in keeplock confinement from September 30, through October 15, 2004, threatening Plaintiff with physical harm

2008 WL 466255

if Plaintiff did not withdraw the grievances, flooding Plaintiff's cell on October 15, 2004, and that Petties assaulted Plaintiff on October 15, 2004. Complaint ¶¶ 8, 27, 31-37. Defendants argue in support of summary judgment that Plaintiff is unable to establish that Defendants took any adverse action against Plaintiff, or that any adverse action taken against Plaintiff was causally connected to Plaintiff's participation in any protected activity, in this case, his grievance filings. Defendants' Memorandum at 23-27.

**\*21** For a plaintiff to succeed in a First Amendment retaliation claim, he must show that 1) the conduct cited as the cause for retaliation is protected; 2) the defendant took adverse action against the plaintiff; and 3) there was a causal connection between the protected conduct and the adverse action. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003). Courts are properly skeptical of prisoner retaliation claims as "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." " *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis,* 320 F.3d at 353 (internal quotation marks and citation omitted). In making this determination, courts are to "bear in mind" that "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Dawes,* 239 F.3d at 493 (internal quotation marks and citations omitted).

The filing of prisoner grievances is among the conduct protected by the First Amendment and thus actionable under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). *See Smith v. Woods,* 2006 WL 1133247, at \* 10 (N.D.N.Y. Apr. 24, 2006) (extending First Amendment protection to making of oral complaints to correctional officers), *aff'd,* 219 Fed. Appx. 110 (2d Cir.2007). As such, Plaintiff's allegations that he was subjected to retaliatory conduct for filing Grievances 47427-04 and 47428-04 satisfies the first element of the retaliation claim.

With regard to the second element requiring adverse action, Plaintiff's alleges that Defendants threatened and

harassed him to drop the grievances, flooded Plaintiff's cell with water, placed him in keeplock confinement, and that Petties, at Markowski's direction, assaulted him. Complaint ¶¶ 8, 27, 31-37; Plaintiff's Memorandum at 24-26; Plaintiff's Declaration ¶¶ 12-13. Insofar as Plaintiff maintains that Defendant Petties and Markowski threatened and assaulted Plaintiff and Defendants flooded Plaintiff's cell, such assertions satisfy the second element of a retaliation claim. *See Davis,* 320 F.3d at 352 (the use of unnecessary force to retaliate against a plaintiff for engaging in protected activity constitutes unlawful retaliation); *Gill v. Pidlypchak,* .389 F.3d 379, 384 (2d Cir.2004) (allegations that corrections officers made threats against inmate for filing prison grievance along with allegation that corrections officers followed through with such threats constitutes adverse action for § 1983 retaliation claim); *Woods v. Medlock,* 2008 WL 123845, \*6 (W.D.Pa. Jan. 9, 2008) (denying motion to dismiss inmate's § 1983 retaliation claim alleging defendant correctional officers placed inmate plaintiff in unlighted, flooded, filthy cell to retaliate against plaintiff's filing lawsuits). [10] Nevertheless, although "[a]n allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a prison grievance, states a claim under § 1983," *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (citing *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d Cir.1988)), Plaintiff's allegation that he was placed in keeplock confinement on September 30, 2004, in retaliation for filing the grievances, however, is without merit.

[10]    Defendants' assertion, Dixon Declaration ¶ 27, and October 16, 2004 Memorandum from DOCS Lt. J. Lambert to Sgt. K. Barbary, Dixon Declaration Exh. P, explaining that no "logical explanation why water was coming through the cell vent of Odom's cell" on October 15, 2004, and that such flooding has not reoccurred does not, as Defendants insist, Defendants' Memorandum at 25 n. 5, establish that no Defendant was responsible for the flooding of Plaintiff's cell or that such flooding was unintentional. Rather, the unexplained cause of the undisputed, but suspicious, flooding can be interpreted as establishing the flooding was the result of a purposeful act. Significantly, Defendants, who possess the exclusive capability to do so, fail to explain what steps were taken to objectively investigate the issue, or any other efforts to establish the actual cause of the flooding. Surely, a competent plumber could provide

a reasonable explanation. Indeed, DOCS's failure to determine the cause could be circumstantial evidence of a conscious avoidance of knowledge of Defendants' involvement.

**\*22** Essentially, such an allegation calls into question the validity of the prison violation with which Plaintiff was charged, resulting in the keeplock confinement. Plaintiff, however, has not challenged the veracity of such charges. *See Jones v. Coughlin,* 34 F.3d 677 at 679 (2d Cir.1995) (vacating and remanding district court's decision that inmate plaintiff's claim of retaliatory filing of false misbehavior report was wholly conclusory as based solely on adverse disciplinary decision where plaintiff, although provided a hearing on the disputed disciplinary charges, "was unfairly denied the right to call key witnesses in defense of the charges against him," and, thus, had no opportunity to prove charges were false, as required before the district court could consider whether filing of false charges was intended to retaliate against the plaintiff). Further, the filing of a false misbehavior report does not constitute "a *per se* constitutional violation actionable under § 1983" provided the inmate is afforded due process protection through a disciplinary hearing on the misbehavior report. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) ("prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest"), *cert. denied,* 485 U.S. 982 (1988). "The key inquiry in assessing an allegation that an inmate has been found guilty of false disciplinary charges is whether or not the prison has provided the inmate with the minimum procedural due process protections [to dispute a false or incorrect charge] guaranteed by the Fourteenth Amendment." *Franco v. Kelly,* 854 F .2d 584, 587 (2d Cir.1988) (bracketed material added). Summary judgment on a retaliation claim based on the filing of a false misbehavior report, however, is improper where an inmate either is not granted a hearing on the alleged false disciplinary charges, or is granted a disciplinary hearing, but is unfairly denied the right to rebut the charges by presenting evidence or calling witnesses in defense of the charges against him. *Jones,* 45 F.3d at 679. Here, Plaintiff does not allege that no disciplinary hearing on the charges was ever held, or that Plaintiff was denied due process in connection with such hearing. As such, Plaintiff cannot establish the second element of a retaliation claim based on his keeplock confinement and summary judgment is GRANTED as to this aspect of Plaintiff's retaliation claim.

Finally, with regard to the third element requiring a causal connection between Plaintiff's participation in the protected action, *i.e.,* the filing of grievances, and the adverse action, the Second Circuit has held that the temporal proximity of an adverse action in relation to the filing of an inmate grievance is circumstantial evidence of a causal connection so as to establish a retaliation claim. *Colon,* 58 F.3d 872. Here, because the alleged threats, assault, and unexplained flooding of Plaintiff's cell occurred within a short time after Plaintiff filed the grievances on September 1, 2004, a material fact issue regarding the causal connection is established as to this aspect of the claim.

**\*23** As Plaintiff has demonstrated a material issue of fact necessary to establish that Defendants took adverse action against Plaintiff based on Plaintiff's grievances, *i.e.,* flooding Plaintiff's cell and threatening and assaulting Plaintiff, summary judgment on this portion of Plaintiff's retaliation claim is DENIED.

### 6. Qualified Immunity

Alternatively, Defendants argue they are qualifiedly immune from liability in the instant action. Defendant's Memorandum at 27-30. Because summary judgment is GRANTED in favor of Defendants on the Plaintiff's First Amendment and RLUIPA religious freedom claims and the Fourteenth Amendment Equal Protection claim, qualified immunity is considered only with regard to Plaintiff's Eighth Amendment excessive force and First Amendment retaliation claims. Plaintiff argues in opposition that Defendants are not qualifiedly immune from liability in the instant case because it was not objectively reasonable for Defendants to believe the actions of which Plaintiff accuses them did not violate Plaintiff's civil rights as alleged in his Second Cause of Action. Plaintiff's Response at 32-40.

The doctrine of qualified immunity "shields a government official acting in an official capacity from suit for damages under § 1983 unless the official 'violated clearly established rights of which an objectively reasonable official would have known.' " *Blouin v. Spitzer,* 356 F.3d 348, 359 (2d Cir.2004) (quoting *Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003)). "The determination generally involves a two-step inquiry: do the facts alleged show the officer's conduct violated a constitutional right, and, if so, was the right in question clearly established?" *Blouin,* 356 F.3d

2008 WL 466255

at 359 (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001) (qualified immunity does not shield government official from liability in civil rights action where alleged facts, taken in light most favorable to party asserting injury, show defendant government official's conduct violated a constitutional right that was clearly established at the time of the alleged violation)). Here, the record before the court fails to establish that qualified immunity shields Defendants from the instant litigation with regard to the Eighth Amendment excessive force claim and the retaliation claim based on threats, abuse and flooding.

In particular, at the time of the alleged constitutional violations, excessive use of force against inmates for any purpose regarding prison administration was well established. *See Hudson,* 503 U.S. at 7-8. Plaintiff's right to file an inmate grievance, including verbal complaints to prison supervisors, without fear of retaliation was equally well established at the time of the alleged events in this case. *Davis,* 320 F.3d at 352-53 (filing of prison grievances is activity protected by the First Amendment). Moreover, on this record, the court finds that if the facts pertaining to Plaintiff's excessive force claim as alleged by Plaintiff are established at trial, no reasonable corrections officer could reasonably believe he was not violating Plaintiff's constitutional rights. *Saucier,* 533 U.S. at 201.

**\*24** As such, Defendants' summary judgment motion, insofar as it alternatively asserts the defense of qualified immunity, is DISMISSED as moot in regard to Plaintiff's religious freedom and equal protection claims, and the excessive force claim as alleged against Dixon, and is DENIED as to the excessive force claim against Defendants Petties and Markowski and the retaliation claim.

### CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment (Doc. No. 47) is GRANTED in part and DENIED in part.

The parties are to appear before the undersigned on April 2, 2008 at 11:00 A.M. to schedule further proceedings. The Attorney General's Office shall make arrangements for Plaintiff to appear by telephone.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 466255

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3254908
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Christopher W. NEAL, Plaintiff,
v.
S.E. BYRNE, Correction
Lieutenant, et al., Defendants.

No. 06–CV–6250 CJS.
|
Oct. 7, 2009.

West KeySummary

1    **Federal Civil Procedure**
    👉  Civil Rights Cases in General

A prisoner's civil rights claim pursuant to
§ 1983 created genuine issues of material
fact concerning a prison superintendent's
personal involvement in alleged retaliation
against the prisoner by a corrections officer.
The superintendent and officer made only
a cursory and conclusory argument that
superintendent made an investigation and
found no evidence to substantiate prisoner's
allegation. Furthermore, superintendent and
officer failed to present prisoner's letter
complaining of retaliation or the response or
affidavit of the superintendent. 42 U.S.C.A. §
1983.

Cases that cite this headnote

**Attorneys and Law Firms**

Christopher W. Neal, Brooklyn, NY, pro se.

Thomas J. Kidera, Benjamin A. Bruce, New York
State Attorney General's Office, Rochester, NY, for
Defendants.

DECISION AND ORDER and ORDER TO SHOW
CAUSE PURSUANT TO LOCAL RULE 41.2

CHARLES J. SIRAGUSA, District Judge.

**\*1** This is an action pursuant to 42 U.S.C. § 1983, in
which Plaintiff, formerly a prison inmate in the custody of
the New York State Department of Correctional Services
("DOCS"), alleges that Defendants, all employees of
DOCS, violated his federal constitutional rights. Now
before the Court is Defendants' unopposed motion for
partial summary judgment [# 29]. For the reasons that
follow, the application is granted in part and denied in
part. Additionally, Plaintiff is directed to show cause why
his remaining claims should not be dismissed for failure to
prosecute.

BACKGROUND

Unless otherwise noted, the following are the undisputed
facts of this case, viewed in the light most-
favorable to Plaintiff, the non-moving party. At all
relevant times, Plaintiff was housed at Five Points
Correctional Facility ("Five Points"). During the
relevant period, Defendant Thomas Poole ("Poole")
was the Superintendent at Five Points, Defendant
Lawrence Weingartner ("Weingartner") was the Deputy
Superintendent, Defendant S.E. Byrne ("Byrne") and
Defendant Henry ("Henry") were Corrections Officers,
and Defendant Omar Abdel–Rassaq ("Omar") was the
Muslim Imam or Chaplain. At all relevant times,
Defendant Glenn Goord ("Goord") was the DOCS
Commissioner, and Defendant Kenneth McLaughlin
("McLaughlin") was employed by the Office of the New
York State Inspector General.

On June 22, 2005, Plaintiff was assigned to a new
cell at Five Points, in which there was no mattress.
Plaintiff complained about the missing mattress to several
corrections officers, including Defendant Henry. Plaintiff
received a mattress the next day.

On July 4, 2005, Plaintiff filed an inmate grievance,
stating that he was a Muslim, and that he did not
want to be double-bunked with his non-Muslim cell-
mate, since the man had photographs of family members

Neal v. Byrne, Not Reported in F.Supp.2d (2009)
Case 9:16-cv-01229-FJS-TWD    Document 29    Filed 10/16/18    Page 78 of 148
2009 WL 3254908

displayed, which prevented Plaintiff from praying. The Inmate Grievance Review Committee ("IGRC") denied the appeal, and Poole affirmed the IGRC's decision.

Sometime prior to July 2005, Plaintiff successfully settled a lawsuit in which Byrne was a defendant. On July 28, 2005, Byrne wrote a misbehavior report against Plaintiff, charging him with harassment. Plaintiff was subsequently found guilty of the charge and sentenced to twenty-five days in Keeplock, with loss of privileges. As discussed further below, Plaintiff wrote a letter to the Office of the New York State Inspector General, complaining about Byrne's alleged retaliation. Although the details are not clear from the record, the Inspector General's office initiated some type of investigation. However, Plaintiff was not satisfied with the result. Poole also investigated and found no evidence to substantiate the allegation. (*See,* Letter of Lucien J. Leclaire, Jr. Deputy DOCS Commissioner, dated August 23, 2005).

On August 8, 2005, Plaintiff filed a grievance, complaining that he was not being allowed to purchase Muslim oil from a particular mail-order supplier. The IGRC denied the grievance, finding that Plaintiff was required, by DOCS Directive 4911, to obtain such oil from the facility Imam. In that regard, Five Points's Policies and Procedures, Policy Number 23.1, states, in relevant part: "The facility Imam will provide access to religious oils through a community fund raiser. As per DOCS Directive # 4911, Section IV, Paragraph K, the Superintendent has approved the facility Imam as the only approved source for Islamic oils." (Defendant's Rule 26 Disclosures, Exhibit B). Poole affirmed the IGRC's ruling.

**\*2** On November 8, 2005, Imam Omar sent a memo to Weingartner, advising him that he was suspending Plaintiff, along with four other inmates, from Muslim community call-outs, "due to their misbehavior and continuance [sic] disturbance of the Muslim community programs and activities." On November 10, 2005, Plaintiff filed an inmate grievance, complaining that Omar had "unjustly" removed Plaintiff's name from the call-out list for Islamic classes and "Friday Jummah Services." As part of the grievance, Plaintiff also asked that he be provided with "fasting food for 6 days of Shawwal." Plaintiff did not indicate that he had previously requested or been denied such food. The IGRC denied the grievance, and Poole affirmed the decision, stating: "Imam Omar removed you from the call out based on a disturbance you

caused within the Muslim community. You were advised to write to the Imam and resolve the issue. Appeal denied."

On May 23, 2006, Plaintiff, proceeding *pro se,* commenced this action. On March 8, 2007, Plaintiff filed an Amended Complaint, Docket No. [# 6] ("the Complaint"). The Complaint purports to state the following claims: 1) a claim that Henry deprived Plaintiff of a mattress on one occasion; 2) a claim that Byrne retaliated against Plaintiff by filing a false misbehavior report against him; 3) a claim that Omar violated Plaintiff's rights to religious freedom and due process, by removing him from the Muslim call-out list, resulting in Plaintiff missing Friday Jummah prayer services and religious instruction over a period of three weeks, and by denying him religious meals; 4) a claim that Weingartner permitted Omar to violate Plaintiff's rights of religious freedom and due process; 5) a claim that Poole permitted Byrne to retaliate against him, and permitted Omar and Weingartner to violate his rights to religious freedom and due process, and that Poole further violated Plaintiff's religious rights by allowing him to be double-bunked with a non-Muslim cell mate and by preventing him from receiving Muslim oils through the mail; 6) a claim that Goord failed to prevent retaliation by Byrne, and permitted violations of Plaintiff's religious rights; and 7) a claim that McLaughlin failed to properly investigate Plaintiff's retaliation complaint against Byrne.

On June 25, 2008, Omar filed his sworn responses to Plaintiff's Request for Deposition Upon Written Questions. (Docket No. [# 27] ). Omar stated in relevant part: "On November 8, 2005, C. Neal was suspended from Muslim community call outs due to misbehavior and disturbance of the Muslim community programs and activities.... Directive 4202 sets out the procedure for managing religious services. The inmates and plaintiff were not suspended from practicing their religious faith only from call outs to participate in religious services."

On November 25, 2008, Defendants filed the subject motion for summary judgment. Defendants contend that they are entitled to judgment for the following reasons: 1) Plaintiff lacks standing to challenge his removal from Muslim services, since such removal "was due to Plaintiff's own misbehavior and disturbances"; 2) Plaintiff's First Amendment religious freedom claims must be dismissed, since Plaintiff did not have a sincerely-held belief in the Muslim faith, since Defendants did not substantially burden Plaintiff's beliefs, and since Defendants acted

reasonably; 3) the claims against Goord, Poole, and McLaughlin must be dismissed for lack of personal involvement; 4) Defendants are entitled to qualified immunity on the claim involving double-bunking with non-Muslim cell mates; and 5) Plaintiff cannot recover compensatory damages, since he suffered no physical injury. Defendants also contend that the claim against C.O. Henry must be dismissed, pursuant to FRCP 4(m), for failure to effect service. Along with their motion, Defendants served Plaintiff with an *Irby* notice, advising him, *inter alia,* that his claims could be dismissed unless he responded with "sworn affidavits or other papers as required by Rule 56(e)." (Docket No. [# 32] ).

 **\*3** On February 5, 2009, the Court issued a Motion Scheduling Order [# 34], directing Plaintiff to file and serve any response to the summary judgment motion on or before March 6, 2009. On February 9, 2009, the Court issued a Decision and Order [# 35], denying Plaintiff's motion for appointment of counsel, and reiterating that he had to "comply with the scheduling deadlines set forth in the Motion Scheduling Order (Docket No. [# 34] ) filed on February 5, 2009 ." On May 18, 2009, the Court issued an Amended Motion Scheduling Order [# 36], noting that Plaintiff had failed to file any responsive papers, and cancelling oral argument. To date, the Court has received no response from Plaintiff.

## DISCUSSION

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to

support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir.1996) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied,* 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson,* 477 U.S. at 249; *see also,* FED. R. CIV. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party ." *Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e). Moreover, since Plaintiff is proceeding *pro se,* the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

 **\*4** Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. See, *e.g., Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977).

**Neal v. Byrne, Not Reported in F.Supp.2d (2009)**
Case 9:16-cv-01229-FJS-TWD    Document 29    Filed 10/16/18    Page 80 of 148
2009 WL 3254908

* * *

An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation. *See Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Personal involvement can be shown by: evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

*Back v. Hastings On Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122, 127 (2d Cir.2004).

*Retaliation Claim Against Byrne*
At the outset, the Court notes that Byrne has not moved for summary judgment on the retaliation claim, except to seek partial summary judgment as to compensatory damages. The Court will discuss the compensatory damages issue below.

*Henry Was Never Served*
On May 18, 2008, the Honorable Jonathan W. Feldman, United States Magistrate Judge, issued a Decision and Order [# 25] in this action, which noted, in relevant part, that "[a] review of the Docket in this action reveals that defendant C.O. Henry has not been served, [and] that plaintiff has neither requested assistance with service or otherwise pursued his claim against C.O. Henry." Judge Feldman extended the deadline for service by one hundred twenty days, to give Plaintiff a "final opportunity" to either serve Henry or request the Court's assistance in doing so. In response, Plaintiff did nothing. Consequently, Plaintiff has failed to make timely service on Henry, and the claim against Henry is dismissed without prejudice, pursuant to FRCP 4(m). The Court notes, though, that even if Plaintiff had served Henry, the bare allegation that

Henry failed to provide Plaintiff with a mattress on one occasion fails to state a constitutional claim.

*First Amendment Claims*
 **5** The legal principles applicable to prisoners' claims under the First Amendment's Free Exercise Clause are well-settled:

[A]lthough prisoners do not abandon their constitutional rights at the prison door, lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. Accordingly, ... a challenged prison regulation is judged under a 'reasonableness' test less restrictive than that ordinarily applied: a regulation that burdens a protected right passes constitutional muster 'if it is reasonably related to legitimate penological interests.

Courts must evaluate four factors in making the reasonableness determination: [1] whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; [2] whether prisoners have alternative means of exercising the burdened right; [3] the impact on guards, inmates, and prison resources of accommodating the right; and [4] the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests. The first ... "factor" is more properly labeled an "element" because it is not simply a consideration to be weighed but rather an essential requirement.

The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs. The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational.

*Salahuddin v. Goord,* 467 F.3d 263, 274–275 (2d Cir.2006) (citations and internal quotation marks omitted). To summarize, the plaintiff has the threshold burden of establishing that the complained-of action substantially burdened his sincerely-held religious belief, and if that burden is met, the burden shifts to the defendant to identify a legitimate penological interest for the action. Once defendant does that, the court must consider

whether the action is reasonable, using the test described above.

Here, Defendants maintain that Plaintiff cannot meet his threshold burden, because he does not have a sincerely-held belief in the Muslim faith, as shown by his disruptive behavior during religious services, and because Defendants did not substantially burden his religious beliefs. Defendants further contend that, even if Plaintiff can meet his initial burden, their actions were reasonably related to legitimate penological interests, namely, "the legitimate governmental interest of preserving order within the prison system." (Defendants' Memo of Law [# 33] at 6). As a separate grounds for dismissal, Defendants contend that Plaintiff lacks standing to challenge his exclusion from Muslim services, since it was caused by his own misbehavior. In that regard, Defendants cite *Jackson–Bey v. Hanslmaier,* 115 F.3d 1091 (2d Cir.1997).

**\*6** Even assuming, *arguendo,* that Plaintiff has standing and that his religious beliefs are sincerely held, the Court agrees that he has not shown that Defendants substantially burdened those beliefs. In that regard, Plaintiff contends only that he missed three Jummah prayer services and Islamic study classes, that he could not purchase Muslim oils through the mail, and that he had to share a cell with a non-Muslim.[1] Plaintiff was not prevented from praying by himself or obtaining oils from the Imam, nor was he otherwise prevented from observing his Muslim faith. The Court finds that these incidents of which Plaintiff complains do not amount to a substantial burden.

[1] Plaintiff also complains that he was denied "fasting food" during Shawwal. However, there is no indication that Plaintiff made a request for such food to any Defendant in this action. In that regard, Plaintiff inserted his request for such food, apparently as an afterthought, into an inmate grievance in which he was complaining about his removal from the Muslim call-out list for prayer services and classes. There is no indication that it was necessary for him to be on the call-out list to receive the fasting food, and there is no indication that he requested such meals through the proper channels. As to that, the Court finds that making such a request as part of a grievance, where there is no indication that such a request had previously been denied, was not the proper channel.

Additionally, the Court finds, after considering the factors set forth above, that, even if these incidents amounted to a substantial burden, that Defendants acted reasonably. In that regard, Defendants maintain that Plaintiff was removed from the Muslim call-out list because of disruptive behavior, and Plaintiff has not produced any evidentiary proof, in admissible form, to dispute that claim. Furthermore, it was not unreasonable to require Muslim inmates to obtain oil from the facility Imam, or to house them in the same cell with inmates of different faiths. Therefore, Defendants' motion for summary judgment on the First Amendment religious freedom claims is granted.

*Personal Involvement By Goord, Poole, and McLaughlin*
As discussed above, a defendant cannot be held liable under Section 1983 unless he was personally involved in the alleged constitutional violation. The Complaint contains conclusory allegations that Poole "refused to address" the double-bunking issue, allowed Omar and Weingartner to violate Plaintiff's rights, prevented Plaintiff from receiving Muslim oils, and allow[ed] bias[ed] investigations." As for the alleged biased investigations, the Court construes the complaint to allege that Poole ignored the alleged retaliation by Byrne. The Complaint also contains conclusory allegations that Goord "refused to move" Plaintiff away from Byrne, and permitted violations of Plaintiff's religious freedom. The Complaint further alleges that McLaughlin failed to order an investigation, after being "notified" of Byrne's alleged retaliation.

With regard to Goord, the record indicates that, although Plaintiff wrote letters to Goord, concerning the double-bunking and alleged retaliation by Byrne, Goord referred the letters to other staff members, who investigated and responded to Plaintiff. (Defendants' Rule 26 Disclosures, Exhibit A). Additionally, Plaintiff's letter regarding double-bunking did not mention religious issues, but merely complained about double-bunking generally. (*See,* Letter to Goord, dated received December 8, 2006, complaining about cell mates who are dirty, don't like to clean, or homosexual).

With regard to McLaughlin, the record indicates that on July 28, 2005, Plaintiff wrote a letter to the Office of the Inspector General, requesting some type of investigation. Apparently, the letter involved alleged retaliation by Byrne, since July 28, 2005 is the same

date that Byrne issued Plaintiff the misbehavior report. Plaintiff apparently received some type of response from the Inspector General's office on August 1, 2005. On or about August 17, 2005, Plaintiff wrote to McLaughlin, complaining that whatever investigation was being conducted was "frivolous." There is no indication that McLaughlin responded to the letter.

**\*7** As for Poole, the record indicates that Plaintiff wrote a grievance concerning double-bunking with non-Muslims, and that Poole affirmed the denial of the grievance, finding that "there is no statewide mandate to house same race or same ethnicity inmates together." (Defendant's Rule 26 Disclosures, Exhibit B). Plaintiff also filed a grievance, complaining that he was not being permitted to purchase Muslim oils through the mail, and Poole affirmed the denial of that grievance. In that regard, Poole noted that DOCS Directive 4911 permitted Plaintiff to obtain such oils, but that Plaintiff had to obtain the oil from the facility Imam, not through the mail. Further, Plaintiff filed a grievance concerning his removal from the Muslim call-out list, and Poole affirmed the denial of the grievance, noting: "Imam Omar removed you from the call out based on a disturbance you caused within the Muslim community. You were advised to write to the Imam to resolve the issue." Finally, Plaintiff complained to Poole regarding retaliation by Byrne, and Poole found no evidence to substantiate the claim.

The Court has already found that Defendants are entitled to summary judgment on the merits of religious freedom claims. Additionally, the Court finds that Goord and McLaughlin are entitled to summary judgment on the remaining retaliation claim, since there is no indication that they were personally involved. Plaintiff has not come forward with evidentiary proof in admissible form, showing that Goord or McLaughlin was actually aware of the alleged retaliation.

As for Poole, the record indicates that Plaintiff wrote a letter to the DOCS Commissioner complaining of retaliation by Byrne, that the Commissioner's office referred the letter to Poole, and that Poole investigated and found no evidence to substantiate Plaintiff's allegation. (Defendants' Rule 26 Disclosure, Exhibit A, Letter of Lucien J. Leclaire, Jr., dated August 23, 2005). The record does not contain Plaintiff's complaint

letter, Poole's response, or an affidavit from Poole, and Defendants' counsel makes only a cursory and conclusory argument. (Defendants' Memo of Law at 7). Consequently, the Court finds that there are triable issues of fact concerning Poole's personal involvement in the alleged retaliation by Byrne.

*Compensatory Damages*

Defendants further maintain that Plaintiff cannot recover compensatory damages, since he did not suffer any physical injury. 42 U.S.C. § 1997e(e) provides that, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." Plaintiff has not shown that he suffered any physical injury in connection with the claims in this action. Accordingly, Defendants are granted summary judgment as to compensatory damages.

CONCLUSION

The claim against C.O. Henry is dismissed without prejudice. Defendants' motion for partial summary judgment [# 38] is granted in part and denied in part. In that regard, Defendants are granted summary judgment as to all claims, except the retaliation claim against Byrne and Poole. The Clerk of the Court is directed to enter judgment for Goord, Omar, McLaughlin, and Weingartner. Byrne and Poole are granted summary judgment as to compensatory damages, and Plaintiff's demand for such damages is dismissed.

**\*8** Based upon Plaintiff's failure to contest the summary judgment motion, as well as the fact that the Court has heard nothing from Plaintiff since April 2008, it is unclear whether Plaintiff has abandoned this action. Accordingly, Plaintiff is Ordered to Show Cause, pursuant to Local Rule of Civil Procedure 41.2, in writing on or before **October 23, 2009,** why this action should not be dismissed for failure to prosecute. If Plaintiff fails to comply with this direction, the Court will dismiss this action.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3254908

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-01229-FJS-TWD    Document 29    Filed 10/16/18    Page 83 of 148
Singleton v. Williams, Not Reported in F.Supp.3d (2014)
2014 WL 2095024

2014 WL 2095024
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Dwayne SINGLETON, Plaintiff,
v.
Correction Officer WILLIAMS, Defendant.

No. 12 Civ. 02021(LGS).
|
Signed May 20, 2014.

*OPINION AND ORDER*

LORNA G. SCHOFIELD, District Judge.

**\*1** Dwayne Singleton, pro se, brings this action pursuant to 42 U.S.C. § 1983 against Defendant Correction Officer Kimberly Williams, alleging interference with his mail during his incarceration at the George R. Vierno Center ("GRVC") on Rikers Island, in violation of the First and Fourteenth Amendments. Defendant moves for summary judgment dismissing the Complaint in its entirety ("Motion"). Because Plaintiff has failed to adduce sufficient evidence to permit a reasonable juror to return a verdict in his favor, Defendant's Motion is granted.

## BACKGROUND

### I. Factual Background
The following facts are taken from Plaintiff's deposition, Plaintiff's Complaint, Defendant's Statement pursuant to Local Rule 56.1 ("56.1 Statement") and Defendant's other filings in support of her Motion.

This case involves Plaintiff's allegations that his mail was stolen or withheld while he was incarcerated at GRVC, from December 2009 to May 2010, and from September 2011 to March 2012. While at GRVC, Plaintiff drafted letters "everyday," usually "ten, fifteen letters in one shot." Plaintiff corresponded with his mother, his cousins, an ex-girlfriend, his lawyers, a friend named "Stacy," whose last name and contact information is unknown to Plaintiff, and several other women whose names he does not recall. Plaintiff also sent letters to outpatient programs, drug programs, magazines, and "businesses," including a record company and a film company.

Plaintiff received "a lot of mail" while incarcerated at GRVC, including from his mother, the ex-girlfriend, a social worker and other individuals. Plaintiff also received money from his mother and his cousins on numerous occasions. In addition to personal mail, Plaintiff received legal mail, which was recorded in a log. Plaintiff signed for legal mail on twelve occasions between December 2011 and March 2012.

Plaintiff suspected he was not receiving all of his mail because he "wrote to certain people and he didn't get [any] response back [from] ... a few girls ... [and] businesses." In addition, Plaintiff's friend "Stacy" told him that she had not received any of the four or five letters Plaintiff had sent her, and that she had sent him letters, which Plaintiff did not receive. Plaintiff testified that no one except Stacy told him they had sent mail that he had not received.

While Plaintiff was an inmate at GRVC, Defendant was the primary mail officer on duty from Monday to Friday, and frequently distributed Plaintiff's mail, usually after lunch. When Defendant was unavailable, other correction officers filled in and distributed mail to the inmates.

Plaintiff and Defendant offer conflicting evidence concerning Defendant's alleged interference with Plaintiff's mail. Plaintiff asserts that he first suspected that Defendant was stealing his mail because she spoke to him disrespectfully. Plaintiff testified that "[t]hings started to get out of hand when [Plaintiff] suspected that [Defendant] was ... messing with [his] mail." Plaintiff observed that Defendant was friendly with some inmates and delivered their mail, but heard that she was "playing with" the mail of inmates she did not like.

**\*2** According to Plaintiff, when he confronted her, she "would look at [him] with the mail in her hand, and keep walking." On March 5, 2012, Defendant made two statements to Plaintiff, both of which he interpreted as admissions that she was withholding his mail. Defendant made the statements when Plaintiff was questioning or accusing Defendant about his mail, apparently not for the first time, and she responded, "[y]ou keep asking me stupid questions, you aint' getting your f*ckin' mail." Defendant also said "you crazy, take ya' medication, cause you got that right, you won't be getting no f*ckin' mail

from me." According to Plaintiff, he could not "prove" that Defendant was interfering with his mail until she made these statements. Plaintiff stated that during this exchange he was being "volatile" and "probably having bipolar disorder." After that incident, Plaintiff did not recall receiving mail from Defendant again, although he did receive mail from other correction officers. Plaintiff was transferred out of GRVC approximately one week after the confrontation with Defendant.

According to Defendant, near the end of Plaintiff's incarceration at GRVC, he accused her of stealing his mail, spit on the glass separating them, and threatened to kill her, at which point Defendant gave Plaintiff's mail to a different correction officer for delivery. Defendant states that after this incident, Plaintiff would "yell and threaten [her]" and on multiple occasions, threatened to kill her and her family. Defendant denies withholding, tampering, or otherwise interfering with Plaintiff's mail.

## II. Procedural History

On December 19, 2013, Defendant filed her Motion, 56.1 Statement, and supporting papers, including excerpts from Plaintiff's deposition. On January 22, 2014, Plaintiff filed his opposition to the Motion ("Opposition"). Plaintiff's Opposition consisted of six declaratory sentences reiterating the assertions in his Complaint. Plaintiff filed no supporting affidavits or other evidence, and no opposition to Defendant's 56.1 Statement. On January 29, 2014, Defendant filed her reply to Plaintiff's Opposition. On March 17, 2014, Plaintiff filed a "response" to Defendant's reply, asserting that he "did overhear [Defendant] tell [him] with her own words that she was stealing [his] mail," and that "there are no witnesses because it was just [Defendant] in front of [Plaintiff's] cell."

## STANDARD

The standard for summary judgment is well established. Summary judgment is appropriate where the record before the court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial burden of informing the court of the basis for the summary judgment motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact. Fed.R.Civ.P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477

U.S. 317, 322 (1986); Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir.2002). The court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); In re "Agent Orange" Prod. Liab. Litig., 517 F.3d 76, 87 (2d Cir.2008).

**\*3** If the non-moving party has the burden of proof on a specific issue, the moving party may satisfy its own initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. See, e.g., Celotex, 477 U.S. at 322–23; PepsiCo, Inc. v. Coca–Cola Co., 315 F.3d 101, 105 (2d Cir.2002). In other words, summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

"Although pro se plaintiffs are entitled to special latitude, when defending against summary judgment motions, absent a showing of concrete evidence from which a reasonable juror could return a verdict in [the non-moving party's] favor, summary judgment must be granted to the moving party." Jermosen v. Coughlin, 877 F.Supp. 864, 867 (S.D.N.Y.1999) (alteration in original) (citations omitted) (internal quotation marks omitted). "Evidence which is merely colorable, conclusory, speculative or not significantly probative is insufficient to withstand a summary judgment motion." Id. (internal quotation marks omitted).

Where the non-moving party fails to respond to a Rule 56.1 statement submitted by the moving party, the facts in the moving party's Rule 56.1 statement may be deemed admitted as a matter of law. S.D.N.Y.R. 56.1–56.2. In the Second Circuit, however, "[c]ourts ... typically forgive a pro se plaintiff's failure to file a Local Rule 56.1 Statement, and generally conduct their own independent review of the record." Lloyd v. Holder, No. 11 Civ. 3154, 2013 WL 6667531, at *5 (S.D.N.Y. Dec. 17, 2013).

## DISCUSSION

The Complaint alleges a violation of "federal laws," including the First Amendment to the Constitution and "Section 1309 of the U.S. Postal Code" [1] on account of Defendant "stealing" "personal mail ... business mail

and more," and asserts that jurisdiction is proper under [42 U.S.C. § 1983](). Construing the Complaint broadly, Plaintiff has stated claims pursuant to [42 U.S.C. § 1983]() for deprivation of Plaintiff's First Amendment rights on account of interference with non-legal mail, and deprivation of Plaintiff's First and Fourteenth Amendment rights on account of interference with legal mail. Because Plaintiff has failed to adduce evidence sufficient for a reasonable juror to find that the alleged interference with his mail amounted to a constitutional violation, summary judgment is granted on all claims.

1       Because no such legal provision exists, this claim will not be addressed.

### I. Non–Legal Mail

An inmate has a First Amendment right to "the free flow of incoming and outgoing mail." *Davis v. Goord,* [320 F.3d 346, 351 (2d Cir.2003)](); *Heimerle v. Attorney General,* [753 F.2d 10, 13 (2d Cir.1985)](). Restricting prisoners' right to mail is permissible only where it "further[s] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and is] no greater than is necessary or essential to the protection of the particular governmental interest involved." *Ahlers v. Rabinowitz,* [684 F.3d 53, 64 (2d Cir.2012)]() (quoting *Davis,* [320 F.3d at 351]()). To establish a claim for interference with regular, non-legal mail in violation of the First Amendment, an inmate "must show a pattern and practice of interference that is not justified by any legitimate penological concern." *Cancel v. Goord,* [No. 00 Civ.2042, 2001 WL 303713, at \*6 (S.D.N.Y. Mar. 29, 2001)]() (dismissing First Amendment claim where inmate identified only a "single instance" of interference with his regular mail). The Second Circuit has directed that "an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Davis,* [320 F.3d at 351]().

**\*4** Here, the evidence in the record is insufficient for a reasonable juror to find that Plaintiff has established interference with his incoming non-legal mail rising to the level of a First Amendment violation. Even construing the evidence in Plaintiff's favor, Plaintiff has alleged only one specific incident involving interference with his mail— that he attempted to exchange mail with his friend Stacy, whose last name and contact information he does not know, and that neither Plaintiff nor Stacy received each other's mail. Plaintiff's assertion that Defendant interfered

with his mail is otherwise based upon three facts: (1) that he wrote numerous letters to individuals, businesses and organizations, and did not receive responses to all of his letters; (2) that approximately one week before Defendant was transferred from GRVC, Defendant responded to Plaintiff's allegations that she was stealing his mail by stating "you crazy, take ya' medication, cause you got that right, you won't be getting no f\*ckin' mail from me" and "[y]ou keep asking me stupid questions, you' aint' getting your f\*ckin' mail"; and (3) that he heard from "some other guys" that Defendant was "playing with the mail" of the inmates she did not like. These allegations are insufficient to "establish a pattern and practice of interference [with Plaintiff's mail]," particularly where Plaintiff also testified that he otherwise received mail from "a lot of people" and that no other individuals told him that they had sent mail that he had not in fact received. Accordingly, Defendant's Motion as to Plaintiff's First Amendment claim for interference with non-legal mail is granted.

### II. Legal Mail

Interference with legal mail may constitute a violation of the right to free speech under the First Amendment and the right of access to the courts under the First and Fourteenth Amendments. *Davis,* [320 F.3d at 351](); *Monsky v. Moraghan,* [127 F.3d 243, 246–47 (2d Cir.1997)]() (citing *Lewis v. Casey,* [518 U.S. 343 (1996)]()). As with interference with non-legal mail, interference with legal mail is permissible only where it "further[s] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and is] no greater than is necessary or essential to the protection of the particular governmental interest involved." *Ahlers,* [684 F.3d at 64]() (internal quotation marks omitted). Legal mail, however, is "afforded greater protection ... than ... non-legal mail." *Davis,* [320 F.3d at 351](); *accord Cancel,* [2001 WL 303713, at \*6](). To establish a violation of the right to free speech, an inmate must still demonstrate that prison officials "regularly and unjustifiably interfered with the ... legal mail." *Cancel,* [2001 WL 303713, at \*6]() (citing *Washington v. James,* [782 F.2d 1134, 1139 (2d Cir.1986)]()). To establish a claim of denial of access to the courts, a plaintiff must show: (1) that the defendant acted deliberately and maliciously; and (2) that the plaintiff suffered actual injury in pursuing a legal claim. *Davis,* [320 F.3d at 351]() (internal quotation marks omitted).

**\*5** The record does not contain sufficient evidence to permit a reasonable juror to find that Plaintiff

Case 9:16-cv-01229-FJS-TWD    Document 29    Filed 10/16/18    Page 86 of 148
Singleton v. Williams, Not Reported in F.Supp.3d (2014)
2014 WL 2095024

has established that Defendant's conduct in respect of Plaintiff's legal mail amounted to a constitutional violation. First, Plaintiff has neither alleged nor produced evidence that his receipt or delivery of legal mail was impeded. Plaintiff testified that he "sent a lot of different pieces of mail" to his lawyers, that "legal mail is always recorded when you receive it," and that he "received mail from the lawyer." [2] The record indicates at least twelve occasions on which Plaintiff signed for legal mail for the period from December 2011 through March 2012. Second, there is no evidence that Plaintiff suffered any injury in pursuing his legal claims as a result of any interference with his legal mail. For example, when asked during his deposition whether his criminal case was affected in any way by the incident involving "[the] messing with [his] mail," Plaintiff responded "[o]nly in a mental way." Defendant's Motion for summary judgment on Plaintiff's claims in respect of his legal mail is accordingly granted.

[2]    Similarly, because Plaintiff has not alleged any interference with his access to counsel, nor did any of the evidence indicate as much, a Sixth Amendment claim would also fail on these facts.

**CONCLUSION**

For the reasons discussed above, Defendant's Motion for summary judgment dismissing all of Plaintiff's claims is hereby GRANTED.

The Clerk of Court is directed to close the motion at docket number 38, to close this case, and to mail a copy of this Opinion and Order to the pro se Plaintiff.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 2095024

---

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Collins v. Artus, N.D.N.Y., March 9, 2009

2001 WL 303713

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Frankie CANCEL and Melvin Owens, Plaintiffs,

v.

Glenn S. GOORD, Commissioner
of New York State Department of
Correctional Services, et al. Defendants.

No. 00 CIV 2042 LMM.
|
March 29, 2001.

*MEMORANDUM AND ORDER*

MCKENNA, J.

**\*1** Frankie Cancel and Melvin Owens (collectively "Plaintiffs"), inmates at Fishkill Correctional Facility ("Fishkill"), bring this pro se civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Glenn S. Goord, Commissioner of the New York State Department of Correctional Services ("DOCS"); Anthony Annucci, Deputy Commissioner of DOCS; Jennifer Jones, Staff Attorney at DOCS; William Mazzuca, Fishkill Superintendent; Robert Ercole, Fishkill Deputy Superintendent; Robert Erbert, Fishkill Deputy Superintendent, Administration; Ada Perez, Fishkill Deputy Superintendent, Programs; Stephan Lowry, Fishkill Captain; Lewis Goidel, Fishkill Inmate Grievance Program ("I.G.P.") Supervisor; Christine O'Dell, Fishkill Senior Mail Clerk; Sandie Breen, Fishkill Mail Clerk; and John/Jane Doe[s], unknown Members of the Fishkill Mail Room Staff (collectively "Defendants") for unconstitutionally implementing the inmate grievance program and for deliberately tampering and interfering with their regular and legal mail. The Plaintiffs seek injunctive relief as well as compensatory and punitive damages from each Defendant individually and in their official capacities. The Defendants filed a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons set forth below the Defendants' motion is granted in part and denied in part. [1]

[1]    Plaintiffs' independently move pursuant to Fed.R.Civ.P. 37(d) for an order compelling defendants to comply with Plaintiffs' interrogatories. As Defendants do not oppose this motion, and because the court has partially denied Defendants' motion to dismiss, Plaintiffs' motion is granted. Defendants are hereby required to respond to Plaintiffs' interrogatories, except those regarding the Inmate Grievance Program, within sixty days of the date hereof.

Statement of Facts [2]

[2]    The facts set forth herein are adduced from a liberal reading of Plaintiffs' complaint. *See Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1998).

On Friday August 28, 1998 Plaintiff Cancel received a piece of legal mail marked as such from the Criminal Term Clerk's Office of the Supreme Court in the State of New York which had been opened outside his presence. (Am.Compl.¶ 22.) The letter had been opened by Defendants O'Dell, Breen, and unknown members of Fishkill mail room staff even though it was clearly marked as privileged legal mail. (*Id.* ¶¶ 22–24.)

On August 31, 1998 Cancel filed a grievance with the Fishkill I.G .P. Supervisor, Defendant Goidel, regarding the August 28 legal mail incident. (*Id.* ¶¶ 25–26.) Goidel failed to process Cancel's grievance. (*Id.*) Subsequently, on October 5, 1998 Cancel filed a second grievance, this time against Goidel for refusing to process Cancel's original grievance. (*Id.* ¶¶ 27–28.) This second grievance was not processed. (*Id.*) On October 19, 1998 Cancel wrote a letter to the I.G.P. Director informing him of Goidel's refusal to process the two grievances. (*Id.*) Subsequently, on November 2, 1998 both grievances were processed (*Id.* ¶ 29) and on November 19, 1998 Cancel received a grievance decision by Defendant O'Dell who wrote that "such mistakes should not occur in the future." (*Id.* ¶ 36.) Despite this statement both Cancel's legal mail and regular mail were continually interfered with. (*Id.* ¶ 37.)

On December 4, 1998 Cancel put together a complaint pursuant to New York State Civil Service Law § 75 seeking a hearing, disciplinary action and the removal of Goidel for his improper actions and unlawful manner of running the I.G.P. [3] (*Id.* ¶ 33.) On December 9, 1998 the complaint was mailed to Defendants Goord and Goidel. (*Id.* ¶¶ 33–35.) The complaint was ignored by both of these

2001 WL 303713

Defendants. (*Id.*) On December 14, 1998 Cancel sent a letter with a copy of the complaint to Defendant Annucci who also did not respond. (*Id.* at 35.)

3   New York Civil Service Law § 75 provides a cause of action for civil service employees unlawfully removed. Although neither party addressed this claim in their motion papers, the Court notes that § 75 specifically delineates five categories of persons who may maintain a cause of action for removal. Because Cancel does not fall into one of these five categories he has no standing to bring suit under this provision.

**\*2** On June 28, 1999 Cancel filed another grievance stating that both his regular and legal mail were being withheld. (*Id.* ¶ 38.) Subsequent to the filing of this grievance, but on the same day, Cancel received sixteen pieces of regular mail that had been withheld for several weeks by Defendants Mazzuca, O'Dell, Breen and unknown members of the Fishkill mail room staff. (*Id.*) Cancel filed a grievance about this interference with his regular mail recommending there be an investigation; however, his recommendation was denied. (*Id.* ¶ 39.)

On December 21, 1999 Cancel received another piece of legal mail which had not been processed or handled as legal mail because it was opened outside his presence. (*Id.* ¶ 40.) Cancel filed a complaint regarding this incident and attached photocopies of the legal mail that had been opened outside his presence. (*Id.* ¶ 41.)

On April 17, 2000 Cancel notarized two documents for a personal Family Court matter concerning his son, placed the legal documents in an envelope, sealed it, placed stamps on it and placed it in the outgoing mail addressed to "the other party in the matter." (*Id.* ¶ 49.) The envelope was intercepted, opened and photocopied by Mazzuca, O'Dell, Breen and unknown members of the Fishkill mail room staff and the photocopies were placed in Cancel's file. (*Id.* ¶¶ 49–51.) On July 12, 2000 Cancel met with a member of the Parole board who had Cancel's file which contained a memo from Mazzuca with the Family Court documents attached. (*Id.* ¶ 51.) Defendants continue to withhold Cancel's legal and regular mail. (*Id.*)

On November 5, 1999 Plaintiff Owens picked up a piece of legal mail that had been opened and photocopied outside his presence and had been withheld for about a week. (*Id.* ¶ 45.) As a result, Owens was unable to "research and file a timely Criminal motion for which he received an

adverse decision." (*Id.*) The Defendants responsible for withholding this piece of legal mail were Mazzuca, Ercole, Erbert, Perez, O'Dell, Breen and unknown members of the Fishkill mail room staff. (*Id.*) Owens filed a grievance for the opening and photocopying of his legal mail denying him access to the courts, but it was denied. (*Id.* ¶ 47.)

Legal Standard

On a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), the court must accept as true all well pleaded factual allegations set forth in the complaint and must draw all positive inferences in favor of the pleader. *Hudson v. Greiner,* No. 99 Civ. 12339, 2000 U.S. Dist. LEXIS 17913, at *4 (S.D.N.Y. Dec. 12, 2000). A case should only be dismissed when "it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957)). A plaintiff must do more than plead mere "conclusory allegations or legal conclusions masquerading as factual conclusions" to survive a motion to dismiss. *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y.2000).

**\*3** Furthermore, since the Plaintiffs are proceeding pro se their submissions should be judged on a more lenient standard than that accorded to formal pleadings drafted by lawyers. *McNeil v. United States,* 508 U.S. 106, 113 (1993). The court must make some reasonable allowances so that a pro se plaintiff does not forfeit his rights by virtue of a lack of legal training. *Hudson,* 2000 U .S. Dist. LEXIS 17913, at *3. However, proceeding pro se does not altogether relieve a plaintiff from the usual pleading requirements. *Id.* at *4.

Plaintiffs' Civil Rights Claims

A plaintiff has a civil cause of action under § 1983 against:

> Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to

the deprivation of any rights,
privileges, or immunities secured by
the Constitution and laws, shall be
liable to the party injured in an
action at law, suit in equity, or other
proper proceedings for redress.

42 U.S.C. § 1983.

Plaintiffs bring this action under § 1983 alleging that
Defendants violated their rights under the First, Fourth,
Sixth and Fourteenth Amendments by unconstitutionally
implementing the inmate grievance programs and by
deliberately tampering and interfering with their regular
and legal mail thereby denying them access to the courts
and impinging on their rights to free speech.

Discussion

1. Denial of Access to Grievances and the Unlawful
Operation of the Inmate Grievance Program
The amended complaint alleges that Defendant Goidel
failed to process Cancel's grievance complaints and
that the improper and unlawful running of the I.G.P.
violated Cancel's First Amendment right to petition the
government for redress and right of access to the courts.
(Am.Compl.¶ 52.) Cancel also claims that Defendants
Goord, Annucci, Mazzuca, Ercole, Perez, Erbert and
Lowry failed to take action to "curb the unlawful practices
of Defendant Goidel" even though they were aware
that his unlawful conduct proximately caused the above
constitutional violation. (Id. ¶ 53.)

While there is a First Amendment right of meaningful
access to the courts and a right to petition the government
for redress, e.g ., Bill Johnson's Rest., Inc. v. NLRB, 461
U.S. 731, 741 (1983) (finding that "the right of access
to the courts is an aspect of the First Amendment right
to petition the Government for redress of grievances"),
inmate grievance procedures are not required by the
Constitution and therefore a violation of such procedures
does not give rise to a claim under § 1983. Justice v.
Coughlin, III, No. 94–CV–1287, 1996 U.S. Dist. LEXIS
15341, at *11 (N.D.N.Y. July 1, 1996). When an inmate
sets forth a constitutional claim in a grievance to prison
officials and the grievance is ignored, the inmate has the
right to directly petition the government for redress of
that claim. Flick v. Alba, 932 F.2d 728, 729 (8th Cir.1991).
Therefore, the refusal to process an inmate's grievance or

failure to see to it that grievances are properly processed
does not create a claim under § 1983. Id.

 *4  Thus, Cancel's claim that the Defendants violated his
First Amendment right of access to the courts and right to
petition the government for redress by failing to process
his grievances lacks merit and is dismissed with prejudice.

Cancel also claims that Goidel's failure to process
his grievances and his unlawful and unfair running
of the inmate grievance program violates New York
State Correction Law § 139 which sets forth prison
grievance procedures. (Am.Compl.¶ 52.) First, the failure
to process a grievance in a timely manner only entitles
an inmate to review at the next appeal level in the
grievance process. See Cliff v. Goodman, 710 N.Y.S.2d 718
(App.Div.2000) (citing 7 NYCRR § 701.8 (2001)). Second,
under New York law a claim generally challenging
the constitutionality of the inmate grievance program
does not constitute an actual controversy reviewable
in an Article 78 proceeding or otherwise. Matter of
Hall v. State of N.Y. Dept. of Corr., 453 N.Y.S.2d 58
(App.Div.1992). When Cancel's grievances were ignored
by Goidel, Cancel sought review at the next level and his
grievances were subsequently processed. Further, Cancel's
general dissatisfaction with the inmate grievance program
does not constitute an actual controversy reviewable by
the Court. Id. Therefore, Cancel's claim that Goidel's
actions violated New York State Corrections Law § 139 is
dismissed with prejudice.

2. Denial of Access to the Courts as a Result of Legal
Mail Tampering
Prisoners have a First Amendment right of access to the
courts, and where there is a deliberate and malicious
interference with that right they may seek redress from
the court. Washington v. James, 782 F.2d 1134, 1138 (2d
Cir.1986). To state a valid § 1983 claim for denial of access
to the courts due to interference with an inmate's legal
mail, an inmate must allege that a defendant's deliberate
and malicious interference actually impeded his access to
the court or prejudiced an existing action. Lewis v. Casey,
518 U.S. 343, 349 (1996). Therefore, in order to survive a
motion to dismiss a plaintiff must allege not only that the
defendant's alleged conduct was deliberate and malicious,
but also that the defendant's actions resulted in actual
injury to the plaintiff such as the dismissal of an otherwise
meritorious legal claim. Id. at 351. In other words "the
plaintiff must show that a 'non-frivolous legal claim had

been frustrated or was being impeded' due to the actions of prison officials." *Warburton v. Underwood,* 2 F. Supp .2d 306, 312 (W.D.N.Y.1998) (quoting *Lewis,* 518 U.S. at 353); *see also Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997).

Plaintiff Cancel does not state a cognizable § 1983 claim for denial of access to the courts because he has not alleged any actual injury resulting from Defendants' actions. Cancel alleges three instances where his legal mail was handled inappropriately. [4] Cancel must show that because Defendants opened his outgoing and incoming legal mail he was prejudiced in a legal action he sought to pursue. Because Cancel has not alleged such an injury, his claim under the First Amendment for denial of access to the courts is dismissed with leave to amend the complaint with allegations, if true, that (1) Defendants' interference with Cancel's legal mail injured him by prejudicing him in a legal action; and (2) that the outgoing envelope containing the Family Court documents mailed on April 17, 2000 was clearly identifiable as legal mail. [5]

[4] Liberally construing Plaintiffs' complaint, the Court assumes that the Family Court documents Cancel mailed on April 17, 2000 were in an envelope addressed to a person or entity that would clearly identify the letter as legal mail or that the envelope was marked as "legal mail." Plaintiff only alleges that he sent these Family Court documents to "the other party in the matter" (Am.Compl.¶ 49) and the Court assumes for the purpose of this motion only that the envelope in question was clearly identified as legal mail.

[5] "[T]he court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999) (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)).

**\*5** As to Plaintiff Owens' claim with respect to legal mail, the amended complaint alleges that because Owens' mail was opened and withheld for about a week he was "unable to research and file a timely response to a Criminal motion for which he received an adverse decision." (Am.Compl.¶ 45.) A delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation. *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing *Jones v. Smith,* 784 F.2d 149, 151–52 (2d Cir.1986)). However, if Owens'

adverse judgment to his otherwise meritorious Criminal motion was the result of the named Defendants' opening and withholding of his legal mail then he has stated a claim under § 1983 for denial of access to the courts. For purposes of this motion, the Court accepts all allegations as true and draws all positive inferences in favor of Plaintiff. *See Hudson,* 2000 U.S. Dist LEXIS 17913, at *3. Therefore, Defendants' motion is denied as to Plaintiff Owens' claim under the First Amendment for denial of access to the courts.

3. Violation of the First Amendment Right to Free Speech for Interference with Cancel's Mail

Cancel alleges that Defendants' continuous actions of opening and reading his incoming legal mail, the temporary withholding of his regular mail and the opening and photocopying of his outgoing legal mail impinges on his constitutional right to free speech. (Am.Compl.¶¶ 54, 60, 63.) Inmates unquestionably have a First Amendment right of free speech to send and receive mail, *Wolfish v. Levi,* 573 F.2d 118, 130 (2d Cir.1978), *rev'd in part on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520 (1979), and a prison official's interference with an inmate's mail may violate his First Amendment right to free speech, which includes the "right to be free from unjustified governmental interference with communication." *Brewer v. Wilkinson,* 3 F.3d 816, 820 (5th Cir.1993).

The boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise. However, when analyzing such claims courts have consistently made distinctions between outgoing and incoming mail and legal and non-legal mail based on the various rights and interests at stake. *See Taylor v. Sterrett,* 532 F.2d 462, 475 (5th Cir.1976) (holding that the governmental interest in monitoring incoming mail is more substantial than its interest regarding outgoing mail); *see also Lewis,* 518 U.S. at 353 (holding that prison regulations or practices that affect a prisoner's legal mail are of particular concern because of the potential for interference with a prisoner's right of access to the courts).

With respect to the first distinction, the Supreme Court has recognized that "the implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Thornburgh v. Abbott,* 490 U.S. 401,

2001 WL 303713

413 (1989). Therefore, the penological interests for interference with outgoing mail must be more than just the general security interest which justifies most interference with incoming mail. *Davidson v. Scully,* 694 F.2d 50, 53 (2d Cir.1982).

**\*6** As to the second distinction, many courts have held that a prisoner's legal mail is entitled to a higher degree of protection than his regular mail. *See Morgan v. Montanye,* 516 F.2d 1367, 1368 (2d Cir.1975) (holding that although prison officials can inspect an inmate's general correspondence, different procedures apply to an inmate's legal mail which should be treated as confidential material); *see also Taylor,* 532 F.2d at 475. Therefore, prison polices or practices which interfere with legal mail on a regular basis whether incoming or outgoing must be supported by a legitimate penological interest other than mere general security concerns which permit interference with regular mail. *Washington,* 782 F.2d at 1139 (citing New York State Department of Corrections Directive 4421).

A. Incoming Mail

1. Withholding of Incoming Non–Legal Mail

Cancel alleges that Defendants withheld his incoming non-legal mail and relies on a single instance when he received sixteen pieces of regular mail on the same day he filed a grievance about the opening of his legal mail. (Am.Compl.¶ 38.) These sixteen pieces of regular mail had been withheld for several weeks. (*Id.*) Prison regulations or practices affecting a prisoner's receipt of non-legal mail must be "reasonably related to legitimate penological interests," *Abbott,* 490 U.S. at 409 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)), and "prison security is a sufficiently important governmental interest to justify limitations on a prisoner's [F]irst [A]mendment rights." *Gaines v.. Lane,* 790 F.2d 1299, 1304 (7th Cir.1986). However, this general security interest will not justify a regular pattern and practice of such interference absent other prison concerns with regards to a particular inmate. *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir.1999).

This Court agrees with the reasoning of the Seventh Circuit in *Rowe* that in order for an inmate to state a claim for interference with incoming non-legal mail he must show a pattern and practice of interference that is not justified by any legitimate penological concern. *Id.* Because Cancel only alleges that prison officials

withheld his regular mail on one occasion, rather than showing a pattern and practice of such behavior, his First Amendment free speech claim for the withholding of his regular incoming mail is dismissed with leave to amend the complaint to include specific allegations, if true, establishing such a pattern and practice.

2. Opening and Withholding of Incoming Legal Mail

Cancel alleges two occasions upon which the Defendants opened his incoming legal mail outside his presence. (Am.Compl.¶¶ 22, 40.) Although legal mail is "privileged" and is afforded a higher degree of protection, there still must be a showing that prison officials regularly and unjustifiably interfered with the incoming legal mail rather than merely showing an isolated incident. *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986).

**\*7** In *Washington,* the Second Circuit held that more than one incident of interference with legal mail could give rise to a constitutional claim if it indicated ongoing activity. 782 F.2d at 1139; *see also Bieregu v. Berman,* 59 F.3d 1445, 1452 (3d Cir.1995) (finding that an allegation that prison officials had opened an inmate's incoming legal mail on fifteen occasions was sufficient to show a pattern and practice of deliberate interference). However, in the present case Plaintiff proffers only two instances of opening incoming legal mail with no indication that such practices are ongoing. Without alleging additional facts to establish a pattern and practice that rises to the level of constitutionally impermissible censorship, Plaintiff's complaint is deficient. Therefore, Cancel's claim that Defendants violated his First Amendment right to free speech for interference with his incoming legal mail is dismissed with leave to amend the complaint to include specific allegations, if true, that establish the requisite pattern and practice of interference. [6]

[6]    Plaintiffs' also allege that in October 1999 Defendant Lowery ordered mail sent to any inmate by the Legal Aid Society regarding contemplated litigation against the New York State Parole Board to be confiscated if seen. (Am.Compl.¶ 42.) In addition, Defendant Ercole also instructed the Fishkill mail room staff to confiscate all mail envelopes larger than regular size, to transfer the contents to a facility envelope and then forward it to the inmate to whom it is addressed. (*Id.* ¶ 43.) Plaintiffs make these allegations in their complaint without stating that they personally were to receive this letter from the Legal Aid Society or

Case 9:16-cv-01229-EJS-TWD    Document 29    Filed 10/16/18    Page 92 of 148
Cancel v. Goord, Not Reported in F.Supp.2d (2001)
2001 WL 303713

that Ercole's policy affected their mail in any way. Because there is no allegation that Plaintiffs' mail was affected by either policy they have no standing to bring a suit for these allegations and they are not addressed by the Court. Plaintiffs' are given leave to amend the complaint to allege, if that be the case, that these polices affected their personal legal mail. If such allegations are made they will be considered in establishing a pattern and practice of interference with legal mail.

B. Outgoing Legal Mail

Cancel's claim that prison officials interfered with his outgoing legal mail poses a different question. As previously stated, the Supreme Court has explicitly recognized that there are "differing penological concerns with respect to outgoing and incoming mail." *Brewer v. Wilkinson,* 3 F.3d 816, 825 (5th Cir.1993) (citing *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989)). The Second Circuit has held that prison officials can only open an inmate's outgoing legal mail if there is a "rational justification" for doing so. *Davidson,* 694 F.2d at 54 (citing *Wolfish,* 573 F.2d at 130.). The Fifth Circuit has applied the same standard to an instance where an inmate's outgoing legal mail was opened and censored without a "legitimate penological interest" and found the practice to violate the inmate's First Amendment right to free speech. *Brewer,* 3 F.3d at 825.

In the present case, Defendants have failed to state any rational justification for opening and photocopying Cancel's outgoing legal mail. Because interference with outgoing legal mail cannot be based on a general prison security interest, Defendants must provide additional justification for their actions. Therefore, because Defendants have interfered with Cancel's outgoing legal mail without providing any legitimate penological interest, Cancel has stated a valid claim under the First Amendment right to free speech. [7] Defendants' motion to dismiss Cancel's claim for violation of his First Amendment right to free speech is denied with respect to his outgoing legal mail.

[7]    As originally stated in footnote 4, the Court again presumes that the Family Court documents were placed in an envelope marked or addressed in such a way that it could be identified as legal mail. If in fact this document was not privileged legal mail, this First Amendment free speech claim may require a different analysis.

4. Money Damages Barred by 42 U.S.C. § 1997e(e) of the Prison Litigation Reform Act

Defendants argue that the money damages Plaintiffs seek are barred by 42 U.S.C. § 1997e(e) of the Prison Litigation Reform Act because the complaint does not allege any physical injury. (Defs.' Mem. at 8–9.) Section 1997e(e) states, "[n]o federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in the custody without a prior showing of physical injury." *Id.*

**\*8**  The plain language of the statute does not prohibit a plaintiff's First Amendment claim. Section 1997e(e) specifically prohibits federal civil action[s] for mental or emotional injury without a showing of physical injury. In this case Plaintiffs do not allege any claim of mental or emotional distress for which they are seeking redress. Furthermore, the few courts that have addressed this issue have held that:

> the deprivation of First Amendment rights entitles a plaintiff to judicial relief wholly aside from any physical injury he can show, or any mental or emotional injury he may have incurred. Therefore, § 1997e(e) does not apply to First Amendment claims regardless of the form of relief sought.

*Reynolds v. Goord,* No. 98 Civ. 6722, 2000 U.S. Dist LEXIS 2140, at \*23 (S.D.N.Y. Mar. 1, 2000) (quoting *Canell v. Lightner,* 143 F.3d 1210, 1213 (9th Cir.1998)). Therefore, § 1997e(e) is not applicable to the present case and does not bar Plaintiffs from seeking recovery for First Amendment claims of denial of access to the courts and violation of free speech.

5. Lack of Personal Involvement of Defendants

The personal involvement of defendants in an alleged constitutional violation is a prerequisite under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). A plaintiff must allege that each defendant was directly and personally responsible for the purported conduct and establish fault and causation on the part of each defendant. *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883 (2d Cir.1987).

Case 9:16-cv-01229-EJS-TWD    Document 29    Filed 10/16/18    Page 93 of 148
Cancel v. Goord, Not Reported in F.Supp.2d (2001)
2001 WL 303713

Defendants move to dismiss all claims against Defendants Goord, Annucci, Jones, Mazzuca, Ercole, Perez and Erbert for lack of personal involvement. Plaintiffs' amended complaint as to Owens' legal mail claim alleges that Defendants Mazzuca, Ercole, Perez, and Erbert were personally involved in the opening and withholding of his legal mail. Additionally, Mazzuca is implicated in Cancel's claim for violating his First Amendment right to free speech. Accepting these allegations as true, the Defendants' motion to dismiss for lack of personal involvement against Mazzuca, Ercole, Perez, and Erbert is denied.

As to Defendants Goord, Annucci and Jones, in a § 1983 action supervisors cannot be held liable under the theory of respondeat superior for the acts of their subordinates. *Id.* at *7. A supervisor can only be found to be personally involved if there is evidence that there was: (1) direct participation in the alleged constitutional violation, (2) failure to remedy a wrong after learning of it, (3) creation or maintenance of a policy under which unconstitutional violations occurred, (4) gross negligence in managing subordinates who committed the unconstitutional acts, or (5) deliberate indifference by failing to act on information indicating that constitutional violations were occurring. *Id.; see also Colon,* 58 F.3d at 873. Allegations that a supervisor ignored an inmate's grievance letter of protest and request for an investigation is insufficient to find that a supervisor is personally involved in the alleged constitutional violations. *Kinch v. Artuz,* No. 97 Civ. 2419, 1997 U.S. Dist. LEXIS 13998, at *8 (S.D.N.Y. Sept. 15, 1997).

**\*9** Plaintiffs' amended complaint contains no allegations relating to the personal involvement of Defendants Goord, Annucci and Jones either through direct participation, maintenance of a policy or deliberate disregard for Plaintiffs' rights. Plaintiffs' sole claim against these three Defendants is that they were sent grievances and complaints by Cancel which were ignored. Plaintiffs' claims as to these three Defendants are dismissed with prejudice.

Conclusion
For the above stated reasons the Defendants' motion is granted in part and denied in part as follows:

(1) Cancel's claims against Goidel under the First Amendment right to petition the government for redress and right of access to the courts for failure to process grievances and for the unlawful running of the I.G.P. are dismissed with prejudice.

(2) Cancel's claims against Defendants Goord, Annucci, Mazzuza, Ercole, Perez, Erbert and Lowry for failure to curb the unlawful practices of Goidel in his unlawful running of the I.G.P. are dismissed with prejudice.

(3) Cancel's claim that Goidel's actions violated New York State Corrections Law § 139 is dismissed with prejudice.

(4) Cancel's claim under the First Amendment for denial of access to the courts is dismissed with leave to amend the complaint with allegations that (a) Defendants' interference with Cancel's legal mail injured him by prejudicing him in a legal action; and (b) that the outgoing envelope containing the Family Court documents mailed on April 17, 2000 was clearly identifiable as legal mail.

(5) Defendants' motion is denied as to Owens' claim under the First Amendment for denial of access to the courts against Mazzuca, Ercole, Perez, Erbert, O'Dell, Breen and unknown members of the Fishkill mail room staff.

(6) Cancel's claim under the First Amendment right to free speech for the withholding of his regular incoming mail is dismissed with leave to amend the complaint with specific allegations that establish a pattern and practice of interference.

(7) Cancel's claim that Defendants violated his First Amendment right to free speech for interference with his incoming legal mail is dismissed with leave to amend the complaint with specific allegations that establish a pattern and practice of interference with Cancel's incoming legal mail.

(8) Defendants' motion is denied as to Cancel's claim under the First Amendment for a violation of free speech for interference with his outgoing legal mail against Mazzuca, O'Dell, Breen and unknown members of the Fishkill mail room staff.

(9) Defendants' motion to dismiss the claims against Mazzuca, Ercole, Perez, and Erbert for lack of personal involvement is denied.

2001 WL 303713

(10) Defendants' motion to dismiss the claims against Goord, Annucci and Jones for lack of personal involvement is granted with prejudice.

(11) The Court also considered Plaintiffs' claim that Defendants' actions violated Article 14 and 17 of the International Covenant on Civil and Political Rights ("ICCPR"). (Am.Compl.¶ 54, 55, 58, 60.) However, courts have uniformly held that the ICCPR is not self-executing and does not give rise to a private right of action. *See Beazley v. Johnson,* No. 99–41383, 2001 WL 118393, at [*]18– [*]19 (5th Cir.2001) (citing additional cases). Therefore, the Court sua sponte dismisses Plaintiffs' claims under the ICCPR.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 303713

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-01229-FJS-TWD    Document 29    Filed 10/16/18    Page 95 of 148

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

***MEMORANDUM DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"),
against numerous employees of New York State or the
Central New York Psychiatric Center ("Defendants"),
are Plaintiff's motion to proceed *in forma pauperis,* his
motion for a temporary restraining order and preliminary
injunction, and his motion for appointment of counsel.
(Dkt.Nos.2, 3, 4.)[1] For the reasons set forth below,
Plaintiff's motion to proceed *in forma pauperis* is granted;
his motion for a preliminary injunction is denied; his
motion for appointment of counsel is denied; Plaintiff's
claims of deliberate indifference to his mental health
needs against Defendants Bill, Carver and DeBroize are
*sua sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged
personal involvement in the August 8, 2011 assault are

*sua sponte* dismissed without prejudice and with leave to
amend in this action in accordance with Fed.R.Civ.P.
15; Sgt. Sweet is *sua sponte* dismissed without prejudice
as a Defendant in this action; the Clerk is directed to
issue summonses, and the U.S. Marshal is directed to
effect service of process on Defendants Davis, Sill, and
Nicolette.

1    This is the fourth civil rights action filed by Plaintiff
     in this District. Generally, two of these actions arose
     out of Plaintiff's refusal to consent to a strip search
     and the subsequent actions taken against Plaintiff
     as a result of his refusal. *See Groves v. New York,*
     09–CV–0406, Decision and Order (N.D.N.Y. filed
     May 11, 2009) (Hurd, J.) (*sua sponte* dismissing
     complaint pursuant to 28 U.S.C. § 1915[e][2][B] );
     *Groves v. The State of New York,* 9:09–CV–0412,
     Decision and Order (N.D.N.Y. filed Mar. 26, 2010)
     (Sharpe, J.) (granting defendants' motion to dismiss
     the complaint pursuant to Fed.R.Civ.P. 12[b][6] ).
     The third action alleged numerous violations of
     Plaintiff's constitutional rights during the period July
     23, 2009, and August 26, 2009, and was dismissed
     without prejudice upon Plaintiff's request in October,
     2010. *See Groves v. Maxymillian,* 9:09–CV–1002,
     Decision and Order (N.D.N.Y. filed Oct. 8, 2010)
     (Suddaby, J.). As a result, it does not appear that
     the current action is barred because of res judicata,
     collateral estoppel, and/or the rule against duplicative
     litigation.

**I. RELEVANT BACKGROUND**
On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with
a motion to proceed *in forma pauperis.* (Dkt. Nos.1,
2.)[2] Liberally construed, Plaintiff's Complaint alleges
that the following constitutional violations against him
occurred during his confinement at Central New York
Psychiatric Center ("CNYPC"): (1) Defendants Davis and
Sill used excessive force against him under the Eighth
and/or Fourteenth Amendments; (2) Defendant Nicolette
knew of and failed to take action to protect Plaintiff
from the assault under the Eighth and/or Fourteenth
Amendments; (3) Defendants Bill, Carver, and DeBroize
were deliberately indifferent to his mental health needs
under the Eighth and/or Fourteenth Amendments;
and (4) Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, Bosco, and Hogan failed to "adequately
train the staff under their supervision" and to take
appropriate action in response to the incident. (*See*

*generally* Dkt. No. 1.) For a more detailed description of Plaintiff's claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

2      At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*
Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis.* (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT
In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that —... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

3      The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

### A. Governing Legal Standard
**\*2**  It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by

the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[6]

[4]   *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[5]   *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[6]   It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15– 16 (N.D.N.Y. filed Nov. 18, 2009). [7]

[7]    *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV– 0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them

that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

 *4  Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an

2012 WL 651919

Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp.

35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

[8]   Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

[9]   Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment

2012 WL 651919

when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading.[10] Rather, this claim is hereby dismissed with prejudice.

[10]    The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[11]

[11]    *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not

2012 WL 651919

establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011). [13]

[12]   See also *Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

[13]   See also *Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force

on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court— to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at *3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted

2012 WL 651919

unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill,

Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

2012 WL 651919

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

[14]   For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10** **ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;** [15] and it is further

[15]   Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* **DISMISSED without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 843872
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Derrick THOMPSON, Plaintiff,

v.

Mr. CARLSEN, Superintendent of
Ulster Correctional Facility; White, Ms.,
Administrative Nurse; Franza, Nurse,
Ulster Correctional Facility; Crawley, Nurse,
Ulster Correctional Facility, Defendants.

Civ. No. 9:08-CV-487 (TJM/RFT).
|
March 10, 2010.

**Attorneys and Law Firms**

Derrick Thompson, Rego Park, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Krista A. Rock, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Randolph F. Treece, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). No objections to the Report-Recommendation and Order dated February 16, 2010 have been filed, and the time to do so has expired. Furthermore, after examining the record, this Court has determined that the Report-Recommendation and Order is not subject to attack for plain error or manifest injustice. Accordingly, the Court adopts the Report-Recommendation and Order for the reasons stated therein.

It is therefore,

ORDERED that Defendants' Motion for Summary Judgment (Dkt. No. 24) is **GRANTED** and the Complaint (Dkt. No. 1) is **DISMISSED** in its entirety. The Clerk of the Court is instructed to enter judgment in favor of Defendants and to close the file in this matter.

**IT IS SO ORDERED.**

**REPORT-RECOMMENDATION and ORDER**

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Derrick Thompson has filed a civil rights action, pursuant to 42 U.S.C. § 1983, alleging that Defendants were deliberately indifferent to his serious medical needs and therefore violated his Eighth Amendment rights. Dkt. No. 1, Compl. Defendants now move for summary judgment pursuant to FED. R. CIV. P. 56(c). Dkt. No. 24. Plaintiff opposes the Motion. Dkt. No. 26. For the reasons that follow, it is recommended that the Defendants' Motion be **GRANTED**.

**I. FACTS**

The following facts were derived mainly from the Defendants' Statement of Material Facts, submitted in accordance with N.D.N.Y.L.R. 7.1, which were not, in their entirety, specifically countered nor opposed by Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* (emphasis in original)). However, where Plaintiff has contradicted Defendants' Statement of Material Facts, either in his Complaint or in his Response in Opposition to Defendants' Motion, we will not deem those facts admitted for the purposes of addressing this Motion.

At around 9 a.m. on October 9, 2007, while Plaintiff was housed at Ulster Correctional Facility ("Ulster"), Plaintiff complained to his dorm officer about pain in his chest. Dkt. No. 24, Defs.' 7.1 Statement at ¶ 1. The dorm officer called Defendant Nurse Franza and informed her that Plaintiff wished to be seen by medical staff as soon as possible. *Id.* at ¶ 2. At the time Franza received that call, the regular sick call for that day was over, nonetheless, an

2010 WL 843872

emergency sick call procedure is available every day for inmates who need to be seen for a medical emergency. *Id.* at ¶¶ 3-4.

At around 9:30 a.m. that morning, Defendant Nurse Crawley received a phone call from a corrections officer working in Plaintiff's housing dorm, stating that Plaintiff was complaining about burning in his chest and wanted to be seen by medical staff. *Id.* at ¶ 9. Crawley advised the corrections officer that Plaintiff should sign up for the next available sick call. *Id.* at ¶ 10; Pl.'s Resp. in Opp'n to Defs.' Mot., Mem. of Law at p. 2. The corrections officer asked Crawley whether Plaintiff should be sent for emergency sick call, to which Crawley responded that Plaintiff's description of his medical problem did not seem to constitute a medical emergency. Defs.' 7.1 Statement at ¶¶ 11-12. Crawley questioned the officer about whether Plaintiff was showing any signs of distress, including profuse sweating, chest pain and/or difficulty breathing. *Id.* at ¶ 13; Pl.'s Mem. of Law at pp. 3-4. There was no indication that Plaintiff was exhibiting any such symptoms. Defs.' 7.1 Statement at ¶ 14.

**\*2** Thereafter, a sergeant sent Plaintiff to the infirmary to be seen by medical staff. *Id.* at ¶ 15. Nurse Crawley attended to Plaintiff upon his arrival in the infirmary, where he complained of chest pain. *Id.* at ¶¶ 16-17; Pl.'s Mem. of Law at p. 2. Plaintiff left the emergency room area without permitting Crawley to complete a more thorough physical examination. Defs.' 7.1 Statement at ¶ 21. Crawley issued Plaintiff a Misbehavior Report, alleging that after he arrived at the infirmary on October 9, 2007, Crawley denied his request for non-emergency medication and Plaintiff became loud, argumentative, and refused further assessment. *Id.* at ¶ 22; Dkt. No. 24-10, Nurse W. Crawley Aff., dated June 10, 2009, Ex. C, Misbehavior Rep., dated Oct. 9, 2007 (hereinafter "Misbehavior Rep."). In the Misbehavior Report, Plaintiff was charged with interference with an employee, harassment, and disobeying a direct order. Defs.' 7.1 Statement at ¶ 22; Misbehavior Rep. Plaintiff pled guilty to all three charges. Defs.' 7.1 Statement at ¶ 23.

On October 10, 2007, Plaintiff again went to the infirmary and was seen by Defendant Franza. *Id.* at ¶ 24. Plaintiff filed a Grievance regarding the allegedly inappropriate medical care provided on October 9, 2007. *Id.* at ¶ 25. That Grievance was processed pursuant to departmental policy and was ultimately denied. *Id.* at ¶¶ 28-29.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any,' " that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is] a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736,

742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**B. Eighth Amendment Claim**

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The plaintiff must allege conduct that is " 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992)) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105-06).

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Hathaway I,* 37 F.3d 63, 66 (2d Cir.1994)). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic

and substantial pain." *Chance v. Armstrong,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir.1992)). The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301-03 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

**\*4** In this case, Plaintiff asserts that Defendants Franza and Crawley were deliberately indifferent to his serious medical needs when they allegedly denied him treatment for his chest pain on October 9 and 10, 2007.

*1. Claims against Crawley*

In his Complaint, Plaintiff alleges that on October 9, 2007, Defendant Crawley denied his request to see a doctor and denied him medical treatment. Compl. at p. 3. Plaintiff further asserts that he was seen by a doctor on the following day, and was diagnosed as having a heart murmur. *Id.* In his Grievance, dated October 9, 2007, Plaintiff made the following allegations: On October 9th, Crawley denied his request to see a doctor through a corrections officer with whom she was speaking on the telephone. Grievance at p. 2. Thereafter, Plaintiff was sent down to the medical clinic, where Crawley again denied him the medical attention he needed. *Id.*

In her Affidavit submitted in support of the Motion for Summary Judgment, Crawley affirms that on the morning of October 9th, she received a phone call from a corrections officer working in Plaintiff's housing dorm,

who told her that Plaintiff "was complaining of burning in his chest and that he was out of his acid reflux medication and wanted to be seen by medical staff as soon as possible." [1] Crawley Aff. at ¶¶ 5-6. Crawley swears that she asked the officer "whether plaintiff was showing any signs of distress, including profuse sweating, chest pain and/or difficulty breathing, which would have been indicators of some sort of cardiac event." Crawley Aff. at ¶ 8. However, because "[t]here was no indication that plaintiff was suffering any such symptoms," Crawley concluded that it was not an emergency situation, and "advised the Corrections Officer that [Plaintiff] should sign up for the next available regular sick call." Crawley Aff. at ¶¶ 7-9. Crawley states that shortly thereafter, a sergeant called and informed her he was sending Plaintiff to the infirmary. Id. at ¶ 10. According to Crawley, upon Plaintiff's arrival at the infirmary, he showed no signs of physical distress, complained only of a burning sensation in his chest, and asked for more acid reflux medication, showing her a prior prescription for acid reflux medication. Id. at ¶ 11. Plaintiff denies asking for medication, Pl.'s Mem. of Law at p. 2, however, he stated in his Grievance that "when I asked for something for the pain [ ] ... I was told no," and that he "tried to show [Crawley] what a [ ] doctor on Riker's Island gave [him] when [he] had this problem [ ]," Grievance at p. 2 (emphasis added). Thus, Plaintiff's statement in his Grievance confirms that he did in fact ask for medication to remedy his chest pain.

1    In his Response to Defendants' Motion, Plaintiff denies complaining of burning in his chest. Pl.'s Resp. at p. 4. However, we note that Plaintiff stated in his Complaint that his "chest was burning," Compl. at p. 3, and complained in his Grievance that he "was stuck in a dorm left with a burning chest!," Grievance at p. 2.

Crawley "advised Plaintiff that in order to have his medication refilled, [she] could not do so as a Nurse, he would have to sign up for regular sick call." Crawley Aff. at ¶ 12. At that point, Plaintiff "became very loud and argumentative[,] insisting that he be given medication at that time. He then left the emergency room area without permitting me to complete a more thorough examination." Id. As a consequence, Crawley issued Plaintiff a Misbehavior Report on October 9th charging him with interference with an employee, harassment, and disobeying a direct order; Plaintiff later pled guilty to all three charges. [2] Id. at ¶ 15; Dkt. No. 24-16, Scott

Carlsen Aff., dated June 22, 2009, Ex. C, Disciplinary Hr'g Tr., dated Oct. 20, 2007, at p. 4 (pleading guilty with an explanation to all three charges).

2    In his Complaint, Plaintiff does not bring any claims related to the filing of the Misbehavior Report. In his Response to Defendants' Motion, Plaintiff alleges that the Misbehavior Report was false and retaliatory in nature. These new and conclusory claims are addressed below in Part II.B.3.

*5  Crawley asserts that Plaintiff has failed to demonstrate any deliberate indifference on her part. We agree. Plaintiff has offered no evidence to rebut Crawley's sworn Affidavit. Furthermore, based on the allegations contained in Plaintiff's Grievance, it appears that Crawley examined Plaintiff, determined his condition was non-severe based on his subjective complaints and his lack of symptoms, and told him to submit his request for medicine in accordance with standard non-emergency procedures. Even assuming Crawley was incorrect in her medical assessment of Plaintiff's condition, [3] such a misdiagnosis does not constitute deliberate indifference and therefore is not a valid basis for an Eighth Amendment claim. Estelle v. Gamble, 429 U.S. at 106 (a claim that a medical professional "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Thus, to the extent Plaintiff brings this § 1983 claim on a theory of negligence, see Compl. at p. 5, that claim must fail. Id. Finally, Plaintiff's preference for a different course of treatment than the one provided does not form the basis of a valid § 1983 claim; a prisoner does not have the right to the treatment of his choice. Chance v. Armstrong, 143 F.3d at 703.

3    Defendants do not challenge Plaintiff's factual allegation that he suffered from a heart murmur condition nor his legal conclusion that his condition was sufficiently serious under the objective prong of the Eighth Amendment test. Thus, for the purposes of addressing Defendants' Motion, we need not address those issues.

Because Plaintiff has failed to demonstrate that a material question of fact exists with respect to his Eighth Amendment claim based on Crawley's medical treatment, it is recommended that Summary Judgment be **granted** on this claim.

### 2. Claims against Franza

In his Complaint, Plaintiff alleges that Franza denied his request to see a doctor when the corrections officer in his unit called the infirmary on October 9, 2007. Compl. at p. 3. In support of his Motion for Summary Judgment, Franza has submitted an Affidavit in which he states that the corrections officer who called the infirmary on October 9th told him that "inmate Thompson was complaining of heartburn and was out of his acid reflux medication and wanted to be seen by medical staff as soon as possible." Dkt. No. 24-14, C. Franza Aff., dated June 10, 2009, at ¶ 5. Franza states that neither heartburn nor a request for a medication refill constitute a medical emergency and therefore, he advised Plaintiff to sign up for the next regular sick call day. *Id.* at ¶ 8. Finally, Franza states that his "entire understanding of inmate Thompson's condition was based on what the Corrections Officer told [him]. In [his] professional opinion, there was nothing in the description provided to [him] by the officer that led [him] to believe plaintiff was in any danger or had a condition requiring immediate medical attention." *Id.* at ¶ 9.

Again, Plaintiff has failed to rebut Franza's Affidavit, in which he swears that based on the information provided to him by the corrections officer, he determined that Plaintiff did not require immediate medical attention. As previously discussed, such a medical assessment, even if wrong, does not constitute deliberate indifference. *Estelle v. Gamble,* 429 U.S. at 106.

**\*6** For the above reasons, it is recommended that Summary Judgment be **granted** on Plaintiff's Eighth Amendment claim against Franza.

### 3. Allegations against Crawley and Franza raised in Plaintiff's Response in Opposition to Defendants' Motion

Although unmentioned in the Complaint, Plaintiff alleges in his Response to Defendants' Motion that he saw Franza during another emergency sick call on October 10, 2007. Pl.'s Mem. of Law at pp. 2-3. Plaintiff alleges that Franza threatened him during his sick call visit and conspired with Crawley to "pre-date" the Misbehavior Report in retaliation for Plaintiff's October 9th Grievance. These new allegations were not added to the Complaint by amendment, and are therefore improper. However, even if we were to consider the merits of these new claims, they would still fail.

It is well-settled in this Circuit that "threats do not amount to violations of constitutional rights." *Moncrieffe v. Witbeck,* 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (quoting *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995)). Furthermore, there is "no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)); *see also Gill v. Riddick,* 2005 WL 755745, at *7 (N.D.N.Y. Mar. 31, 2005). Finally, Plaintiff's claim that Franza and Crawley conspired to file a false Misbehavior Report against him in retaliation for the Grievance he filed against them on October 9th is wholly conclusory and belied by the record. *See Bell. Atl. Corp. v. Twombly,* 550 U.S. 544-45 (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"). Plaintiff pleaded guilty to all the charges brought in Crawley's Misbehavior Report. Disciplinary Hr'g Tr. at p. 4. Moreover, the Misbehavior Report is dated October 9, 2007, and, although Plaintiff claims that Crawley and Franza "pre-dated" the Misbehavior Report, there is no evidence on the record of such action. Nor is there any other evidence to suggest that the Misbehavior Report was issued for anything other than Plaintiff's violation of the rules, for which he admitted guilt and accepted responsibility. Thus, Plaintiff's retaliation and conspiracy claims are also without merit.

For the above reasons, it is recommended that these claims be **dismissed.**

### C. Supervisory Liability

Plaintiff names Superintendent of Ulster Correctional Facility Carlsen and Administrative Nurse Ms. White as Defendants. Beyond listing these Defendants in his Complaint, Plaintiff provides no details concerning his claims against these Defendants. However, given their supervisory roles, we assume Plaintiff seeks damages against these Defendants based on a theory of supervisory liability.

2010 WL 843872

If a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

> **\*7** in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

In this case, because we find that Plaintiff's underlying Eighth Amendment claims are without merit, none of the above bases for supervisory liability are applicable. *See Blyden v. Mancusi,* 186 F.3d 252, 265 (2d Cir.1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation."). Therefore, to the extent Plaintiff intended to bring claims of supervisory liability against Defendants

Carlsen and White, it is recommended that Summary Judgment be **granted** on those claims.

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion for Summary Judgment (Dkt. No. 24) be **GRANTED** and the Complaint (Dkt. No. 1) **DISMISSED** in its entirety; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 843872

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3357171
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Shawn D. THOMAS, Plaintiff,

v.

WESTCHESTER COUNTY, Correct Care
Solutions LLC, Westchester County Correctional
Officer VAL # 1439, Individually and in his
Official Capacity, Dr. Paul Adler, Individually
and in his Official Capacity, and New York
Correct Care Solutions P.C., Defendants.

No. 12–CV–6718 (CS).
|
July 3, 2013.

**Attorneys and Law Firms**

Shawn D. Thomas, pro se.

James C. Freeman, Kent Hazzard, LLP, White Plains,
NY, for Defendants Correct Care Solutions LLC, New
York Correct Care Solutions P.C., and Dr. Paul Adler.

*OPINION AND ORDER*

SEIBEL, District Judge.

**\*1** Before the Court is the Motion to Dismiss of
Defendants Correct Care Solutions LLC ("CCS"), New
York Correct Care Solutions P.C. ("NYCCS"), and
Dr. Paul Adler pursuant to Federal Rule of Civil
Procedure 12(b)(6). (Doc. 16.) For the following reasons,
Defendants' Motion is GRANTED.

**I. Background**
For the purposes of the present Motion, the Court accepts
as true the facts (but not the conclusions) stated in
Plaintiff's Amended Complaint ("AC"), (Doc. 8).

Plaintiff was incarcerated at the Westchester County Jail
("WCJ") in Valhalla, New York on August 9, 2011, (AC
3.1), [1] at which time he had an open wound in his ankle
from a shooting at close range in April 2010, [2] which
required daily bandage changing to prevent infection, (id.

Exs. 4, 20). Prior to his incarceration, Plaintiff had twelve
surgeries on his ankle, faced "life threatening" infections
in his wound, and developed a chronic need for pain
medication. (Id. Ex. 20.)

[1]  Page 3.1 refers to the first of the three pages of the
AC's "Facts" section.

[2]  Plaintiff alleges that he told the nurse at his medical
screening on August 10, 2011, that he had been shot
in the heel two months previously, (AC 3.1), but the
exhibits he attaches to the AC—including medical
records from North Bronx Healthcare Network, (id.
Exs. 5, 6), and Plaintiff's own statement, (id. Ex. 20)—
make clear that the shooting occurred approximately
fifteen months before his incarceration.

At his initial medical screening, Plaintiff informed the
nurse that he was taking ten milligrams of Percocet
three times daily, which was effective for his "severe
pain." (Id. at 3.1) The nurse responded that "we only give
[M]otrin or [T]ylenol," and put Plaintiff on the list to see
a doctor. (Id.) Plaintiff subsequently met with Dr. Paul
Adler, [3] who refused to prescribe him stronger medication
despite Plaintiff's assertion that Motrin was ineffective
in alleviating his pain; Dr. Adler allegedly stated that,
"[T]his department is cheap they'LL [*sic* ] just prolong
so it becomes someone else's problem sorry." (Id. at 3.1–
3.2.) In response to Plaintiff's concern about the effect
of taking extended doses of Motrin, Dr. Adler explained
that switching between Tylenol and Motrin would avoid
any liver damage. (Id. at 3.2.) Plaintiff further informed
Dr. Adler that his injury required at least daily cleaning,
and he alleges that CCS failed to clean the wound on
"numerous occasions," "causing ... an infection which
is now a[n] ulcer on [his] right ankle heel injury." (Id.)
Plaintiff also specifically alleges that two nurses refused to
change his bandages on January 3, 2012. (Id. Ex. 4.)

[3]  Plaintiff states in his reply brief that Dr. Adler was
removed as medical director at WCJ for drinking
alcohol on the job and bringing contraband into
the facility. (See Plaintiff['s] Memorandum of Law
in Opposition to Defendant[s'] Motion to Dismiss,
(Doc. 21), 8.) This allegation is not contained in the
AC, but even if it were, it is unsupported by facts and,
in any event, irrelevant.

On August 21, 2011, Plaintiff alleges that he suffered
further injury to his ankle when a corrections officer closed
a door on him. (Id. at 3.2.) He immediately requested

Case 9:16-cv-01229-EJS-TWD    Document 29    Filed 10/16/18    Page 112 of 148

medical attention but did not receive it until thirty minutes later, whereupon he was given Motrin and was scheduled for an X-ray with an outside provider. (*Id.; see id.* Exs. 3, 15.) On August 23, 26, and 29, 2011, Plaintiff received X-rays of his foot, which revealed a previous fracture of the heel bone in the process of healing. (*Id.* Exs. 10, 12, 13.) Plaintiff alleges that he did not receive the X-rays of his chest, lower back, and lower neck that he requested following the door incident. (*Id.* Ex. 18.) Plaintiff also received two orthotic shoes on August 23, 2011, (*id.* Ex. 2), but he alleges that he has not yet received the physical therapy that he requires for his injury, (*id.* at 3.3).

**\*2** Plaintiff brings a claim against CCS, NYCCS, and Dr. Adler under 42 U.S.C. § 1983 for deliberate indifference to his medical needs, as well as a *Monell* claim against CCS and NYCCS for engaging in a pattern or practice of constitutional violations. (*See id.* at 3.3.)

## II. *Legal Standard*

### A. Motion to Dismiss
"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929).[4] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal,* 556 U.S. at 678–79.

[4]     Defendants erroneously cite to a case that relies on the antiquated "no set of facts" pleading standard articulated in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *overruled by Twombly,* 550 U.S. at 563. (Defendant's [*sic* ] Memorandum

of Law in Support of Motion to Dismiss Plaintiff's Amended Complaint ("Ds' Mem."), (Doc. 18), 4.) As the Supreme Court stated in *Twombly,* the "no set of facts standard" "has earned its retirement .... [and] is best forgotten as an incomplete, negative gloss on an accepted pleading standard...." In the future, Defendants should cite the current legal standard for evaluating Rule 12(b)(6) motions set forth in *Twombly* and *Iqbal.* Indeed, given that the correct standard is more favorable to Defendants than the *Conley* standard, defense counsel's reference to the old standard is baffling.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.' " *Id.* (alteration omitted) (quoting Fed.R.Civ.P. 8(a)(2)).

*Pro se* complaints are held to less stringent standards than those drafted by lawyers, even following *Twombly* and *Iqbal. See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam); *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). But while pleadings of a *pro se* party should be read " 'to raise the strongest arguments that they suggest,' " *Kevilly v. New York,* 410 F. App'x 371, 374 (2d Cir.2010) (summary order) (quoting *Brownell v. Krom,* 446 F.3d 305, 310 (2d Cir.2006)), dismissal of a *pro se* complaint is nevertheless appropriate where a plaintiff has clearly failed to meet minimum pleading requirements, *see Rodriguez v. Weprin,* 116 F.3d 62, 65 (2d Cir.1997); *accord Honig v. Bloomberg,* No. 08–CV–541, 2008 WL 8181103, at \*4 (S.D.N.Y. Dec.8, 2008), *aff'd,* 334 F. App'x 452 (2d Cir.2009).[5]

[5]     Copies of all unpublished decisions cited herein will be sent to the *pro se* Plaintiff, along with a copy of this Opinion and Order.

### B. Documents Considered on a Motion to Dismiss

**\*3** When deciding a motion to dismiss, the Court's "review is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007); *see Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006). There are limited circumstances, however, when it is appropriate for a court to consider documents outside of the complaint on a motion to dismiss. *See Weiss v. Inc. Vill. of Sag Harbor,* 762 F.Supp.2d 560, 567 (E.D.N.Y.2011) (court may properly consider documents "integral" to complaint, documents relied upon in drafting complaint, public documents, and facts of which judicial notice may be taken). When matters outside the pleadings that do not fall into these limited categories are included in a response to a 12(b)(6) motion, "a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment ... and afford all parties the opportunity to present supporting material." *Friedl v. City of N.Y.,* 210 F.3d 79, 83 (2d Cir.2000) (internal quotation marks omitted).

Here, Defendants submitted the Affidavit of Paul Adler, D.O., (Freeman Decl. Ex. C), [6] with their motion papers, stating only that extrinsic documents that are integral to Plaintiff's claims may be considered on a Rule 12(b)(6) motion. (Ds' Mem. 5 (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991).) This is a correct statement of the law, but it has no application to the Adler Affidavit—a factual affidavit based on Adler's personal knowledge—which is not integral to Plaintiff's claims. *See Bill Diodato Photography LLC v. Avon Prods., Inc.,* No. 12–CV–847, 2012 WL 4335164, at \*3 (S.D.N.Y. Sept. 21, 2012) (document considered "integral" where plaintiff has "(1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint.") (internal quotation marks omitted). I thus cannot consider the facts contained in the Adler Affidavit without converting the instant Motion to one for summary judgment, [7] *see Friedl,* 210 F.3d at 83, which I decline to do . [8] Accordingly, I will consider only the factual allegations in Plaintiff's AC and the exhibits attached thereto in assessing the plausibility of his claims.

[6] "Freeman Decl." refers to the Declaration of James C. Freeman. (Doc. 17.)

[7] Local Rule 12.1 requires that a represented party moving to dismiss a *pro se* complaint under Rules 12(b) or 12(c) provide notice to the *pro se* litigant if the represented party refers to matters outside of the pleadings in its motion, thus making it possible that the Court could convert the motion to one for summary judgment. As far as the Court can tell, defense counsel did not comply with this rule and failed to provide Plaintiff with the required notice set forth in the text of Local Rule 12.1.

[8] Defendants also include in the statement of facts in their Memorandum of Law, (*see* Ds' Mem. 2–4), numerous "facts" for which they provide no citation but which apparently come from medical records not provided to the Court (or, presumably, to Plaintiff). Even if I could consider facts outside the AC on a motion to dismiss, which I cannot, I would have to disregard sourceless "facts" provided only in a memorandum of law. *See Kulhawik v. Holder,* 571 F.3d 296, 298 (2d Cir.2009) ("An attorney's unsworn statements in a brief are not evidence.").

## III. *Discussion*

### A. *Deliberate Indifference*

"A convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care ... arises from the Eighth Amendment's prohibition of cruel and unusual punishment." *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009) (internal quotation marks omitted). While prison officials must ensure that prisoners [9] receive adequate medical care, *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), "not every lapse in medical care is a constitutional wrong," *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). "Rather, a prison official violates the Eighth Amendment only when two requirements"—one objective and one subjective—"are met." *Id.* (internal quotation marks omitted).

[9] The AC does not state whether Plaintiff is a pre-trial detainee or a convicted prisoner. I may take judicial notice, however, of the fact that Plaintiff was a federal pre-trial detainee at the relevant times. (Indeed, his criminal case is assigned to me. *See United States v. Hardy,* No. 11–CR–629 (CS) (S.D.N.Y. filed Aug. 2, 2011).) Although a deliberate indifference claim must be brought under different constitutional provisions depending on the Plaintiff's status—the Eighth Amendment for convicted prisoners and

the Fourteenth Amendment for pre-trial detainees —the standard for evaluating claims of deliberate indifference is the same under both amendments. *See Caiozzo,* 581 F.3d at 69.

### 1. *Objective Prong*

**\*4** To satisfy the objective requirement, Plaintiff must allege that he was "actually deprived of adequate medical care," *id.* ("[T]he prison official's duty is only to provide reasonable care."), and "that the alleged deprivation of medical treatment [wa]s ... sufficiently serious—that is, the prisoner must prove that his medical need was a condition of urgency, one that may produce death, degeneration, or extreme pain," *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (internal quotation marks omitted); *see Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) ("The standard for Eighth Amendment violations contemplates a condition of urgency that may result in degeneration or extreme pain .") (internal quotation marks omitted). The inquiry is "fact-specific" and "must be tailored to the specific circumstances of each case." *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003). Relevant factors include: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (quoting *Chance,* 143 F.3d at 702).

Where the inadequacy alleged is the medical treatment given, "the seriousness inquiry is narrower.... [I]f the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Goris v. Breslin,* 402 F. App'x 582, 584–85 (2d Cir.2010) (summary order) (internal quotation marks omitted); *see Smith,* 316 F.3d at 186–87 (among other things, court must look at reasons for and effect of delay in treatment); *Ferguson v. Cai,* No. 11–CV–6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) ("Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness.").

Plaintiff does not allege that Defendants failed to provide any medical treatment. Indeed, Plaintiff's AC details the ongoing medical treatment that he received at WCJ, including over-the-counter medication for his chronic pain, (AC 3.1–3.2), orthotic shoes, (*id.* Ex. 2), and visits to outside providers for X-rays, (*id.* Exs. 10, 12, 13). Plaintiff alleges that interruptions in his treatment—specifically, Defendants' failure to consistently change his bandages —exacerbated his condition and resulted in an infection and ulcer in the open wound on his foot. "[T]he failure to provide treatment for an otherwise insignificant wound may violate the Eighth Amendment if the wound develops signs of infection, creating a substantial risk of injury in the absence of appropriate medical treatment." *Smith,* 316 F.3d at 186; *accord Chance,* 143 F.3d at 702 ("[I]f prison officials deliberately ignore the fact that a prisoner has a five-inch gash on his cheek that is becoming infected, the failure to provide appropriate treatment might well violate the Eighth Amendment."); *Odom v. Kerns,* No. 99–CV–10668, 2008 WL 2463890, at *7 (S.D.N.Y. June 18, 2008) (cuts and open wounds that eventually became infected could be serious medical needs, even absent allegations that plaintiff had chronic pain or inhibition of daily activities); *cf. Brock,* 315 F.3d at 163–64 (failure to properly treat a painful scar, which "d[id] not present a risk of serious harm as would an infected wound," was sufficiently serious). Moreover, Plaintiff alleges that the chronic pain resulting from his ankle injury and open wound also constitutes a serious medical condition, and courts have held that injuries causing chronic and extreme pain can be sufficiently serious. *See Johnson,* 412 F.3d at 403; *Chance,* 143 F.3d at 702. Accordingly, Plaintiff's assertions of an infection in his open wound and chronic pain from his ankle injury plausibly allege sufficiently serious medical conditions. [10]

[10]  To the extent that Plaintiff asserts that he experienced pain from the door incident affecting his chest, lower back, and neck, (*see* AC Ex. 18 ("[O]fficer Val # 1439 closed me up between the sliding doors which causes severe pain to my foot, chest, lower back, and lower neck. And I only receive the x-ray for my foot.")), Plaintiff appears only to allege pain in these areas resulting from this specific incident— particularly as the AC and its numerous attachments contain no other allegations of chest, back, or neck pain—and not the kind of chronic pain courts have found sufficient to allege a serious medical condition. *See Walker v. Dep't of Corr. Serv.,* No. 11–CV–993, 2012 WL 527210, at *1 (S.D.N.Y. Feb.14, 2012) ("A

determination of whether an incident is sufficiently serious to invoke the Eighth Amendment requires the Court to assess the duration of the condition and the potential for serious physical harm. Where a medical need is at issue, an Eighth Amendment violation may be sustained only where plaintiff proves that it was a condition of urgency, one that may produce death, degeneration, or extreme pain.") (citation and internal quotation marks omitted).

2. *Subjective Prong*

**\*5** The subjective component requires that the prison official acted with a "sufficiently culpable state of mind." *Salahuddin, 467 F.3d at 280*. Specifically,

> [a] prison official cannot be found liable ... unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer, 511 U.S. at 837*. "This 'deliberate indifference' element is equivalent to the familiar standard of 'recklessness' as used in criminal law." *Phelps v. Kapnolas, 308 F.3d 180, 186 (2d Cir.2002)* (citing and quoting *Farmer, 511 U.S. at 839–40*).

Although Plaintiff's infection may be a sufficiently serious medical condition, he also "must demonstrate that the defendants acted or failed to act while actually aware of a substantial risk that serious inmate harm would result." *Farid v. Ellen, 593 F.3d 233, 248 (2d Cir.2010)* (alterations and internal quotation marks omitted). Plaintiff has not set forth any facts plausibly showing that any Defendant's occasional failure to change his bandages was accompanied by the requisite state of mind. Indeed, his sole allegations are that he spoke with prison officials and nurses who refused to change his bandages on January 3, 2012, (AC Ex. 4), and that CCS failed to change his bandages on "numerous occasions," (*id.* at 3.2).[11] Even affording Plaintiff the special solicitude due *pro se* litigants, there are simply no facts rendering it plausible that Defendants acted with a state of mind akin to criminal recklessness. *See Phelps, 308 F.3d at 186*. While not changing Plaintiff's bandages daily may potentially amount to negligence, nothing

alleged in the AC makes it plausible that Defendants knew of and consciously disregarded an excessive risk to Plaintiff's health and safety—particularly as Plaintiff received ongoing *dressing* changes and treatment, and admitted to missing clinic visits that may account for some instances when his bandages went unchanged. Accordingly, Plaintiff's allegations are insufficient to state a plausible claim for deliberate indifference. *See Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)* ( "[A] complaint that a physician has been negligent in ... treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Hill v. Curcione, 657 F.3d 116, 123 (2d Cir.2011)* ("Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness—an act or a failure to act by a prison doctor that evinces a conscious disregard of a substantial risk of serious harm.") (alteration and internal quotation marks omitted).

11    The AC further admits that while "[Plaintiff] ha[s] a[n] order to go to the clinic every day," he missed going to the clinic for several days prior to and on August 27, 2011. (*Id.* Ex. 18.) Nurse's notes dated August 22, 2011 indicate that he was receiving daily bandage changes. (*Id.* Ex. 15.)

Further, Plaintiff's allegation that *Motrin* and *Tylenol* were insufficient to alleviate his chronic pain also does not state a plausible claim for deliberate indifference. The law is clear that a "mere disagreement over the proper treatment" is not actionable, *Chance, 143 F.3d at 703,* and courts have found that treating pain with over-the-counter, as opposed to prescription, medication is a disagreement over treatment that does not rise to the level of deliberate indifference, *see, e.g., Hill, 657 F.3d at 123 (2d Cir.2011)* (prescribing *Motrin* rather than stronger pain medication to treat broken wrist, with no concomitant allegation of "a culpable state of mind," falls short of claim for deliberate indifference); *Reyes v. Gardener, 93 F. App'x 283, 284 (2d Cir.2004)* (holding that alternative medical plan incorporating weaker pain medication to treat inmate was "mere disagreement over the proper treatment") (internal quotation marks omitted); *Rush v. Fischer, No. 09–CV–9918, 2011 WL 6747392, at \*3 (S.D.N.Y. Dec.23, 2011)* ("The decision to prescribe one form of pain medication in place of another

does not constitute deliberate indifference to a prisoner's serious medical needs."). [12]

[12]  Even if Plaintiff had plausibly alleged chronic chest, lower back, and lower neck pain, the failure to X-ray these areas at his request is not actionable as it is also a mere disagreement over proper treatment. *See Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (allegation of failure to X-ray finger "does not rise to the level of a constitutional violation" because "disagreements over medications [and] diagnostic techniques (*e.g.,* the need for X-rays) ... implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment."). The same is true of Plaintiff's allegation that he has not received the necessary physical therapy for his ankle injury. *See O'Diah v. Mawhir,* No. 08–CV–332, 2012 WL 4482579, at *9 (N.D.N.Y. Sept. 5, 2012) (prisoner's allegation that he required physical therapy was disagreement over proper treatment).

**\*6** Dr. Adler's alleged response to Plaintiff's request for stronger pain medication and provision of his outside doctor's contact information—"[T]his department is cheap they'LL [*sic* ] just prolong so it becomes someone else's problem sorry," (AC 3.2)—does not plausibly indicate that *Dr. Adler* knew of and disregarded an excessive risk to Plaintiff's health or safety, *see Farmer,* 511 U.S. at 837—particularly in light of Plaintiff's receipt of non-prescription pain medication and ongoing medical attention. Although the Second Circuit has held that allegations of personal financial incentive are sufficient to state a claim for deliberate indifference, *see Chance,* 143 F.3d at 704 (claim survived motion to dismiss where two defendants recommended a treatment option "not on the basis of their medical views, but because of monetary incentives," which, if true "would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment"), *Chance* can be distinguished from the case at bar. First, the claim survived under the previous, more lenient standard for evaluating a motion to dismiss—whether the plaintiff could prove "no set of facts" that would entitle him to relief, *see Conley,* 355 U.S. at 45–46—and the *Chance* court noted that dismissal of the plaintiff's claim would be inappropriate there even if "[it] [thought] it highly unlikely that [plaintiff] [would] be able to prove his allegations" of the defendants' ulterior financial motives, *Chance,* 143 F.3d at 704. Further, the allegation that the

treating physician personally had a financial incentive in recommending a particular course of treatment—and thus was potentially reckless in treating the plaintiff—differs substantially from Plaintiff's allegation here that his treating physician stated only that the Department of Corrections (apparently as opposed to himself) was cheap and would rather have Plaintiff be someone else's problem. Finally, the *Chance* plaintiff alleged that there was legitimate disagreement among physicians about how to treat his condition, whereas Plaintiff has failed to allege that any other medical professional questioned Dr. Adler's decision to treat Plaintiff's pain with over-the-counter medication.

For the reasons stated above, Defendants' Motion is granted with respect to Plaintiff's deliberate indifference claim.

### *B. Monell Claim*

Absent an underlying constitutional violation, a *Monell* claim cannot lie. *See Bolden v. Cnty. of Sullivan,* No. 11–CV–4337, 2013 WL 1859231, at *2 (2d Cir. May 6, 2013) (summary order) ("[B]ecause the district court properly found no underlying constitutional violation, its decision not to address the County defendants' liability under *Monell* was correct."); *Segal v. City of N. Y.,* 459 F.3d 207, 219 (2d Cir.2006) (*"Monell* does not provide a separate cause of action ... it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.") (emphasis in original). Even if the underlying claims had survived, however, Plaintiff has not plausibly alleged a *Monell* claim against CCS and NYCCS. [13]  Plaintiff alleges that CCS failed to change his bandages, but there are no allegations that this failure was the result of a formal policy, a widespread practice, or a failure to properly train or supervise employees. Rather, Plaintiff relies exclusively on an investigation report dated November 19, 2009 [14]  issued by the Department of Justice ("Investigation Report") detailing in part "Medical Care Deficiencies" found at WCJ—specifically in infection control, dental care, mental health care, and the medical grievance process, [15] (AC Ex. 17, at 19–27), without alleging that CCS, NYCCS, or any of its policymakers were the subject of or privy to the results of the Investigation Report. Neither CCS nor NYCCS is mentioned in the Investigation Report, (*see id.* Ex. 17); Plaintiff's allegations occurred

nearly two years after the Investigation Report was issued; and the medical care policies found deficient at WCJ—including inadequate treatment of infectious diseases and lack of dental care, (*id.* Ex. 17, at 19–22)—are unlike the deprivation of medical care Plaintiff alleges here. [16] Plaintiff's *Monell* claim is accordingly dismissed.

[13]  I assume without deciding for the purposes of this Motion that *Monell* would apply to private entities providing care to state inmates, such as CCS or NYCCS. *See Bektic–Marrero v. Goldberg,* 850 F.Supp.2d 418, 432–33 (S.D.N.Y.2012) (accepting plaintiff's argument that defendant New York Medical College acted under color of state law by virtue of its agreement to administer medical services to inmates at WCJ).

[14]  Defendants argue in their brief that CCS/NYCCS did not become responsible for inmate healthcare until July 26, 2010. (Ds' Mem. 10 .) I must ignore this allegation because it is not in or integral to the AC, and because it appears only in Defendants' Memorandum of Law.

[15]  Although Plaintiff alleges that he was unable to file a grievance at WCJ, (*see* AC Exs. 18–19), the grievance in question relates to his claims against Defendant Officer Val # 1439 arising from the incident in which he was caught in a door and does not implicate NYCCS or CCS, (*see id.* Ex. 3).

[16]  The Investigation Report notes that a medical intake was performed in an open area within the sight and sound of other inmates and WCJ staff. (AC Ex. 17, at 19 n. 22.) Although Plaintiff alleges that his intake was also performed in an open area where anyone could overhear what was said, (*id.* at 3.1), the Investigation Report found that this "appeared to be an isolated incident," and thus does not constitute a custom or practice sufficient to allege a plausible *Monell* claim. Further, while the Court does not condone such a breach of Plaintiff's privacy and the medical staff's professional obligations, it would not meet either the objective or subjective prongs of the deliberate indifference test.

*C. Leave to Amend*

**\*7** Although *pro se* plaintiffs are generally given leave to amend a deficient complaint, *see Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795–96 (2d Cir.1999) (per curiam), a district court may deny leave to amend when amendment would be futile because the problem with the claim "is substantive ... [and] better pleading will not cure it," *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000). While courts should be more lenient when considering a *pro se* party's motion to amend than when considering that of a represented party, *see In re Sims,* 534 F.3d 117, 133 (2d Cir.2008), leave to amend is properly denied where all indications are that the *pro se* plaintiff will be unable to state a valid claim, *see Valle v. Police Dep't Cnty. of Suffolk Cent. Records,* No. 10–CV–2847, 2010 WL 3958432, at \*2 (E.D .N.Y. Oct. 7, 2010). I find that to be the case here, where Plaintiff's AC and its many attachments contain no factual allegations rendering either of his claims plausible. Further, Plaintiff has neither asked to amend again nor otherwise indicated that he is in possession of facts that could cure the deficiencies identified in this Opinion. Thus, because Plaintiff has already had the opportunity to amend his Complaint, and because it appears to the Court that amendment would be futile, I decline to *sua sponte* grant leave to amend again. *See Coleman v. brokersXpress, LLC,* 375 F. App'x 136, 137 (2d Cir.2010) (summary order) (denial of leave to amend affirmed where *pro se* plaintiff had already had opportunity to amend once and made no specific showing as to how he would remedy defects in complaint); *cf. Ariel (UK) Ltd. v. Reuters Grp., PLC,* 277 F. App'x 43, 45–46 (2d Cir.2008) (summary order) (district court did not exceed its discretion in not *sua sponte* granting leave to amend where Plaintiff had already amended complaint once and amendment would have been futile).

\* \* \*

Although I am granting Defendants' Motion to Dismiss, defense counsel should take no pride in his professional performance in this case. He: (1) cited an outdated legal standard that is less favorable to his clients than the applicable standard; (2) submitted an affidavit that cannot be considered on a motion to dismiss; (3) apparently violated Local Rule 12.1 by not providing (as far as the Court can tell) the notice required to be provided to a *pro se* plaintiff when the moving party refers to matters outside of the pleadings on a Rule 12 motion; (4) referred in his Memorandum of Law to "facts" that cannot be found in the record; and (5) apparently violated Local Rule 7.2 by not providing to Plaintiff (as far as the Court can tell) printed copies of cases cited in his Memorandum of Law that are unreported or reported only on computerized databases.

2013 WL 3357171

**IV.** *Conclusion*

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. The Clerk is respectfully directed to terminate the pending Motion, (Doc. 16), and terminate CCS, NYCCS, and Dr. Adler from the case.

**\*8  SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3357171

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3503511
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
W.D. Texas,
El Paso Division.

Leonard W. SHELTON, Plaintiff,
v.
EL PASO COUNTY, Defendant.

No. EP–08–CV–26–DB–ML.
|
Sept. 1, 2010.

**Attorneys and Law Firms**

Leonard W. Shelton, Huntsville, TX, pro se.

Ian Russell Kaplan, El Paso County Attorney's Office, El Paso, TX, for Defendant.

*REPORT AND RECOMMENDATION*
*OF THE MAGISTRATE JUDGE*

MARGARET F. LEACHMAN, United States Magistrate Judge.

**\*1** Plaintiff, LEONARD W. SHELTON, a prisoner in state custody, filed an amended *pro se* [1] complaint pursuant to 42 U.S.C. § 1983, alleging that El Paso County violated his First Amendment right to the free exercise of his religion and his right to Equal Protection. Both Plaintiff and Defendant have filed motions for summary judgment. For the reasons set forth below, the Court recommends that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

[1]     Because Plaintiff is proceeding *pro se*, the Court has read his complaint and pleadings liberally. *See Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)* (*pro se* pleadings are held to less stringent standards than are pleadings drafted by lawyers).

*PROCEDURAL HISTORY*

Plaintiff is currently in the custody of the Texas Department of Criminal Justice–Correctional Institutions Division, at the Byrd Unit in Huntsville, Texas. **Docket Entry ("D.E.") 76** (Notice of Change of Address). Plaintiff was in custody at the El Paso County Jail Annex, in El Paso, Texas from approximately June 6, 2007, to April 29, 2008. **D.E. 15 at 1, D.E. 35 at 1** (Plaintiff's Amended Objections to the Report and Recommendation of the Magistrate Judge ("R & R")).

On January 24, 2008, Plaintiff filed an application to proceed *in forma pauperis* to prosecute a § 1983 complaint. **D.E. 1.** Adopting in part and rejecting in part a R & R entered by Magistrate Judge Michael S. McDonald, the United States District Judge David Briones found Plaintiff's allegations—that Defendant interfered with Plaintiff's ability to exercise his religion when Defendant's employees denied him his personal Quran and refused to provide him with a blanket or towel to use as a prayer rug—were sufficient to state a claim upon which relief may be granted, granted Plaintiff's *in forma pauperis* application, and remanded the cause to Judge McDonald for further proceedings. **D.E. 7** (R & R); **D.E. 16 at 4–5** (District Court Order).

When Defendant's motion to dismiss was granted because Plaintiff had named a non-jural entity as defendant, Plaintiff was given an opportunity to amend his complaint. **D.E. 24** (Def's Motion to Dismiss); **D.E. 26** (Pl's Response); **D.E. 28** (R & R); **D.E. 30** (District Court Order). Plaintiff's amended complaint was subsequently dismissed as to all defendants except for El Paso County. **D.E. 34** (Amend.Compl.); **D.E. 42** (R & R); **D.E. 45** (Def's Objections to R & R); **D.E. 46** (Pl's Response); **D.E. 47** **(District Court Order)**.

Subsequently, Defendant's motion to dismiss for failure to state a claim and Plaintiff's motion for default judgment were both denied and a deadline was set for filing dispositive motions. **D.E. 56** (Def's Motion to Dismiss); **D.E. 58** (Pl's Motion for Default Judgment); **D.E. 60** (R & R); **D.E. 63** (District Court Order).

Plaintiff filed a motion for summary judgment on January 25, 2010, **D.E. 67,** and a supplemental motion for summary judgment on February 18, 2010. **D.E. 70.**

2010 WL 3503511

Defendant filed a motion for summary judgment and response to Plaintiff's motion on February 17, 2010. **D.E. 77.**

On June 30, 2010, Magistrate Judge McDonald entered an order transferring Plaintiff's case to this Court. **D.E. 78.**

### *PLAINTIFF'S CLAIMS*

**\*2** Plaintiff claims that Defendant violated his First Amendment rights to the free exercise of religion while he was a prisoner in the El Paso County Jail Annex. **D.E. 34 at 4; D.E. 35 at 4.** Specifically, Plaintiff asserts that Defendant, pursuant to jail policy, refused Plaintiff possession of or access to his personal Quran and prayer rug and refused to provide a softcover Quran or an additional blanket or towel to use during his prayers. *Id.* He further asserts that Defendant violated his constitutional right to Equal Protection by failing to make the same provisions available (services, materials, or religious representatives) for him as it did for similarly situated inmates of other faiths. **D.E. 15 at 2–3; D.E. 35 at 3–6; D.E. 67 at 3.**

Plaintiff alleges that he had a personal Quran, but was required to send it out because he was not allowed to have a hardback book. **D.E. 1–1 at 7** (Grievance stating that he had a Quran in his property but had to send them out because the jail administration said he could not have hardback books); **D.E. 15 at 3–4; D.E. 19 at 7** (Amend.Complaint); **D.E. 35 at 3, 5.** He alleges that he attempted to get it back, but was denied both possession of and access to it. **D.E. 15 at 3–4; D.E. 35 at 5.** Plaintiff asserts that he attempted to obtain a Quran or an address to one of the Islamic Centers in El Paso from the jail ministry. **D.E. 1–1 at 7.** He alleges that he was informed that the ministry did not have and was unable to get what he had requested, that he had been given the only address that they had, that the official had tried in the past to get things from a Muslim organization and was told that if you were a true Muslim you would not be in jail, but that the official would try one more time to get at least a Quran. **D.E. 1–1 at 11–12.** Plaintiff argues that denying him possession of or access to his own Quran was not reasonably related to a legitimate penological interest where no alternative means of exercising his rights were made available. **D.E. 15 at 3–4; D.E. 35 at 5.**

Similarly, Plaintiff alleges that he had a prayer rug but was told by staff in the property room that he was not allowed to have it in his possession. **D.E. 1–1 at 7–8.** He alleges that he was given an additional blanket which he used as a makeshift prayer rug for months, but that it was confiscated and not returned to him. **D.E. 1–1 at 7; D.E. 15 at 3–4; D.E. 35 at 5.** Plaintiff alleges that he used the grievance procedure to attempt to obtain authorization for an extra blanket or towel for his prayers. **D.E. 1–1 at 8, D.E. 35 at 5.** Plaintiff argues that confiscating his rug and disallowing him an extra towel or blanket was not reasonably related to a legitimate peneological interest. **D.E. 35 at 5.**

Plaintiff seeks declaratory and injunctive relief as well as $250,000 in compensatory, exemplary, and punitive damages. **D.E. 34 at 4; D.E. 35 at 8; D.E. 46 at 3; D.E. 58 at 2.**

### *DISCUSSION*

#### I. Summary Judgment Standard

**\*3** Plaintiff argues that he is entitled to summary judgment as a matter of law because the court previously found that his claims were sufficient to state a claim upon which relief may be granted. **D.E. 67; D.E. 70.** To be entitled to or survive summary judgment, however, a Plaintiff must do more than state a claim upon which relief may be granted. [2]

[2]    Defendant's motion to dismiss relied in part on documents outside of the pleadings and arguments regarding the merits of Plaintiff's claims. **D.E. 60 at 13.** Further, the Magistrate noted that the District Court had already determined that Plaintiff's allegations that he was denied access to his personal Quran and denied a blanket to use as a prayer rug were sufficient to state a claim and had stated that it was "unwilling to accept Defendant's unsubstantiated and conclusive assertions that property restrictions on prayer rugs are clearly related to the legitimate penological interest of enforcing discipline or that Shelton's complaint regarding the provision of a Qu'ran is spurious." *Id* **., (citing D.E. 47 at 3–4).** The Magistrate Judge found that part of Defendant's motion should be construed as a motion for summary judgment for which all parties must be given a reasonable opportunity to respond. *Id.* The summary judgment standard was set forth. *Id.* Plaintiff was put

2010 WL 3503511

on notice as to what was required of him to defeat Defendant's motion for summary judgment.

Summary judgment is proper where the pleadings and evidence on file demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." **Fed.R.Civ.P. 56(c).** A party seeking summary judgment bears the initial burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* **477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).** Once the movant carries this burden, the burden shifts to the nonmovant to show the existence of a genuine issue for trial. *Id.,* **at 324–325.** Conclusory allegations are not competent summary-judgment evidence and are insufficient to defeat a motion for summary judgment. *Eason v. Thaler,* **73 F.3d 1322, 1325 (5th Cir.1996).**

All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* **477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).** "If the record, viewed in this light, could not lead a rational trier of fact to find for [the nonmoving party], there is no genuine issue for trial, and summary judgment is proper. If, on the other hand, the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." *Kelley v. Price–Macemon, Inc.,* **992 F.2d 1408, 1413 (5th Cir.1993)** (internal citations omitted).

## II. Section 1983

Generally, to succeed on a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate the violation of a right secured by the Constitution and laws of the United States committed by a person acting under color of state law. *West v. Atkins,* **487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988);** *Biliski v. Harborth,* **55 F.3d 160, 162 (5th Cir.1995).**

To establish county liability under § 1983, a plaintiff must demonstrate that the enforcement of an official county policy or custom was the moving force behind the alleged illegal or unconstitutional action depriving the plaintiff of constitutional or federal rights. *Williams v. Kaufman County,* **352 F.3d 994, 1013–14 (5th Cir.2003)** (citing *Colle v. Brazos County,* **981 F.2d 237, 244 (5th Cir.1993);** *Bryan County v. Brown,* **520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997));** *Piotrowski v. City of Houston,*

**237 F.3d 567, 578 (5th Cir.2001)** (citing *Monell v. Dept. of Soc. Svcs.,* **436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978)).** An official policy or custom is: (1) "[a] policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or (2) "[a] persistent, widespread practice of city officials or employees, which, though not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy" about which such officers of the governing body has actual or constructive knowledge. *Webster v. City of Houston,* **735 F.2d 838, 841 (5th Cir.1984)** (en banc).

**\*4** Even a facially lawful policy may constitute the moving force of a constitutional violation where it led an employee to violate a plaintiff's rights and the plaintiff shows that the policy was implemented with "deliberate indifference" as to its known or obvious consequences. *Williams v. Kaufman County,* **352 F.3d at 1014 n. 66.**

## III. First Amendment—Free Exercise of Religion

Although imprisonment necessarily entails a loss of many rights, prisoners retain the First Amendment right to the free exercise of religion, though such right may be limited by prison regulations that are reasonably related to legitimate penological interests such as crime deterrence, prisoner rehabilitation, and institutional security. *O'Lone v. Estate of Shabazz,* **482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987);** *Pell v. Procunier,* **417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974);** *Cruz v. Beto,* **405 U.S. 319, 321–322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972).** There are four factors courts consider in determining whether the requisite reasonable relationship exists:

(1) whether there is a 'valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it';

(2) 'whether there are alternative means of exercising the right that remain open to the inmates';

(3) 'the impact that accommodation ... will have on guards and other inmates, and on the allocation of other resources generally'; and

Case 9:16-cv-01229-EJS-TWD    Document 29    Filed 10/16/18    Page 122 of 148
Shelton v. El Paso County, Not Reported in F.Supp.2d (2010)
2010 WL 3503511

(4) whether there are 'ready alternatives that could fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests.'

*Mayfield v. Texas Dept. of Crim. Justice,* 529 F.3d 599, 607 (5th Cir.2008) **(quoting** *Turner v. Safley,* 482 U.S. 78, 89–91, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)**).** Further, such regulations must operate in a neutral fashion. *Id.*

With respect to the four factors, the Fifth Circuit has held that "... rationality is the controlling factor, and a court need not weigh each factor equally." *Mayfield v. Texas Dept. of Crim. Justice,* 529 F.3d at 607. Additionally, in weighing these factors, courts must accord prison officials broad discretion and deference in making and administering policies that are needed to maintain institutional order. *Thornburgh v. Abbott,* 490 U.S. 401, 416, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). In considering a challenge to a prison policy as applied, the proper inquiry is whether the actions of the prison officials are reasonably related to legitimate penological interests. *Thornburgh v. Abbott,* 490 U.S. at 404.

If a court is reviewing an action taken by prison officials rather than a regulation, the same standard is applicable to determine whether the prison official's act is constitutionally permissible. *Jackson v. Cain,* 864 F.2d 1235, 1248 (5th Cir.1989). However, an "administrative foul-up" depriving an inmate of the right to practice his religious beliefs may amount to mere negligence, insufficient to support a claim for violation of the First Amendment. *Eason v. Thaler,* 73 F.3d at 1327 n. 2 (suggesting that foul-up in providing pork-free inmate with pork meal would amount to mere negligence and would not amount to a violation of the Free Exercise clause of the First Amendment).

**\*5**  Also, specific to Plaintiff's claims, there is no "constitutional or legal requirement that the government provide materials for every religion and sect practiced in this diverse country." *Cruz v. Beto,* 405 U.S. at 323 **(Burger, C.J., concurring).** But religious "materials cannot be denied to prisoners if someone offers to supply them." *Id.*

### A. Denying Plaintiff Possession of his Personal Quran
Plaintiff complains that he had a Quran, but that prison officials required him to send it out, pursuant to policy,

because, as he was told, he was not allowed to have a hardback book in his possession. D.E. 1–1 at 7; D.E. 15 at 3–4; D.E. 35 at 3.

The El Paso County Jail Annex policy specifically prohibits the possession of hardback books by any inmate, in the context of both general and religious inmate services. D.E. 56 at 23 (Exh A at 10); D.E. 77 at 20. The El Paso County Sheriff's Office Detention Services Division, Inmate Handbook, provides:

...

XIV. Services and Activities

...

B. Mail—...

10. The following will not be accepted:

...

*f. Posters; hardcover books; jewelry.*

11. The following will be accepted:

...

B. Soft cover books or magazines sent directly from the publisher or bookstore....

D.E. 56 at 21–23 (emphasis in original).

Chapter 4.21 of the Detention Services Policy and Procedures Manual, Inmate Religious Services Policy provides:

III. Procedures

...

G. No jewelry, medication, *hard cover books,* non-religious literature, candy, gum, stamps, paper, money, pens, or any other contraband will be given to the inmates.

...

D.E. 56 at 26 (emphasis in original).

Chapter 10.04 of the El Paso County Sheriff's Office Policies and Procedures Manual, Jail Ministry, provides:

Case 9:16-cv-01229-EJS-TWD    Document 29    Filed 10/16/18    Page 123 of 148
Shelton v. El Paso County, Not Reported in F.Supp.2d (2010)
2010 WL 3503511

I. Procedures

...

O. All donated materials must be religious in nature. Donated materials given to the Jail Ministry cannot be designated for a specific inmate and therefore will not be accepted.

II. Jail Ministry Rules of Conduct and Behavior

...

C. Items are contraband, which is identified as anything that is not authorized in the inmate floors or pods. The following items are prohibited from secured areas but are not limited to:

...

7. Hard cover books

...

D. Other items which will not be given to inmates include:

...

8. any item that is not authorized by the detention facilities.

**D.E. 77 at 19–21.**

Lieutenant Michaela Hebeker, who has been with the El Paso County Sheriff's Office for over eighteen years and whose duties include acting as liaison between inmates and the jail ministry, provided an affidavit explaining the reason for the jail's prohibition against hardback books. **D.E. 77 at 32–35** (Affidavit of Lt. Michaela Hebeker).

7. "Hardback books are not allowed in the Jail Annex due to the jail facility administration security concerns involving the use of the hardback books to hide contraband such as needles within the binding material and because the hardness of the binding material may be misused as a weapon against other inmates or staff. If hardback books were allowed, there would be an increased administrative burden involved in checking each hardback book for contraband items, such as needles. This increased administrative burden may even result in the need to hire additional staff or screening

equipment such as metal/drug detectors to accomplish the additional scrutiny burden.

**\*6** 8. "Prison security is of great concern to the detention facility. I believe that prohibiting hardback books, regardless of the subject area, is one method of increasing prison security.

***Id.,* at 34–35.**

In his affidavit, Detention Officer David Peña had this to say regarding hardback books:

3. "... Hardback books of any type are not provided to inmates for security and safety reasons.

...

8. "The reason the detention facility does not provide hard cover books is they can be used as weapons against another inmate or an officer. Additionally, weapons can be made from the book's hard back material.

9. "Prison security is of great concern to the detention facility.

**D.E. 77 at 36–39** (Affidavit of Detention Officer David Peña).

Defendant argues that these are valid penological concerns. **D.E. 77 at 4.**

Plaintiff does not dispute that hardbound books pose a substantial threat to prison security. *See* **D.E. 67, 70.** He does not suggest that the policy prohibiting hardbound books is an exaggerated response to a legitimate need to maintain institutional security. Plaintiff asserts only that the items he requested "did not create a penological interest no more than those imposed by inmates of other religions that were similarly situated as Plaintiff ." [3] **D.E. 70 at 3.** The rule prohibiting hard bound books is not related to any particular religious belief or practice; it is neutral.

[3]  Plaintiff's Equal Protection claim is addressed in section V, below. Plaintiff, however, does not contend, or provide evidence to suggest, that any other inmate was allowed religious materials in hardback format.

The Supreme Court has stated "[i]t hardly needs to be emphasized that hardback books are especially serviceable

2010 WL 3503511

for smuggling contraband into an institution; money, drugs, and weapons easily may be secreted in the bindings." *Bell v. Wolfish,* 441 U.S. 520, 550–51, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Although the Supreme Court found blanket bans on publications unconstitutional, it approved of the restriction on hardback books, because it was content neutral, there were alternative sources to obtain softcover formats, and the inmates were incarcerated for only a short period of time. *Id.,* 441 U.S. at 551–52.

Defendant cites other cases in which restrictions on hardbacked books, including religious materials, have been upheld by other courts. **D.E. 77 at 11** (citing *Tate v. Lewis,* No. 86–14, 1986 WL 12687, 1986 U.S. Dist. LEXIS 18397, 1986 WL 12687 (E.D.La. Oct. 1986); *Mustafa– Ali v. Irvin,* No. 2:03cv594–MTP, 2007 WL 2302278, 2007 U .S. Dist. Lexis 58477, at *7 (S.D.Miss., Aug. 9, 2007)). In *Tate v. Louis,* defendants had removed the hardcover backing from plaintiff's Holy Quran pursuant to policy prohibiting hardcover books. *Tate v. Louis,* 1986 WL 12687. The District Court concluded after a trial: "[w]e do not find that a decision to exclude hardcover books to be unreasonable. It is conceivable that hardback books, whether in a prison environment or otherwise, could be used as a 'weapon' to cause injury to another." *Id.* In *Mustafa–Ali v. Irvin,* the District Court determined on summary judgment review that the safety considerations behind allowing only soft-cover books were self-evident and the ability to possess a soft-cover Quran provided a sufficient alternative such that jail policy prohibiting hardcover books was not a substantial burden on plaintiff's ability to freely exercise his faith. *Mustafa–Ali v. Irvin,* 2007 WL 2302278, at *7.

 **\*7** Other courts have also found the prohibition of hardback books reasonable, even with respect to religious materials. In an unpublished decision, the Fifth Circuit upheld such a prohibition, finding that the purchase of softbound books in lieu of hardbound books is a reasonable alternative means of exercising a right. *Leachman v. Thomas,* No. 99–20209, 229 F.3d 1148, 2000 WL 1239126 (5th Cir.2000) (not designated for publication). The regulation under consideration contained exceptions for correspondence classes and situations in which only hardbound books were available such as publications from the Church of Jesus Christ of Latter Day Saints and the Gideons that each produce their respective religious tracts only in hardbound form.

*Id.* In *Pressley v. Beard, et al,* the Third Circuit affirmed the District Court's grant of summary judgment for the defendant, finding that the confiscation of the prisoner's hard-bound Quran and prayer rug was intended to further legitimate penological objectives and therefore did not violate free exercise of religion where evidence was submitted that inmates were able to practice their faith without access to a prayer rug or a hard-bound copy of the Quran. *Pressley v. Beard, et al,* No. 07–4150, 266 Fed. Appx. 216, *218–19 (3rd Cir.2008)* (not designated for publication). Finally, in *Skelton v. Pri–Cor, Inc.,* the Sixth Circuit affirmed the District Court's grant of summary judgment for the defendant finding that the decision to refuse delivery of a hardcover Bible was reasonably related to legitimate penological interests and the center would allow possession of a softcover Bible. *Skelton v. Pri–Cor, Inc.,* 963 F.2d 100, 102–104 (6th Cir.1991).

Defendant argues that Plaintiff was not prohibited from possessing a soft-cover Quran. **D.E. 77 at 11.** Some courts have found that a regulation banning hardback books without exception was unreasonable where materials were not available in soft-cover format. *See Reimer v. Hastings,* No. 93–8642, 30 F.3d 1492, 1994 WL 398363 (5th Cir.1994) (not designated for publication) (affirming injunctive relief mandating that inmates be allowed to keep magazines and books in their cells and if only a hardback book is available, the inmate should be allowed one such book in his cell which pertains to the course he is pursuing because the underinclusive nature of the exclusion indicated that it was an exaggerated response to potential fire hazards and because there was no evidence that fashioning weapons from books was a real concern or that hardback books provide better material for making weapons than other materials); *Jackson v. Elrod,* 881 F.2d 441 (7th Cir.1989) (finding blanket prohibition against hardcover books unconstitutional where inmate was denied both hard and soft-cover materials, denied access to such materials in the library, and materials sought were not available in soft-cover). Plaintiff, however, has neither alleged nor provided summary judgment evidence to suggest that the Quran is not available in a soft-cover format. Nor has Plaintiff alleged that he attempted and was unable to obtain a soft-cover Quran directly from a publisher or bookstore with his own resources or with the help of family or friends. The report of his jail account provided to support his application to proceed *in forma pauperis* reflects that Plaintiff periodically had a balance of up to twenty dollars in his account. **D.E. 1 at 3 .**

Case 9:16-cv-01229-FJS-TWD    Document 29    Filed 10/16/18    Page 125 of 148
Shelton v. El Paso County, Not Reported in F.Supp.2d (2010)
2010 WL 3503511

**\*8** Regarding the impact that accommodation of the asserted right would have on other inmates, guards, and prison resources, Defendant echoes Lt. Hebeker's statement regarding the increased administrative burden involved were hardback books generally allowed, and argues that the added security protocols to maintain facility security if hardback books were provided to all inmates would impose more than *de minimis* cost on the jail. **D.E. 77 at 9–11.** Defendant adds that if Plaintiff were allowed to have his hardback Quran, even though hardback books are not generally allowed, it may be perceived as favoritism which would have a negative effect on morale. **D.E. 77 at 10.** Plaintiff has failed to provide evidence that accommodation would not have such a negative effect on the facility, guards, and other inmates or that the added security required if hardback books were allowed would not impose more than *de minimis* cost.

Plaintiff has failed to demonstrate that there exists a genuine issue of material fact as to the reasonableness of this prohibition, on its face or as applied. Even viewed in the light most favorable to Plaintiff, a rational trier of fact could not reasonably find in favor of Plaintiff on this issue based on the evidence in the record. Rather, the pleadings and the evidence on record demonstrate that Defendant is entitled to judgment as a matter of law on Plaintiff's claim that Defendant violated his First Amendment right to the free exercise of religion by requiring Plaintiff to send out his hardbound Quran pursuant to policy prohibiting possession of hardbound books.

**B. Failure to Provide Plaintiff a Soft-cover Quran**
With respect to Defendant's failure to provide Plaintiff with a soft-cover copy of the Quran to replace his hardbound copy, Plaintiff complains that Defendant failed to take the necessary steps to make ways for Plaintiff to exercise his right to practice religion through donations from outside sources, placing the burden on Plaintiff to obtain the things he needed. **D.E. 15 at 2–5.**

As previously noted, there is no constitutional requirement that Defendant provide religious materials to Plaintiff. *Cruz v. Beto*, 405 U.S. at 323 (Burger, C.J., concurring). Although Defendant cannot deny a prisoner religious materials if someone offers to supply them, Plaintiff has not identified a constitutional requirement that the government take certain steps to solicit such donations. Nor does Plaintiff allege that anyone offered

to supply Plaintiff a soft-cover Quran. To the contrary, evidence in the record, submitted by both Plaintiff and Defendant, indicates that Defendant did not have a soft-cover Quran to provide to Plaintiff and attempted to locate someone who would offer to supply Plaintiff a soft-cover Quran, but without success. **D.E. 1–1 at 11–12; D.E. 77 at 37–39** (Affidavit of Officer Peña).

Plaintiff has failed to demonstrate that there exists a genuine issue as to any material fact regarding his claim that Defendant violated his First Amendment right to the free exercise of religion by failing to provide Plaintiff with a soft-cover Quran. Even viewed in the light most favorable to Plaintiff, a rational trier of fact could not reasonably find in favor of Plaintiff on this issue based on the evidence in the record. The pleadings and the evidence in the record demonstrate that Defendant is entitled to summary judgment as a matter of law.

**C. Prayer Rug**
**\*9** Plaintiff contends that Defendant violated his First Amendment right to the free exercise of religion when he was denied use of either his personal prayer rug, which was kept with his personal belongings by the Jail Annex personnel, or the use of an extra blanket as a prayer rug, after the extra blanket he had been using was confiscated by Jail Annex personnel and was not returned to him. **D.E. 1–1 at 8; D.E. 34 at 4.** Defendant asserts that Plaintiff's personal prayer rug was kept in property pursuant to policy and that the confiscated additional blanket was returned to Plaintiff. **D.E. 77 at 12, 37–39** (Affidavit of Officer Peña); **D.E. 56 at 34** (Inmate Notes Screen dated 4/10/08).

**1. Denying Plaintiff Possession of his Personal Prayer Rug**
The Sheriff Department's regulation governing prisoner initial intake of property provides:

IV. "Initial Intake"

...

G. After all paperwork has been reviewed, the arresting officer will remove the prisoner's restraints and place all of the prisoner's property, except for his clothing, on the counter for inventory.

...

X. Personal Property (4A–04)

A. All inmate property will be secured either in the male or female property room....

**D.E. 77 at 26, 30** (Affidavit of Lt. James D. Nance).

Defendant asserts that no exceptions are made to this regulation, that the regulation is neutral, and that the regulation is premised on accountability as well as prison security for both the inmates and the detention officers. **D.E. 77 at 12, 31.** The policy aids in preventing contraband, such as weapons, drugs or cash from entering the prison and insuring that inmate property remains secure until they are released. ***Id.,*** at 12, 27(G–M).

Plaintiff has not presented any summary judgment evidence to raise a genuine issue of material fact regarding whether the intake and personal property storage policies are rationally related to the legitimate penological interest of prison security and accountability. Plaintiff also acknowledged that, absent his personal prayer rug, he was afforded other opportunities and accommodation to practice his faith; he was able to use an extra blanket as a prayer rug. Plaintiff does not allege that this accommodation was inadequate.

Even viewed in the light most favorable to Plaintiff, a rational trier of fact could not reasonably find in favor of Plaintiff on this issue based on the evidence in the record. The pleadings and evidence of record demonstrate that Defendant is entitled to summary judgment as a matter of law on Plaintiff's claim that refusing Plaintiff possession of his personal prayer rug while at the facility violated his First Amendment right to the free exercise of his religion.

**2. Denying Plaintiff Additional Blanket to Use as Prayer Rug**

Officer Peña states in his affidavit "[a]s additional accommodation the Plaintiff was provided with a blanket for use in the practice of his religion.... The Plaintiff's blanket was taken from his cell once during a shake-down of the cell block; however, it was returned to him." **D.E. 77 at 12, 38–39 nos. 10–11** (Affidavit of Officer Peña). Plaintiff alleges that he was in possession of an additional blanket from the time he had been in his room to the time it was confiscated. **D.E. 1–1 at 8.** Plaintiff's grievance complaining that his extra blanket had been

taken was dated December 27, 2007. ***Id.*** Officer Peña does not provide exact dates of when the blanket was first provided or when it was taken during the shake-down. Defendant does not present any other evidence on summary judgment as to these dates. Thus, the record supports the inference that Plaintiff's extra blanket was taken on or shortly before December 27, 2007.

**\*10** Officer Peña also does not allege a specific date on which Plaintiff was again provided an additional blanket to use as a prayer rug. He does, however cite to a note entered in Defendant's computer system, which appears on Plaintiff's "Inmate Notes Screen" that states "may have extra blanket for use as prayer rug." **D.E. 56 at 34.** The note is dated April 10, 2008. ***Id.*** In his objections filed July 29, 2008, Plaintiff stated that the extra blanket had never been returned. **D.E. 15 at 3.** Yet Plaintiff has not provided any summary judgment evidence contradicting Officer Peña's assertion, based on the inmate notes screen, to demonstrate the existence of a genuine issue of material fact regarding whether Plaintiff's additional blanket was returned to him. His mere assertion that it was not is insufficient to survive Defendant's motion for summary judgment.

Thus, the evidence on summary judgment review reflects that Plaintiff somehow obtained an extra blanket that he was able to use as a prayer rug from at least June 6, 2007, to December 27, 2007. Plaintiff alleged that there had been shake-downs before and that his additional blanket had not previously been taken. **D.E. 1–1 at 8.**

The Court notes that the Detention Services Policy and Procedures Manual regarding Initial Intake Policy, Chapter 5.01, section IX.D.3, provides that upon intake a Property Officer will issue the inmate *one* blanket, among other items. **D.E. 77 at 33.** It is not clear how Plaintiff initially obtained an additional blanket, whether he had obtained permission to have an additional blanket as a religious accommodation, or whether such permission had previously been noted such that the officer performing the shakedown in December 2007 should have been aware of it. Even assuming all of these facts in Plaintiff's favor, however, they would establish nothing more than at most negligence in removing Plaintiff's additional blanket.[4] Such an "administrative foul-up" is insufficient to support a claim for violation of the First Amendment. ***Eason v. Thaler,* 73 F.3d at 1327 n. 2.** Nor does it amount to

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    8

Case 9:16-cv-01229-EJS-TWD    Document 29    Filed 10/16/18    Page 127 of 148
Shelton v. El Paso County, Not Reported in F.Supp.2d (2010)
2010 WL 3503511

a pattern displaying wanton prejudice amounting to a policy to violate Plaintiff's right to exercise his faith.

4    Plaintiff has not alleged and provides no evidence to suggest that the officer who took the extra blanket was actually aware that Plaintiff had permission to possess an additional blanket or that Plaintiff was using the additional blanket as a prayer rug.

In response to Plaintiff's grievance dated December 27, 2007, Plaintiff was told "You would need to write to the administrative Lt." **D.E. 1–1 at 8.** Although it appears Plaintiff was without an extra blanket to use as a prayer rug for less than four months, Plaintiff has neither alleged nor provided evidence to demonstrate what actions he took, or at what time after receiving that response, to pursue obtaining permission through the proper channels to possess an additional blanket for use as a prayer rug.

Further, regardless of whether Plaintiff was denied an extra blanket as a religious accommodation, Defendant argues that Plaintiff does not allege that jail officials prevented him from engaging in prayers multiple times a day as is the Islamic tradition. **D.E. 77 at 9.** Thus, Defendant argues, Plaintiff retained a reasonable opportunity to exercise his faith. ***Id.; see also Mayfield v. Texas Dept. of Crim. Justice,*** **520 F.3d at 609.** Plaintiff has not provided any summary judgment evidence to demonstrate that there is a genuine issue of material fact regarding whether he was permitted to engage in such prayers.

**\*11** Even viewed in the light most favorable to Plaintiff, a rational trier of fact could not reasonably find in favor of Plaintiff on this issue based on the evidence in the record. Rather, the pleadings and evidence of record demonstrate that Defendant is entitled to summary judgment as a matter of law on Plaintiff's claim that denying Plaintiff possession of an additional blanket to use as a prayer rug for four months of his detention at the facility violated his First Amendment right to the free exercise of his religion.

### D. Access to Muslim Representative

In his original complaint, Plaintiff alleged that he was denied contact with a representative from the Muslim religion. **D.E. 1–1 at 3.** For the factual details supporting this allegation, Plaintiff referred to his exhibits. ***Id.*** In a grievance, Plaintiff stated that he had requested an address for one of the Islamic Centers in El Paso. ***Id., at 7.*** In

a note from the jail ministry, he was told that he had been given the only address the ministry had for a Muslim representative. ***Id., at 11.*** The Magistrate Judge pointed out in his R & R that Plaintiff had not alleged that any representative had come to the jail to contact Plaintiff on any particular date and time such that Plaintiff was denied contact. **D.E. 7 at 6.** In his objections to the R & R, Plaintiff alleged that the jail ministry had provided him "with addresses of individuals and entities (outside sources) some of which were not deliverable addresses." **D.E. 15 at 2.** The District Court did not find that Plaintiff's allegations on this issue stated a claim upon which relief may be granted. **D.E. 16 at 4–5.** Plaintiff did not reassert this claim in his amended complaint. **D.E. 34 at 4.**

Defendant argued that Plaintiff faulted Defendants for the jail ministry's lack of success in inviting a representative from the Islamic community to the jail and that Plaintiff did not allege that Defendants prevented someone from the Islamic community from visiting Plaintiff while he was incarcerated at the jail. **D.E. 45 at 9.** Defendant suggested that Plaintiff's difficulties in securing a compliant Islamic representative may have been caused by a dearth of clergy and authorized volunteers in the area given that Muslims make up only .9% of the population in El Paso County. ***Id.***

Plaintiff's allegations fail to state a claim that his right to exercise his faith by contacting a Muslim religious representative was violated by an official policy or custom. Plaintiff acknowledged that the jail ministry provided him with addresses for Muslim sources and did not allege that he was prevented from writing to those addresses; he alleges that only some of the addresses provided were undeliverable. Plaintiff did not allege what responses he received, if any, from any attempt to correspond with contacts at the other addresses. Further, even if all of the addresses provided by the jail ministry were undeliverable, Plaintiff did not allege that he was prevented from seeking contact information for representatives of his faith from any other source, such as family and friends.

**\*12** Even if the allegations were sufficient to state a claim, however, viewed in the light most favorable to Plaintiff, a rational trier of fact could not reasonably find in favor of Plaintiff on this issue based on the evidence in the record. The pleadings and evidence of record demonstrate that Defendant is entitled to summary judgment as a matter of law on Plaintiff's claim that the jail ministry's failure to provide him with additional addresses for Muslim

2010 WL 3503511

contacts violated his First Amendment right to the free exercise of his religion.

### E. Pork–Free Diet

In his original complaint, Plaintiff attached a grievance complaining that at least once a week the jail kitchen tries to serve him pork, while his diet is to be pork-free because of his faith as a Muslim. **D.E. 1–1 at 9.** Officer Peña responded to that complaint by informing Plaintiff that the jail kitchen does not serve pork. *Id.*

The District Court did not enter a finding that Plaintiff's allegations regarding denial of his pork-free diet were sufficient to state a claim upon which relief may be granted. **D.E. 16 at 4–5 .** The District Court recognized that prison officials need not respond to a prisoner's particularized religious dietary requests. **D.E. 16 at 4 n. 15 (citing** *Kahey v. Jones,* **836 F.2d 948, 950–51 (5th Cir.1988)** (upholding prison policy denying specially-tailored menu to accommodate the practice of Islam) and *Udey v. Kastner,* **805 F.2d 1218 (5th Cir.1986)** (explaining government interest sufficiently strong to outweigh prisoner's First Amendment right to be provided with special diet)).

In his amended complaint, Plaintiff reasserted his claim that Defendant was not allowing him his proper non-pork diet and that this was pursuant to jail policy. **D.E. 34 at 4.** Plaintiff did not identify a particular policy prohibiting Plaintiff from having a pork-free diet. Nor has Plaintiff replied to Defendant's arguments or evidence regarding this claim.

Defendant argued that Plaintiff's dietary complaint was clearly frivolous under established Fifth Circuit jurisprudence. **D.E. 45 at 8 (citing** *Baranowski v. Hart,* **486 F.3d 112 (5th Cir.2007)** (holding that prison officials' failure to provide kosher meals did not violate inmates free exercise rights)). Defendant also provided evidence indicating that Plaintiff was provided with a dietary modification providing for no red meat. **D.E. 56 at 5, 34** (Exh. B. Inmate Notes Screen).

Plaintiff's allegations fail to state a claim that his right to exercise his faith by maintaining a pork-free diet has been violated by an official policy or custom. Even if the allegations were sufficient to state a claim, however, viewed in the light most favorable to Plaintiff, a rational trier of fact could not reasonably find in favor of Plaintiff

on this issue based on the evidence in the record. Rather, the pleadings and evidence of record demonstrate that Defendant is entitled to summary judgment as a matter of law on Plaintiff's claim that the jail kitchen's attempt to serve him pork violated his First Amendment right to the free exercise of his religion.

### F. RLUIPA

 **\*13** Plaintiff has not explicitly claimed that Defendant violated his rights under Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Magistrate Judge McDonald set forth the legal standard to assert a claim under RLUIPA in his initial R & R on June 4, 2008, and found that Plaintiff's allegations failed to assert such a claim. **D.E. 7 at 5–8.** The District Court did not find that Plaintiff's allegations were sufficient to state such a claim. **D.E. 16 at 4–5.**

RLUIPA provides that the government shall not "impose a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the burden furthers "a compelling governmental interest" and does so by "the least restrictive means." **42 U.S.C. § 2000cc1(a);** *Cutter v. Wilkinson,* **544 U.S. 709, 714–15, 125 S.Ct. 2113, 2117–2118, 161 L.Ed.2d 1020 (2005).** Plaintiff has incorporated some of the language from this standard into his subsequent filings, alleging that Defendant placed a substantial burden on Plaintiff's observation of his central religious beliefs without reasonable relation to any legitimate or apparent penological interest. **D.E. 15 at 3; D.E. 26; D.E. 29; D.E. 35 at 6–8.** This Court finds, however, that Plaintiff's allegations are insufficient to state such a claim or survive Defendant's motion for summary judgment.

The Fifth Circuit has held that under RLUIPA, it must first be determined whether the activities alleged to be burdened constitute a "religious exercise," and then whether the burden is substantial. *Mayfield v. Texas Dept. Of Crim. Justice,* **529 F.3d at 613 (citing** *Adkins v. Kaspar,* **393 F.3d 559, 567 (5th Cir.2004).** Although the religious exercise need not be central to the adherent's religious belief system, the adherent has the burden of demonstrating the honesty and accuracy of his contention that the religious practice is important to the free exercise of his religion. *Adkins v. Kaspar,* **393 F.3d at 570.**

Plaintiff has alleged that Defendant's policies have burdened the observation of his central beliefs. **D.E.**

**15 at 3; D.E. 26; D.E. 29; D.E. 35 at 6–8.** The Court interprets this to allege that having a Quran, material to use as a prayer rug, a pork-free diet, and contact with a Muslim religious representative are important to the free exercise of Plaintiff's religion. Although Plaintiff has not provided evidence to establish this fact, Defendant has not contested these implicit assertions.

The Fifth Circuit has determined that governmental action or regulation creates a "substantial burden" on a religious exercise if it "truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs." *Adkins v. Kaspar*, 393 F.3d at 570. That is, when it either (1) "influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between enjoying some generally available, non-trivial benefit, and following his religious beliefs." *Id.* A governmental action or regulation does not rise to the level of a substantial burden on religious freedom if it "merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed ." *Id.*

 **\*14** With respect to the Quran, Plaintiff's allegations fail to establish that Defendant's policies substantially burden his practice. Defendant's refusal to allow Plaintiff possession of his personal Quran, pursuant to policy prohibiting hardcover books, prevented Plaintiff from enjoying a benefit that is not otherwise generally available. It did not pressure Plaintiff to modify his religious behavior or significantly violate his religious beliefs. At most, it required Plaintiff to follow proper procedures to obtain a softcover Quran. As noted above, although he was unsuccessful in obtaining a free softcover Quran from the Jail Ministry Program, Plaintiff does not allege that he attempted and was unable to obtain a soft-cover Quran directly from a publisher or bookstore with his own resources or the help of family and friends.

With respect to the additional blanket to use for prayer, Plaintiff's allegations also fail to establish that Defendant's policies substantially burden his practice. Without an additional blanket, Plaintiff may have been influenced or pressured to choose between using his one blanket for prayers or for covering his body, thus having to choose between his religious practice and enjoying a generally available, non-trivial benefit. The evidence in the record, however, reflects that the one-

blanket per inmate policy is not without exception and that accommodation was available. The response to Plaintiff's grievance informed Plaintiff of what step to take to obtain such accommodation. Defendant's summary judgment evidence reflects that Plaintiff did receive such accommodation. Although it is likely that Plaintiff's additional blanket was taken pursuant to the one-blanket per inmate policy, as discussed above, Plaintiff has failed to allege or demonstrate that this was more than mere negligence on the part of the officer enforcing the general policy. Nor has he demonstrated that the policy itself was implemented with "deliberate indifference" with this result being a known or obvious consequence.

With respect to Plaintiff's attempts to contact a Muslim representative, Plaintiff's allegations fail to establish that such contact is a religious practice necessary for the free exercise of his faith or that Defendant's policies substantially burdened this need. Moreover, the evidence in the record reflects that the jail ministry did provide Plaintiff with the addresses it had for Muslim contacts in the area. Defendant's failure to provide Plaintiff with addresses of Muslim contacts who would actually be willing to visit Plaintiff or donate the requested materials neither influenced him to act in a way that violated his religious beliefs nor forced him to choose between practicing his faith or enjoying some generally available, non-trivial benefit. At most, it made it necessary for Plaintiff to take additional steps to seek such information from other sources, such as friends and family. Plaintiff has failed to present any evidence to support his allegation that there existed an official policy pursuant to which he was denied contact with a representative from the Muslim faith willing and able to visit Plaintiff or provide the requested materials. Viewed in the light most favorable to Plaintiff, the evidence and pleadings on record demonstrate that Defendant is entitled to summary judgment on any such claim.

 **\*15** With respect to Plaintiff's religious practice of consuming a pork-free diet, Plaintiff's allegations fail to establish that Defendant's policies substantially burden his practice. Although Plaintiff alleged that at least once a week the kitchen attempted to serve him a pork product, he did not allege that he was forced to accept the pork product, or that refusing the product meant forgoing a generally-available non-trivial benefit. Moreover, the evidence in the record reflects that the jail kitchen did not serve pork and that Plaintiff obtained a dietary

accommodation of no red-meat. Plaintiff has failed to present any evidence to support his allegation that there existed an official policy pursuant to which he was denied a pork-free diet or that his practice of not eating pork was substantially burdened. Viewed in the light most favorable to Plaintiff, the evidence and pleadings on record demonstrate that Defendant is entitled to summary judgment on any such claim.

### IV. First Amendment—The Establishment Clause

In his motion for summary judgment, Plaintiff appears to allege, for the first time, that the effect of Defendant's Jail Ministry Program was to endorse one religious view while excluding the Muslim Religion, conveying a message of official preference for one religious view in violation of the Establishment Clause. **D.E. 67 at 3, 5.** Plaintiff, however, has produced no evidence that the primary effect of Defendant's program, or its relevant policies, is to advance religion in violation of the Establishment Clause or that such creates an excessive "entanglement" between church and state. *See Lynch v. Donnelly,* 465 U.S. 668, 679, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984).

Lieutenant Hebeker stated in her affidavit:

> Inmates at the Jail Annex practice numerous religions and jail personnel do not discriminate against an individual because of his religious beliefs. The Sheriff's Office maintains an active jail ministry program which minister to the different religious needs.... The El Paso County Sheriff's Office has a written nondiscriminatory policy in it's Inmate Handbook *"... It is the policy of the El Paso County Sheriff's Office not to discriminate against an individual because of gender, race, color, creed, religion, disability or national origin ..."* and based upon my experience the jail dutifully complies with that policy.... I have observed that inmates are free to participate in various religious practices.... At the time of Plaintiff's incarceration at the Jail Annex, and continuing through the present, a "Jail Ministry" program

actively continued to provide access to services and materials for an inmates' individual religious needs. For some requests, it becomes necessary to depend on community resources causing a delay in services.

**D.E. 77 at 34.** Further, as noted above, the relevant policies about which Plaintiff complains are neutral as to religion.

Additionally, the uncontested summary judgment evidence establishes that members of the Jail Ministry program attempted to assist Plaintiff in obtaining the requested materials. **D.E. 1–1 at 12; D.E. 77 at 38** (Affidavit of Officer Peña). The uncontested evidence also reflects that the statement Plaintiff attributes to jail personnel was merely conveyed by them and made by representatives of the Muslim faith. *Id.* Although it may have been better not to convey such statement to Plaintiff, this does not evince a wanton pattern of prejudice.

**\*16** Plaintiff has failed to demonstrate that there exists a genuine issue as to any material fact regarding this claim. Even viewed in the light most favorable to Plaintiff, a rational trier of fact could not reasonably find in favor of Plaintiff on this issue based on the evidence in the record. Based on the pleadings and the evidence on record, Defendant is entitled to summary judgment as a matter of law as to Plaintiff's Establishment Clause claim.

### V. Equal Protection

Plaintiff also claims that Defendant violated Plaintiff's right to Equal Protection, discriminating against him on the basis of his religion, by failing to meaningfully seek out volunteers of the Muslim faith in the same way Plaintiff claims Defendant has for inmates of other faiths, making provisions through donations for materials and programs to exercise their faith. **D.E. 15 at 4–5; D .E. 35 at 3; D.E. 67 at 3.** Defendant argues that Plaintiff has failed to offer any evidence to support his claims to raise a material question of fact regarding his Equal Protection claim. **D .E. 77 at 14.**

Because the Equal Protection Clause requires only that "all persons similarly circumstanced shall be treated alike" and not that things different in fact or opinion be treated as if there were no difference, to succeed on an equal protection challenge, a plaintiff must prove purposeful

2010 WL 3503511

discrimination resulting in a discriminatory effect among persons similarly situated. *Plyler v. Doe,* 457 U.S. 202, 215, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Purposeful discrimination is action taken "at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group." *Woods v. Edwards,* 51 F.3d 577, 580 (5th Cir.1995). The Fourteenth Amendment does not demand "that every religious sect or group within a prison-however few in numbersmust have identical facilities or personnel." *Cruz v. Beto,* 405 U.S. at 322 n. 2.

In her affidavit, Lieutenant Hebeker stated that, including the time that Plaintiff was incarcerated at the Jail Annex, the El Paso County Sheriff's Office has a written non-discriminatory policy in it's Inmate Handbook, with which in her experience the jail dutifully complies, that inmates at the Jail Annex practice numerous religions, that the Sheriff's Office maintains an active jail ministry program ministering to the different religious needs, and that jail personnel do not discriminate against inmates based on religious beliefs. **D.E. 77 at 34.**

Officer Peña stated in his affidavit that, based on his "experience and understanding of the Sheriff's Office and Jail Annex policy, every prisoner can access a member of the jail ministry." **D.E. 77 at 38.**

Plaintiff acknowledges that there is no written policy pursuant to which the Jail Ministry discriminates against inmates of Plaintiff's religion. **D.E. 67 at 5, D.E. 70 at 3.** He argues, instead, that Defendant's statements, actions, and responses to his grievances establish a custom or implied policy or practice of prejudice and discrimination against inmates of his faith. *Id.* Specifically, Plaintiff complains that the jail ministry was unsuccessful in obtaining donations of religious materials for the practice of his faith, where it had been successful in obtaining such donations for other religions. **D.E. 15 at 4–5.** He attributes this success to the jail ministry taking additional or more meaningful steps in an effort to successfully provide for inmates of other faiths. *Id.*

**\*17** Plaintiff, however, has not alleged nor provided evidence to establish the existence of a genuine issue of material fact regarding whether there exist inmates of other religions that were in fact similarly situated or whether the Jail Ministry took additional or more

meaningful steps on behalf of any such inmate that ultimately resulted in success. Plaintiff's vague and conclusory allegations that there were similarly situated inmates and that the jail ministry did take such steps on their behalf that were not taken on his are insufficient to overcome Defendant's motion for summary judgment. Nor does the evidence in the record regarding statements, actions, and responses to grievances related to Plaintiff's attempts to practice his faith establish a custom, implied policy, or practice of prejudice.

Plaintiff also complains that there are no provisions in the El Paso County Jail Annex Jail Ministry Handout for his particular religion. **D.E. 35 at 3.** The Court notes that the El Paso County Sheriff's Office Policies and Procedures Manual, Policy 10.04 regarding Jail Ministry does specifically provide for communion services and baptism. **D.E. 77 at 22.** Although there is no explicit reference to a particular religion, these services appear to relate generally to Christianity. Plaintiff, however, does not allege what provisions should be included for his particular religion.

Even viewed in the light most favorable to Plaintiff, a rational trier of fact could not reasonably find in favor of Plaintiff on this issue based on the evidence in the record. Rather, the pleadings and evidence of record demonstrate that Defendant is entitled to judgment as a matter of law as to Plaintiff's Equal Protection Claim.

### CONCLUSION

Based on the foregoing, it is the **RECOMMENDATION** of this Court that:

(1) Plaintiff's motion for summary judgment (**D.E.67, 70**) be **DENIED;**

(2) Defendant's motion for summary judgment (**D.E.77**) be **GRANTED;**

(3) Any other pending motions not specifically addressed be **DENIED;**

(4) Judgment be entered for Defendant; and

(5) The case be closed.

2010 WL 3503511

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3503511

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

✚ Positive
As of: October 15, 2018 8:41 PM Z

# *Wells v. McKoy*

United States District Court for the Northern District of New York

May 7, 2018, Decided; May 7, 2018, Filed

9:16-CV-405 (GTS/ATB)

**Reporter**

2018 U.S. Dist. LEXIS 77516 *

PETER WELLS, et al., Plaintiffs, vs. JEFF McKOY, et al., Defendants.

**Subsequent History:** Adopted by, Summary judgment granted by *Wells v. McKoy, 2018 U.S. Dist. LEXIS 162429 (N.D.N.Y., Sept. 24, 2018)*

## Core Terms

mess hall, meals, food, inmates, religious, dietary, plaintiffs', substantial burden, summary judgment, prepare, restrictions, religion, defendants', recommends, exercise of religion, evening, staff, requirements, individuals, holidays, rights, Menu, burdened, personal involvement, practicing, cleared, select, bread, summary judgment motion, religious belief

**Counsel:** [*1] PETER WELLS, Plaintiff, Pro se.

PATRICK JEANTY, Plaintiff, Pro se.

DERRICK FULTON, Plaintiff, Pro se.

WAYNE WASHINGTON, Plaintiff, Pro se.

CHRISTOPHER J. HUMMEL, Asst. Attorney General for Defendants.

**Judges:** Hon. Andrew T. Baxter, United States Magistrate Judge.

**Opinion by:** Andrew T. Baxter

## Opinion

### REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Glenn T. Suddaby, Chief United States District Judge, pursuant to *28 U.S.C. § 636(b)* and *Local Rules N.D.N.Y. 72.3(c)*. In

their civil rights complaint, the four plaintiffs, who are all practicing members of the Nation of Islam ("NOI"), allege that defendants violated their *First Amendment* right to practice their religion, their rights under the *Religious Land Use and Institutionalized Persons Act*, ("RLUIPA"), *42 U.S.C. § 2000cc-1(a)*, and their rights to equal protection under the *Fourteenth Amendment* by failing to provide meals that were consistent with NOI dietary restrictions during the holy month of Ramadan in 2014, while plaintiffs were incarcerated at Auburn Correctional Facility ("Auburn"). (Dkt. No. 1, "Compl." at CM/ECF pp. 4-14). Plaintiffs seek monetary and injunctive relief. (Compl. at CM/ECF p. 15).

Presently before the court is the defendants' motion for summary judgment pursuant to [*2] *Fed. R. Civ. P. 56*. (Dkt. No. 53). Plaintiffs Wells, Jeanty, and Washington have filed responses in opposition to the motion, and plaintiff Washington has filed a cross-motion for summary judgment. (Dkt. No. 80, 83, 84). Defendants filed a reply to all defendants and a response to plaintiff Washington's cross-motion, and plaintiff Washington filed a reply in further support of his cross-motion. (Dkt. No. 85, 88). For the reasons set forth below, this court recommends granting defendants' motion for summary judgment as to all plaintiffs' claims. For the same reasons, this court also recommends denial of plaintiff Washington's cross-motion for summary judgment.

### DISCUSSION

#### I. Facts and Contentions

In 2014, Ramadan took place between June 28 and July 27, 2014. (Dkt. No. 71-8 at CM/ECF p. 15, "Schattinger Decl.", Ex. A). As plaintiff Wells described during his deposition, Ramadan is a month of purification for Muslims, including NOI members, that includes a thirty day fast. (Dkt. No. 71-2 at CM/ECF p. 24-25, Hummel Decl. Ex. A ("Wells Dep.") at 21-22). In addition to

abstaining from food, NOI members abstain from negative behavior and negative thoughts, and focus on prayer and studying of the Quran. (Dkt. No. [*3] 71-2 at CM/ECF p. 131, Hummel Decl. Ex. B ("Jeanty Decl.") at 14). At sunrise, participants consume a light breakfast from a Sahor bag, that typically consists of cereal, eggs, whole wheat bread, and fruit. (Jeanty Decl. at 15; Dkt. No. 71-8 at CM/ECF p. 15, Schattinger Decl., Ex. A). They then abstain from eating for more than sixteen hours, until sunset. (Wells Dep. at 22). At Auburn, the dinner meal was typically provided around 9 p.m. (Dkt. No. 71-6, "Martin Decl." ¶ 13).

During Ramadan, observant NOI members make a concerted effort to abide by their religion's dietary restrictions. (Jeanty Dep. at 15-17). Plaintiff Jeanty testified that NOI dietary requirements are based upon the extensive writings of Elijah Muhammad regarding proper diet and nutrition. (Jeanty Dep. at 16). In following those protocols, plaintiffs generally abstain from beef, beef byproducts, white bread, certain types of beans, precooked or leftover food, white rice, white potatoes, and similar starches. (Id.)

Plaintiffs were all incarcerated at Auburn in June and July 2014, when the events described in the complaint occurred. (Compl. ¶ 6). On June 2, 2014, defendant Shabazz, the NOI chaplain at Auburn, advised [*4] plaintiffs and other NOI inmates that only inmates who were already cleared to work in the Auburn mess hall would be permitted to assist in meal preparation during Ramadan. (Compl. ¶ 7). This approach differed from prior years, when the NOI inmates were allowed to select temporary mess hall workers from among their members during Ramadan. (Wells Dep. at 23-24). Plaintiffs contend that this previous approach better ensured that mess hall workers were familiar with NOI mandatory dietary restrictions. Plaintiffs also assert that these access restrictions were inconsistent with DOCCS policy, but defendants contend that they adhered to a policy that was in place since 2011. (Compl. ¶¶ 7-8; Dkt. No. 71-5. "Thomas Decl." ¶¶ 5-7).

Defendants contend that the policy did not prohibit workers who were not regular mess hall employees from assisting during religious holidays, but merely gave preference to inmates who had already been cleared to work in the mess hall. (Thomas Decl. ¶ 8). They further contend that this preference reduced the risk of injury and food borne illness, by ensuring that all mess hall workers had been properly trained on the kitchen equipment and medically cleared to work [*5] with food. (Thomas Decl. ¶ 11-12). Defendants also assert that

their reliance on inmates who had already been cleared for mess hall duty was a more efficient and economical use of facility resources. (Thomas Decl. ¶ 13-14).

In accordance with this policy, defendant Martin, the Auburn Food Service Administrator, and defendant Shabazz, the NOI chaplain, conferred to select the inmate cooks who would prepare the NOI Ramadan meals. (Martin Decl. ¶ 9; Dkt. No. 71-7, "Shabazz Decl." ¶ 8-9). Defendant Martin provided defendant Shabazz a list of six inmates who were mess hall workers and registered as NOI members, and defendant Shabazz selected two or three names from the list. (Martin Decl. ¶ 11; Shabazz Decl. ¶ 9). Plaintiffs contend that even if those inmates were registered as NOI members, they had limited involvement in the community, and possessed insufficient knowledge of NOI dietary requirements. (Wells Dep. at 24; Jeanty Dep. at 22, 24-26).

Plaintiffs contend that their fears about the mess hall staff were realized on the first day of Ramadan, when they were served white bread in violation of the NOI diet. (Compl. ¶ 18; Jeanty Dep. at 26). Plaintiffs all allege that they were repeatedly [*6] served foods during Ramadan that contained white flour or starch, as well as foods that were precooked or leftovers. (Compl. ¶ 13). They allege that these foods not only violated their religion, but also were inconsistent with the state-approved Ramadan menu ("State Menu"). (Id.). Plaintiffs also allege that some of the meals contained raw or undercooked food, such as chicken, that was inedible. (Compl. ¶ 16). As a result of these assorted violations, plaintiffs allege that they were forced to choose between obeying their religion's dietary restrictions and eating a nutritionally sufficient meal after their fast. Plaintiffs were frequently able to supplement their meal by saving part of the Sahor bag until the evening, or eating food that they purchased from the Auburn commissary. (Wells Dep. at 50-52; Jeanty Dep. at 33-34; Dkt. No. 71-2 at CM/ECF p. 222, Hummel Decl., Ex. C ("Fulton Dep.") at 27; Dkt. No. 71-2 at CM/ECF pp. 278-280, Hummel Decl., Ex. D ("Washington Dep." ) at 24-26). On some evenings, plaintiffs did not eat any of the food prepared by the mess hall kitchen, due to the combination of prohibited and poorly prepared food items. (Wells Dep. at 51; Jeanty Dep. at 32, Fulton [*7] Dep. at 26-27; Washington Dep. at 25-27).

Plaintiffs also allege that other religions were granted greater access to the mess hall kitchen during religious holidays. (Compl. ¶ 33). They have submitted the affidavit of Joseph Dexter, a Rastafarian inmate at

Auburn, who asserts that he was permitted to work in the kitchen on Rastafarian holy days in May 2015, despite not being a regular mess hall employee. (Dkt. No. 71-2 at CM/ECF p. 362, Hummel Decl., Ex. F). At his June 30, 2017 deposition, plaintiff Derrick Fulton testified that he observed several Rastafarian inmates being permitted access to the mess hall kitchen in 2014, even though they were not regular mess hall employees. (Fulton Dep. at 30). Defendants have no record of any special treatment being afforded Rastafarian inmates, and contend that all religions are treated equally with regard to mess hall access. (Martin Decl. ¶ 17; Dkt. No. 83-3 at CM/ECF p. 44; Wells Decl. Ex. N).

## II. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56*; *Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006)*. "Only disputes over ["material"] facts that might **[*8]** affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)*.

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord, 467 F.3d at 273*. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)*; *Salahuddin v. Goord, 467 F.3d at 272*.

## III. Personal Involvement

### A. Legal Standard

Personal involvement is a prerequisite to the assessment of damages in a *section 1983* case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003)*. In *Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)*, the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional **[*9]** deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty, 490 F.3d 143, 152-53 (2d Cir. 2007)* (citing *Colon v. Coughlin, 58 F.3d 865, 873) (2d Cir. 1995))*, *rev'd on other grounds, Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*.

Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft*. *See Conklin v. County of Suffolk, 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012)* (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon*. *Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state **[*10]** a claim against a defendant-supervisor.'" *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec., 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011))*.

### B. Application

## 1. Selection of Mess Hall Staff During Ramadan

The record demonstrates that defendant Thomas first developed Auburn policy's regarding the selection of mess hall staff during religious holidays in a memorandum dated February 15, 2011. (Dkt. No. 71-5 at CM/ECF p. 9, Thomas Decl., Ex. A). It also shows that plaintiffs alerted defendants Graham, McKoy, and Thomas about their concerns regarding the selection of mess hall staff immediately prior to Ramadan in 2014. (Dkt. No. 71-2, at CM/ECF p. 336, Hummel Decl., Ex. F). Defendants Martin and Shabazz contend that they were not personally involved in the development and implementation of the contested policy, and request summary judgment as to the claims arising from it. However, defendants Martin and Shabazz were involved in the actual selection of mess hall staff during Ramadan in 2014. (Martin Decl. ¶ 9; Dkt. No. 71-7, "Shabazz Decl." ¶ 8-9). Plaintiffs also contend that they expressed their concerns about the selected inmates to Martin and Shabazz prior to Ramadan in 2014. (Compl. ¶¶ 15-16). Therefore, plaintiffs have adequately alleged personal involvement of all defendants [*11] with regard to Auburn's policy on selection of NOI inmates to work in the mess hall during Ramadan.

## 2. Violation of NOI Dietary Requirements During Ramadan

Plaintiffs have made a far more limited showing regarding individual defendants' personal involvement in the preparation and delivery of meals that allegedly violated NOI dietary requirements. The record convincingly demonstrates that defendants Graham, McKoy, Thomas and Shabazz had no involvement in menu preparation or food service at Auburn. (Graham Decl. ¶ 26; Dkt. No. 71-3, McKoy Decl. ¶¶ 9, 24; Thomas Decl. ¶ 28; Shabazz Decl. ¶¶ 22-23). Therefore, this court recommends granting summary judgment for defendants Graham, McKoy, Thomas, and Shabazz with regard to the alleged violations of NOI dietary restrictions, for lack of personal involvement.

In contrast, defendant Martin, as Auburn Food Service Administrator, was responsible for ordering the appropriate amount of food for Ramadan, and ensuring that meals were prepared and served consistent with the State Menu for religious holidays. (Martin Decl. ¶ 12; Graham Decl. ¶ 28). Although defendant Martin states that she was not physically present when the evening Ramadan meals were [*12] prepared or served (Martin Decl. ¶ 23), plaintiffs have raised sufficient questions of

material fact with regard to her control over mess hall operations to preclude a grant of summary judgment on this claim for lack of personal involvement. Accordingly, this court will address the substance of all of plaintiffs' religious exercise and equal protection claims.[1]

## IV. Religious Exercise Claims

## A. Legal Standards

## 1. *First Amendment* Claims

Inmates have the right under the *First* and *Fourteenth Amendments* to freely exercise a chosen religion. *Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003)* (citing *Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974))*. However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990)*. The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987)* and *Turner v. Safley, 482 U.S. 78, 84, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987)*. This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford, 352 F.3d at 588*.

In *O'Lone*, the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. *482 U.S. at 349* (quoting *Turner, 482 U.S. at 89*). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under [*13] the same standard. *Salahuddin v. Goord, 467 F.3d 263, 274 n.4 (2d Cir. 2006)* (citations omitted). In *Farid v. Smith, 850 F.2d 917, 926 (2d Cir. 1988)*, the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials

---

[1] Plaintiffs exhausted the administrative grievance process for both the selection of mess hall staff and the food served during Ramadan. (Compl. ¶ 27-29).

furthers some legitimate penological interest."

The Second Circuit has examined the standard for analyzing a *First Amendment* religion claim. *Holland v. Goord, 758 F.3d 215, 220-22 (2d Cir. 2014)*. In *Holland*, the court discussed the degree of burden required for a *First Amendment* claim. *Id. at 220-21*. The court noted that it has not been decided in this Circuit whether, to state a claim under the *First Amendment*, the inmate must show at the onset that the disputed conduct "substantially burdens his sincerely held religious beliefs." *Id.* (citing *Salahuddin, supra at 274-75*; *Ford, supra at 592* (where the court assumed without deciding that the substantial burden test applies)). The court in *Holland* did not decide the issue, rather the court assumed the continued validity of the substantial burden test and analyzed the case accordingly.[2] *Id.* This court will follow the analysis in *Holland* and proceed to consider the *First Amendment* analysis, assuming **[*14]** that the substantial burden test is still valid. *See also Williams v. Doe, 639 Fed. Appx. 55, 56 (2d Cir. 2016)* (discussing the unsettled status of the substantial burden test).

Once a substantial burden is found, the court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett, No. 02-CV-349, 2007 U.S. Dist. LEXIS 27702, 2007 WL 1017102, at *4 (W.D.N.Y. March 30, 2007)* (citing *Salahuddin, 467 F.3d at 274*). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford, 352 F.3d at 595*.

## 2. RLUIPA Claims

RLUIPA provides that

   No government shall impose a substantial burden

on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person -

   (A) is in furtherance of a compelling governmental interest; and

   (B) is the least restrictive **[*15]** means of furthering that compelling governmental interest.

*42 U.S.C. § 2000cc-1(a)*. Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial.[3] *Marria v. Broaddus, 200 F. Supp. 2d 280, 297 (S.D.N.Y. 2002)* (citing *42 U.S.C. § 2000cc-2(b)*). The burden then shifts to the government to show that the burden furthers a compelling governmental interest *and* that it is the *least restrictive* means of achieving that interest. *Id.* The act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *42 U.S.C. § 2000cc-5(7)(A)*.

A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Singh v. Goord, 520 F. Supp. 2d 487, 498 (S.D.N.Y. 2007)* (citing, *inter alia, Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir. 1996)*). Inconvenience alone is insufficient to establish a substantial burden. *Id.* (citing *Westchester Day School v. Village of Mamaroneck, 379 F. Supp. 2d 550, 557 (S.D.N.Y. 2005)*). Furthermore, the substantial burden test presupposes that some inconveniences may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis, 357 F.3d 197, 203 n.6 (2d Cir. 2004)* (discussing in a footnote the applicability of the "time-honored maxim '*de minimis non curat lex*'"). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether **[*16]** a burden was substantial. *See Ford v. McGuinis, 352 F.3d 582, 593-94 (2d Cir. 2003)* (discussing *First Amendment* protections).

## B. Application

---

[2] This finding was supported by the fact that the court's "precedent squarely dictat[ed] that Holland's religious exercise was unconstitutionally burdened," a point that the defendants in that case did not challenge on appeal. *Holland, 758 F.3d at 221*.

[3] RLUIPA uses the term "substantial burden" in the language of the statute, removing any ambiguity with respect to the extent of the burden required to establish a statutory claim.

Plaintiffs raise two distinct, but related, religious exercise claims. First, they argue that defendants' refusal to allow the NOI community to select the inmates who would prepare and cook the meals served during Ramadan impermissibly burdened their ability to practice their religion. Second, plaintiffs claim that they were served food during Ramadan that was inconsistent with NOI dietary restrictions. Plaintiffs further contend that the meals were prepared improperly because defendants refused to allow the NOI inmates to select the most knowledgeable and observant members to work in the mess hall.

**1. Selection of Mess Hall Staff During Ramadan**

Plaintiffs have not demonstrated that the Auburn policy governing the selection of mess hall employees during religious holidays substantially burdened their sincerely held religious beliefs during Ramadan 2014. First, plaintiffs have not presented any evidence that the NOI has any requirements or guidance regarding who may prepare meals during Ramadan, or otherwise demonstrated a subjective "sincerely held belief" regarding who may prepare their food. In reaching this determination, **[*17]** this court has considered the Second Circuit's warning that

> Our founding principles require that courts resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith. For it is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of these creeds.

*McEachin v. McGuinnis, 357 F.3d 197, 201 (2d Cir. 2004).* Instead, a court should consider whether a plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford, 352 F.3d at 595* (quotation omitted). In other words, the Second Circuit has "jettisoned the objective, content-based approach previously employed to define religious belief, in favor of a more subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system." *Ford, 352 F.3d at 588-89* (quoting *Patrick v. LeFevre, 745 F.2d 153 (2d Cir. 1984)).*

In depositions conducted in June 2017, all four plaintiffs testified at length about their subjective religious views. Although all four plaintiffs expressed their preference of control over the individuals who prepared the Ramadan meals, none testified that such control was a religious **[*18]** mandate. For example, plaintiff Wells testified that he was not aware of "any rules for members of the Nation of Islam regarding who is supposed to prepare the food for Ramadan meals." (Wells Dep. at 50). Plaintiff Fulton testified that "it would be preferred that we had someone that was more apt to knowing and understanding the significance of how our . . . meals are to be prepared . . . ." (Fulton Dep. at 15). Plaintiff Washington testified that "[d]uring Ramadan, a Muslim is supposed to have food that's prepared by a clean person." (Washington Dep. at 16). He also testified that ". . . what I do recall from the 2014 Ramadan, is that they had people preparing food who both wasn't a part of the community, which is not necessarily the issue but it's an issue when you have people preparing who obviously don't care if they have hygiene." (Washington Dep. at 16). Plaintiff Jeanty testified that "[i]t's pretty much very preferred that a practicing Muslim cook our meals." (Jeanty Dep. at 19). Based upon plaintiffs' own description of their faith, it is evident that control over who prepares their meals during Ramadan is, at most, a preference. Therefore, the defendants' interference with **[*19]** plaintiffs' stated preference does not violate plaintiffs' free exercise rights.

Moreover, even if plaintiffs' stated preference rose to the level of a religious belief protected by the *First Amendment* or RLUIPA, plaintiffs have not demonstrated that Auburn's Ramadan policy in 2014 imposed a substantial burden upon it. The strongest articulation of plaintiffs' position is plaintiff Jeanty's statement that it is "very preferred" that a practicing Muslim prepare Ramadan meals for the community. (Jeanty Dep. at 19). The record shows that defendants accommodated this view. Defendant Martin prepared a list of NOI members who already were cleared to work in the mess hall, and defendant Shabazz relied on that list to select two or three individuals who would work during Ramadan. (Martin Decl. ¶¶ 4-6; Martin Decl. Ex. A; Shabazz Decl. ¶ 9.). All four plaintiffs concede that at least one of the inmates who prepared the Ramadan meals was from the NOI community, and therefore was a practicing Muslim. (Wells Dep. at 55; Jeanty Dep. at 24; Fulton Dep. at 16; Washington Dep. at 25). Therefore, plaintiffs have not demonstrated that a substantial burden arose from defendants' selection of one or more practicing Muslims **[*20]** to assist in the preparation of the Ramadan meals.

Even if the refusal to allow inmates to select the specific mess hall workers during religious holidays had

imposed a substantial burden, summary judgment in favor of all defendants on this claim would still be appropriate. Defendants have offered a variety of valid penological interests for controlling the selection of mess hall staff. As set forth by defendant Thomas, the Auburn policy, as implemented in 2014, made it more likely that inmates selected to work in the mess hall had already been medically cleared to handle food, thereby reducing the potential spread of food-borne illnesses. (Thomas Decl. ¶ 11). Prioritizing existing mess hall workers also reduced the risk for injury or property damage from untrained use of mess hall equipment. (Thomas Decl. ¶ 12). In addition, allowing every religious group at Auburn to select mess hall staff for each religious holiday would have imposed a significant logistical burden on Auburn resources, by repeatedly requiring expedited medical evaluations and training. (Thomas Decl. ¶¶ 13-14).

In addition, plaintiffs had alternative means to ensure that individuals with appropriate dietary knowledge [*21] were present in the mess hall during religious meals. No Auburn policy prevented NOI community members from obtaining approval to work as a mess hall worker on a regular basis. (Graham Decl. ¶ 16; Thomas Decl. ¶ 18). Indeed, plaintiff Fulton, who is still incarcerated at Auburn, testified that religious meal service improved after 2014, when NOI members who worked in the mess hall became more experienced and knowledgeable about the religious dietary restrictions. (Fulton Dep. at 28-29). Plaintiffs have failed to show that defendants' rationale for the policy was irrational. Accordingly, this court recommends granting defendants' motion for summary judgment as to all claims arising from the selection of mess hall staff during Ramadan 2014.

## 2. Violation of NOI Dietary Requirements During Ramadan

The Second Circuit has stated that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples . . . ." *Ford, 352 F.3d at 597* (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith . . . unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis, 357 F.3d 197, 203 (2d Cir. 2004).* Plaintiffs have demonstrated that compliance with NOI [*22] dietary requirements is a major part of their observance of Ramadan. (Wells Dep. at 21-22; Jeanty Dep. at 14). Defendants do not dispute the sincerity of plaintiffs'

beliefs, but contend that plaintiffs' dietary restrictions and nutritional needs were adequately met during Ramadan. To support this argument, defendants assert that each meal complied with the State Menu that is implemented at all DOCCS facilities, including Auburn.[4] (Schattinger Decl. ¶ 4).

The State Menu provides that every evening meal during Ramadan should consist of a salad, a protein entree, six slices of whole wheat bread, one or two servings of fruit, one or two servings of vegetables, one or two starch-based side dishes, a beverage, and a dessert. (Schattinger Decl. ¶ 12, Ex. A). The main course consisted of a rotation of baked fish, halal chicken patties, omelets with vegetables and cheese, baked halal chicken, whole-wheat pizza, macaroni and cheese, and grilled cheese sandwiches. (Schattinger Decl. Ex. A).

Plaintiffs claim that they repeatedly received evening meals during Ramadan that failed to meet their dietary requirements, and failed to comply with the State Menu.[5] None of the plaintiffs allege [*23] an outright denial of evening meals. Instead, they have alleged numerous instances in which some portion of the meal contained food that was inconsistent with NOI dietary requirements, or was otherwise poorly prepared.

For example, plaintiffs were served white bread on the first day of Ramadan, even though the State Menu listed wheat bread. (Compl. ¶ 13; Jeanty Dep. at 26). Plaintiffs also submitted a list of specific dates on which they were served food items during the evening meal that failed to meet their dietary restrictions. (Dkt. No. 71-2 at CM/ECF p. 359, Hummel Decl., Ex F). This includes five dates on which they were served a prohibited dessert item that included white flour, such as cake with icing,

_____

[4] Because defendants have only argued that the meals were compliant with NOI dietary restrictions and therefore did not impose a burden, this court will not engage in the *O'Lone/Turner* analysis with respect to this claim.

[5] To the extent that plaintiffs claim that the Ramadan meals do not comply with a state policy such as the State Menu, a violation of state policy would not give rise to a constitutional claim under *§ 1983.* See *Ahlers v. Nowicki, No. 9:12-CV-539 (DNH/RFT), 2014 U.S. Dist. LEXIS 35607, 2014 WL 1056935, at *4 (N.D.N.Y. Mar. 18, 2014)* ("[C]laims involving the improper adherence to proprietary facility policies are incognizable under *§ 1983*; only rights secured by the Constitution and federal law are actionable under *§ 1983*.") (citations omitted).

bread pudding, chilled rice pudding, or orange sherbert ice cream. (*Id.*) The list also includes three items of "cooked chilled food" (cole slaw, potato salad, and macaroni salad) that were served as a side dish on numerous occasions, in violation of the NOI dietary restriction against foods that were not prepared on the day that they were served. (*Id.*). Plaintiffs also specified five dates on which they received white rice, an impermissible starch. (*Id.*) They **[\*24]** also specified five different dates on which they were served green peas.[6] (*Id.*) Plaintiffs' list also alleges one instance when they were served a beef patty containing soy, and another when they received raw or undercooked chicken. (*Id.*; Wells Dep. at 37) During their depositions, some of the individual plaintiffs recalled other discrete occurrences when the food served was objectionable, but many of these were related to personal taste. (Wells Dep. at 38; Fulton Dep. at 17).

Even when viewed in the most favorable light, none of the plaintiffs have shown a substantial burden on their religion. Isolated deprivations of a religious meal have historically been found to impose only de minimis burdens on an inmate's free exercise rights. *See McEachin v. McGuinnis, 357 F.3d 197, 203 (2d Cir. 2004)* ("[t]here may be inconveniences so trivial that they are most properly ignored"); *Washington v. Afify, 968 F. Supp. 2d 532, 538-39 (W.D.N.Y. 2013)* (plaintiff's allegations that he was denied two religious breakfast meals and one evening meal was only minimally burdensome on his religious practice). However, the Second Circuit recently cautioned against making conclusory judgments about the de minimis impact of missed religious meals, which may still be important to the religious practice of the adherent. *See Williams v. Doe, 639 Fed. Appx. 55, 57 (2d Cir. 2016)* (vacating **[\*25]** dismissal of plaintiff's claim that defendants refused to serve Ramadan meals after sunset on five occasions).

This case is readily distinguishable from *Williams*. First, plaintiffs have not alleged that defendants ever denied them a meal during Ramadan. More significantly, *Williams* involved a *12(b)(6)* motion to dismiss. In this case, defendants have moved for summary judgment after the completion of discovery. As a result, the record

in this case is well-developed regarding the burden imposed on plaintiffs' observance of Ramadan, as described in plaintiffs' own deposition testimony. That testimony shows that the alleged inadequacies in portions of some of their evening meals presented only a minimal intrusion into plaintiffs' ability to maintain their fast. *See Perrilla v. Fischer, No. 13-CV-398M, 2013 U.S. Dist. LEXIS 154449, 2013 WL 5798557, at \*5 (W.D.N.Y. Oct. 28, 2013)* (denial of additional portions and occasional "ill-prepared meals . . . prepared by non-believers" during Ramadan did not impose a substantial burden). Plaintiffs' religious objections to the meals almost exclusively involved side dishes and dessert items, such as white rice or cake. (Dkt. No. 71-2, at 359). In addition, all of the plaintiffs testified that they would regularly supplement **[\*26]** their evening meal with religiously permissible food purchased from the commissary, or with food saved from the morning Sahor bag. (Wells Dep. at 50-52; Jeanty Dep. at 33-34; Fulton Dep. at 27; Washington Dep. at 24-26). *See DeJesus v. Bradt, 174 F. Supp. 3d 777 (W.D.N.Y. 2016)* (policy prohibiting inmate from taking hot food from mess hall during Ramadan, but allowing purchase of commissary food to consume in his cell did not impose a substantial burden). Although plaintiff Jeanty testified that there were some days that he refused to eat anything at all, he also testified that was a result of unrelated stress, rather than a lack of religiously compliant food with which to break his fast.[7] (Jeanty Dep. at 33-34).

Accordingly, plaintiffs have failed to state a claim for relief under the *First Amendment* or RLUIPA. Therefore, this court recommends granting defendants' motion for summary judgment as to all plaintiffs' religious exercise claims.

### 3. Additional Grounds for Dismissal of Certain RLUIPA Claims

This court will also briefly address additional grounds for dismissal of most of plaintiffs' RLUIPA claims. Plaintiffs seek monetary and injunctive relief in their complaint. (Dkt. No. 1, at CM/ECF p. 11). RLUIPA does not authorize claims for money damages **[\*27]** against state officers in either their individual or official capacities. *Holland, 758 F.3d at 224*. Therefore, all four plaintiffs' monetary RLUIPA claims would be subject to

---

[6] Plaintiffs do not all agree that green peas always violated NOI dietary restrictions. Plaintiffs Jeanty, Fulton, and Washington testified that green peas were always prohibited, but plaintiff Wells testified that his only objection to the green peas was that they were uncooked. (Jeanty Dep. at 30; Fulton Dep. at 40; Washington Dep. at 15; Wells Dep. at 37)

---

[7] Plaintiff Jeanty testified that ". . . I remember that particular year was a trying time and a stressful moment for me during that Ramadan and I had a hard time even touching anything in that mess hall." (Jeanty Dep. at 33).

dismissal. In addition, plaintiffs Wells, Jeanty, and Washington are no longer housed at Auburn. (Dkt. Nos. 24, 41, 43). Their transfer to another facility mooted claims for declaratory or injunctive relief against Auburn officials. *Shepherd v. Goord, 662 F.3d 603, 610 (2d Cir. 2011)* (citing *Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006))*; see also *Wright v. N.Y. State Dep't of Corr. & Cmty. Supervision, 568 Fed. Appx. 53, 55 (2d Cir. 2014)*; *Wood v. Captain Colon, No. 3:13-CV-1467, 2016 U.S. Dist. LEXIS 66235, 2016 WL 2930882, at *3 (D. Conn. May 18, 2016)*. Because plaintiff Fulton is still housed at Auburn, the mootness doctrine would not apply to his RLUIPA claims for injunctive relief.

## V. Equal Protection

### A. Legal Standards

The *Equal Protection Clause of the Fourteenth Amendment* provides that the government shall treat all similarly-situated people alike. *Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir. 1995)* (citing *Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985))*. Generally, the *equal protection clause* has been "concerned with governmental 'classifications that affect some groups of citizens differently than others.'" *Engquist v. Or. Dep't of Agric., 553 U.S. 591, 601, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008)*. To establish an equal protection violation, plaintiffs must show that the defendants applied a different standard to similarly situated individuals. *Skehan v. Village of Mamaroneck, 465 F.3d 96, 111 (2d Cir. 2006)*. Plaintiffs must first show that they were treated differently than others similarly situated because of intentional or purposeful discrimination. *Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005)*. Then, plaintiffs must show that the difference in treatment cannot **[*28]** survive the appropriate level of scrutiny. *Id.*

### B. Application

Plaintiffs contend that the NOI community was treated differently than other religions with regard to religious holidays. They rely upon the sworn affidavit of Joseph Dexter, a Rastafarian inmate at Auburn, who stated that he was assigned "as one of many" to prepare food in the Auburn mess hall for an unspecified Rastafarian holiday in May 2015. (Dkt. No. 71-2 at CM/ECF p. 362, Hummel Decl., Ex. F; Dkt No. 84-3, at 12). Mr. Dexter

stated that he did not have a food handler certificate and had not received a medical clearance examination prior to working in the mess hall. (*Id.*) Plaintiff Fulton also testified that he observed unidentified Rastafarian inmates exiting the mess hall kitchen toward the end of Ramadan in 2014. (Fulton Dep. at 30).

As described above, an Equal Protection claim must state that the defendants applied a different standard to similarly situated individuals. Although the pleading standard does not require "detailed factual allegations," it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal, 556 U.S. 662, 677, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. Furthermore, a complaint does not suffice if it tenders 'naked assertion[s] devoid **[*29]** of 'further factual enhancement.'" *Id.* (citing *Bell Atlantic Corp. v. Twombly, 550 U.S. 555, 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929)*.

Applying that test, this court must conclude that plaintiffs have failed to state an equal protection claim. Even assuming that Mr. Dexter was not a regular mess hall worker, plaintiffs have not presented any evidence that defendants applied a different standard to NOI and Rastafarian inmates. All parties agree that the relevant policy prioritizes inmates who have already been cleared to work in the mess hall. It further provides, "[i]f the Food Service Administrator and chaplain are unable to identify enough inmates of that faith group that are programmed in the Mess Hall, then the chaplain may suggest other non-Mess Hall inmates of that faith group to cook." (Dkt. No. 71-5, Thomas Decl. Ex. A, at CM/ECF p. 9). Plaintiffs have offered no evidence to suggest that Auburn officials did not follow that approach when Mr. Decker worked in the mess hall in 2015. They have also offered no evidence that Mr. Decker was selected instead of other Rastafarian inmates who already worked in the mess hall. In addition, Mr. Decker's May 2015 service in the mess hall came almost a full year after the NOI Ramadan took place in June and July 2014. The only **[*30]** other evidence offered to support plaintiffs' equal protection claim is plaintiff Fulton's speculation that certain unidentified inmates were allowed greater access to the mess hall. Therefore, plaintiffs have not demonstrated that the defendants treated the NOI community differently than similarly situated individuals, let alone that such disparate treatment was the result of intentional or purposeful discrimination. Accordingly, this court recommends that defendants be granted summary judgment as to plaintiffs' equal protection claim. Thus,

2018 U.S. Dist. LEXIS 77516, *30

the entire complaint may be dismissed.[8]

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 71) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY**, and it is further

**RECOMMENDED** that plaintiff Washington's cross motion for summary judgment (Dkt. No. 84) be **DENIED**.[9]

Pursuant to *28 U.S.C. § 636(b)(1)* and *Local Rule 72.1(c)*, the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993)* (citing *Small v. Sec. of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989))*; *28 U.S.C. § 636 (b)(1)*; *Fed. R. Civ. P. 6(a)*, *6(e)*, *72*.

Dated: May 7, 2018

/s/ Andrew T. Baxter

**Hon. [*31] Andrew T. Baxter**

**U.S. Magistrate Judge**

---

End of Document

---

[8] Defendants also argued that summary judgment was appropriate on qualified immunity grounds. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*. Because this court has found that the defendants have not violated plaintiffs' rights in the first instance, it need not reach the issue of whether a reasonable person would have known of the violation.

[9] Plaintiff Washington moved for summary judgment on all claims. Because this court is recommending that defendants' motion for summary judgment be granted on all claims, I relied on the analysis set forth herein to also recommend denial of plaintiff Washington's cross-motion seeking identical relief.

Ⓐ Neutral
As of: October 15, 2018 8:42 PM Z

# *Wells v. McKoy*

United States District Court for the Northern District of New York

September 24, 2018, Decided; September 24, 2018, Filed

9:16-CV-0405 (GTS/ATB)

**Reporter**
2018 U.S. Dist. LEXIS 162429 *; 2018 WL 4561458

PETER WELLS; PATRICK JEANTY; DERRICK FULTON; and WAYNE WASHINGTON, Plaintiffs, v. JEFF MCKOY, Dep. Comm'r of Dep'y of Corr. and Comm. Supervision; HAROLD D. GRAHAM, Superintendent of Auburn Corr. Fac.; JUSTIN J. THOMAS, Superintendent of Marcy Corr. Fac.; DONNA M. MARTIN, F.S.A., Auburn Corr. Fac.; and MINISTER SUNNI SHABAZZ, N.O.I. Chaplain, Auburn Corr. Fac., Defendants.

**Prior History:** *Wells v. McKoy, 2018 U.S. Dist. LEXIS 77516 (N.D.N.Y., May 7, 2018)*

## Core Terms

magistrate judge, Report-Recommendation, Attach, rejects, Defendants', incorrectly, inmates, reasons, district court, mess hall, recommendation, religion, meals, food, genuine dispute, material fact, clear error, staff, deposition testimony, summary judgment, summary judgment motion, alleged violation, religious, entirety, dietary, cases, pages, novo

**Counsel:** **[*1]** PETER WELLS, 07-A-0650, Plaintiff, Pro se, Coxsackie, New York.

PATRICK JEANTY,98-A-1874, Plaintiff, Pro se, Attica, New York.

DERRICK FULTON, 08-B-2651, Plaintiff, Pro se, Auburn, New York.

WAYNE WASHINGTON, 02-A-3665, Plaintiff, Pro se, Napanoch, New York.

For General for the State of New York, Defendants: HON. BARBARA UNDERWOOD, CHRISTOPHER J. HUMMEL, ESQ., Assistant Attorney General, The Capitol, Albany, New York.

**Judges:** Hon. Glenn T. Suddaby, Chief United States District Judge.

**Opinion by:** Glenn T. Suddaby

# Opinion

## DECISION and ORDER

Currently before the Court, in this *pro se* prisoner civil rights action filed by the four above-captioned inmates ("Plaintiffs") against the five above-captioned employees of the New York State Department of Corrections and Community Supervision ("Defendants"), are the following: (1) Defendants' motion for summary judgment; (2) Plaintiff Washington's cross-motion for summary judgment; (3) United States Magistrate Judge Andrew T. Baxter's Report-Recommendation recommending that Defendants' motion be granted, Plaintiff Washington's cross-motion be denied, and Plaintiffs' Complaint be dismissed in its entirety; (4) Plaintiff Jeanty's Objection to the Report-Recommendation; (5) Plaintiff **[*2]** Wells' Objection to the Report-Recommendation; and (6) Plaintiff Washington's Objection to the Report-Recommendation. (Dkt. Nos. 71, 84, 89, 92, 94, 95.) For the reasons set forth below, Defendants' motion for summary judgment is granted, Plaintiff Washington's cross-motion for summary judgment is denied, and Plaintiffs' Complaint is dismissed in its entirety.

## I. RELEVANT BACKGROUND

### A. Magistrate Judge Baxter's Report-Recommendation

Generally, in his Report-Recommendation, Magistrate Judge Baxter rendered the following seven findings of fact and conclusions of law: (1) a genuine dispute of material fact exists as to whether Defendants were

personally involved in the selection of mess hall staff during Ramadan in 2014 or the development of Auburn Correctional Facility's policy regarding the selection of Nation of Islam inmates to work in the mess hall during Ramadan; (2) no genuine dispute of material fact exists as to whether Defendants Graham, McKoy, Thomas and Shabazz were personally involved in the alleged violations of Nation of Islam dietary restrictions; (3) a genuine dispute of material fact exists as to whether Defendant Martin was personally involved in the violations giving **[\*3]** rise to Plaintiffs' religious exercise and equal protections claims; (4) no genuine dispute of material fact exists as to any religious exercise claims arising from the selection of mess hall staff during Ramadan in 2014; (5) no genuine dispute of material fact exists as to any religious exercise claims arising from the alleged violation of Nation of Islam dietary restrictions during Ramadan in 2014; (6) in the alternative, monetary relief is not available any of Plaintiffs on their *RLUIPA* claims, and injunctive relief is not available to Plaintiffs Wells, Jeanty and Washington on their RLUIPA claims; and (7) no genuine dispute of material fact exists as to any Plaintiffs' equal protection claim. (Dkt. No. 89, at Part IV.)

## B. Plaintiffs' Objections to the Report-Recommendation

While Objections were filed by Plaintiffs Jeanty, Wells and Washington, they were not filed by Plaintiff Fulton. (Dkt. Nos. 92, 94, 95.) Generally, in their Objections, Plaintiffs Jeanty, Wells and Washington assert eleven arguments, which are described in more detail below in Part III of this Decision and Order.

## II. STANDARD OF REVIEW

When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, **[\*4]** the Court subjects that portion of the report-recommendation to a *de novo* review. *Fed. R. Civ. P. 72(b)(2)*; *28 U.S.C. § 636(b)(1)(C)*. To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." *N.D.N.Y. L.R. 72.1(c)*.[1] When performing

such a *de novo* review, "[t]he judge may . . . receive further evidence. . . ." *28 U.S.C. § 636(b)(1)*. However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance.[2] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. *See Zhao v. State Univ. of N.Y., 04-CV-0210, 2011 U.S. Dist. LEXIS 90502, 2011 WL 3610717, at \*1 (E.D.N.Y. Aug. 15, 2011)* ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009)* ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and **[\*5]** recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted).

---

respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

[2] *See Paddington Partners v. Bouchard, 34 F.3d 1132, 1137-38 (2d Cir. 1994)* ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters, 894 F.2d 36, 40, n.3 (2d Cir. 1990)* (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U. S. v. Raddatz, 447 U.S. 667, 676, n.3, 100 S. Ct. 2406, 65 L. Ed. 2d 424 (1980)* ("We conclude that to construe *§ 636(b)(1)* to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); *Fed. R. Civ. P. 72(b)*, Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

---

[1] *See also Mario v. P&C Food Markets, Inc., 313 F.3d 758, 766 (2d Cir. 2002)* ("Although Mario filed objections to the magistrate's report and recommendation, the statement with

2018 U.S. Dist. LEXIS 162429, *5

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. *Fed. R. Civ. P. 72(b)(2),(3)*; *Fed. R. Civ. P. 72(b)*, Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters, 95-CV-1641, 1997 U.S. Dist. LEXIS 14718, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept. 22, 1997)* (Pooler, J.) [collecting cases], *aff'd without opinion*, *175 F.3d 1007 (2d Cir. 1999)*. Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review.[3] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. *Fed. R. Civ. P. 72(b)*, Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*[4]

After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *28 U.S.C. § 636(b)(1)(C).*

## III. ANALYSIS

---

[3] *See Mario, 313 F.3d at 766* ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either *Fed. R. Civ. P. 72(b)* or *Local Civil Rule 72.3(a)(3).*"); *Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan, 806 F. Supp. 380, 382 (W.D.N.Y. 1992)* (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady, 09-CV-0924, 2010 U.S. Dist. LEXIS 98067, 2010 WL 3761902, at *1, n.1 (N.D.N.Y. Sept. 20, 2010)* (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue, 728 F. Supp. 2d 168, 2010 WL 2985968, at *3 & n.3 (N.D.N.Y. 2010)* (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole, 04-CV-0484, 2006 U.S. Dist. LEXIS 2926, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006)* [*6] (Sharpe, J.).

[4] *See also Batista v. Walker, 94-CV-2826, 1995 U.S. Dist. LEXIS 10687, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995)* (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

After carefully reviewing the relevant papers herein, including Magistrate Judge Baxter's thorough Report-Recommendation, the Court can find no error in those parts of the Report-Recommendation to which Plaintiffs Jeanty, Wells and Washington have specifically objected, and no clear error in the remaining parts of the Report-Recommendation: Magistrate Judge Baxter employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Report-Recommendation is accepted and adopted in its entirety for the reasons stated therein. To those reasons, the Court adds the following analysis.

As a threshold basis for concluding that Defendants' motion for summary judgment should be granted against Plaintiff Fulton, the Court finds that, by failing to oppose Defendants' properly supported motion, Plaintiff Fulton has lightened Defendants' burden with regard to their arguments for the dismissal of Plaintiff Fulton's [*7] claims.[5] At the very least, Defendants have met that modest threshold burden.[6] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules. *Cusamano v. Sobek, 604 F. Supp.2d 416, 426-27 & n.4 (N.D.N.Y. 2009)* (Suddaby,

---

[5] *See N.D.N.Y. L.R. 7.1(b)(3)* ("Where a properly filed motion is unopposed and the Court determined that the moving party has met to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini, 07-CV-0279, 2009 U.S. Dist. LEXIS 101160, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009)* (Suddaby, J.) (collecting cases); *Este-Green v. Astrue, 09-CV-0722, 2009 U.S. Dist. LEXIS 69054, 2009 WL 2473509, at *2 & nn. 2, 3 (N.D.N.Y. Aug. 7, 2009)* (Suddaby, J.) (collecting cases).

[6] Alternatively, the court can deem, and does deem, the challenged claims abandoned (regardless of the facial merit of the unresponded-to argument). *See Jackson v. Fed. Exp., 766 F.3d 189, 197-98 (2d Cir. 2014)* ("Where a partial response to a motion is made—i.e., referencing some claims or defenses but not others—a distinction between pro se and counseled responses is appropriate. In the case of a pro se, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. In contrast, in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned. In all cases in which summary judgment is granted, the district court must provide an explanation sufficient to allow appellate review. This

J.) (citing cases).[7]

Regarding Plaintiff Jeanty's first objection (i.e., that Magistrate Judge Baxter failed to recite the fact that, before the start of Ramadan, Plaintiffs had notified Defendants Graham, McKoy, Thomas and Shabazz of their concerns regarding the staff members who were to prepare their Ramadan meals), the Court rejects that objection. The fact of such prior notice of Defendants Graham, McKoy and Thomas was indeed recited by Magistrate Judge Baxter in his Report-Recommendation. (Dkt. No. 89, at 8 ["The record . . . also shows that plaintiffs alerted defendants Graham, McKoy, and Thomas about their concerns regarding the selection of mess hall staff immediately prior to Ramadan in 2014."].) Plaintiff Jeanty's assertion that Defendant Shabazz also received prior notice is not supported by the record evidence he cites in his Objection. (Dkt. No. 92, at 1 [citing deposition testimony of Jeanty **[8]** and Wells].) In any event, the fact of such prior notice is immaterial given Magistrate Judge Baxter's finding that a genuine dispute of material fact exists regarding whether Defendant Shabazz was personally involved in the alleged violations through (1) his selection of mess hall staff during Ramadan in 2014, and (2) his investigation of the issues in question. (Dkt. No. 89, at 8.) The Court notes that, while it may have reached a different conclusion that Magistrate Judge Baxter on the personal involvement of Defendant Shabazz, it finds no clear error in that conclusion.

Regarding Plaintiff Jeanty's second objection (i.e., that Magistrate Judge Baxter incorrectly assumed that an inmate who is a registered member of the Nation of Islam is therefore a practicing Muslim, given Plaintiff Jeanty's deposition testimony to the contrary), the Court rejects that objection as well.[8] As an initial matter,

___

explanation should, where appropriate, include a finding of abandonment of undefended claims or defenses.").

[7] The Court notes that Plaintiff Fulton was sufficiently advised of the consequences of failing to submit such a proper response to Defendants' motion through his receipt of, and/or access to, the following documents: (1) the courtesy copies of *Local Rule 7.1(b)(3) of the District's Local Rules of Practice* and pages 39 and 40 of the District's *Pro Se* Handbook, which were on file at Plaintiff Fulton's Correctional Facility when Defendants served him with their motion; (2) the Notice of Consequences of Failing to Respond that was provided to Plaintiff Fulton by Defendants in their motion for summary judgment (Dkt. No. 71, at 3); and (3) a secondary Notification of Consequences of Failing to Respond that was provided by the Court (Dkt. No. 72, at 2).

Plaintiff Jeanty's reliance on his own deposition testimony is misplaced, given that it merely (1) raised the *possibility* that a registered member of the Nation of Islam is not an actual adherent to the Islamic faith, and (2) stated that he personally had seen two of the staff members only **[9]** "sometimes" in Islamic class. (Dkt. No. 92, at 2; Dkt. No. 71, Attach. 2, at 141-42 [attaching pages "24" and "25" of Jeanty Depo. Trans.].) In any event, Magistrate Judge Baxter's inference that an inmate who has registered as a member of the Nation of Islam also practices the religion of Islam was supported by the deposition testimony of Plaintiff Wells (while the testimony of Plaintiff Fulton did not negate that inference and the testimony of Plaintiff Washington suffered from defects similar to that of Plaintiff Jeanty. (Dkt. No. 71, Attach. 2, at 59 [attaching page "56" of Wells Depo. Trans.]; Dkt. No. 71, Attach. 2, at 210-11 [attaching pages "15" and "16" of Fulton Depo. Trans.]; Dkt. No. 71, Attach. 2, at 278-79 [attaching pages "24" and "25" of Washington Depo. Trans.].) Moreover, even if Magistrate Judge Baxter's inference could be found to be unreasonable, the Court would be persuaded by his finding that Auburn Correctional Facility's Ramadan policy in 2014 did not impose a substantial burden on Plaintiffs' religion, because Defendants selected at least one member of the Nation of Islam to prepare the Ramadan meals in question.

Regarding Plaintiff Jeanty's **[10]** third objection (i.e., Magistrate Judge Baxter incorrectly assumed that Plaintiff had testified in his deposition that sometimes he refused to eat not because of a lack of religiously compliant food but because of unrelated stress), the Court rejects that objection as well. Despite Plaintiff Jeanty's late-blossoming attempt to change his deposition testimony, Magistrate Judge Baxter's interpretation of that deposition testimony is entirely reasonable. (Dkt. No. 71, Attach. 2, at 150-51 [attaching pages "33" and "34" of Jeanty Depo. Trans., testifying that he "[s]ometimes" did not eat food that complied with his dietary laws because "I was so frustrated I didn't touch anything. . . . I remember that particular year was a trying time and a stressful moment for me during

___

[8] The Court notes that this argument reiterates an argument previously asserted by Plaintiff Jeanty. (*Compare* Dkt. No. 92, at ¶ 1 [Plf. Jeanty's Obj.] *with* Dkt. No. 80, Attach. 2, at 12 [attaching page "10" of Plf. Jeanty's Opp'n Memo. of Law].) As a result, the "challenged" portion of the Report-Recommendation is entitled to only a clear-error review, which it easily survives. In the alternative, that portion of the Report-Recommendation survives a *de novo* review for the reasons set forth above.

Ramadan and I had a hard time even touching anything in that mess hall"].)

Regarding Plaintiff Wells' first objection (i.e., that Magistrate Judge Baxter incorrectly found that Plaintiffs have not presented any evidence that the Nation of Islam has any requirement or guidance regarding who may prepare meals during Ramadan), the Court rejects that objection. Plaintiff Wells' reliance on the DOCCS memorandum of May 22, 2014, **[\*11]** is misplaced. A DOCCS policy is not the same as a requirement of, or guidance by, the Nation of Islam. This is especially true for a policy that states merely that "Muslim inmates *should* be selected to be *part of* the food preparation team . . . ." (Dkt. No. 83, Attach. 3, at 29 [emphasis added].)

Regarding Plaintiff Wells' second objection (i.e., that Magistrate Judge Baxter incorrectly found that Plaintiffs have not shown a *substantial* burden on their religion but merely a de minimis burden), the Court rejects that objection as well. Plaintiff Wells focuses on the fact that the violations were not "isolated" but were "several" in number. However, more important here are (1) the fact that the violations consisted not of denials of entire meals but mere inadequacies in certain aspects of some of Plaintiffs' meals (usually side dishes and dessert items), and (2) Plaintiffs would regularly supplement those meals with religiously permissible foods otherwise obtained by them.

Regarding Plaintiff Wells' third objection (i.e., that Magistrate Judge Baxter incorrectly found that Plaintiffs have failed to state an equal protection claim), the Court rejects that objection as well.[9] By simply repeating **[\*12]** his allegation that Defendants' policy showed a preference for one religion (i.e., the Rastafarian religion) over another (i.e., the religion of Islam), Plaintiff Wells' overlooks Magistrate Judge Baxter's finding that, based on the current record, there have, in fact, been no inconsistent applications of DOCCS' policy on the subject (which merely prioritizes inmates who have already been cleared to work in the mess hall, and

provides that, when the Food Service Administrator and chaplain are unable to identify enough inmates of the relevant faith group who are programmed in the Mess Hall, the chaplain may suggest other non-Mess Hall inmates of that faith group to cook).

Regarding Plaintiff Washington's objection that Magistrate Judge Baxter incorrectly found no personal involvement by Defendants Graham, McKoy, Thomas and Shabazz in the alleged violations of Nation of Islam dietary restrictions, the Court rejects that objection. Even if substantiated by the record, Plaintiff Washington's assertion that these four Defendants "sudden[ly] enforce[d] . . . a policy that had been written three years prior" would not serve as admissible evidence from which a rational fact **[\*13]** finder could conclude that they were personally involved in the alleged violations of Nation of Islam dietary restrictions.

Regarding Plaintiff Washington's objection that Magistrate Judge Baxter incorrectly found that Plaintiffs have conceded that at least one of the staff members in question was a member of the Nation of Islam and thus a practicing religion, the Court rejects this objection for the same reasons that it rejects Plaintiff Jeanty's second objection above.

Regarding Plaintiff Washington's objection that Magistrate Judge Baxter incorrectly found that Plaintiffs have not shown a *substantial* burden on their religion, the Court rejects this objection for the same reasons that it rejects Plaintiff Wells' second objection above. To those reasons, the Court adds only that whether a hypothetical inmate might not have sufficient funds in his commissary account sufficient to pay for supplemental food items is immaterial to this action, given that it is undisputed that Plaintiffs did in fact supplement their inadequate meals through food purchased from the commissary.

Regarding Plaintiff Washington's objection that Magistrate Judge Baxter incorrectly interpreted Plaintiffs' claims **[\*14]** as alleging that "Ramadan meals do not comply with a state policy such as the State Menu," the Court rejects that objection as well. Magistrate Judge Baxter did not base the bulk of his analysis on such an interpretation but merely noted in a footnote that, "[t]o the extent that" Plaintiffs were attempting to assert such a claim, that claim would not be actionable. (Dkt. No. 89, at 18, n.5.)

Finally, regarding Plaintiff Washington's objection that Magistrate Judge Baxter incorrectly found that Plaintiffs have failed to state an equal protection claim, the Court

---

[9] The Court notes that this argument reiterates an argument previously asserted by Plaintiff Wells. (*Compare* Dkt. No. 94, at ¶ 3 [Plf. Wells' Obj.] *with* Dkt. No. 83, Attach. 2, at 19 [attaching page "17" of Plf. Wells' Opp'n Memo. of Law].) As a result, the "challenged" portion of the Report-Recommendation is entitled to only a clear-error review, which it easily survives. In the alternative, that portion of the Report-Recommendation survives a *de novo* review for the reasons set forth above.

2018 U.S. Dist. LEXIS 162429, *14

rejects that objection for the same reasons that it rejects Plaintiff Wells' third objection above.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Baxter's Report-Recommendation (Dkt. No. 89) is ACCEPTED and ADOPTED in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 71) is GRANTED, Plaintiff Washington's cross-motion for summary judgment (Dkt. No. 84) is **DENIED**, and Plaintiffs' Complaint (Dkt. No. 1) is DISMISSED in its entirety.

Dated: September 24, 2018

Syracuse, New York

/s/ Glenn T. Suddaby

Hon. Glenn T. Suddaby

Chief U.S. District Judge

---

**End of Document**